UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIE BAPTISTE and MITCHELL MATORIN,

Plaintiffs,

v.

COMMONWEALTH OF MASSACHUSETTS and
EXECUTIVE OFFICE OF HOUSING AND
ECONOMIC DEVELOPMENT,

Defendants.

CIVIL ACTION
NO.  1:20-CV-11335-MLW

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MAURA HEALEY
ATTORNEY GENERAL

Jennifer E. Greaney, BBO No. 643337
*Assistant Attorney General*
Pierce O. Cray, BBO No. 104630
*Senior Appellate Counsel*
Richard S. Weitzel, BBO No. 630303
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Flr.
Boston, Mass.  02108
(617) 963-2855
jennifer.greaney@mass.gov
pierce.cray@mass.gov
richard.weitzel@mass.gov

Dated: July 27, 2020

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION ...............................................................................................................1

FACTS ............................................................................................................................1

    I.    The Public Health Crisis. ............................................................................ 1

    II.    The Economic Crisis. .................................................................................. 3

    III.    Evictions Increase the Risk of COVID-19 In Already-Vulnerable
        Populations. ................................................................................................. 3

    IV.    Evictions Before COVID-19 ....................................................................... 6

    V.    The Act and Regulations. ............................................................................ 6

    VI.    The Act's Impact on Tenants. ...................................................................... 8

    VII.    The Act's Impact on Landlords. .................................................................. 9

    VIII.    Enjoining the Act Would Create a Housing Crisis and Threaten Public
        Health. ......................................................................................................... 9

ARGUMENT ..................................................................................................................10

    I.    The Preliminary Injunction Criteria. ......................................................... 10

    II.    The Landlords Have No Likelihood of Success On the Merits. .................. 11

        A.    The Act Does Not Violate the Federal Right to Petition. ................ 11

            1.    Legislatures Have Wide Latitude to Affect Legal Rights
                and Remedies Without Violating the Petition Clause.................. 12

            2.    Legislative Acts Have Generally Been Upheld Against
                Petition Clause Claims................................................................. 13

            3.    Even if the Act Affects the Right to Petition, It Is Narrowly
                Tailored to Achieve a Compelling State Interest......................... 14

        B.    Neither the Act nor the Regulations Violate the Free Speech
            Clause. ............................................................................................. 15

            1.    The Free Speech Clause Does Not Constrain the Act's
                Temporary Restraint on Legally Operative Notices. ................... 16

                 a.    The Act Regulates Conduct, Not Speech........................... 16

    b. Alternatively, Any 'Speech' That The Act Does Reach Is Commercial Speech. ......................................... 17

  2. The Free Speech Clause Also Does Not Bar the Regulations' Requirements for Missed-Rent Notices.................. 19

C. The Act Does Not Violate the Contracts Clause. ..................................... 21

  1. Restraints on Real Property Rights Generally Do Not Violate the Contracts Clause........................................................ 22

  2. The Act Easily Passes the Two-Part Test Recently Articulated in *Sveen*. ..................................................... 23

    a. The Act Does Not Substantially Impair Contracts. .......... 24

    b. Under the Second Part of the *Sveen* Test, the Act Is Appropriate, Reasonable, and Advances "A Significant and Legitimate Public Purpose." .................... 26

  3. The Legislature is Well Within Its Authority to Suspend Enforcement of Contracts As an Exercise of Its Police Power During A Crisis.................................................................. 27

D. The Eviction Moratorium Is Not an Unconstitutional Taking................. 30

  1. The Moratorium Is Not A 'Per Se' Or Categorical Taking. ......... 30

    a. There Is No 'Physical Invasion.' ...................................... 31

    b. There Similarly Is No Deprivation of All Economically Beneficial Use............................................ 32

  2. The Moratorium Is Not a Partial or 'Temporary' Taking............ 32

    a. The Landlords Do Not Have a Viable "Facial" Takings Claim................................................................. 33

    b. The Landlords' Claims Cannot Satisfy the *Penn Central* Criteria. ............................................................. 34

      i. A Single Rental Unit is Not a 'Relevant Parcel' for Takings Purposes. .............................. 35

      ii. The Act's Impact on Value Is Minimal. .............. 35

      iii. The Act Does Not Disturb Investment Backed Expectations............................................. 37

iv.   The Character of the Statue Weighs Heavily
Against a Taking. ................................................... 38

3.   In Any Event, An Injunction Is Not an Available Form of
Relief For a Takings Claim. .......................................... 38

III.   Any Harm to The Landlords of Denying an Injunction is Far Outweighed
By the Potential Harm to the Public of Entering One. .......................................... 39

CONCLUSION ........................................................................................................................ 40

**INTRODUCTION**

Today, "[t]he world is navigating the deadliest pandemic in over a century." *Elmsford Apt. Assocs., LLC v. Cuomo*, 20-cv-4062 (S.D.N.Y. June 29, 2020), slip op. at 1, copy attached hereto as *Exhibit A* (upholding New York eviction moratorium). In such a situation, the U.S. Constitution "principally entrusts '[t]he safety and health of the people' to the politically accountable officials of the States 'to guard and protect.'" *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (May 29, 2020) (Roberts, C.J., concurring), quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Id.*, quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974). And, as the Supreme Court stated more than a century ago, "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson*, 197 U.S. at 27. Ultimately, this case reduces to one relatively straightforward question: is the Massachusetts Legislature's decision to impose a temporary moratorium on non-essential evictions a constitutional exercise of its police power in the context of the COVID-19 pandemic? That question can be answered only in the affirmative.

**FACTS**

I.      **The Public Health Crisis.**

COVID-19 is "a novel severe acute respiratory illness that has killed . . . more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others." *South Bay*, 140 S. Ct. at 1613. On February 1, 2020, the first Massachusetts case of COVID-19 was confirmed in Boston. Affidavit of Monica Bharel, M.D., ¶5. The Governor

1

declared a state of emergency on March 10, 2020, when there were 91 presumed positive cases of COVID-19 in the Commonwealth.  *Id.*, ¶¶7-8.  By July 25, 2020, there were 108,107 confirmed COVID-19 infections in Massachusetts, and the death count reached 8,291.[1]

The virus is "most commonly spread via respiratory droplets."  Bharel, ¶10.  Those droplets may be large and expelled a distance of six feet or more by coughing or sneezing, or, as emerging data suggest, may be smaller, resulting from simply talking or breathing.  Affidavit of Joshua A. Barocas, M.D., ¶¶9, 11.  Thus, COVID-19 appears to be airborne, and especially contagious.  *Id.*, ¶¶ 9, 10-12, 15, 21.  Currently, increased transmission of COVID-19 is occurring in parts of the United States where social distancing measures were relaxed, resulting in a rapid increase of COVID-19 cases nationwide.  *Id.*, ¶18; *see also* Bharel, ¶13.  As the Commonwealth's Commissioner of Public Health warns, "to minimize the number of COVID-19 cases and fatalities in the Commonwealth and to stave off the possibility of our health care systems and facilities becoming overburdened, it is imperative that individuals in the Commonwealth – until the crisis is over on not just a local but also a national level – practice social distancing and other risk reduction measures . . . ."  Bharel, ¶15.

"[O]ne important strategy for containment of the disease is for individuals to avoid coming into close physical contact with each other and to practice 'social distancing' measures."  Bharel, ¶10.  Additionally, Massachusetts residents are required to wear a covering over their mouths and noses whenever they are in public and cannot maintain a distance of approximately six feet from every other person.  *Id.*, ¶16; *see* 105 Code Mass. Regs. §§ 316.001-.030.

---

[1]     *See* https://www.mass.gov/info-details/covid-19-response-reporting#covid-19-daily-dashboard-.

Even a casual observer of the daily news is aware that information about this virus and its deleterious effects is rapidly changing.  Barocas, ¶¶31-33.  Undoubtedly, this pandemic is "fraught with medical and scientific uncertainties."  *South Bay*, 140 S. Ct. at 1613.

## II.      The Economic Crisis.

Nearly as concerning as the public health crisis emanating from COVID-19 is the economic catastrophe accompanying it.  There has been an unprecedented surge in claims for unemployment insurance benefits, correlated directly with the COVID-19 crisis.  Affidavit of Rosalin Acosta, ¶¶ 5-10.  Moreover, the unemployment rate in Massachusetts reached 16.2% in April 2020 – an all-time high since 1976.  *Id.*, ¶¶ 18, 19.  And, more recently, as published by the *Boston Globe*, the jobless rate soared to 17.4% in June – the highest rate in the country.[2] Another measure of this economic catastrophe is increased food insecurity.[3]

## III.     Evictions Increase the Risk of COVID-19 In Already-Vulnerable Populations.

By the time the Legislature passed the Act in April 2020, the Commonwealth was facing two simultaneous crises – a pandemic and a severe economic downturn – each of which threatened to exacerbate the effects of the other.  Two consequences flow from this circumstance.  First, evictions increase the risk of contracting COVID-19 for those displaced. Second, those who are most at risk of eviction are already highly vulnerable to COVID-19.

---

[2]      *See* https://www.bostonglobe.com/2020/07/17/business/massachusetts-employers-added-83700-jobs-june-economy-reopened/.

[3]      For example, the Food Bank of Western Massachusetts (FBWM) distributed 18% more food in March 2020 as compared to March 2019.  Affidavit of Christina Maxwell, ¶9.  During May and the first half of June, FBWM distributed 16% more food than it did during the same time period in 2019.  *Id.* Moreover, in April, FBWM saw an increase of 19% in the number of people it served, as compared to the average for the months of October 19, 2019 through February 2020, and 22% as compared to April of the previous year.  *Id.*, ¶ 10.  Of those people served by FBWM in April 2020, 36% were new visitors to FBWM's food assistance sites.  *Id.; see also* Affidavit of Michael Cole, ¶¶ 8-14, 24-30 (describing surges in applications for the Supplemental Nutrition Assistance Program and the Transitional Aid to Families with Dependent Children Program).

As to the first point, evicted families often do not enter the shelter system immediately. They instead may stay with relatives or other families first – described by housing experts as "doubling up." Affidavit of Jessie M. Gaeta, M.D., ¶32. Unfortunately, doubling up in the middle of a pandemic increases the risk of spreading disease – for all involved.[4] Bharel, ¶19; Barocas, ¶25; Gaeta, ¶33. Moreover, individual adults who end up living in shelters are "extraordinarily vulnerable" to the risk of contracting COVID-19. Gaeta, ¶8. Research conducted at one Greater Boston area shelter for individual adults showed that 30% of staff and 36% of residents tested positive for the virus on April 2-3, 2020.[5] Gaeta, ¶24. This statistic is unsurprising because infection control is very difficult in congregate settings for adults experiencing homelessness. *Id.*, ¶¶8, 17-20.

