UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
MARIE BAPTISTE, MITCHELL MATORIN        ) C.A. No. 1:20-CV-11335 (MLW)
                                                    )
                                                    )
            Plaintiffs,                             )
                                                    )
            v.                                      )
                                                    )
COMMONWEALTH OF MASSACHUSETTS,          )
EXECUTIVE OFFICE OF                      )
HOUSING AND ECONOMIC DEVELOPMENT,       )
                                                    )
            Defendants.                             )
                                                    )
_____)

**<u>PLAINTIFFS' REPLY IN SUPPORT OF</u>**
**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

Plaintiffs respectfully submit this Reply Brief in support of their Motion for Preliminary

Injunction.

**<u>ARGUMENT</u>**

**A.  The Act Violates Plaintiffs' Constitutional Right To Petition and Access The Courts.**

The Commonwealth appears to concede that the Act directly implicates the Plaintiffs'

right to petition under the First Amendment, but argues that it does not step over the line because

the Massachusetts Legislature may curtail rights of litigants to pursue particular causes of action,

or to eliminate causes of action altogether.  In support, the Commonwealth cites to a handful of

circuit rulings and one Supreme Court opinion which have little if any direct relevance to the

unique nature of the Moratorium.  Def. Oppo at 11-13.

The Commonwealth cites *Los Angeles Cty Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir. 1992)

in which a California Bar Association challenged the constitutionality of a statute prescribing the

number of judges on Los Angeles County Superior Court, arguing that it caused inordinate delays that deprived litigants of their right to access the courts and deprived LA County litigants of equal protection of the laws because they suffered greater delays than surrounding counties. The Ninth Circuit court agreed with the First Circuit in *Ad Hoc Comm. on Judicial Admin. v. Commonwealth*, 488 F.2d 1241, 1244 (1st Cir. 1973) that "[d]elay *per se* is not unconstitutional," but found that "on this record," the Bar Association had not provided evidence that the delays led to ineffective relief or had deprived any litigant of the ability to vindicate important rights, nor was the court able to determine "on this record" how much of the delay was attributable to the litigants rather than to the system. The court explicitly stated, however, that "we do not discount the possibility that litigation delays in certain circumstances could effectively deprive individual litigants of the ability to vindicate fundamental rights." 979 F.2d at 707.

The Ninth Circuit's limited quotation from *Ad Hoc Comm.*, elides the fundamental agreement between the two courts. The full quotation from *Ad Hoc Comm.* is as follows:

> Delay *per se* is not unconstitutional; it may become such only
> when an injured plaintiff, ready and eager for trial, or a defendant,
> seeking vindication and himself ready for trial, are denied for too
> long his day in court. If a five year delay in a civil action reflects
> simply the parties' utilization of pre-trial discovery or settlement
> negotiations there is no constitutional violation.

*Ad Hoc Comm.*, 488 F.2d at 1244. As in *Los Angeles County*, the First Circuit observed the difficulty in determining the cause of the delays from filing to trial, amongst factors such as discovery, negotiation, strategy, and even procrastination, to tease out which delays if any might arise to constitutional levels. *Id.* at 1245.

The problems that the *Ad Hoc Comm.* and *Los Angeles County* cases foresaw in evaluating the constitutional problems of court delays are not present here. To the contrary, we can calculate essentially *to the day* the delay each Plaintiff is suffering in exercising their

fundamental property rights and that delay is without question attributable *entirely* to the Eviction Moratorium Act. We can also calculate to the penny the monetary damages that Plaintiffs are suffering as a result of the Act. Under the Summary Process Rules, a property owner is presumptively entitled to a hearing on the merits and adjudication of his right to regain possession of his property within 10 days of filing the case. *See* Mass. R. Summ. P. 2(c) ("Entry dates for summary process actions shall be each Monday and cases shall be placed on the list for hearing on the second Thursday following the entry date."). In Plaintiff Matorin's case, he served a 14-day Notice to Quit for nonpayment of rent on February 19, 2020, and served the Summary Process Summons and Complaint on March 9, 2020, which was entered in the Housing Court on March 11, 2020. Consistent with Summary Process Rule 2(c), the case was set for hearing on March 26, 2020. Thereafter, the Housing Court temporarily shut down due to COVID-19 and Matorin's case was rescheduled to May 6, 2020. However, after the passage of the Eviction Moratorium Act, the Housing Court canceled that hearing and placed the case in an indefinite "TBD" status. Thus, Matorin's current delay caused by the Moratorium is 78 days (May 26 – August 11) and if the Moratorium continues through its current expiration date of October 18 (a Sunday), that delay will be 147 days (May 26-October 19). But even that will not be the end, because it is only after the Housing Court is allowed to function again that it will begin assigning new trial dates, and the process is likely to be even slower than usual as the courts play catch-up. *See* Ward Affidavit, filed herewith. And of course, the Governor retains the absolute authority to continue extending the Moratorium indefinitely. If he does, then it will be just as simple to continue calculating the delays caused exclusively by the Moratorium.

Similarly, Plaintiff Baptiste served a 14-day Notice to Quit for nonpayment on March 9, 2020. But for the passage of the Moratorium, she could have served the Summary Process

Summons and Complaint and entered it in the Housing Court as early as March 23, 2020, and under Rule 2(c) the case would have been listed for hearing 9 days later, on April 1, 2020.[1] During that period, the Housing Courts were shut down due to COVID-19, and thereafter the Moratorium went into effect on April 24, 2020. Baptiste's delay due to the Moratorium is therefore currently 110 days (April 24-August 11). If the Moratorium expires on Sunday October 18, 2020, she will have suffered a delay of 179 days before she can serve the Summary Process Summons and Complaint (April 24 – October 19) and the *earliest* her case may be placed on the list will be November 5, 2020 (196 days). And again, if the Moratorium is further extended, it will be just as simple to continue calculating the delays caused by the Moratorium.

Plaintiff DaPonte has not been able to serve a Notice to Quit for nonpayment due to the Moratorium. His delay caused exclusively by the Moratorium currently is 110 days (April 24-August 11), and if the Moratorium continues through October 18, his delay will be 179 days (April 24-October 19). Once again, if the Moratorium is extended, it will take only a calendar to calculate the delays he will have suffered exclusively because of the Moratorium.

As just demonstrated, unlike *Los Angeles County* and *Ad Hoc Comm.*, it is simple to calculate the precise delays that each Plaintiff has suffered to their right to access the courts and ultimately to regain possession of their real property. And also unlike those cases, the Moratorium is the exclusive cause of the delays. The question then comes down to this: given that both the Ninth Circuit in *Los Angeles County* and the First Circuit in *Ad Hoc Comm.* explicitly recognized that delays can deny a plaintiff his day in court for "too long," *Ad Hoc Comm.*, 488 F.2d at 1244, such that they "effectively deprive individual litigants of the ability to vindicate fundamental rights," *Los Angeles Cty*, 979 F.2d at 707, do the delays imposed on

---

[1] Metro-South Housing Court trial days are the second Wednesday after the Monday entry day.