Yet, going completely "unsheltered," – *i.e.*, living on the street or in a car – may be even more risky, because the unsheltered generally lack control over factors such as how many people they encounter, their proximity to those contacts, how frequently they can clean and sanitize belongings and surfaces, whether they have access to unsoiled facial masks, and the need to use

---

[4]     Indeed, there is a striking correlation between the rate of overcrowded households in a city (defined as households with more than one occupant per room) and its rate of COVID-19 infection, suggesting that crowded housing is even more indicative of a higher rate of COVID-19 than is a city's population density alone. Affidavit of Mark Melnik, ¶9. For example, Chelsea has both the highest rate of COVID-19 infection in the State and one of the highest rates of overcrowded households, with 10% of residents living in homes where the number of people exceeds the number of rooms. Melnik, ¶¶9-12. Other cities with higher rates of overcrowded housing (like Lawrence and Everett) have similarly experienced higher rates of COVID-19 infections, as compared to higher-population-density (but also wealthier) cities like Cambridge and Somerville that have lower rates of overcrowded houses and correspondingly lower rates of COVID-19 infections. *Id.*, ¶¶9-10, 12; *see also* Barocas, ¶25 ("In general, the risk of COVID-19 spreading increases with the number of people living in a confined space, particularly if any of those people are having contacts with the outside environment.").

[5]     Similar studies in Seattle, Atlanta, and San Francisco showed comparable results. *Id.*, ¶24. And, locally, in April and May 2020, clinicians conducted universal testing for COVID-19 at eight shelters for individual adults in Boston. *Id.*, ¶26. That testing, along with testing at local hospitals, indicated an infection rate of 32.7% within the adult homeless population. *Id.*, ¶27. In comparison, as of June 10, 2020, testing in Boston's overall population indicated only a 19.86% infection rate. Gaeta, ¶¶17-21.

public restrooms where fecal particles may spread the virus.  Barocas, ¶26.  And, even among the *housed*, the risk of COVID-19 infection is not spread evenly across society – nor is the risk of housing loss that would increase that risk of infection even further.  Communities with higher concentrations of low-income households tend to have higher positive COVID-19 testing rates.  Melnik, ¶¶13-15, 31, 32.

Additionally, "[t]he relationship between communities with a high concentration of people of color and the confirmed COVID-19 case rate is striking and clear." *Id.*, ¶7, *see also id.*, ¶31;[6] Affidavit of Pamela Schwartz, ¶6.  More detail can be found in the affidavits filed with this Opposition, but the upshot is this:  Massachusetts residents who are persons of color, live in crowded conditions, and/or have a low income experience higher rates of COVID-19 infection, even in the absence of an eviction.  Melnik, ¶¶6-16, 32.  Because evictions are also disproportionately likely to impact these same groups,[7] they further increase an already elevated risk of contracting COVID-19 in communities that are disproportionately affected by the disease.

---

[6]     Chelsea and Lawrence have the highest percentage of people of color in the State, while Chelsea has the highest COVID-19 case rate and Lawrence has the second highest.  Melnik, ¶7.  Similar correlations exist for Brockton, Lynn, Everett, Revere, Worcester, Randolph, and Lowell, all of which have comparatively high populations of people of color.  *Id.*, ¶¶7-8.

[7]     Both before and during the pandemic, the State's unemployment rate has been elevated among Black and Latinx residents as compared to whites; additionally, 56% of unemployment claimants in May 2020 earned less than $700 per week on average before becoming unemployed.  Melnik, ¶¶19, 20, 22, 23; *see* Acosta, ¶21; *see also* Affidavit of Timothy Reardon, ¶14 (households affected by unemployment more likely in municipalities where confirmed cases of COVID-19 are more prevalent).  And because Black and Latinx residents are disproportionately affected by unemployment, it stands to reason that they are also at heightened risk of eviction.  Melnik, ¶¶31, 32; *see also* Reardon, ¶¶17.  In that regard, according to a recent survey, the Massachusetts residents most likely to have missed a rent or mortgage payment since April included non-whites (33%), those employed part time (30%), and those in households earning below $50,000 per year (25%).  Melnik, ¶30.  The likely impact of COVID-19 on existing inequities in a densely packed city like Boston is obvious, as observed by Domonique Williams, Deputy Director of Boston's Office of Housing Stability:  "The impact of COVID-19 threatens to destabilize the housing of residents throughout Boston, thereby exacerbating existing inequities, as well as involving tenants who never faced a missed rent payment before."  Williams, ¶31; *see* Schwartz, ¶ 5.

Increasing the risk of COVID-19 infection for the Commonwealth's most vulnerable residents additionally heightens the risk for *all* Massachusetts residents. "While there are many unknowns about the long-term impacts of COVID-19, it is very clear that how we respond to protecting vulnerable people strongly dictates how well we will control the pandemic, not just in Massachusetts but everywhere. If we allow the risk experienced by already vulnerable populations to be increased, we increase the risk for everyone . . . ." Barocas, ¶33.

## IV.   **Evictions Before COVID-19.**

Massachusetts evictions are governed by the Summary Process Act, Mass. Gen. Laws c. 239, § 1, *et seq.*, which is a "purely statutory procedure," *Fafard v. Lincoln Pharm. of Milford, Inc.*, 439 Mass. 512, 515 (2003), with jurisdictional issues being resolved by statutory interpretation. *See id.* at 517; *Bank of Am., N.A. v. Rosa*, 466 Mass. 613, 621 (2013). There is a right to a jury trial in eviction cases, *Cort v. Majors*, 92 Mass. App. Ct. 151, 153 (2017); and, by separate statute, "self-help" evictions are barred. Mass. Gen. Laws c. 184, § 18.

## V.   **The Act and Regulations.**

The Act, codified at St. 2020, c. 65, affects only "non-essential evictions," which it defines as those:

> (i) for non-payment of rent; (ii) resulting from a foreclosure; (iii) for no fault or no cause; or (iv) for cause that does not involve or include allegations of: (a) criminal activity that may impact the health or safety of other residents, healthcare workers, emergency personnel, persons lawfully on the subject property or the general public; or (b) lease violations that may impact the health or safety of other residents, health care workers, emergency personnel, persons lawfully on the subject property or the general public . . . "

St. 2020, c. 65, § 1. Where an eviction is "non-essential" and concerns a residential premises or a small business premises unit (SBPU), the Act temporarily prohibits a court with jurisdiction over eviction cases from accepting a summons and complaint, entering judgment, issuing an execution, denying a stay of execution or continuance, or scheduling an event, such as a trial. *Id.*

§ 3(b).  Additionally, for purposes of a non-essential *residential* eviction, the Act further bars a landlord from: (1) terminating a tenancy or (2) sending any notice "requesting or demanding that a tenant of a residential unit vacate the premises."  *Id.* § 3(a).

The Act was made effective on April 20, 2020, and its eviction-related provisions were originally set to expire on the earlier of: (1) 120 days later – on August 18, 2020; or (2) 45 days after the State's emergency declaration is lifted.  *Id.* § 7.  The Act allows for an extension of its provisions by the Massachusetts Governor in increments of up to 90 days, to an outer limit of 45 days after the state of emergency ends.  *Id.* § 6.  On Tuesday, July 21, 2020, Governor Baker announced that he will extend the Act for 60 days, so that it is now scheduled to expire at 11:59 p.m. on October 17, 2020.  *See* Letter dated July 21, 2020, attached hereto as *Exhibit B*.  Notably, by *tolling* all deadlines to file a summons and complaint, appeal from a judgment, or levy on an execution, the Act preserves affected landlords' rights to eventually recover possession of rented premises where they are entitled to do so.  *Id.* §§ 3(c), 6.  And, as the Act states plainly, "Nothing in this section shall relieve a tenant from the obligation to pay rent or restrict a landlord's ability to recover rent."  *Id.* § 3(f).  The Act contains no prohibition on filing collections actions.

The Act requires EOHED to adopt regulations as necessary for its implementation, and those regulations have been codified at 400 Code Mass. Regs. §5.00, *et seq.* (the Regulations). The Regulations state, "Throughout the period during which these emergency regulations are in effect, every tenant shall remain obligated to pay rent on the due date if and to the extent the tenant has the means to do so."  *Id.* § 5.03(1).  They go on to specify that landlords "should provide tenants of residential dwelling units a written notice of each missed rent payment.  If a landlord delivers such a notice, the notice must include the following statements, prominently displayed on the first page[. . . .]"  *Id.* § 5.03(2).  Thereafter, the Regulations list three mandatory disclosures that must be included on any notice of missed rent sent by a landlord during the Act's

effective period.  *Id.*  Those disclosures are summarized as:  (1) a clear statement that the notice

of nonpayment is *not* a notice to quit or of eviction; (2) a statement about where, on the Internet,

tenants may find resources "that may help you pay your rent;"[8] and (3) a statement that tenants

receiving such a notice are protected under the Act from late fees or a negative credit report upon

certification that nonpayment is due to financial impact from COVID-19, *see* St. 2020, c. 65,

§ 3(e); *see also* 400 Code Mass. Regs. § 5.03(2).[9]

## VI.    The Act's Impact on Tenants.

One indicator of how the eviction rate would have been affected by the pandemic *absent*

the Act is a demonstrable recent surge in applications for financial assistance for housing costs.

For example, Boston has established a Rental Relief Fund, and in response to its initial $3

million in funding, more than 5,000 tenants applied for assistance.  *Id.*, ¶¶18-19.  Similarly, the

agency administering the Residential Assistance for Families in Transition program in Hampden

and Hampshire Counties received 141 applications per week on average from May to mid-June,

compared to just 21 per week pre-pandemic.  Schwartz, ¶13; *see* Bartosch, ¶¶24-25; *see also*,

Bartosch, ¶¶ 15-20 (describing increase in utilization of Emergency Assistance Program,

---

[8]     The second disclosure includes https addresses for two worldwide websites.  The first of those
websites is maintained by the Regional Housing Network, a statewide non-profit membership
organization.  *See* Affidavit of Amy Stitely, ¶17.  It provides a list of Housing Consumer Education
Centers, which are agencies that administer the State's Residential Assistance for Families in Transition
program, a program offering public funds to families at risk of becoming homeless.  *Id.*, ¶¶ 10-20.  The
second of those websites is maintained by Massachusetts Housing Partnership, a quasi-public body politic
and corporate organized pursuant to St. 1985, c. 405, § 35; that site provides a list of resources for tenants
concerned about being unable to pay rent because of the pandemic.  *Id.*, ¶¶25, 28.