Plaintiffs by the Moratorium rise to that constitutionally critical level here? Plaintiffs submit that they certainly do. The Moratorium has unconstitutionally eliminated Plaintiffs right to prompt resolution of their summary process cases and has delayed Plaintiffs' rights to regain their property under the Summary Process Rules by anywhere from **1400% to 1800% or more**—with no firm end date anywhere in sight. Such massive delays on the most fundamental property rights cannot be constitutional, especially when the State is effectively forcing Plaintiffs to provide public housing for free while simultaneously forcing them to continue paying all of the regular costs of maintaining that free housing, including having to pay for water and sewer to the very tenants who are receiving state-mandated free housing.

The Commonwealth blithely dismisses the unconstitutional infringement on Plaintiffs right to access the courts by arguing that the Legislature can provide defenses or "modify existing law in a way that limits or eliminates a legal claim without running afoul of the Petition Clause, because the right of access to the courts 'is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." The Commonwealth further argues that there is "no constitutional right to receive or be eligible for a particular form of relief." (AG Brief at 12, quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), and *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997)).[2] This argument is

---

[2] The other cases the Commonwealth cites in this section are not on point. *Bowman v. Niagra Machine and Tool Works, Inc.*, 832 F.2d 1052 (7th Cir. 1987), concerned a ten-year statute of repose that did not bar a plaintiff from asserting a claim in court, it simply required it to be brought within a specific period of time. The court held this did not violate the Equal Protection Clause. *Id.* at 1054. The court went on to observe that "[c]laims of violation of the right of access to courts have thus focused on the availability of suitable court processes to vindicate existing rights or, more commonly, the ability of an individual to make use of those processes." *Id.* at 1054. That is the situation here: the Eviction Moratorium Act has taken away suitable court processes to vindicate Plaintiffs' rights and prohibited them from making use of those processes. As the Commonwealth argues in its Contract Clause section, the Plaintiffs continue to

stunning in its cuteness.  What the Commonwealth contends is that because the right of access is

"ancillary" to a legal claim, that right no longer exists and thus cannot be violated if the

Legislature simply eliminates the claim entirely.  To begin with, this creates massive new

constitutional problems if taken at face value.  For example, in exchange for providing a fast

summary process proceeding to regain possession from a breaching tenant, Massachusetts law

prohibits property owners from engaging in any self-help remedies, subject to substantial

financial penalties for violations.  G.L. c. 184, § 18.  Under the Commonwealth's view, the state

can encourage property owners to rent their property to tenants and then immediately and

indefinitely eliminate the property owner's rights in their property.  If a tenant does not pay, too

bad!  The joke is on the property owners, because—Shazam!—the property owner no longer has

an eviction remedy.  Instantly, private rental property owners are transformed into public

housing providers at their own cost.[3]  But this is not a constitutional problem for the right to

petition, the Commonwealth contends, because the Legislature has simply eliminated the

---

have the same legal rights as before, they simply are not allowed to access the courts to enforce
them.

In *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), a statute barred suits
against gun manufacturers by victims of gun violence.  The court held that the statute did not
interfere with the right of access to the courts because it provided a complete defense to a
particular cause of action, thereby eliminating any claim that could support the right of access.
*Id.* at 397-98.  Again here, by contrast, the Commonwealth argues that Plaintiffs still have their
legal rights to which the right to access the courts is "ancillary," they are simply prohibited from
exercising that right.

In *Sieverding v. Colorado Bar Ass'n*, 469 F.3d 1340 (10th Cir. 2006), the court held that "there is
no right to access to the courts to prosecute an action that is frivolous or malicious," and federal
courts have the inherent power "to regulate the activities of abusive litigants by imposing
carefully tailored restrictions under the appropriate circumstances."  *Id.* at 1343.  The
Commonwealth does not contend that Plaintiffs' existing or anticipated summary process actions
are frivolous or malicious or that Plaintiffs are abusive litigants.

[3] The elimination of all remedies for breach by a tenant and converting private housing stock into
mandatory public housing would certainly be an unconstitutional taking.

"ancillary" right to petition by eliminating the underlying claim. No harm, no foul. This simply cannot be the case. The right of the Legislature to restrict access to the courts must be subject to constitutional limits; the Legislature cannot simply statutorily remove a constitutional right. And in fact, as discussed above, it is subject to constitutional limits.

Moreover, the Commonwealth's argument that the Legislature is free to eliminate the right to petition by eliminating the right to evict altogether runs headlong into the Commonwealth's argument a few pages later that the Moratorium does not violate the Contracts Clause because:

> [a]t most, the Act's §§3(a) & (b) deprive some landlords, temporarily, of a statutory remedy they otherwise would have had for non-payment of rent. The Act does not eliminate the obligation to pay rent, or even landlords' ability to collect rent. It merely bars them from evicting tenants in some (but not all) circumstances, and only for a limited time…. Here, as in *Elmsford, supra*, the eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants.

(AG Brief at 24-25 (internal quotation omitted.)

The Commonwealth thus seeks to have it both ways. When it comes to the constitutional right to petition, the Commonwealth argues that the massive delays that the Moratorium is daily imposing on property owners' fundamental property rights are of no constitutional import because nothing prevents the Legislature from eliminating that "ancillary" constitutional right by eliminating the right to evict altogether. But when it comes to the Contracts Clause, the Commonwealth contends that there is no constitutional violation because the Moratorium is "merely" imposing "temporary delays" on Plaintiffs' contract rights that otherwise remain wholly intact. The Commonwealth cannot have it both ways.

*Elmsford Apt. Associates LLC v. Cuomo*, 2020 WL 3498456 (S.D.N.Y. June 29, 2020),

has at best limited relevance.  Of course, this Court is not bound by its reasoning, and there are

many aspects of the New York Moratorium which make Plaintiffs' point that the Massachusetts

Moratorium goes too far and is not narrowly tailored to address the Covid-19 crisis.  New York's

moratorium was originally in place for only 90 days,[4] only applied to non-payment cases, did not

stay cases filed before the moratorium, and tenants could only receive a stay of their eviction

case if they were "eligible for unemployment insurance or benefits under state or federal law or

otherwise facing financial hardship due to the COVID-19 pandemic…"  The New York

moratorium also provided that tenant security deposits could be used for rent arrearages and if

used, must be replenished by the tenant.  By contrast, the Massachusetts Moratorium is far more

draconian.  Its duration is indefinite with the Governor's unlimited discretion to extend, is

currently in place for 6 months, and likely longer.  It applies to virtually every type of eviction

case, not just non-payment.  Property owners cannot even serve notices to quit that are

prerequisites to eventually filing summary process cases and that by themselves do not impose

any obligation to vacate the premises.  *Adjartey v. Cent. Div. of Hous. Court Dep't*, 481 Mass.

830, 850, 120 N.E.3d 297, 316 (2019)("Receipt of a notice to quit, however, does <u>not</u> legally

require the tenant to move out of his or her home.").

Property owners who have already served notices to quit are barred from filing new

cases, the Housing Court is barred from receiving any filings at all, and all pending cases are

indefinitely frozen.  There is *no requirement* for tenants to establish a Covid-19 related hardship;

they can simply refuse to pay even if they can, yet cannot be evicted.  And property owners may

---

[4] The New York Moratorium was enacted as a series of executive orders by Governor Cuomo, who has extended the moratorium through September 4, 2020.

not use tenant security deposits for unpaid rent – they remain liable to comply with G.L. c. 186 s. 15B in its entirety, complete with its draconian financial penalties for even inadvertent mistakes. The New York moratorium is thus substantially less onerous across the board than the Massachusetts Moratorium and imposes far less of a burden on property owners' constitutional rights. Though Plaintiffs would certainly argue that *Elmsford* was wrongly decided, it is a very different case from this one and is of little relevance.