[9]     The third disclosure includes an https address for a worldwide website maintained by EOHED
that includes a link to a form suitable for use by tenants who wish to certify that their nonpayment is
related to the pandemic.  Stitely, ¶9.

providing emergency shelter to families).  Thus, it is highly likely that the Act has, since its effective date, reduced the number of evictions that would otherwise have occurred. [10]

## VII.    **The Act's Impact on Landlords.**

While the Act will undoubtedly have an adverse economic impact on some landlords, the Landlords here have not attempted to quantify any State-wide impact – nor can they, since every eviction case necessarily involves different facts related to whether that landlord is entitled to possession of the relevant premises.  Moreover, the economic impact of the Act on rental housing owners overall may not be as dire as the plaintiffs here (the Landlords) suggest. MassHousing, a quasi-public agency that provides financing for development of affordable housing, has reported that 90% of the property owners in its portfolio have federally-backed mortgages and would be able to benefit from the forbearance protections put in place by the federal Coronavirus, Aid, Relief, and Economic Stabilization Act (CARES Act).  Affidavit of Colin McNiece, ¶¶9-10.  But MassHousing has received only two such forbearance requests from multi-family borrowers since the CARES Act was passed – and both were later rescinded. *Id.*, ¶11-12; *see also, id.*, ¶14.  Additionally, the Act itself provides mortgagors of owner-occupied one-to-four unit properties with mortgage-related relief.  St. 2020, c. 65, § 5.

## VIII.   **Enjoining the Act Would Create a Housing Crisis and Threaten Public Health.**

COVID-19 has increased tension on an already stretched system of emergency housing. Shelters have "de-congregated" – *i.e.*, reduced their populations – to allow for social distancing, Gaeta, ¶11; Schwartz, ¶11; Bartosch, ¶¶ 20-21, while also having to adopt sanitary and infection-detection measures that consume scarce resources, Gaeta, ¶¶12-16, 21.  At the same time, it is

---

[10]     *See Ex. B* hereto (Massachusetts Governor stating,"The Act's limitations on evictions and foreclosures have allowed many tenants and homeowners impacted by COVID-19 to remain in their homes during the state of emergency.  I am confident that this action, coupled with federal assistance, helped to slow the spread of COVID-19 while minimizing the impact to date on vulnerable families and on our housing market.").

estimated that 29% of all Massachusetts renters missed all or part of a housing payment in April,

May, or June 2020.  Melnik, ¶28.  Further compounding the problem, the enhanced

unemployment insurance benefits currently provided by the federal government are due to end

on July 31, 2020.  Acosta, ¶29.  By one estimate, there are approximately 98,000 renter

households Statewide for whom the enhanced unemployment payments will end on July 31,

likely resulting in difficulty paying rent, and thus, potential eviction.  Reardon, ¶21.

Accordingly, an order enjoining enforcement of the Act would almost certainly result in a surge

of eviction proceedings, *see* Reardon, ¶23, at the very moment that:  (1) emergency housing

resources are already stretched to their breaking point; (2) the capacity to pay rent of those forced

into unemployment by COVID-19 will be further reduced; and (3) the COVID-19 crisis in other

states threatens the gains achieved in Massachusetts to slow virus transmission rates.

## **ARGUMENT**[11]

### I.      **The Preliminary Injunction Criteria.**

A preliminary injunction is an "extraordinary and drastic" remedy, "never awarded as of

right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citation omitted).  To obtain such

relief, the movant must show: "(1) a substantial likelihood of success on the merits, (2) a

significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of

hardships, and (4) a fit (or lack of friction) between the injunction and the public interest."

*Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

---

[11]      The Court's Order dated July 20, 2020 (Paper No. 12) requires the Commonwealth to address: (1) "any claim that this court lacks subject matter jurisdiction;" (2) "any claim that this case should abstain from deciding this case in view of the parallel state court case;" (3) "any claim of sovereign immunity;" and (4) "whether if the Act expires on August 18, 2020, this case will be moot."  The last topic above has been addressed by the parties' joint report to the Court dated July 23, 2020 (Paper No. 25), which informed the Court that the Governor has extended the eviction moratorium through October 17, 2020.  See *Exhibit B* hereto.  The first three topics above have been fully briefed in the Commonwealth's Memorandum in support of its Motion to Dismiss or in the Alternative to Stay (Paper No. 27) (Commonwealth's MTD Memo.), which was filed on July 24, 2020, and is incorporated in full herein.

**II.     The Landlords Have No Likelihood of Success On the Merits.**

The first factor of the above-stated test is the "*sine qua non* of a preliminary injunction."

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc*., 794 F.3d 168, 173 (1st Cir. 2015).

"If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining

factors become matters of idle curiosity."  *Id.* (internal quotations omitted).  And the last two

factors – balance of hardships and promotion of the public interest – "merge when the

Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the

Landlords' request for a preliminary injunction must be denied because their claims are without

legal merit, as demonstrated by the recent rejection of several of the same constitutional

arguments in a similar case by the Chief Judge of the United States District Court for the

Southern District of New York.  *Elmsford*, *supra*, *Ex. A* hereto.  Because the Landlords cannot

establish a likelihood of success on the merits, the remaining preliminary injunction factors need

not even be examined.  *Arborjet Inc*., 794 F.3d at 173.

**A.     The Act Does Not Violate the Federal Right to Petition.**

The Landlords' claim that the Act violates the First Amendment's Petition Clause is

unavailing.  The Petition Clause holds that "Congress . . . shall make no law . . . abridging . . . the

right of the people to . . . petition the Government for a redress of grievances," U.S. Const.,

amend 1.  This is "an assurance of a particular freedom of expression[,]" *McDonald v. Smith*,

472 U.S. 479, 482 (1985), and the right of access to the courts is "but one aspect of the right of

petition."  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1971).  While the

right to petition is undeniably important, *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741

(1983), it is not absolute.  *McDonald*, 472 U.S. at 484.  For example, although filing a complaint

is a form of petitioning activity, "baseless litigation is not immunized by the First Amendment

right to petition."  *Id*.  The petitioning right is manifestly not implicated here.

### 1.    Legislatures Have Wide Latitude to Affect Legal Rights and Remedies Without Violating the Petition Clause.

Of direct applicability to the present case, courts have articulated fundamental limiting principles on Petition Clause challenges brought in response to legislative enactments.  First, "[T]he right to petition exists in the presence of an underlying cause of action and is not violated by a statute that provides a complete defense to a cause of action or curtails a category of causes of action." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008).  In other words, the Legislature may modify existing law in a way that limits or eliminates a legal claim without running afoul of the Petition Clause, because the right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see Doherty v. Merck & Co., Inc.,* 892 F.3d 493, 499 (1st Cir. 2018) (right to petition "ancillary to underlying claim"); *Bowman v. Niagara Mach. & Tool Works, Inc*., 832 F.2d 1052, 1054 (7th Cir. 1987) (a plaintiff "cannot claim that he has been denied access to court simply because [a] . . . legislature has restricted a particular cause of action in a way that makes it unavailable to him.").  Second, "while there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief." *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997).  Here, the Massachusetts Legislature unquestionably has the power to alter the jurisdiction and power of the Massachusetts trial courts to hear and decide all types of cases. *See, e.g., Gray v. Comm'r of Rev*., 422 Mass. 666, 673 (1996).  Third, imposing obstacles or delay in litigation does not necessarily violate the right of access to the courts, which is "neither absolute nor conditional." *Sieverding v. Colorado Bar Ass'n*, 469 F.3d 1340, 1343 (10th Cir. 2006); *see Miller v. Donald*, 541 F.3d 1091, 1096 (11th Cir. 2008).  In particular, the right of access to the courts does *not* include "a right to judicial determination of a

civil claim within a prescribed period of time." *L.A. Cty. Bar Assn v. Eu*, 979 F.2d 697, 706 (9th Cir. 1992); *see Ad Hoc Comm. on Judicial Admin. v. Commonwealth*, 488 F.2d 1241, 1244 (1st Cir. 1973) ("[d]elay per se is not unconstitutional").  Indeed, a court of the S.D.N.Y recently placed special emphasis on just this point in the context of an eviction moratorium:

> Since mere delay to filing a lawsuit cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process[,] . . . the Plaintiffs' right to collect both the monetary remedies and injunctive relief they would seek through an eviction proceeding has not been completely foreclosed . . . .  The eviction moratorium [, thus,] does not violate Plaintiffs' First Amendment Rights.

*Elmsford*, *Ex. A* hereto, slip op. at 34 (internal quotations and citations omitted).  In short, legislative bodies have wide latitude to affect both the procedural and substantive rights of litigants without unconstitutionally curtailing the petitioning right – latitude that the Massachusetts Legislature quite reasonably exercised here.

### 2.      Legislative Acts Have Generally Been Upheld Against Petition Clause Claims.

Typically, legislative acts have survived scrutiny under the Petition Clause.  *See L.A. Cty. Bar*, 979 F.2d at 699 (upholding statute fixing limited number of judges sitting on court, notwithstanding claim that resulting shortage "cause[d] inordinate delays in civil litigation, depriving litigants of access to the courts"); *Bowman*, 832 F.2d at 1053 (upholding statute of repose requiring that claims "be filed within 10 years of delivery of the product to its initial user or consumer"); *Beretta*, 524 F.3d at 390 (upholding federal statute mandating dismissal of actions brought against manufacturer of firearms based on the criminal or unlawful misuse of such weapons by third parties).