Massachusetts went overboard with the "nuclear" option, while New York went with a targeted strategy, more narrowly tailored to address Covid-19 economic impacts. There were many options available to the Massachusetts Legislature other than a blanket and complete shutdown of the entire summary process system and evisceration of Plaintiffs' constitutional rights if it wished to reduce the number of evictions during the Covid-19 crisis while respecting the constitutional rights of housing providers. For example, lawmakers could have let summary process cases proceed, while staying executions (move-out orders) where a particular tenant adequately demonstrated to the judge that COVID-19 had prevented the tenant from paying rent. Non-contested cases in which parties were willing to, or already had entered into, a voluntary agreement could have been allowed to proceed. Housing Court judges could have continued to move cases along virtually through discovery and pre-trial procedures. There was no justification for banning the service of Notices to quit, as they do not legally require a tenant to vacate the premises short of a Housing Court move-out order. As in New York, holdover tenants could be subject to summary process. The Legislature could have allowed security deposits to be used for unpaid rent and required tenants to replenish them as they did in New York. And of course, the Legislature could have and should have funded the entire Moratorium instead of

leaving it unfunded, thereby causing all economic impact to fall entirely on landlords required to provide free public housing as a matter of government policy.

Plaintiffs respectfully contend that if the Massachusetts moratorium were before Judge McMahon the result may well have been different, and in any event, her conclusion that a delay in the right to file a lawsuit caused by a state law can *never* support a Right to Petition is incorrect as a matter of law. *See* discussion *of Los Angeles County and Ad Hoc Comm., supra*.

The simple fact remains: A plaintiff in a Massachusetts summary process case is entitled to a trial on the merits and a presumptive final resolution of the case within 10 days of filing the case. *See* Unif. R. Summ. P. 2. The Moratorium imposes an effective delay on this presumptive right to trial in Plaintiffs' cases by an astronomical ***1700-1800%,*** to about 180 days. Such a massive delay in all summary process cases statewide is, and should be held to be, a presumptive violation of the Right to Petition, where Massachusetts policy is to "secure the just, speedy, and inexpensive determination of every summary process action." Unif. R. Summ. P. 1.

**B.  The Act Violates Plaintiffs' Free Speech Rights Under the First Amendment.**

The Commonwealth argues that the Act's censorship and prohibition on notices to quit does not implicate the First Amendment because it is a "conduct-based" prohibition. This is nonsense. A notice to quit is a formal legal document in the English language which is served or delivered to a tenant notifying the tenant that they have done something to violate a lease or tenancy agreement. That message can only be conveyed by actual words, not conduct. Indeed, by statute, a written notice to quit is the *only* way a landlord in Massachusetts can communicate such an occurrence and terminate a tenancy. *See* G.L. c. 186, § 11-12 (requiring written notice to quit to terminate for non-payment and tenancies at will). The Commonwealth's citation of *Homeaway.com, Inc. v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019) has no application here

because there the local regulation against Airbnb type short term rentals only applied to the completed booking transaction of a rental, not to the actual listings (speech) on the website.

The Commonwealth next argues that even if notices to quit are protected as commercial speech, the Act is permissible under the *Central Hudson* test which provides for intermediate scrutiny. A close examination of the Act and the nature of notices to quit shows that this argument goes too far. The Commonwealth argues that a notice to quit issued while the Moratorium is effective is inherently misleading because the Act bans evictions. Putting aside the circular reasoning of this argument, the issuance of a notice to quit is not equivalent to a tenant being evicted after a summary process case is concluded and is therefore not misleading. In Massachusetts, tenants are not legally required to move out of a unit upon the issuance of a notice to quit, and rarely if ever do they do so on their own. *See Adjartey v. Cent. Div. of Hous. Court Dep't*, 481 Mass. 830, 850 (2019) ("[r]eceipt of a notice to quit, however, does <u>not</u> legally require the tenant to move out of his or her home.")

Moreover, by statute in non-payment situations, a tenant served with a 14 day notice to quit has a right to cure the default and remain in possession by paying the amount of unpaid rent up to the day an answer is due in court. *See* G.L. c. 186, § 11. Tenants at will served with a 14-day notice for non-payment of rent enjoy similar cure rights and the right to remain in possession. *See* G.L. c. 186, § 12. The Commonwealth is therefore wrong making this argument. Further, a notice to quit is also required to be served if a landlord desires to increase the rent for a tenant at will. *See id*. Second, in "for cause" cases, a notice to quit provides the tenant with the first formal notice that they have done something constituting a violation of their tenancy. The notice will often encourage parties to work out differences and problems on their

own, avoiding an eviction altogether. Accordingly, there is nothing misleading about notices to quit being issued in Massachusetts regardless of whether the Act is in place.

Next, while the Plaintiffs do not dispute that the government has a substantial interest in mitigating the effects of Covid-19, it has not come close to demonstrating how the censorship of all notices to quit across the board statewide in every conceivable landlord-tenant situation is not more "extensive than is necessary to serve that interest." *Central Hudson*, 447 J.S. at 566. Again, the state chose the "nuclear" option rather than a targeted strike. The Commonwealth has failed to prove by admissible evidence, that the mere issuance of a legally required notice (which is not a court move out order and contains various cure rights) would demonstrably increase the rate of displacement, homelessness and Covid-19 transmission. The Commonwealth has not cited any instance of a tenant pre-Covid who received a notice to quit and thereafter moved out of their home within 14 days. The fact is that the Massachusetts summary process statutory scheme is one of the most tenant-favorable in the country, as the Commonwealth concedes. Procedural safeguards to displacement are found throughout the statutory system, with cure rights after service of notices to quit, complete defenses to move out for sanitary code violations and security deposit mishandling, jury trial rights, and stays of execution for any number of hardship situations, to name just a few. *See, e.g*, G.L. c. 239, § 8A (providing for defenses for sanitary code violations); G.L. c. 239, § 9-10 (stay of execution for elderly, disabled, lack of suitable housing/hardship); Meikle v. Nurse, 474 Mass. 407 (2016) (violation of the security deposit statute is a defense to landlord's claim for possession); Unif. R. Summ. P. 8 (providing right to jury trial). A ban on free speech, even commercial in nature, simply goes too far and is far more extensive than necessary to stop displacement, given that the Act already bans all evictions in the first place.

**C. The Regulations Are a Form of Unconstitutional Compelled Speech.**

The main problem with the EOHED Regulations is that they compel all landlords choosing to communicate a message to their tenants to use a state-sponsored pro-tenant message directing them to tenant activist organizations and legal referral services which are openly hostile to landlords, such as CityLife/Urbana Vida (which this Court refused to let intervene). By "compelling individuals to speak a particular message," the Commonwealth is engaged in content-based regulation of speech. *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Part of the required regulatory notice provides:

> "For information about resources that may help you pay your rent, you can contact your regional Housing Consumer Education Center. For a list of agencies, see https://www.masshousinginfo.org/regional-agencies. Additional information about resources for tenants is available at https://www.mhp.net/news/2020/resources-for-tenants-during-covid-19-pandemic."