As these cases make clear, federal courts have declined to strike down duly enacted legislative acts as violative of the Petition Clause, upholding them even where they delay or eliminate entire causes of action.  Here, the Act simply delays eviction proceedings, and only in

certain categories of cases – specifically, residential and SBPU evictions deemed "non-essential." St. 2020 c. 65, §§ 1, 2(b).  And by expressly tolling all deadlines associated with prosecuting an action for possession, the Act preserves all landlords' rights to recover their property at a later time, if legally entitled to do so.  Moreover, the Act does not prevent landlords from accessing the courts to collect rent, through a breach of contract action or otherwise. Simply put, the Act does not deprive landlords of either a right or a remedy – it merely delays temporarily the statutory recourse of eviction, and does so in the context of a worldwide pandemic of epic proportions.[12]

### 3. Even if the Act Affects the Right to Petition, It Is Narrowly Tailored to Achieve a Compelling State Interest.

Even if the Act were to affect landlords' rights of petition, it would, nonetheless, pass constitutional muster, because it is narrowly tailored to address a compelling state interest.  *See Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 438 (1963); *Cornelius*

---

[12]     The Landlords rely heavily on a recent decision by Judge Stearns in this District allowing a motion for preliminary injunction enjoining enforcement of a pandemic-related emergency regulation promulgated by the Attorney General.  *ACA Int. v. Healey* – F.Supp.3d –, 2020 WL 2198366.  Notably, *ACA* did *not* involve a legislative act, and, thus, the District Court had no occasion to consider the previously discussed cases upholding statutes that modify litigants' rights in connection with existing causes of action.  Moreover, the *ACA* case – unlike this one -- did not involve a situation where the Massachusetts Legislature was exercising its clear authority to modify the jurisdiction and delineate the powers of the lower state courts.  *See Gray*, 422 Mass. at 673; *Johnson v. Commonwealth,* 409 Mass. 712, 716 (1991).  Since the Landlords' Right to Petition claim is premised on their "right . . . to access the courts," *see* Memorandum in Support of Motion for Preliminary Injunction (Paper No. 6) (Landlords' PI Memo.) at p. 11, the unequivocal power of the Massachusetts Legislature to alter the jurisdictional reach of these courts is front-and-center here, but was *not* a factor in *ACA*.  Moreover, *ACA* relied heavily on *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963), which involved only an as-applied challenge and placed minimal emphasis on the right to petition.  The Commonwealth submits that *Elmsford*, *supra*, provides a more appropriate analysis in the instant case.  *See Elmsford, Ex. A* hereto, slip op. at 36 (contrasting debt collection regulation in *ACA* with eviction moratorium, which "suspended one of several avenues by which landlords can seek relief for nonpayment, while leaving other (if less favored) remedial proceedings for breach of contract . . . in place").  As in *Elmsford*, *supra*, to adopt Judge Stearns's ruling in *ACA* here "would greatly exaggerate the actual effects of a temporary pause on a subset of evictions, which nevertheless preserved the landlords' economic rights under the affected rental agreements, and which was tailored to avoid crowding in housing courts and homeless shelters during an ongoing public health emergency."  *Id.*

*v. NAACP Legal Defense and Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985).  More than 8,000 Massachusetts residents have died from COVID-19 infection.  *See* fn. 1, *supra*.  This virus also has proven itself to be mercilessly efficient at spreading.  Undoubtedly, controlling the pandemic is a compelling state interest, *see Jacobson*, 197 U.S. at 27, and the Act directly serves that interest by preventing a surge of evictions that could increase the spread of infection.

Moreover, the Act is narrowly tailored.  It prevents only what it describes as "non-essential" evictions from dwellings and non-SBPUs; it expressly exempts evictions where the safety or health of other residents is at stake; it does not pertain to commercial evictions involving large, non-local businesses, or evictions from SBPUs where the tenant was already in breach before the declaration of emergency; and it expressly preserves all landlords' rights to eventually regain possession. St. 2020, c. 65, § 3(c).  Perhaps most importantly, the Act is time limited.  *Id.* at § 6.  In short, the Act is narrowly tailored to accomplish the Legislature's goal of slowing the spread of COVID-19 by preventing housing insecurity that would in turn increase the infection risk of both those likely to be displaced and the broader population.

**B.      Neither the Act nor the Regulations Violate the Free Speech Clause.**

The Landlords separately invoke the First Amendment's Free Speech Clause to challenge both the Act's prohibition of notices to "vacate the premises" (Count II)  and the Regulations' requirement that certain specific language be included in notices about missed rent (Count III). Each claim founders on core First Amendment principles. [13]

---

[13]     The Commonwealth incorporates Part II of the Argument section of its MTD Memo. (Paper No. 27), at pp. 7-11, which explains why both of the Landlords lack standing to press their First Amendment claims.  The arguments set forth in pp. 7-11 of the Commonwealth's MTD Memo are fully incorporated herein as an alternative reason why the Landlords cannot succeed on the merits of their case.

      **1.**      **The Free Speech Clause Does Not Constrain the Act's**
                       **Temporary Restraint on Legally Operative Notices.**

The Landlords attack the Act's temporary bans on termination of tenancies and "any notice, including a notice to quit, requesting or demanding that a tenant of a residential dwelling unit vacate the premises," St. 2020, c. 65, § 3(a), as violating the Free Speech Clause. This claim fails for two reasons.

      **a.**      **The Act Regulates Conduct, Not Speech.**

The most basic problem with the Landlords' argument is that it fails to recognize § 3(a) of the Act for what it actually is: a prohibition on trying to compel a tenant to vacate rental housing on an extra-judicial basis, at a time when non-essential evictions are forbidden. This is a conduct-based prohibition, and "[i]t has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *U.S. v. Sayer*, 748 F.3d 425, 433 (1st Cir. 2014).[14] Last year, the Ninth Circuit found that an ordinance barring use of online bidding platforms for illegal short-term rentals fell outside the First Amendment, ruling that "[b]ecause the conduct at issue . . . consists only of nonspeech, nonexpressive conduct, we hold that the Ordinance does not implicate the First Amendment." *HomeAway.com, Inc. v. Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019). The same result should obtain here. Just as a law barring landlords from using "rental housing bidding platforms" regulates "conduct, not speech," *Rentberry, Inc. v. Seattle*, 374 F. Supp. 3d 1056, 1063 (W.D. Wash. 2019), so too does one

---

[14]     *See generally NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) (employer's "threat of retaliation" is "without the protection of the First Amendment").

temporarily prohibiting landlords from terminating leases or ordering existing tenants to vacate.[15]

Even if the Act's § 3(a) includes a communicative element, the statute is at most a regulation of commercial conduct that incidentally affects speech.  Here too, however, "[t]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  *Nat'l Inst. of Family and Life Advocates v. Becerra,* 138 S. Ct. 2361, 2373 (2018), quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  As the Supreme Court has explained, "[t]hat is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs, . . .  and why antitrust laws can prohibit 'agreements in restraint of trade.'"  *Sorrell*, 564 U.S. at 567; *see also Becerra*, 138 S. Ct. at 2373.

> **b.      Alternatively, Any 'Speech' That The Act Does Reach Is Commercial Speech.**

Even if the Act were assumed to address "speech," the Landlords' challenge would fail nonetheless because any speech it prohibits is concededly "commercial speech," Landlords' PI Memo. at pp. 13-14, and the Act's provisions fit comfortably within the standard for restricting such speech.  *See Central Hudson Gas & Elec. Corp. v. Pub. Svc. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (commercial speech is "related solely to the economic interests of the speaker and its audience").  As to governmental limits on commercial speech, "intermediate scrutiny" applies:

> For commercial speech to come within th[e First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental

---

[15]     This is consistent with what have been variously called "verbal acts" or legally "operative words" falling outside the First Amendment.  *See King v. Fed. Bureau of Prisons*, 415 F.3d 634, 637 (7th Cir. 2005) ("an order to sell [stocks] . . . is not the kind of verbal act that the First Amendment protects"); *see also Int'l Franchise Ass'n, Inc. v. Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) ("A business agreement or business dealings between a franchisor and a franchisee" does not have a "significant expressive element."); *cf. U.S. v. Bowles*, 751 F.3d 35, 40 (1st Cir. 2014) (hearsay does not include "verbal acts" such as committing fraud, offering a bribe, or making a threat).  As the Landlords, themselves, admitted in their own brief, "[a] notice to quit or to terminate a tenancy is . . . a legal notice that a lease or tenancy is being terminated.  Indeed, a notice to quit is a *prerequisite* to filing a summary process action[,]" (emphasis in original).  Landlords' PI Memo. at p. 14.

> interest is substantial. If both inquiries yield positive answers, we must determine
> whether the regulation directly advances the governmental interest asserted, and whether
> it is not more extensive than is necessary to serve that interest.

*Cent. Hudson*, 447 U.S. at 566.[16]  Here, this test is immediately fatal to the Landlords' claims,

because issuing notices to quit during an eviction moratorium would be inherently misleading.

Under *Central Hudson*'s first prong, "[c]ommercial statements that are . . . inherently misleading

do not enjoy the protections of the First Amendment." *Express Oil Change, LLC v. Miss. Bd. of*

*Licensure*, 916 F.3d 483, 488 (5th Cir. 2019).  "The 'inherently misleading' character of speech

'may be inferred from [its] 'particular content,'" *1-800-411 Pain Referral v. Otto*, 744 F.3d 1045,

1056 (8th Cir. 2014), quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982), and "[w]hether speech is

'inherently misleading' is a question of law," *1-800 Pain*, 744 F.3d at 1056.[17]  Here, a notice

demanding that a tenant vacate the premises necessarily would imply that the landlord has the

legal right to make the tenant leave, at a time when, given the Act, the landlord unquestionably

does not have that right.  Such an implication would be not only "inherently misleading" but flat-

out false,[18] and, thus, *Central Hudson*'s first prong plainly precludes the Landlords' claim.  As

---

[16]     The Landlords stress that § 3(a) is a "content-based" regulation of speech.  But even if this were assumed to be true, it adds nothing to their argument, because *Central Hudson* provides the standard for content-based prohibitions of *commercial* speech, and it is an "intermediate" standard, *Bulldog Investors Gen'l P'ship v. Sec'y of Comm.*, 460 Mass. 647, 660 (2011), that is less stringent than the "strict scrutiny" given fully protected speech.  *See*, *e.g.*, *Naser Jewelers, Inc. v. Concord*, 513 F.3d 27, 33-34 (1st Cir. 2008).  Two Circuits have in fact clearly indicated, post-*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)*,* that *Central Hudson* still governs commercial-speech restrictions.  *Contest Promotions, LLC v. San Francisco*, 874 F.3d 597, 601 (9th Cir. 2017); *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1246, 1249 (11th Cir. 2015).  The prior-restraint doctrine, *see* Landlords' PI Memo. at pp. 13, 31, is similarly inapplicable.  *Discount Tobacco City & Lottery v. U.S.*, 674 F.3d 509, 532 & n.7 (6th Cir. 2012).

[17]     *Accord Milavetz, Gallup & Milavetz, P.C. v. United States*, 559 U.S. 229, 251 (2010) (evidence unnecessary).  "Actually" misleading commercial speech also falls outside the First Amendment, but evidentiary proof is required.  *Express Oil Change*, 916 F.3d at 491.  Commercial speech that is only "potentially" misleading (and concerns lawful activity) comes within the First Amendment and enjoys the protections of the rest of the *Central Hudson* standard.  *Id.* at 488.