When the reader clicks on the second link above, it takes them to a webpage, where the reader is instructed to click on a second webpage (link "**English**") titled "MHP resources for Massachusetts tenants during the COVID-19 pandemic."[5] That page contains the following information:

---

[5] This webpage can be found at: https://www.mhp.net/writable/resources/documents/Resources-for-tenants_updated_6-12-20.pdf

If you are dealing with an eviction that was already in progress, here is a good source of legal information about when cases can proceed in housing court: https://www.masslegalhelp.org/covid-19/eviction-court-updates. They also have information about how to find a lawyer if you think you need one.

If your landlord is threatening to lock you out or evict you, or is turning off the utilities in your unit, you can find information here https://www.masslegalhelp.org/health-mental-health/covid-19-illegal-eviction about your rights and how to get legal help.

You might also contact City Life/Vida Urbana, which is a tenant advocacy group. Ask them if they can help you or give you a referral. English (617) 934-5006 Español (617) 397-3773.

The link for "masslegalhelp.org/covid-19/eviction-court-updates" above pulls up a website with the following information:

### Changes to eviction cases in Housing Court and District Court during Coronavirus pandemic

On April 20, 2020 Massachusetts passed an emergency law to stop evictions and foreclosures during the COVID-19 state of emergency.

Landlords cannot file any new eviction cases in court, including:

- Non-payment of rent, or
- No-fault/no cause.

Courts can only schedule hearings if the case is an emergency.

Courts cannot enter judgments, including agreements for judgment and default judgments.

Courts cannot issue orders to evict, "executions."

Landlords may still go to court to remove tenants in an emergency. Emergencies involve criminal activity or lease violations that endanger the health and safety of others.

### How long does the moratorium last?

The moratorium is in effect until August 18, 2020 **or** until 45 days after the Governor lifts the state of emergency, whichever comes first.

The Governor can extend the end date of the moratorium so that it does not end before the end of the state of emergency.

### What if I already had a non-emergency eviction case in court before the moratorium was passed?

- All deadlines in your case are paused as long as the moratorium is in effect.
- No court hearings can be scheduled unless they involve an emergency.
- Courts cannot enter judgments, including agreements for judgment, or issue orders to evict (called "executions").
- Sheriffs and movers cannot move you out of your home.

**Additional Resources**

If you get an eviction notice, a court complaint, or any other papers related to an eviction, contact your local legal aid office.
MassCourts.org - view your case information
City Life Vida Urbana - tenant advocacy group
English (617) 934-5006
Español (617) 397-3773

See the full text of the moratorium law, Chapter 65 of the Acts of 2020.

**Find Legal Aid**

You may be able to get free legal help from your local legal aid program. Or email a question about your own legal problem to a lawyer.

→ Find Legal Aid
→ Mass Legal Answers Online

**Ask a Law Librarian**   Screens

If it's
Monday-Friday
between
9am and 4pm

→ Talk to a law librarian now!

**Court Service Centers Offer Chat**

If it is
Monday-Friday
between
9am and 12 pm

→ Chat with the Court Service Center now!
to get help with legal information, forms completion, and legal and community referrals

In sum, the state-mandated notice that a landlord must send to a tenant must advise the tenant that s/he cannot be evicted, and contains: (a) links to three state-endorsed legal/lawyer referral sites which, if used, would likely undermine a landlord's legal position and litigation efforts, and (b) two state-endorsed suggestions to contact City Life/Vida Urbana, an organization notoriously hostile to housing providers and a proposed intervenor in this case which has been actively opposing the Plaintiffs' legal positions in this very case and in the pending state case, and in practice encourages tenants not to pay rent.

The Commonwealth fails to adequately explain how requiring landlords to provide this specific information to tenants in this manner "compels truthful disclosure," and "involves purely factual and uncontroversial information that relates to the service or product provided." AG Brief at 20, citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). More importantly, the Commonwealth cannot demonstrate that such an egregiously one-sided message helps the fight against the spread of the Coronavirus. Like much of the Moratorium, the required notice simply goes too far. As the Supreme Court has held in a post *Zauderer* decision, the "State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 578–79 (2011).

*Zauderer* upheld the use of a required disclaimer in an attorney's advertisement to prevent the ad from potentially misleading consumers. While indicating that *inherently* misleading advertisements could be constitutionally suppressed, the Court found suppression of advertisements that are merely *potentially* misleading to violate the First Amendment. 471 U.S. at 644. Pointing to "material differences between disclosure requirements and outright prohibitions on speech," the Court noted that in insisting upon such disclosures the state "has not attempted to prevent attorneys from conveying information to the public; it has only required

them to provide somewhat more information than they might otherwise be inclined to present." *Id*. at 650.  As a leading First Amendment scholar has commented, "[w]hen read with the gloss of the far more protective subsequent line of commercial speech cases, the state bears a "heavy burden" to show that its restriction on commercial speech truly advances a state interest.  Martin H. Redish, *Compelled Commercial Speech and the First Amendment*, 94 Notre Dame L. Rev. 1749, 1760 (2019).[6]

The Commonwealth cannot meet this heightened burden.  How exactly does it help stop the spread of Covid-19 virus to require landlords to eschew a standard notice to quit for a state-mandated notice advising the tenant that they cannot be evicted and providing numerous web-links to tenant activist organizations who will actively encourage tenants not to pay rent and fight them in housing court?  Can the Commonwealth explain this? No, they cannot, and they do not even attempt to do so.

### D.  The Moratorium Is An Unconstitutional Taking.

#### 1.  Injunctive Relief is Available Because There is No Adequate Remedy for Monetary Damages

We begin with the Commonwealth's final argument on the Takings analysis:  that even if Plaintiffs can establish a compensable taking, injunctive relief is unavailable because Massachusetts provides an adequate remedy for monetary damages.  (AG Opp. Br. at 38.) Plaintiffs acknowledge that "[a]s long as an adequate provision for obtaining just compensation exists," injunctive relief is not available.  *Knick v. Township of Scott, Pa.*, 139 S.Ct. 2162, 2176 (2019).  But there is no such adequate provision here.

---

[6] *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173 (1999); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996).

The Commonwealth points out that damages under c. 79 are available even for temporary regulatory takings, which the Commonwealth concedes that the Eviction Moratorium affects. Although there is a superficial attractiveness to this argument, it quickly falls apart.  G.L. c. 79, § 10 provides in pertinent part:

> Section 10. When the real estate of any person has been taken for the public use … or has been entered for a public purpose, but such taking, entry or damage was not effected by or in accordance with a formal vote or order of the board of officers of a body politic or corporate duly authorized by law, … the damages therefor may be recovered under this chapter. … In case of **a specific taking**, entry, seizure **or other act** causing destruction or damage or **depriving the owner of the use of his property** permanently **or for a definite period of time** the damages shall be **assessed as of the date of such taking**, entry, seizure or other act **and the right thereto shall vest on such date and a petition for an award of damages therefor under this section may be filed within one year thereafter**;