[18]     It certainly would be more deceptive than many communications held to be "inherently misleading."  *See*, *e.g.*, *Milavetz*, 559 U.S. at 250 (a "promise of debt relief without any reference to the

(footnote continued)

18

for *Central Hudson*'s remaining prongs, were the Court to reach them, mitigating effects of the worldwide COVID-19 pandemic represents a "substantial" governmental interest. *Cent. Hudson*, 447 U.S. at 566. Keeping people in their homes during that crisis "will in fact alleviate [it] to a material degree," *Edenfield v. Fane*, 507 U.S. 761, 762 (1993), by preventing increased populations in contagion-promoting congregate shelters and "doubled-up" private households, *see* Facts, Pts. I, III, *supra*. There also is a "reasonable fit between the means and ends of the regulatory scheme." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001). Given the sheer immensity of the pandemic's impact on Massachusetts, a temporary ban on evictions and the notices to quit that are a prerequisite to them are measures proportional to the public-health crisis faced. *Sorrell*, 564 U.S. at 572. Thus, although this Court need not go beyond the first prong of the *Central Hudson* test (since any "speech" implicated by the temporary prohibition on notices to quit is inherently misleading during this time), the Act easily passes muster under the test's remaining prongs.

### 2.    The Free Speech Clause Also Does Not Bar the Regulations' Requirements for Missed-Rent Notices.

The Landlords separately contend that the Regulations violate the Free Speech Clause as content-based "compelled speech" insofar as they require that any notice sent to a tenant about missed rent include specific disclosures (1) making clear that it is not also an eviction notice and (2) identifying resources that could help tenants make rent payments. (Count III) For the reasons argued in Section B.1.a above, these rules are fundamentally conduct-directed and therefore fall outside the First Amendment.[19] But even if the requirements were assumed to

---

possibility of filing for bankruptcy, which has inherent costs," held inherently misleading); *1-800-411 Pain*, 744 F.3d at 1056 ("reference in [referral service's] radio ads to a possible entitlement of 'up to $40,000 in injury and lost wage benefits'" seen as falsely "impl[ying] that consumers will receive a floor of benefits").

[19]    *See Becerra*, 138 S. Ct. at 2373 (medical informed-consent disclosure requirements cited as example of conduct regulation that "impos[es] incidental burdens on speech").

address speech, such speech would be at most commercial speech, where the special and more relaxed standard of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) applies.

As the Ninth Circuit recently summarized, "[u]nder *Zauderer* . . . , the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest, . . . , and involves 'purely factual and uncontroversial information' that relates to the service or product provided." *CTIA v. Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019) (quoting *Zauderer*, 471 U.S. at 651). The Landlords make no explicit argument under "the *Zauderer* reasonable relation test," for good reason, since *Zauderer*'s reach is not limited to the governmental interest in preventing deception.[20] *American Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 20 (D.C. Cir. 2014). Clarifying that a seemingly ominous document tenants receive does not mean eviction is imminent and informing them of resources available to help them are both reasonably related to the Commonwealth's interest in reducing housing loss during the pandemic. *See Zauderer*, 472 U.S. at 651.

The Supreme Court recently reiterated that to satisfy *Zauderer*, a disclosure requirement must involve "purely factual and noncontroversial information." *Becerra*, 138 S. Ct. at 2372.[21] The Landlords cannot reasonably claim that the Regulations' required information is nonfactual, because the affected notices could not, in fact, serve as eviction notices, St. 2020, c. 65 at § 3(a), and the websites that the Regulations require to be listed do, in fact, identify resources that could

---

[20]     Two circuits sitting *en banc* have specifically held that *Zauderer* encompasses substantial governmental interests in general. *Am. Meat Inst. v. U.S. Dep't. of Agric.*, 760 F.3d 18, 22 (D.C. Cir. 2014) (*en banc*); *Am. Bev. Ass'n v. San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (*en banc*). Moreover, even if *Zauderer* were limited to deception-related disclosure rules, the required "not a notice to quit" language *does* combat the deception lurking in an aggressively worded missed-rent notice.

[21]     *Zauderer* also requires that a mandated disclosure not be "unduly burdensome," in the sense of not "drown[ing] out" the speaker's own message. *CTIA*, 928 F.3d at 848-49. That cannot be the case here, where apart from the required language, the missed-rent notice can be as long and detailed as the landlord wishes. *See id*. at 849 (no "drown out" where "retailer may add additional information").

help tenants with rental payments, Affidavit of Amy Stitely, ¶¶9, 17, 28.  The Landlords also do not seriously press *Zauderer*'s "uncontroversial" element, which is unsurprising given that under it "controversial" means "forc[ing the speaker] to take sides in a heated political controversy," *CTIA*, 928 F.3d at 848, a high bar to which many contested issues do not rise, *see id.*  The Landlords thus fare no better under *Zauderer* than they do under *Central Hudson*, and, accordingly, their First Amendment claims all must fail.

### C.      The Act Does Not Violate the Contracts Clause.

The Landlords also challenge the Act under the Contracts Clause.  The command that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts,  U.S. Const., art. I, § 10, cl. 1, applies "only to laws with retrospective, not prospective, effect."  *Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth*, 666 F.2d 618, 637 (1st Cir. 1981).  Even as to retrospective statutes, "not all laws affecting pre-existing contracts violate the Clause."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  This is because "[a]lthough the language of the Contract[s] Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"  *Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, (1934).  As a result, "the courts have interpreted the clause so as to harmonize the state's need to legislate in the interests of its citizens with the need to protect investors and other contracting parties against repudiation of a debt or obligation.  In doing so, at least since the early 1930's, they have struck down state laws only infrequently."  *Local Div. 589*, 666 F.2d at 639.  Plainly, this is not one of those infrequent occasions when a state law violates the Contracts Clause.

### 1.      Restraints on Real Property Rights Generally Do Not Violate the Contracts Clause.

A typical Massachusetts residential lease permits a landlord to "pursue any and all remedies provided or recognized by applicable law" in the event of a breach, *see* Affidavit of Mitchell Matorin (Paper No. 4) at its *Ex. A*, p. 1, which normally includes the ability to re-gain possession of the subject unit in accordance with Mass. Gen. Laws c. 239.  Admittedly, for landlords legally entitled to recover rented premises for reasons deemed "non-essential" by the Act, the Act may insert delay in their ability to do so.  But even assuming, *arguendo*, that some such landlords will be meaningfully affected, a long line of Supreme Court decisions holds that similar restraints on an owner's property rights do *not* violate the Contracts Clause.  *See*, *e.g*., *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198 (1921) (New York emergency statute preventing landlord from recovering premises upheld because "contracts are made subject to" an "exercise of the power of the State when otherwise justified"); *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 250 (1922) (upholding statute extending tenants' right to possession as within State legislature's "wide discretion" to address an emergency).

Most prominently, in *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934), the Supreme Court examined a Depression-era Minnesota emergency statute providing that, "during the emergency declared to exist," protection from foreclosure could be sought through judicial proceedings in which "sales may be postponed and periods of redemption may be extended." *Blaisdell*, 290 U.S. at 416.  While recognizing that "emergency does not create power," *id.* at 425, the Court in *Blaisdell* also acknowledged that "emergency may furnish the occasion for the exercise of power."  *Id.* at 426.  In upholding the statute, the Court observed:

> Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.  The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual

> relations are [worthwhile],[] a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.

*Id.* at 434-435; *see also East N.Y. Sav. Bank v. Hahn*, 326 U.S. 230, 232-33 (1945). Moreover, even legislative acts that have destroyed real property rights entirely have been upheld under the Contracts Clause. For example, in *Manigault v. Springs*, 199 U.S. 473, 481 (1905), the Supreme Court found that a statute did not unconstitutionally impair a contract for removal of a dam and "free ingress and egress through the creek thereafter" where the statute authorized the continued existence of the same dam. Generally, private real property interests are subservient to a State's powers to "provid[e] for the general welfare of the people." *Id.*

### 2. The Act Easily Passes the Two-Part Test Recently Articulated in *Sveen*.

The general question whether a statute "crosses the constitutional line" under the Contracts Clause, as recently refined by the Supreme Court, requires application of a two-part test. *Sveen v. Melin*, 138 S. Ct. 1815, 1817 (2018). The first part is "whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Id.* at 1821-22, quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "In answering that question, the Supreme Court has considered the extent to which [a statute] [(1)] undermines the contractual bargain, [(2)] interferes with a party's reasonable expectations, and [(3)] prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. If a "substantial impairment" is found, then the test's second part asks whether "the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S.Ct. at 1822, quoting *Energy Reserves*, 459 U.S. at 411-12. The Landlords cannot meet either part.

### a.      The Act Does Not Substantially Impair Contracts.

The severity of an impairment of contracts "measures the height of the hurdle the state legislation must clear." *Spannaus*, 438 U.S. at 245.[22] "Minimal alteration of contractual obligations may end the inquiry at its first stage[,]" but "[s]evere impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Id.* It merits emphasis that even where a legislative act has undermined enforcement of a contract to the extent that a contracted-for benefit is entirely "wiped out," a statute does not necessarily violate the Contracts Clause. *Sveen*, 138 S. Ct. at 1825-26.[23]

Here, the Plaintiffs do not, and cannot, allege that the Act modifies or abrogates any part of an existing contract.  At most, the Act's §§ 3(a) & (b) deprive some landlords, temporarily, of a statutory remedy they otherwise would have had for non-payment of rent.  The Act does not eliminate the obligation to pay rent, or even landlords' ability to collect rent.  It merely bars them from evicting tenants in some (but not all) circumstances, and only for a limited time.  As the Supreme Court has noted, "a reasonable modification of statutes governing contract *remedies* is much less likely to upset expectations than a law adjusting the express terms of an agreement." *United States Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.17 (1977) (emphasis added).  *See,*

---

[22]      Although in *Spannaus*, *supra*, a private pension benefits statute was struck down, the legislation had "nullifie[d] express terms" of existing agreements and imposed "a completely unexpected liability." *Spannaus*, 438 U.S. at 247.  Here, the Act does no such thing – it simply delays evictions during the pandemic while preserving all landlords' rights to eventually regain possession of the rental premises.  The legislation considered in *Spannaus* also applied to only a small subset of employers, *id.* at 248, 250, while the Act applies to *all* residential and SBPU landlords – and, more importantly, the Act was passed in a context during which various emergency orders enacted by the Governor caused many types of businesses to close down entirely for temporary periods of time and forced many workers to stay home.  The economic burden of combating COVID-19 has, without doubt, not been borne by landlords alone.