The statute thus applies to "specific" takings resulting in a deprivation of use of property either permanently or "for a definite period," establishes that the right to damages vests on the date of the taking, and is subject to a one-year statute of limitations.  Whatever the case may be in an "ordinary" taking case, in the context of the extraordinary Eviction Moratorium, this is not a sufficient remedy.  The Moratorium was enacted as of April 20, 2020, indefinitely suspending all then-pending evictions (such as Plaintiff Matorin's).  So, for Matorin and similarly situated property owners with pre-Moratorium evictions, the right to compensation vested on April 20, 2020.  However, the damages to which they are entitled cannot be determined because the taking is not a singular "specific" event but rather an ongoing and temporally indeterminate process.  Matorin's damages (already $8,400) will continue to accrue at $1,200/mo until he regains possession.  Governor Baker extended the Moratorium through October 17, 2020, but could further extend it in multiple increments, essentially indefinitely; or the Legislature could extend the moratorium by statute.  It is quite conceivable that the Moratorium—and therefore the taking – may not end at all within one year of April 20, 2020, in which case Matorin and other property

owners with pre-Moratorium evictions will be unable to file their claims for damages within the one year statute of limitations.[7]

*Even if* the Moratorium is lifted on October 17, 2020, Matorin would not be able to assert a claim within a year of the taking, because he will not be able to quantify his damages: the rent arrears would be $10,800, but those damages will continue accruing until he regains possession. Under the best case, the eviction process takes several months or much longer, and the process is guaranteed to be even slower as the Housing Court adapts its procedures to COVID in a way that reduces efficiency. Thus, it is quite possible that Matorin will not regain possession until after April 20, 2021, at which point the limitations period will have expired.

Moreover, the Commonwealth would likely argue in any action under c. 79 §10 that no damages could be awarded until Matorin had proceeded through the eviction court process and established that he had the *right* to evict his tenant; otherwise damages might be awarded where he was not entitled to evict and therefore had suffered no damages.

Further, most evictions are resolved short of an actual execution and forced move out. *See* Ward Aff. ¶15. If, once the Moratorium is lifted, Matorin and his tenant use the Housing Court's mediation services and agree for the tenant to move out short of judgment and execution, Matorin will be unable to establish that he had the *right* to evict and therefore a right to compensation for the interference with that right, thereby preventing Matorin from establishing a right to damages. And if a tenant voluntarily moves out for their own reasons, Matorin would also be unable to establish that he had the *right* to evict. Perversely, reliance on c. 79 §10 would cause Matorin and other property owners to insist on obtaining a judgment and execution so that

---

[7] The same is true for damages vesting during the Moratorium, e.g., where a tenant stopped paying rent as of June 1, but could not be evicted, depending on when the Moratorium is lifted.

they could establish compensable damages.  This would not only burden the Housing Court and increase the damages, it would also hurt the tenants because they would have an eviction judgment on their records and would not have been able negotiate favorable terms such as cash for keys or waiver of unpaid rent.

Thus, although *Knick* and similar cases seem to preclude injunctive relief where there is an adequate mechanism to recover damages, that is not the case here.[8]  Indeed, at least one court has held that notwithstanding *Knick*, injunctive relief is available against a takings claim.  In *City of Baton Rouge/Par. of E. Baton Rouge v. Ourso*, No. CV 19-00457-BAJ-RLB, 2020 WL 3036546 (M.D. La. June 5, 2020), the court rejected the argument based on *Knick* because monetary damages would not provide adequate compensation for the taking:

> Unlike the *Knick* case, which addressed a regulation that would require a private property owner to provide access to the cemetery on her property during daylight hours, Plaintiffs here allege an imminent risk of damage and loss of life. Without the benefit of full information on the effects of the aqua dams, including completed hydrological studies, the Court cannot permit Defendants to erect barriers that would alter the natural flow of water to the potential great detriment of Plaintiffs merely because compensation may be available to them. Simply put, the stakes are higher in this matter.
> The Court finds that Plaintiffs have adequately demonstrated the elements required for injunctive relief. At this stage, Plaintiffs have demonstrated that the use of temporary aqua dams could exacerbate flooding in East Baton Rouge Parish that is likely to occur if

---

[8] Plaintiffs are aware that some courts addressing COVID-related takings claims have superficially cited *Knick* and concluded that adequate mechanisms to recover damages existed and therefore injunctive relief was unavailable.  In addition to *County of Butler v. Wolf*, 2:20-cv-677 (W.D. Pa. May 28, 2020), we are aware of *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, No. CV SAG-20-1818, 2020 WL 3639991, at *3–4 (D. Md. July 6, 2020), *Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 WL 3971908, at *9 (D. Ariz. July 14, 2020), and *Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207, at *12 (E.D.N.C. June 8, 2020).  With due respect to each of these Courts, Plaintiffs submit that none of them engaged in any analysis at all of the applicable statutory remedies to recover damages.  Rather, they simply recited the language of *Knick* and assumed there was an adequate remedy to recover damages.  Moreover, the restrictions at issue in each of those cases varied significantly from the across-the-board moratorium on evictions established by the Act. Plaintiffs therefore submit that none of these cases is persuasive authority and the Court should not consider them in ruling on Plaintiffs' motion and instead should engage in the analysis set forth in the text.

Tropical Storm Cristobal makes landfall, which could result in substantial damage to property and loss of life. The balance of the harms, as well as the interest of the public, weigh in favor of granting Plaintiffs' request for injunctive relief, as they do not seek to modify the natural flow of water.

2020 WL 3036546, at *2.

In other words, the mere existence of a statutory mechanism to recover money damages in a typical "specific" taking situation does not *ipso facto* eliminate injunctive relief for a takings claim, where the mechanism does not, in fact, fully and adequately protect the particular property interests at stake. That is the case here, and injunctive relief is an available remedy for the unconstitutional taking of Plaintiffs' property.

### 2. **The Act Physically Takes Plaintiffs' Property.**

The Commonwealth's argument that the Act does not "physically invade" property is misguided. The Act forces property owners to provide free housing to people with no legal right to occupy the property, both tenants who do not pay rent and, for example, Matorin's unauthorized occupant. The Act converts privately-owned rental housing into a massive long-term public housing program–paid for by private property owners rather than the state.

In *Loretto v. Teleprompter Mahattan CATV Corp.*, 458 U.S. 419 (1982), the Court held that the mandatory installation of a cable TV wire in a building by a third-party cable operator, was a taking. The Court emphasized that:

> [W]e have long considered a physical intrusion by the government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, 'the character of the government action' not only is an important factor in resolving whether the action works a taking but also is determinative.

*Id.* at 426. To be sure, the intrusion there was not actually "by the government." Rather, the government mandated that the property owner permit the intrusion by a third-party cable

operator.  Here, too, the government is compelling property owners to allow the intrusion by third parties – tenants with no legal right to be on the property.

The *Loretto* Court further emphasized the critical importance of the right "to exclude the occupier from possession and use of the space."  *Id.* at 435.  Where the government compels a property owner to permit occupancy, it destroys the bundle of rights that ownership entails:

> First, the owner has no right to possess the occupied space himself, and has no power to exclude the occupier from possession and use of the space.  The power to exclude has traditionally been one of the most treasured strands in an owner's bundle of property rights.

*Id.*  The Court went on to describe the constitutional problem created by forced occupancy:

> He not only cannot exclude others but can make no nonpossessory use of the property.  Although the deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, it is clearly relevant.  Finally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property… property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property.  To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury.  Furthermore, such an occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion.