[23]      One notable exception has been in cases where a State's *own* contractual obligations or interests are at issue.  *See United States Trust Co. of N.Y. v. New Jersey.*, 431 U.S. 1, 26 (1977).  One case relied on heavily by the Landlords, *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935), is of this ilk and, thus, wholly inapposite.

*e.g.*, *City of El Paso v. Simmons*, 379 U.S. 497, 499, 513-14 (1965); *City of Charleston v. Pub. Serv. Comm'n of W. Va.*, 57 F.3d 385, 387-88, 393 (4th Cir. 1995); *Local Div. 589*, 666 F.2d at 622, 639, 640, 643; *see also Blaisdell,* 290 U.S. at 431, quoting *Sturges v. Crowninshield*, 4 Wheat. 200, 4 L.Ed. 529 (1819) ("'Without impairing the obligation of the contract, the remedy may certainly be modified . . . .'"). Here, as in *Elmsford*, *supra*, the eviction moratorium "does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants. The tenants are still bound to their contracts . . . ." *Elmsford*, *Ex. A* hereto, slip op. at 31. Accordingly, the provisions of the Act do not significantly undermine contracts. *Sveen*, 138 S. Ct. at 1822.

Under the second factor in *Sveen*'s first prong, a legislative act is far less likely to violate the Contracts Clause where, as here, the affected contract is made in the context of a heavily regulated industry. *Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983); *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940). In this regard, "the Supreme Court has suggested that a sort of sliding scale is appropriate. That is, the level of scrutiny given the law varies directly in accordance with the severity of the impairment of existing contracts . . . and varies inversely in accordance with the degree of prior regulation in a particular field of activity." *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736 (7th Cir. 1987). Here, there is no question that residential tenancies in general, and evictions specifically, are "heavily regulated" in Massachusetts. *See, generally*, G.L. c. 184, § 18; c. 186; c. 239; *cf. Chicago Bd.*, 819 F.2d at 736 (in concluding Contracts Clause challenge to city ordinance unlikely to succeed, Court observed: "We are certain that the landlord-tenant relationship is, if nothing else, heavily regulated."). The temporary change imposed by §§ 3(a) & (b) of the Act is not great at all in its context – and not so great as to violate reasonable expectations. *Sveen*, 138 S. Ct. at 1822.

25

Finally, the third factor in *Sveen*'s first prong asks whether a regulation "prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. The plain text of the Act answers this question, stating that it neither "restricts a landlord's ability to recover rent" nor relieves a tenant's obligation to pay it. St. 2020, c. 65, § 3(f). Moreover, a landlord's ultimate right to recover possession is protected at all times. *See id.*, § 3(c). Accordingly, under the first prong of the *Sveen* inquiry, the Act does not violate the Contracts Clause.

> **b.    Under the Second Part of the *Sveen* Test, the Act Is Appropriate, Reasonable, and Advances "A Significant and Legitimate Public Purpose."**

Even assuming *arguendo*, however, that the Act *does* substantially impair existing contracts, the Contracts Clause analysis is not over. Instead, "the inquiry turns to the means and ends of the legislation." *Sveen*, 138 S.Ct. at 1822. "In particular, the [Supreme] Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.*, quoting *Energy Res.*, 459 U.S. at 411-12. Accordingly, "the State, in justification, must have a significant and legitimate public purpose behind the regulation . . . such as the remedying of a broad and general social or economic problem." *Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983). Here, in context, the Act falls well within a proper exercise of the State's police powers, as it reduces the incidence of contagion in the midst of a pandemic that has cost thousands of Massachusetts lives. *See* Facts, Pts. I-III, *supra*; *see also Jacobson*, 197 U.S. at 27. Thus, even if the Landlords were to clear the first of the *Sveen* hurdles, they would stumble on the second.

3.      **The Legislature is Well Within Its Authority to Suspend Enforcement of Contracts As an Exercise of Its Police Power During A Crisis.**

The Landlords correctly point out that in some of the cases cited above, such as

*Blaisdell*[24] and *Yee v. City of Escondido*, 503 U.S. 519 (1992),[25] during the time that a

landowner's right to possession of property was delayed or suspended by a regulation, the

landowner was, nonetheless, required to pay some sum of money by the occupant.  Landlords' PI

Memo at p. 24.  The Landlords go much too far, though, when they assert that "precedent

unambiguously demonstrates that any delay of a right to possession must be accompanied by

---

[24]     While it is true that in *Blaisdell*, the procedure for extending the redemption period after foreclosure required the mortgagor to make modest payments toward the property's carrying costs (*i.e.*, taxes, insurance, interest, and the loan principle), 290 U.S. at 420, this is not a basis for distinguishing the case.  Here, too, all Massachusetts residents continue to be required to pay rent that is due and owing; the Act says this expressly.  *See* St. 2020, c. 65 § 3(f).  In *Blaisdell*, the Court wrote, "[w]hile the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period."  *Id.* at 425.  Here, the same condition exists in the statute.  The Act provides that residential landlords' ability to recover possession is temporarily disrupted, but "[n]othing [herein] shall relieve a tenant from the obligation to pay rent or restrict a landlord's ability to recover rent."  St. 2020, c. 65, § 3(f).  In *Blaisdell*, the Court upheld the moratorium on foreclosures in part because "[t]he distinction between the obligation of a contract, and the remedy given by the legislature to enforce that obligation . . . exists in the nature of things.  Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct." *Id.* at 430.  Moreover, "the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."  *Id.* at 435.  "The reservation of state power appropriate to . . . extraordinary conditions may be deemed to be as much a part of all contracts as is the reservation of state power to protect the public interest in the other situations to which we have referred.  And, if state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes."  *Id.* at 240-41.

[25]     Landlords attempt to distinguish *Yee* by noting that the ordinance in that case permitted eviction for non-payment of rent, whereas the Act does not.  Landlords' PI Memo. at p. 18, n.16; 26, n.18.  This argument is without merit.  While the *Yee* Court mentions nonpayment of rent as one of the several grounds on which landowners could terminate a tenancy under the challenged ordinance, it places no specific emphasis on that fact and does not suggest that its holding is in any way dependent upon it.  *Yee*, 503 U.S. at 526-32 (no physical taking under Fifth Amendment where landowners' eviction rights curtailed).  Rather, *Yee* stands for the broader concept that a landlord's voluntary act of making property available for leasing forecloses a physical takings claim.  Simply put, "[w]here a rental property owner offers property for rental housing . . . government regulation of the rental relationship does not constitute a physical taking."  *Federal Home Loan Mortg. Corp. v. New York State Div. of Hous. and Cmty. Renewal*, 83 F.3d 45, 48 (2nd Cir. 1996) (citing *Yee*).  Here, the Act allows for evictions under certain conditions, Act, § 1, just like the ordinance in *Yee*.  The precise nature of those conditions was not dispositive in *Yee*, and the Landlords tellingly cite no case that has so interpreted *Yee*.

27

payment . . . as a condition precedent to continued occupation." *Id.* Supreme Court precedent

demonstrates no such thing.  On the contrary, the cases establish that legislatures *can* suspend

enforcement of contractual rights to the extent necessary to address the particular emergency

before them without paying the parties involved.  *See, e.g.*, *Block v. Hirsch*, 256 U.S. 135, 156

(1921) ("a public exigency will justify the legislature in restricting property rights in land to a

certain extent without compensation").  None of the cases cited by plaintiffs where occupants

could be evicted if in arrears on rent involved a global pandemic and an extreme economic

downturn happening simultaneously.  Here, in contrast, we have the "double whammy" of an

economic crisis and a public health crisis at the same time, and it is simply too dangerous to

force people from their homes and into crowded conditions, shelters, or the streets.  In short, the

Act easily passes muster under the Contracts Clause because it is an appropriate exercise of the

State's police powers in the unique and precarious circumstances of the present day.

As explained in *Blaisdell*, *supra*, borrowing from *Long Island Water Supply Co. v.*

*Brooklyn*, 166 U.S. 685, 692 (1934):

> "'. . . into all contracts, whether made between states and individuals or between
> individuals only, there enter conditions which arise, not out of the literal terms of
> the contract itself.  They are superinduced by the pre-existing and higher authority
> of the laws of nature, of nations, or of the community to which the parties belong.
> They are always presumed, and must be presumed, to be known and recognized
> by all, are binding upon all, and need never, therefore, be carried into express
> stipulation, for this could add nothing to their force. Every contract is made in
> subordination to them, and must yield to their control, as conditions inherent and
> paramount, wherever a necessity for their execution shall occur.'"

*Blaisdell*, 290 U.S. at 435-36.  "Legislation to protect the public safety comes within the same

category of reserved power."  *Id.* at 436  Accordingly, "'[i]t is the settled law of [the Supreme

Court] that the interdiction of statutes impairing the obligation of contracts does not prevent the

state from exercising such powers as are vested in it for the promotion of the common weal, or

are necessary for the general good of the public, though contracts previously entered into

between individuals may thereby be affected.'" *Id.* at 437, quoting *Manigault*, 199 U.S. at 480. "'This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals.'" *Id.*

This principle would not permit a state "to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Id.* at 439. "But it does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community." *Id.* at 439. Accordingly, it is not for the Court to determine "[w]hether the legislation is wise or unwise as a matter of policy." *Id.* at 447-48; *see also South Bay United, supra*, at p. 1, quoting *Garcia v. San Antonio Metro. Transit Authy.*, 469 U.S. 528, 545 (1985) (where a legislators' broad latitude to protect the health and safety of citizens is not exceeded, "they should not be subject to second-guessing by an 'unelected . . . judiciary'"). At bottom, the only question presented on the Landlords' Contracts Clause challenge is whether the Act is an appropriate exercise of "the protective power of the state [that] is read into all contracts," including leases and tenancies at will. *Blaisdell*, 290 U.S. at 444.