It is worth stepping back from the language of the *Loretto* decision to consider exactly what was at stake.  There, the government compelled property owners to permit a cable operator to install a <1/2" diameter cable, 30 feet in length about 18" above the roof, and approximately 4"x4" taps on the front and rear of the roof.  *Id.* at 422.  The Court held that this was a Fifth Amendment Taking.  If such a minimal *external* feature that did not in any way interfere with the use and occupancy of the rental units in the building was a taking, then how could the Act possibly not be a taking as well?  After all, the Act compels property owners to provide free housing to tenants who otherwise would be evicted, and those tenants physically occupy entire

rental units to the exclusion of all other persons including the owner and potential paying tenants. The Act further requires property owners to *pay money* out of their own pockets to house non-paying tenants:  owners must pay for water/sewer usage by non-paying tenants, and must absorb the additional utilities, wear and tear, repair and maintenance costs, and other costs of housing them.  Indeed, tenants now spend far more time at home, and therefore actually use *more* of those resources than they did when they left for hours each day.

Nor is it determinative that the Moratorium is – theoretically – "temporary," as the Commonwealth suggests.  There was nothing "permanent" about the exterior cable installation in *Loretto*.  The cables could have been removed at any time, either at the initiative of the cable operator who owned them, or if the law no longer required property owners to permit them.  In any event, the Supreme Court has made clear that "temporary" takings are just as subject to reasonable compensation as permanent takings.  For example, in *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 317–19 (1987), the Court surveyed cases where the government had "only temporarily exercised its right to use private property," and noted that in each of the cases "there was no question that compensation would be required for the Government's interference with the use of the property":

> These cases reflect the fact that "temporary" takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.  … It is axiomatic that the Fifth Amendment's just compensation provision is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

*Id.* at 318-19 (collecting cases).

Here, the Moratorium has already compelled Plaintiffs to continue allowing nonpaying tenants to physically occupy their property (and to pay the increases costs of that physical occupation) for almost five months, and with the extension to October18, will continue the

forced occupancy for another two months, with no definitive end in sight.  And even after (if) the

Moratorium is eventually lifted, Plaintiffs will continue to have to allow their nonpaying tenants

to physically occupy their property and will continue to have to pay the costs of this occupation,

for at a minimum several months more until they can regain possession. A once efficient system

designed to encourage mutual settlement has been turned inside out with a likely result that

landlords and tenants will be unable to reach an agreement due to the massive rent arrears that

will build up in the absence of ongoing discussion and access to the Housing Court's mediation

processes.  As a result, landlords will no longer be interested in anything short of a judgment and

execution, which will result in a higher eventual eviction rate than otherwise would have been

the case.

The Commonwealth's heavy reliance on *Yee v. City of Escondido, Cal.*, 503 U.S. 519

(1992), is also misplaced.  In *Yee,* the plaintiff challenged the city's rent control ordinance, not a

restriction on evictions.  The plaintiff argued that when combined with a previously-enacted

Mobile Home Residency Law that limited a mobile home park owner's right to evict, the rent

control ordinance effectively transferred some of the value of the mobile home park to the

mobile home owner, who could sell the home along with the right to the reduced rent at the park.

*Id.* at 523-26.  The Court held that the government had not compelled the owner to acquiesce to

the physical occupation of the land; rather the owner had agreed to rent the land to the mobile

home owner.  *Id*. at 527.  However, the property owner *maintained the right to evict the tenants,*

*including for nonpayment of rent.  See id.* at 524 (noting that Mobile Home Residency Law

permitted eviction for *inter alia*, nonpayment of rent).  Therefore:

> At least on the face of the regulatory scheme, **neither the city nor the State compels**
> **petitioners, once they have rented their property to tenants, to continue doing so**. To
> the contrary, the Mobilehome Residency Law provides that a park owner who wishes to
> change the use of his land may evict his tenants, albeit with 6 or 12 month's notice.

*Id.* at 527-28 (emphasis added).  The Court went on to explicitly distinguish cases of compelled occupancy or inability to terminate:

> A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.

*Id*. at 528.

That "different case" is presented here.  The Moratorium forcibly compels Plaintiffs to permit their nonpaying tenants to continue occupying the property over their objection, and bars them from terminating any tenancy for any reason, for a very substantial period.

Lastly, citing the Supreme Court's *Tahoe-Sierra Preservation Council* case, the Commonwealth argues that a single non-performing rental unit affected by the Moratorium in any multi-family building cannot support a Takings claim.  The argument is misplaced and ignores common sense.  As Justice Stevens artfully stated in *Tahoe-Sierra*:  "In our view the answer to the abstract question whether a temporary moratorium effects a taking is neither "yes, always" nor "no, never"; the answer depends upon the particular circumstances of the case." 535 U.S. at 321.  And so it is true today.  Despite the *Tahoe-Sierra* Court's reference to considering a parcel "as a whole," there is simply no *per se* categorical rule holding that landlords who own multifamily dwellings are precluded from asserting a Takings claim against an eviction moratorium simply because not *every* one of their tenants is failing to pay rent.  The economic reality of rental housing ownership supports this.  A landlord who owns a two-unit rental dwelling such as Marie Baptiste requires the rental income from both units to achieve the net rental income to pay the mortgage, real estate taxes and property expenses.  Indeed, when a lender granting a mortgage on a property such as Baptiste's performs underwriting, it factors in the gross rental amount for the entire dwelling, not just one or the other.  The same is true for

three, four and much larger multi-unit apartment buildings. If we take this argument to the logical extreme with larger buildings, the Commonwealth would have us believe that the government can impose a regulatory taking (mandatory sober housing, for example) on 29 units out of a 30 unit apartment building and avoid a taking claim. This is preposterous and cannot be the law. As the Supreme Court stated in the seminal regulatory takings case of *Lucas v. South Carolina Coastal Council*, which found a valid taking, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992).

### E. The Act Violates The Contracts Clause.

The Act violates the Contracts Clause because it eviscerates the core remedy in every residential lease in the Commonwealth. No controlling precedent supports such a gutting of the core of a lease contract. And such an evisceration is not a legitimate exercise of government regulation, even in a so-called heavily-regulated industry such as residential rental housing – such a purported destruction of a contractual right crosses that bright line (rent must be actually paid and good behavior maintained in order to maintain possession) and thereby goes too far.

To repeat, the bright line that has never been crossed by any controlling precedent is a simple one: if rent is not actually paid, State action cannot delay a landlord from immediately moving to recover possession. The same applies to the similar mortgagee-mortgagor foreclosure context: if the "rental equivalent" is not actually paid, State action cannot delay a mortgagee from immediately moving to foreclose. Within the Contracts Clause "test", this is the "reasonableness" factor. *Home Bldg. & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 445 (1934). Every controlling case cited by the Defendants, at least the many that deal with either landlord-

tenant eviction or mortgagee-mortgagor foreclosure, supports Plaintiffs' position here. That is, every such case cited by the Defendants requires rent (or "rental equivalent" in the foreclosure context) to be paid in order to delay the landlord's (or mortgagee's) recovery of possession. Literally[9] every one:

- *Home Bldg. & Loan Ass'n. v. Blaisdell*, 290 U.S. 398 (in order to delay foreclosure, mortgagor had to actually pay "rental equivalent" to mortgagor each month)

- *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170 (statute expressly allowed eviction for nonpayment of rent)

- *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242 (same)

- *Block v. Hirsch*, 256 U.S. 135 (same)

- *East N.Y. Sav. Bank v. Hahn*, 326 U.S. 230 (in order to delay foreclosure, statute expressly required mortgagor to actually pay mortgagee the interest, taxes, insurance and 2% of principal per annum)

- *Chicago Bd. Of Realtors, Inc. v. City of Chicago*, 819 F.2d 732 (ordinance at issue expressly allowed eviction for nonpayment of rent)

- *Yee v. City of Escondido*, 503 U.S. 519 (ordinance at issue expressly allowed eviction for nonpayment of rent)

- *United States Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1 (slightly different context, but nonetheless striking down legislation that impaired bondholder security provision)

The Defendants try to casually shrug off this fact (e.g., Defendants' footnotes 24-25), but it remains the fact. The Defendants also try to invoke the "double whammy" card (page 28 of

---

[9] In the literal, rather than figurative, sense.