In *Blaisdell*, the Court upheld the Minnesota statute for five reasons: (1) "an emergency existed . . . which furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community[;]" (2) the legislation was "addressed to a legitimate end" and for "the protection of a basic interest of society;" (3) the relief afforded by the legislation was "of a character appropriate to the emergency, and could be granted only upon reasonable conditions[;]" (4) the imposition on the contracted-for right was not "unreasonable[;]" and (5) the legislation was "temporary in operation." *Blaisdell* 290 U.S. at 444-47. Here, all of

those criteria are easily met:  (1) an emergency exists; (2) the legislation has a legitimate end; (3) the relief is appropriate to the character of the emergency; (4) the imposition on landlords' rights is not unreasonable because it only precludes eviction as a remedy – not the collection of rents – and includes exceptions, such as where an eviction is related to criminal activity that may impact the health or safety of other residents . . . . "  St. 2020, c. 65, § 1; and (5) the legislation is temporary.  Accordingly, the Act is an appropriate exercise of the Massachusetts Legislature's police powers, *see Jacobson*, 197 U.S. at 27 (1905), and, thus, it is well within the parameters of the Contracts Clause.  Ultimately, this Court would "usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case."  *Jacobson*, 197 U.S. at 28.

### D.      The Eviction Moratorium Is Not an Unconstitutional Taking.

Finally, the Landlords claim that the Act works an unconstitutional "taking" of their property without just compensation.  While "[t]he paradigmatic 'taking'" is a "direct government appropriation or physical invasion of private property[,]" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005), there is no such direct governmental appropriation or physical taking here, as discussed below.  Nor can Landlords come close to demonstrating a "regulatory" taking, "arising from a regulation enacted under the State's police power that severely limits the property's use." *See Blair v. Department of Cons. & Rec.*, 457 Mass. 634 (2010; *see also Lucas v. South Carolina Coast. Council*, 505 U.S. 1003, 1014 (1992).

### 1.      The Moratorium Is Not A 'Per Se' Or Categorical Taking.

There are two circumstances in which a regulation can amount to a "*per se*" or "categorical" taking.  "First, where government requires an owner to suffer a *permanent physical invasion* of her property—however minor—it must provide just compensation."  *Lingle*, 544

U.S. at 538 (emphasis supplied).  Second, where a regulation "deprive[s] an owner of '*all*

economically beneficial us[e] of her property.'" *Id.*, quoting *Lucas v. South Carolina Coast.*

*Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original).  Neither has occurred here.

### a.      There Is No 'Physical Invasion.'

First, setting aside for a moment that the Act is *temporary*, and cannot meet the definition

of a "categorical" taking for this reason alone, it also cannot amount to a physical invasion under

the Supreme Court's decision in *Yee,* 503 U.S. 519, *supra*.  There, the plaintiff claimed that a

limitation on evictions from mobile home parks essentially transferred a "perpetual tenancy" to

the tenants, amounting to a physical occupation.  *Id.* at 526-27.  The Supreme Court rejected this

theory, holding that the "element of required acquiescence is at the heart of the concept of

occupation," and does not exist where plaintiffs have "voluntarily rented their land . . . ." *Id.* at

527.  "Put bluntly, no government has required any physical invasion of petitioners' property.

Petitioners' tenants were invited by petitioners, not forced upon them by the government."  *Id.* at

527-28.  As a result, where the State has not occupied the Landlords' property or foisted tenants

upon them here, there has been no physical invasion, and no physical *per se* taking.[26]

---

[26]      The Landlords rely heavily on *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419
(1982), Landlords' PI Memo. at pp. 18-19, where the Supreme Court decided a physical taking occurred
when a New York statute "provid[ed] that a landlord must permit a cable television company to install its
cable facilities upon his property."  *Loretto*, 458 U.S. at 421.  *Loretto* was, however, expressly
distinguished in *Yee, supra*, where the Supreme Court explained that the difference between the physical
invasion in *Loretto* and the tenancies in *Yee* was that in *Loretto*, the presence of the cable equipment was
forced on landowners at the outset of the occupation, while in *Yee*, the landlords had freely granted the
tenants a leasehold.  *See Yee*, 503 U.S. at 527-28 ("The government effects a physical taking only where it
requires the landowner to submit to physical occupation of his land," *id.* at 527).  Moreover, *Loretto*'s
core holding is clear that it refers to "permanent" occupations of land:  "We conclude that a *permanent
physical occupation authorized by government* is a taking without regard to the public interests that it
may serve."  *Loretto*, 458 U.S. at 426 (emphasis supplied).  Nothing about the Act is "permanent."

### b.      There Similarly Is No Deprivation of All Economically Beneficial Use.

A "categorical" regulatory taking may also arise "where regulation denies *all* economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015 (emphasis supplied); *see also Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 153 (1st Cir. 2012).  But the Act obviously does not deprive the Landlords of *all* economically beneficial use of their property.  While Baptiste's building contains two units, and Matorin's includes three, *see* Affidavit of Amber Anderson Villa, ¶¶ 8,17, each complains only about one unit where the tenants are in arrears on rent.  In addition, nothing in the Act prevents any landlord from collecting rent from *any* tenants, and the present Landlords here have supplied no evidence of any impact on the fair market value of their buildings, let alone a sudden reduction to zero caused by the Act.  Accordingly, the Act does not operate as a categorical taking.  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg. Planning Agency*, 535 U.S. 302, 332 (2002) ("Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted."); *Elmsford*, *Ex. A* hereto, slip op. at pp. 17-18.

### 2.      The Moratorium Is Not a Partial or 'Temporary' Taking.

Where a regulation does not result in a categorical taking, the question becomes whether, in Justice Holmes's words, it "goes too far."  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  This analysis is governed by the three-part inquiry summarized in *Penn Central Transp. v. New York City*, 438 U.S. 104 (1978), concerning:  (1) "[a] regulation's economic impact on the claimant," (2) "the extent to which it interferes with distinct investment-backed expectations," and (3) the regulation's "character."  *Lingle*, 544 U.S. 528, 528-29.  The Landlords fare no better under *Penn Central* than they do with a "categorical" taking claim.

a.    **The Landlords Do Not Have a Viable "Facial"
Takings Claim.**

Although it is unclear whether Landlords are bringing a "facial" or "as applied" Takings

Clause challenge, the Court need not linger long over these two possibilities, because it is plain

that the Landlords cannot proceed on a "facial" takings theory.  The Supreme Court has stated

that claimants "face an uphill battle in making a facial attack on [a statute] as a taking."

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987).  This is because, as

with any facial challenge, "the challenger must establish that *no set of circumstances* exists under

which the [challenged action] would be valid."  *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429

F.3d 294, 307 (1st Cir. 2005); *see also U.S. v. Salerno*, 481 U.S. 739, 745 (1987) (facial

challenge to legislative act is the "most difficult" to mount successfully, since the challenger

must establish "no set of circumstances exists under which the [a]ct would be valid.").[27]

The Landlords plainly cannot meet the "no set of circumstances" standard described

above.  Indeed, they admit that only landlords with nonpaying tenants are affected by the Act.

*See* Landlords' PI Memo at p. 20.  Clearly, the Act will have no impact whatsoever on landlords

whose tenants continue to pay their rent, or voluntarily surrender the premises.  Moreover, it may

not be to the economic advantage of *all* landlords to evict *all* nonpaying tenants, regardless of

whether the Act allows them to do so,[28] and the only property right as to which the Landlords

---

[27]    In the takings context, a facial challenge is usually ripe "the moment the challenged regulation or ordinance is passed."  *Pharma. Care*, 429 F.3d at 307, quoting *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10 (1997).  "To succeed on a facial challenge to a statute, however, is very difficult. As we have noted before, a plaintiff wishing to bring a facial challenge 'face[s] an uphill battle.'" *Id.*, quoting *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 52 (1st Cir. 2002) (Lipez, J., dissenting).  "A facial challenge to a legislative Act is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Pharma. Care*, 429 F.3d at 307 (internal quotation marks omitted).

[28]    No certainty can exist in this pandemic regarding how the rental housing market will be affected by COVID-19 in any particular community, both in terms of price and occupancy rate.  Accordingly,

(footnote continued)

33

can possibly claim a "taking" is that of regaining "possession" of their premises – a right that is only available if the subject tenancies have been, or can be, legally terminated.  But whether the Landlords in this case, or any other landlords, are in fact legally entitled to possession requires an individualized factual inquiry.[29]  Because the Act's impact on landlords is thus highly variable and dependent on individualized facts, there is no way its "mere enactment" can be construed as a "taking."  *See Hodel v. Virginia Surface Mining and Reclam. Ass'n, Inc.,* 452 U.S. 264, 295 (1981); *South Lyme*, 539 F.Supp.2d at 542.  Accordingly, the Landlords' takings challenge must be construed to be "as applied" and, thus, subject to the *Penn Central* criteria.

**b.     The Landlords' Claims Cannot Satisfy the *Penn Central* Criteria.**

In general, courts have "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982); *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 234 (2003) ("a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . does not constitute a categorical taking).  *See, e.g.*, *Gilbert v. City of Cambridge*, 932 F.2d 51 (1st Cir. 1991) (rejecting takings clause challenge to municipal ordinance requiring permits for conversion of rental units to condominiums); *Sadowsky v. City of N.Y.*, 732 F.2d 312 (2nd Cir. 1984) (same); *Loeterman v. Town of Brookline*, 524 F. Supp. 1325

---

there may be many landlords who rationally choose to tolerate a few months' breach by a tenant instead of taking a chance on someone new – or gambling whether they will be able to re-let the premises at all.

[29]     There are a variety of ways in which landlords who fully intend to terminate tenancies and prosecute actions for possession may fail to perfect their rights.  *See*, *e.g*., *Youghal, LLC v. Entwistle*, 484 Mass. 1019, 1022 (2020) (judgment for tenant in summary process case where summons and complaint served before 14-day notice to quit expired); *Marion v. Bryson*, 326 Mass. 618, 619 (1950) (after termination, new tenancy-at-will may be evidenced by acceptance of rent).  Numerous defenses are also available to tenants.  *See, e.g.*, Mass. Gen. Laws c. 239, §8A.

(D. Mass. Nov. 6, 1981) (rejecting Takings Clause challenge to town bylaw preventing recovery of possession from certain condominium tenants).  With these principles in mind, the Act's temporary moratorium on evictions does not amount to a "taking."

### i.     A Single Rental Unit is Not a 'Relevant Parcel' for Takings Purposes.

As an initial matter, it merits emphasis that the "relevant parcel" for purposes of a regulatory-takings analysis must be the "parcel as a whole," rather than any one portion.  *See Tahoe-Sierra*, 535 U.S at 327, citing *Gorieb v. Fox*, 274 U.S. 603 (1927) (setback ordinance not considered regulatory taking) and *Keystone*, 480 U.S. at 498 (regulation of coal mine structural design).[30]  Accordingly, for purposes of each of the Landlords' regulatory takings claims, the "relevant parcel" is the entire property, including both the land and the multi-unit dwelling thereon, rather than merely a single unit within the building.  See *Tahoe-Sierra*, 535 U.S. at 327; *Elmsford*, *Ex. A*, slip op. at p. 20 (subset of rental units "do[es] not constitute a separate segment of property for takings law purposes"); *see also Penn Central*, 438 U.S. at 130-131.