Defendants' Memo), by seeming to contend that the current COVID-19 situation is twice as bad as either the Revolutionary War or the Civil War or World War I or the Great Depression or World War II (etc.), and thus lines that have never been crossed can now be crossed. We disagree. We believe the various cited cases have already stretched the exceptions to the Contracts Clause quite far, and far enough. No new lines ought to be crossed. These precedents offer clear boundaries within which legislatures can reasonably impair contractual obligations, but the current Act is unreasonable and out of bounds.

The language of the leading case, relied on heavily by the Defendants, *Blaisdell*, 290 U.S. at 445-46 (bold emphasis added), clearly states the boundary line:

> [T]he relief afforded [by **the moratorium], in order not to contravene the constitution**al provision, … **could be granted only upon reasonable conditions**. … [While **t]he mortgagor**, during the extended period, is not ousted from possession, … he **must pay the rental value** …

Along the exact same line, even though the landlord-tenant relationship is heavily regulated, a putative "regulation" cannot constitutionally cross said line. All of the cases noted above were also in the landlord-tenant context (or mortgage context), and all involved State regulations, statutes and/or municipal ordinances. Again, a regulation that seeks to allow a tenant to indefinitely retain possession while not actually paying rent goes too far.

The following regulatory analogy seems on point to counter Defendants' position. Just because the FDA (Food and Drug Administration) "heavily" regulates food, does not mean the government can require grocery stores to hand out food for free (or even on unsecured credit). That would clearly go too far. The Act (and Defendants' argument justifying it) is no different than the absurdity illustrated by this analogy.

To be clear, regulation around the relative periphery of the landlord-tenant relationship has come to be expected, and has been consistently upheld as constitutional: regulations as at

issue in the various cases cited by the Defendants, such as (a) a cap on the amount of a late fee, or (b) requiring a security deposit to be held in a federally-insured bank, or (c) requiring a landlord to maintain certain housing quality standards, or even (d) reasonable rent control, or (e) so-called "just-cause" eviction.  But dynamiting the bedrock requirement of actual payment of rent in exchange for possession goes too far.

We think the following example, taken from M.G.L. c. 239 (summary process statute), further illustrates the "bright line" here, i.e., the distinction between reasonable landlord-tenant regulation and an unreasonable-and-therefore-unconstitutional violation of the Contracts Clause. While the relatively peripheral edges of the summary process statute have been lawfully modified from time to time over the past 195 years since summary process was enacted (St. 1825, c. 89), the foundation has not changed: if a tenant does not pay, the landlord may promptly regain possession through summary process.  For example, M.G.L. c. 239, §§ 9-11, which allows and governs stays of executions (move out orders) in a summary process case, was inserted (in 1927) and modified a handful of times since (mostly in the 1940's), with each version of the statutory provision allowing a court discretion to grant a stay of eviction in certain circumstances.[10]  But in all of the versions, the requirement that rent be paid during any such stay did not change: the requirement that rent be paid in order to delay turning over possession was express and unwavering, because it is fundamental.  The rent requirement is immovable bedrock.

---

[10] See *Opinion of the Justices*, 321 Mass. 772 (1947), reciting the history of the stay provision. In 1927, the legislature inserted §§ 9-11 into M.G.L. c. 239, which 1927 version reads the same as the current version (still M.G.L. ch. 239, §§ 9-11) with respect to allowing a stay **only if rent is paid during the stay**.  See St. 1927, c. 339, §2.  Subsequent revisions extended the length of the possible stay, one month at a time, from the initial one month to the current six months, but did not touch the rent requirement (see, e.g., St. 1941, c. 700, §1; St. 1946, c. 43, §1; and St. 1947, c. 78, §1).

*See* M.G.L. c. 239 §11.[11]  To allow possession without requiring the basic *quid pro quo* of rent is to destroy the essence of a lease/tenancy, i.e., to take away the core of the landlord's fundamental bargain (possession in exchange for rent).

Accordingly, while a landlord today should not complain (e.g., "make a federal case of it") if the Legislature, for example, extends the outer limits of a court's discretionary right to stay an eviction for an additional month, or other relatively peripheral elements of tenancy, that is a different set of expectations than if the Legislature suddenly removes the bedrock requirement at the foundation of the lease relationship to pay monthly rent during the stay.  The requirement to pay rent is the core of every lease contract, and prompt eviction is the equally core remedy for breach of that obligation.

Finally, we reiterate that the eviction *remedy* is core to the lease contract, and to remove that remedy is indeed to substantially (and unreasonably) impair the lease contract.

> [T]he laws which prescribe the mode of enforcing a contract, which are in existence when it is made, are so far a part of the contract that no changes in these laws which seriously interfere with that enforcement are valid, because they impair its obligation within the meaning of the Constitution…

*Barnitz v. Beverly*, 163 U.S. 118, 122 (1896).  Plainly, the Act "seriously interferes" with Plaintiffs' only practical mode of enforcing the lease contract (summary process).  If it did not, we would not be here.  This same sentiment is reaffirmed in *Blaisdell*, supra, 290 U.S. at 429-30:

> The obligation of a contract is 'the law which binds the parties to perform their agreement.' … [T]he laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. … Nothing can be more material to the obligation than the means of enforcement. … The ideas of validity

---

[11] "Such stay shall be granted and continue effective only upon the condition that the [tenant] shall make a deposit in court of the entire amount, or such instalments thereof from time to time, as the court may direct, for the occupation of the premises for the period of the stay, at the rate to which he was liable as rent for the month immediately prior to the expiration of his term or tenancy plus such additional amount, if any, as the court may determine to be reasonable."

and enforcement are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion. …

**F.  The Balance Of Irreparable Harms Tips Sharply In Plaintiffs' Favor.**

The Commonwealth warns of a flood of evictions leading to widespread homelessness and a dramatic increase in Covid-19 infections.  This is nothing but hyperbolic speculation.  Notwithstanding the voluminous affidavits from doctors, public health officials, and economists (none of which are relevant or disputed here), the only basis for its speculation about a flood of evictions is the affidavit of Colin Harnsgate, Esq., a young lawyer with only two years' experience in Housing Court.[12]  By contrast, Plaintiffs have submitted the expert opinion of G. Emil Ward, Esq., the current Co-Chair of the Landlord-Tenant Section of the Massachusetts Real Estate Bar, REBA, and author of the two leading landlord-tenant treatises.  Attorney Ward has over 40 years of experience in the trenches of the Housing Court.  It is his considered opinion that if the Moratorium is lifted, there will *not be a marked increase of eviction move-outs*.  Ward Affidavit ¶ 7.  Rather, he states, in a new Covid-19 world, the Housing Court will need at least 6-12 months or even longer to process their existing case-load effectively stayed by the Act, and then many more months to process and move the new cases which will be filed once the Moratorium ends.  *Id*.  Moreover, the Housing Court retains broad statutory discretion to consider every tenant's claim, if any, of Covid-19 related hardship, financial or otherwise, which will have the effect of delaying or preventing forced-move outs all together.  *Id*.