### ii.     The Act's Impact on Value Is Minimal.

As for the first *Penn Central* factor, governmental actions do not constitute regulatory takings without "severe economic impact" on the owner.  *City of College Station, Tex. v. Star Ins. Co.*, 735 F.3d 332, 338 (5th Cir. 2013); *see also Concrete Pipe and Products of Calif., Inc. v. Const. Laborers Pension Trust for S. Calif.*, 508 U.S. 602, 645 (1993) ("our cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking").  Indeed, the fact that a governmental action "deprives the property of its most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead, N.Y.*,

---

[30]     This is distinct from a situation where the government has *physically occupied* a portion of a parcel – in that circumstance, just compensation is owed.  *See Lingle*, 544 U.S. at 538. But as previously explained in Pt. II.D.1.a, *supra*, no such physical occupation has occurred here.

369 U.S. 590, 592 (1962); *see also Penn Central*, 438 U.S. at 125.  And, even where investment

property yields a lesser return than expected, no taking occurs where it still can be sold for its

permitted uses.  *Park Ave. Tower Assoc. v. N.Y.*, 746 F.2d 135, 140 (2d. Cir. 1984).

     "The duration of the restriction" is also an important factor in assessing the economic

impact of a governmental action.  *Tahoe-Sierra*, 535 U.S. at 342.  In particular, a landlord

bringing a takings challenge must base its claim of harm on how the subject property is affected

by the regulation during the "entirety" of the "term of years that describes the temporal aspect of

the owner's interest."  *Id.* at 331-32.  Where, for example, a moratorium on development

"temporarily deprived [owners] of all economically viable used of their land" for 32 months, no

taking occurred.  *Id.* at 341-42; *cf. Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1351-52

(2004) (eighteen month delay in regulatory process "far short of extraordinary").

     The Act's eviction moratorium is also of limited duration, and the Landlords have shown

no impact that it has had on the value of their land.  The Act does not prevent the Landlords from

collecting rent, and it does not otherwise restrict the use or transferability of their properties.  At

most, they complain that their income stream has been temporarily reduced because of their

inability to oust non-paying tenants and, presumably, replace them with paying tenants.[31]  *See*

Landlords' PI Memo at 7-10, 20.  But the law is clear that "the mere loss of some income

because of regulation does not itself establish a taking.  Rather, economic impact is determined

by comparing the total value of the affected property before and after the government action."

*Colony Cove Prop. v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018); s*ee also Love Terminal*

---

[31]     Moreover, the Landlords make no mention of any relief their loan servicers may have afforded them due to any reduction in their rental income income.  *See, e.g.*, https://www.spservicing.com/DisasterManagement (worldwide website of loan servicer stating, "[w]e understand the strain that the pandemic is putting on people for various reasons . . . We will work with you to find solutions if you have been financially impacted by COVID-19 and have concerns about being able to pay your mortgage").

*Partners, L.P. v. United States*, 889 F.3d 1331, 1334 (Fed Cir. 2018) ("To assess the severity of a regulation's economic impact, the court must compare the value of the property immediately before the governmental action . . . with the value of the same property immediately after that governmental action").  Here, Plaintiffs present no evidence at all as to the market value of their properties before and after passage of the Act, much less evidence showing a severe and lasting diminution in value.  *See Tahoe-Sierra*, 535 U.S. at 332.  Moreover, no loss of rental income can causally be connected to the Act without the entirely unsupported speculation that the Landlords would be able to replace nonpaying tenants with paying tenants, at a pre-COVID-19 rental rate, and notwithstanding the existence of a global pandemic.  While the Act limits the ability of landlords to evict tenants in "non-essential" cases, St. 2020, c. 65, § 3(a), this temporary curtailment of one selected property right, among several, is not a "taking."  *See Andrus v. Allard*, 444 U.S. 51, 65-66 (1979) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' . . . is not a taking.").

           iii.       **The Act Does Not Disturb Investment Backed Expectations.**

For similar reasons, the Act does not substantially interfere with the Landlords' "distinct investment-backed expectations."  *Penn Central*, 438 U.S. at 124.  This is particularly true where, as noted *supra*, rental property owners in Massachusetts already operate within a heavily regulated industry.  *Peoples Liquor Stores, Inc. v. Jenkins*, 432 F.Supp.2d 200, 215 (D. Mass. 2006) ("[g]iven the heavy regulation of this field by the legislature . . . it could not have come as a shock that the legislature would act as they did").  Given this context, it would have been simply unreasonable for the Landlords to have expected "business as usual" in Massachusetts summary process sessions during a global pandemic.

### iv.   The Character of the Statue Weighs Heavily Against a Taking.

Finally, the nature of the Commonwealth's action here – taken in response to profound economic and public health crises – cuts decisively against the finding of a compensable taking. As the Supreme Court has said in the context of a housing crisis, "a public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation." *Block*, 256 U.S. at 156; *see also Penn Central*, 438 U.S. at 125 (where "health" and "safety" are involved, "this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests."); *U.S. v. Caltex*, 344 U.S. 149, 154 (1952) (times of "imminent peril" may require destruction of property rights without compensation); *Miller v. Schoene*, 276 U.S. 272, 277-81 (1928). Here, the Act was specifically enacted in response to the pandemic, and it serves the legitimate (indeed compelling) public purpose of protecting the health of Massachusetts residents by temporarily limiting non-essential evictions and a corresponding increased risk of spreading COVID-19. *See* Facts, Pts. I-III, *supra*.

### 3.   In Any Event, An Injunction Is Not an Available Form of Relief For a Takings Claim.

Finally, even if the Landlords could establish that a taking has occurred, which they cannot for the reasons set forth above, a preliminary injunction still would not be permissible, as injunctions are unavailable as a form of relief for takings claims in a state that, as here, provides a mechanism for awarding monetary damages. In *Knick v. Township of Scott,* 139 S. Ct. 2162, 2176 (2019), the Supreme Court reviewed historical precedent on the issuance of injunctive relief in takings cases, explaining that injunctions were once available as a response to takings at a time when no provision had been made for compensation. *Id.* at 2175-76. "Today," however, "because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." *Id.* at

2176.  Massachusetts provides for just such relief under Mass. Gen. Laws c. 79.[32]  And, "[a]s

long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin

the government's action effecting a taking."  *Id.*; *see also Maine Educ. Ass'n*, 695 F.3d at 152

n.3 ("ordinarily, injunctive relief is not available under the Takings Clause").  Accordingly, the

Landlords are not entitled to a preliminary or permanent injunction on their takings claim.[33]

### III.  Any Harm to The Landlords of Denying an Injunction is Far Outweighed By the Potential Harm to the Public of Entering One.

Because the Landlords have no likelihood of success on the merits, the Court need not

even consider the other preliminary injunction factors, which are mere matters of "idle

curiosity."  *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st

Cir. 2015).  But, even if the Court deems it necessary to consider the other factors, they tip

decisively against the injunction request.  Here, the Court must consider the "the considerable

harm that an emergency injunction would cause," and the public's interest in maintaining the

"status quo," against any harm that would follow from denying the motion.  *Respect Maine PAC

v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010).  Moreover, "the measure of irreparable harm is not a

rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's

likelihood of success on the merits."  *Vaqueria Tres Montijas Inc. v. Irizarry*, 587 F.3d 464, 485

---

[32]     *See Lopes v. City of Peabody*, 430 Mass. 305, 312 (1999) ("We conclude that G.L. c. 79, §§ 12 and 35A, apply to temporary regulatory takings . . . ."); *Cayon v. City of Chicopee*, 360 Mass. 606, 609 (1971) ("It is well settled that a taking of private property for which compensation must be paid is not necessarily restricted to an actual physical taking of the property.").

[33]     At least one United States District Court has agreed with this view in a pandemic-related takings case by rejecting a request for declaration that would have been equivalent to an injunction.  *See County of Butler v. Wolf*, 2:20-cv-677 (W.D. Pa. May 28, 2020), slip op. at 3-4 (copy attached as *Exhibit C*).  The Commonwealth recognizes that it is also arguing in its MTD Memo., pp. 6-7, that the Eleventh Amendment bars the Landlords from seeking monetary compensation from the Commonwealth under a takings theory.  That *Knick* also bars federal courts from issuing takings-related injunctions (as long as the state provides an adequate remedy) does not lessen the Eleventh Amendment's immunity protections as to money damages.  *See Williams v. Utah Dept. of Corrections*, 928 F.3d 1209, 1214 (10th Cir. 2019); *Bay Point Prop., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456-57 (5th Cir. 2019).

(1st Cir. 2009).  Here, where the likelihood of success is low to nonexistent, the Landlords' assertions of harm are insufficient – especially since the harm they assert is economic.[34]  *Id.* ("it has long been held that traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable").

Here, even if the Landlords demonstrated a likelihood of success on the merits (which they have not), any economic harm they have shown pales in comparison to the COVID-19-related harm to the public health and safety of enjoining the eviction moratorium and its contagion-reducing benefits.  As a result, both the balance of harms and the public interest overwhelmingly favor upholding the Act.  Thus, an injunction may not enter.

## CONCLUSION

For all of the reasons set forth herein, this Court should deny the Landlords' motion for preliminary injunction.

By their attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Jennifer E. Greaney
_____
Jennifer E. Greaney, BBO No. 643337
*Assistant Attorney General*
Pierce O. Cray, BBO No. 104630
*Senior Appellate Counsel*
Richard S. Weitzel, BBO No. 630303
*Assistant Attorney General*
One Ashburton Place
Boston, Mass.  02108
(617) 963-2855
jennifer.greaney@mass.gov
pierce.cray@mass.gov
richard.weitzel@mass.gov

DATED: July 27, 2020

---

[34]  The Landlords correctly assert that loss of free speech is generally considered to constitute irreparable harm.  *See Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007).  The Landlords' likelihood of success on their free speech claims is, however, exceedingly slim.  Accordingly, the sliding scale approach clearly militates against an injunction, even on the Landlords' free speech claims.

## CERTIFICATE OF SERVICE

   I certify that this document, filed through the Court's ECF system will be sent electronically on this day to registered participants as identified on the Notice of Electronic Filing (NEF).

          */s/ Jennifer E. Greaney*
          Jennifer E. Greaney
          Assistant Attorney General

DATED:  July 27, 2020