As Attorney Ward points out, there is a critical distinction between the filing of an eviction case and a forced move-out order.  A forced-move out is extremely rare, and only occurs

---

[12] See Linked In Profile for Colin Harnsgate, Esq., found at https://www.linkedin.com/in/colin-harnsgate-3228432b/

after a very long process including expiration of a lawful notice to quit, filing an eviction case, pre-trial discovery, motions, mediation, bench or jury trial, often a tenant's motion to stay an execution, and appeal, if applicable. This process can take anywhere from 3-24 months depending on the case. Ward Aff. ¶ 9. Attorney Harnsgate, on the other hand, fails to even mention this critical point. He also fails to mention that even where cases are resolved through negotiated agreements or after trial, tenants have the right to, and often do, file motions to stay executions (move-out orders) if they have not secured alternative housing by an agreed upon or court ordered move out date. Ward Aff. ¶ 16. By statute (G.L. c. 239, § 9-10), the Housing Court has wide latitude to consider hardships claimed by tenants who seek to stay a move-out order. A judge may stay an execution for up to 12 months in the case of an elderly (60 years old or more) or disabled tenant, and 6 months in the case of a "no fault" eviction. The judge also has discretion to allow a general stay of execution if a tenant shows good faith efforts to secure new housing. *See* G.L. c. 239, § 10.[13] Attorney Ward expresses great certainty that there will absolutely not be a "tsunami" of eviction move-outs, and correspondingly, no marked increase in the incidence of homelessness caused by evictions, if the Act is lifted. To the contrary, due to

---

[13] As for the concern of overcrowding and spreading COVID-19 in courtrooms, which is largely irrelevant and a matter for internal court administration, the most current Housing Court Standing Order 5-20 suspends indefinitely the long-standing practice of "calling the list" in one courtroom on Thursday mornings (or whenever the session takes place). Ward Aff. ¶ 19, Ex. A. For the foreseeable future, there will not be packed courtrooms/hallways. The current Standing Order also provides that "court proceedings should, to the extent possible, continue to be conducted virtually, but in-person proceedings may be held where it would be more efficient or effective to do so or if a virtual proceeding is not practicable, as determined by the Clerk-Magistrate, in consultation with the respective First Justice. In addition, due consideration must be given to reopening protocols established by the Trial Court." Virtual proceedings will continue to be the norm for the foreseeable future. The Housing Court is currently effectively using the Zoom platform with the ability to do virtual mediations with separate "break-out" rooms. While there was concern regarding possible technical issues for some tenants we believe that in this day and age any tenants who do not have a smart phone is quite rare.

the effect of the Act and the Housing Court's Covid-19 standing orders, evictions will move slower than the norm for probably the next year-plus, as the Housing Court processes existing and new cases in a measured, deliberate manner. Lifting the Moratorium will enable the Housing Court professionals to begin working on and resolving housing disputes being made worse by the Moratorium itself.

With respect to irreparable harm to the Plaintiffs and like rental property owners, the "time lost in regaining [real property] from a party in illegal possession can represent an irreplaceable loss to the owner." *Davis v. Comerford*, 483 Mass. 164, 180 (2109), Commentary to Rule 1 of the Uniform Rules of Summary Process (1980) ("Rules"). It is well-established in Massachusetts that real estate is "unique" and therefore appropriate for equitable remedies to address violations concerning property rights. *See McCarthy v. Tobin*, 429 Mass. 84, 89 (1999). The Moratorium deprives the Plaintiffs of their statutory right to a "just, speedy and inexpensive determination of every summary process action." *See*, Unif. R. Summ. P. 1. The Rules were designed to quickly and efficiently determine possession of real property to protect the rights of the legal owner. Real estate is unique property and, because it generates income, time lost in regaining it from a party in illegal possession can represent an irreplaceable loss to the owner. *See* Commentary to Rule 1, Uniform Rules of Summary Process.

If the Moratorium is left in place, from a practical point of view, the state will have succeeded in creating *at least* 6 months of free housing, paid for by private property owners like the Plaintiffs. In the words of the U.S. Supreme Court, the Moratorium seeks to "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). In the case of Plaintiff Matorin, by the time his eviction case is called for trial in 6 months after the Moratorium ends

(according to Attorney Ward), he could be faced with $20,000 in lost rent and expenses.

Lastly, the Commonwealth's affidavits do not reflect the incredible success Massachusetts has had in fighting the Covid-19 pandemic. As of June 22, 2020, the Commonwealth had the lowest Covid-19 transmission rate in the United States. *See, Mass. Now Has Lowest Coronavirus Transmission Rate in the Country*, Boston Globe (June 22, 2020).[14] As shown below,[15] the seven-day moving average of cases at the peak of the crisis in April was 2,305. As of August 10, 2020, it was down to 275 cases. Every other metric – hospitalization rate, ICU usage, test positivity rate, death rate – is also down significantly since the peak.[16] This is true even though the state is now in "Phase 3, Step 1" in which libraries, casinos, indoor restaurant dining with reduced capacity, and gyms are now open for business.[17] While other states like Florida, California and Texas are surging, the Commonwealth has Covid-19 quite under control, and remains one of the safest states in the country.

---

[14] Available at: https://www.bostonglobe.com/2020/06/22/nation/mass-has-lowest-coronavirus-transmission-rate-country-according-trend-tracking-website/

[15] Chart available at https://www.wbur.org/commonhealth/2020/03/09/coronavirus-cases-massachusetts-map

[16] See https://www.wbur.org/commonhealth/2020/03/09/coronavirus-cases-massachusetts-map

[17] See https://www.mass.gov/info-details/reopening-massachusetts.



**Coronavirus Cases In Massachusetts**

**Rolling average**  Total cases  Daily cases

Here's the 7-day rolling average of new cases each day:

SOURCE: Mass. Department of Public Health

With libraries, casinos, indoor restaurant dining gyms open for business, there is no longer a valid basis for continuing to ban evictions and prohibit even the mailing of a notice to quit for landlords with valid claims to regain possession.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should enter a preliminary injunction enjoining the enforcement of the Act and Regulations throughout the Commonwealth.

Respectfully submitted,

**MARIE BAPTISTE,**
**MITCHELL MATORIN, and**
**JOHN DAPONTE**

By their attorneys:

/s/ Richard D. Vetstein
Richard D. Vetstein
Vetstein Law Group, P.C.
945 Concord St
Framingham, MA 01702
Phone: (508) 620-5352
Fax: (888) 448-1344
Email: rvetstein@vetsteinlawgroup.com

/s/ Jordana R. Greenman
Jordana R. Greenman, Esq. (BBO# 667842)
134 Main Street
Watertown, MA 02472
Tel: (617) 379-6669
Fax: (617) 379-6669
Email: jordana@jrglegal.com

Dated: August 11, 2020

## Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 11, 2020.

/s/ Richard D. Vetstein