UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-11335

————————————————————————————   )
                                                                    )
MARIE BAPTISTE, MITCHELL MATORIN      )
and JONATHAN DAPONTE                          )
                                                                    )
                        Plaintiff,                               )
                                                                    )
            v.                                                      )
                                                                    )
MIKE KENNEALY, IN HIS OFFICIAL          )
CAPACITY AS SECRETARY OF THE        )
EXECUTIVE OFFICE OF                          )
HOUSING AND ECONOMIC DEVELOPMENT,  )
and CHARLES BAKER, in his Official Capacity as )
Governor of the Commonwealth of Massachusetts )
                                                                    )
                        Defendants.                          )
                                                                    )
————————————————————————————  )

## **PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, three rental property owners in the Commonwealth of Massachusetts, seek to declare unconstitutional, and enjoin, the enforcement of Chapter 65 of the Acts of 2020, *An Act Providing for a Moratorium On Evictions and Foreclosures During the COVID-19 Emergency* (hereinafter, "the Act" or "Eviction Moratorium") (attached as **Exhibit A**),[1] and the regulations promulgated thereunder by the Massachusetts Executive Office of Housing and Economic Development (EOHED).  See 400 C.M.R. 5.0: COVID-19 Emergency Regulations ("Regulations"), attached as **Exhibit B.**

---

[1] An official version of Chapter 65 of the Acts of 2020 can be found at on the Legislature's website: https://malegislature.gov/Laws/SessionLaws/Acts/2020/Chapter65.

## PARTIES

1.      Plaintiff, Marie Baptiste ("Baptiste"), is an individual with a principal place of residence located within the Commonwealth of Massachusetts and the owner of the rental property located at 30 Country Club Drive, Randolph, Massachusetts.

2.      Plaintiff, Mitchell Matorin ("Matorin") is an individual with a principal place of residence located in the Commonwealth of Massachusetts and the owner of the rental property located at 162 Ingleside Avenue #A, Worcester, Massachusetts.

3.      Plaintiff, Jonathan DaPonte ("DaPonte") is an individual with a principal place of residence located in the Commonwealth of Massachusetts and the owner of the property located at 108 Hamlet Street #1 West, Fall River, MA 02724.

4.      Defendant, Mike Kennealy ("Kennealy" or "the Secretary"), is the current Secretary of the Executive Office of Housing and Economic Development ("EOHED"), a body politic and agency of the Commonwealth of Massachusetts under the oversight of the executive branch, with a principal place of business located at One Ashburton Place, Boston, MA 02108. Kennealy is responsible for the advancement of Governor Baker's housing and economic development policies.

5.      Defendant, Charles (Charlie) Baker ("the Governor") is the Governor of the Commonwealth of Massachusetts.  The Governor has authority over all executive branch functions of government in Massachusetts.  Pursuant to the Act, the Governor has unlimited discretion to extend the duration of the Act for successive 90-day periods, and has already extended it through October 18.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court under federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 343(a)(3).

7.      Venue lies in this District under 28 U.S.C. § 1391(b)(1), (2), and (3) because the Defendants have their principal place of business in this District, perform their official duties in this District, and many of the events and facts giving rise to this action occurred and are occurring in this District.

## FACTUAL ALLEGATIONS

### The COVID-19 Pandemic

8.      Coronavirus disease 2019 (COVID-19) is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).  First identified in December 2019 in Wuhan, China, the COVID-19 virus has resulted in an ongoing global pandemic.  The virus is primarily spread between people during close contact, most often via small droplets produced by coughing, sneezing, and talking.

9.      On March 10, 2020, when Massachusetts reported less than 500 COVID-19 cases, Governor Baker ("Gov. Baker") declared a State of Emergency.  See Executive Order No. 591. Five days later, Gov. Baker ordered the closing of all public and private schools, banned social gatherings of over 25 people, and prohibited on-premises consumption of food and drink at restaurants and bars.  See Order Prohibiting Gatherings of More Than 25 People and On-Premises Consumption of Food or Drink (March 15, 2020).[2]  A week later, on March 23, 2020, Gov. Baker issued a "Stay At Home" order, closing all "non-essential" businesses and tightened

_____

[2] See https://www.mass.gov/doc/march-15-2020-large-gatherings-25-and-restaurants-order/download

the social gathering restriction to no more than 10 persons.  See COVID-19 Order No. 13[3] and 21.[4]  The Department of Public Health issued advisories that citizens only leave homes for essential errands, and to practice social distancing by staying six feet apart from others. See DPH Public Health Advisories issued on March 24, 2020.[5]  On April 28, 2020, Gov. Baker extended his order closing all non-essential businesses and prohibitions of gatherings over 10 persons, to May 18, 2020. See COVID-19 Order No. 30.[6]

      10.     On May 1, Gov. Baker issued an order requiring that people wear masks in public where social distancing is not feasible.  See COVID-19 Order No. 31.[7]  Effective on May 25, 2020, Gov. Baker issued a "phased re-opening" of the workplaces, lifting many of the restrictions on business operations.  See COVID-19 Order No. 33.[8]

<strong>Massachusetts Court System Response To COVID-19 Pandemic</strong>

      11.     While Gov. Baker was taking executive action in response to the pandemic, Massachusetts court administrators were also taking unprecedented action in response to the virus.  The Supreme Judicial Court, along with the Appeals Court and all Trial Court Departments, have issued a series of Orders, Emergency Administrative Orders, and Standing Orders to address the COVID-19 impact on the judiciary.  On March 13, 2020, the Supreme

---

[3] See https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download

[4] See https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download

[5] See https://www.mass.gov/news/safer-at-home-advisory

[6] See https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download

[7] See https://www.mass.gov/doc/may-1-2020-masks-and-face-coverings/download

[8] See https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download

Judicial Court ("SJC") issued the first of several COVID-19 orders that immediately postponed all empanelment in jury trials, in both criminal and civil cases, until April 21, 2020. <u>See</u> SJC Order In Re: COVID-19 (Coronavirus) Pandemic Regarding Empanelment of Juries. The SJC also ordered that persons who have symptoms of, or any exposure to, COVID-19 may not enter a courthouse or other state court facility, including probation offices, until the SJC determines that it is safe to remove the restrictions. <u>See</u> SJC Order OE-144. Following the SJC's initial orders, all Trial Court Departments issued their own orders significantly limiting all in-person contact and access into courthouse facilities.

12.     On March 17, 2020, the Massachusetts Housing Court issued a series of new COVID-19 Standing Orders to "where practicable, to minimize the foot traffic in each courthouse or confined quarters within the Housing Court Clerks' Offices and courtrooms. The goal is to promote "social distancing," thereby minimizing the risk of exposure to court staff and litigants". <u>See</u> Housing Court Standing Order 2-20. With respect to docket control, the Housing Court continued all non-emergency court events to April 21, 2020, and would hear only emergency matters, preferably telephonically or through video conferencing. <u>See</u> Housing Court Standing Orders 2-20, 3-20. "Emergency matters" were defined to include applications for injunctive relief, temporary restraining orders where a complaint involves a lockout, condemnation, no heat, no water, and/or no utilities; conduct and or conditions endangering the health safety and welfare of residential occupants and others; stay of levy on an execution; or where access is required to address an emergency (e.g., burst water pipe, gas fumes, etc.). Housing Court Standing order 3-20. As the COVID-19 crisis worsened through March, the Housing Court extended its previous standing orders and de facto closure through May 4, 2020. <u>See</u> Housing Court Standing Order 4-20.

13.     On April 27, 2020, with infections and deaths having steadily increased throughout the month of April, the SJC ordered all Massachusetts state courthouses closed to the general public, except for enumerated emergency matters, until at least June 1, 2020.  See SJC Order OE-144 (Apr. 27, 2020).  All criminal and civil jury trials were postponed until no earlier than September 8, 2020.  See SJC Order OE-144 (Updated May 26, 2020).  Each Trial Court has been authorized to conduct hearings of non-emergency matters by virtual means such as through telephonic or Zoom video-conferencing technology.  See id.  Lastly, all deadlines set forth in statutes, court rules, standing orders and tracking orders set to expire between March 16 – June 1, 2020, are tolled until July 1, 2020, with the rule providing for a new calculation formula. See id. § 13.

### Chapter 65 of the Acts of 2020

14.     In early March 2020, in response to the financial impact of COVID-19 on tenants in Massachusetts, legislators began considering a proposal to enact a moratorium on evictions. The legislation was spearheaded by tenant advocacy groups such as City Life/Vida Urbana who organized a well-coordinated online and social media campaign.[9]  No legislative record exists of any public hearing or testimony taken on the bill, despite the fact that it constitutes one of the most unprecedented legislative actions concerning rental housing in Massachusetts history.[10] There is also no record of any study or committee report as to the impacts of the Act's unprecedented shifting of the COVID-19 financial burden from financially distressed tenants to similarly distressed rental property owners.  Moreover, while state legislators were working on this bill, they were largely working from home via e-mail and conducting legislative business in

---

[9] See http://www.clvu.org/petition_covid19_eviction_moratorium
[10] See H.B. 4647 (Bill History) found at https://malegislature.gov/Bills/191/H4647.

remote "informal" sessions.[11]  According to Provincetown State Rep. Sarah Peake, the Legislature conducted these "informal" sessions every 72 hours, which do not require roll call votes, and specifically pointed to the Eviction Moratorium bill as an example of a piece of legislation which went through this expedited, truncated process.[12]  Citing concerns with this process, Rep. Sean Dooley (R- Norfolk) objected to the Act during one of the informal sessions, which under House rules, suspended debate on the bill for that day.[13]  However, the bill was eventually enacted and laid before the Governor on Friday April 17, 2020 and signed into law the following Monday, April 20, 2020.  The bill went from filing in the House to the Governor's pen in only twenty-five (25) days.  See H.B. 4624 (first bill filed 3/26/20); H.B. 4647 (final bill signed by Gov. Baker on 4/20/20).

### Provisions of the Eviction Moratorium Act

15.    The overall intent of the Act with respect to the moratorium on evictions is to prevent the filing, and suspend all pending, residential and commercial summary process cases in the Commonwealth during the COVID-19 Emergency, with certain very limited exceptions.  The Act, read as a whole, is clearly directed at the financial impact of the COVID-19 crisis on tenants and homeowners, rather than safety concerns within courthouse buildings.  Indeed, one of the

---

[11] See *Mass. State Lawmakers Work from Home Amid Coronavirus Outbreak*, NBC Boston, April 7, 2020 (found at https://www.nbcboston.com/news/coronavirus/mass-state-lawmakers-work-from-home-amid-coronavirus-outbreak/2104230/ (last checked 5/15/20).

[12] See id.
[13] See *Emergency Coronavirus Housing Bill Takes Detour in Mass. House*, State House News Service (Apr. 17, 2020) found at https://www.wbur.org/news/2020/04/17/coronavirus-housing-bill-massachusetts-stalled.

lead legislative sponsors of the bill has boasted publicly on Twitter that the Act is the "strongest eviction [] moratorium in the nation."[14]

16.     The Act stops eviction cases through several means.  First, the Act creates a heretofore unrecognized new class of summary process case – defined as a "non-essential eviction," which cannot be filed or prosecuted in any court in the Commonwealth.  A non-essential eviction includes four classes of summary process cases:

- All non-payment cases

- All post-foreclosure cases

- All "no-fault" cases[15]

- All "for cause" cases except those which do not involve or include allegations of criminal activity or a lease violation "that may impact the health and safety of other residents, health care workers, emergency personnel, persons lawfully on the subject property, or the general public."[16]

17.     A "non-essential eviction," includes both residential units and certain commercial premises, newly defined as involving a "small business premises unit."  The Act broadly defines a "small business premises unit" as – "a premises occupied by a tenant for commercial purposes,

---

[14] See Cambridge Representative Mike Connolly on his public Twitter page:  "When organizers, advocates and legislators work together, good things are possible. @Shelfterforce profiles the work @RepKevinHonan and I did in partnership with @Citylife_Clvu and others to pass the nation's strongest Eviction and Foreclosure Moratorium." https://twitter.com/MikeConnollyMA/status/1264209940392153088?s=20

[15] A so-called "no-fault case" would include evictions based on the expiration of a written lease, a holdover tenant, a tenant at sufferance, and the termination of a tenancy at will.

[16] In recent Bench/Bar Zoom Seminars attended by Housing Court justices, "for cause" cases that are considered "essential" under the Act will not include cases relating to smoking in a unit in violation of a lease, noise disturbances, and allowing authorized occupants (with unknown COVID-19 infection status) to occupy a unit in violation of a lease.

whether for-profit or not-for-profit; provided, however, that a small business premises unit shall not include a premises occupied by a tenant if the tenant or a party that controls, is controlled by or is in common control with the tenant: (i) operates multi-state, (ii) operates multi-nationally; (iii) is publicly traded; or (iv) has not less than 150 full-time equivalent employees."

18.     The Act imposes a total prohibition of all new filings in any "non-essential eviction" and a *de facto* stay of all pending non-essential eviction cases, providing as follows:

> Notwithstanding chapter 186 or 239 of the General Laws or any general or special law, rule, regulation, or order to the contrary, a court having jurisdiction over an action for summary process pursuant to said chapter 239, including the Boston municipal court department, shall not, in an non-essential eviction for a residential dwelling unit or small business premises unit: (i) accept for filing a writ, summons or complaint; (ii) enter a judgment or default judgment for a plaintiff for possession or a residential dwelling unit or small business premises unit, (iii) issue an execution for possession of a residential dwelling unit or small business premises unit; (iv) deny, upon the request of a defendant, a stay of execution, or upon the request by a party, a continuance of a summary process case; or (v) schedule a court event, including a summary process trial.
> St. 2020, c. 65, § 3(b)

19.     The Act also prohibits the levy and enforcement of any execution for possession (also known as move-out orders) for both residential and commercial properties, providing as follows:  "A sheriff, deputy sheriff, constable or other person shall not enforce or levy upon an execution for possession for a non-essential eviction of a residential dwelling unit or small business premises unit."  See Act, §3(d).

20.     Not only does the Act ban and suspend virtually every eviction in Massachusetts, it also prohibits residential rental property owners from exercising basic contractual rights through a total prohibition against the termination of any tenancy and the sending of "any notice, including a notice to quit, requesting or demanding that a tenant of a residential dwelling unit vacate the premises."  See Act, § 3(a) ("Notwithstanding chapter 186 or chapter 239 of the General Laws or any other general or special law, rule, regulation or order to the contrary, a

9

landlord or owner of a property shall not, for the purposes of a non-essential eviction for a residential dwelling unit: (i) terminate a tenancy; or (ii) send any notice, including a notice to quit, requesting or demanding that a tenant of a residential dwelling unit vacate the premises.")

21.     The Act further prohibits the imposition of any late fees for non-payment of rent matters in a residential or small business unit premises provided that the tenant provides the rental property owner with notice and documentation of a COVID-19 related financial hardship. See Act, §3(e).

22.     The term and duration of the Eviction Moratorium Act remains a moving target. The Act's eviction moratorium provisions were initially set to expire on August 18, 2020,[17] or 45 days after the Governor lifts the COVID-19 State of Emergency, whichever is earlier.  However, the Act specifically authorizes the Governor himself (without any legislative consent requirement) to postpone the expiration of the Act for 90-day incremental periods (but no later than 45 days after the State of Emergency is lifted).  There is no express limitation on how many 90 day incremental periods the Governor may use to extend the Act, and the outer bounds of the term is tied to the duration of the COVID-19 State of Emergency, which the Governor solely controls.  See Act, § 7 ("the governor may postpone such expiration in increments of not more than 90 days; provided further, that the governor shall not postpone such expiration to later than 45 days after the COVID-19 emergency declaration has been lifted.").

23.     Of even greater concern to rental property owners, on June 30, 2020, Rep. Connolly and Honan, the two original sponsors of the Act, filed a new bill, House Docket No. 5166, proposing to effectively extend the Moratorium for an additional *12 months* after the

---

[17] The Act provides for an expiration date of 120 days after the effective date of the Act (April 20, 2020). Act, § 7.

COVID-19 Emergency is lifted by Gov. Baker.  See H.D. 5166, a true and accurate copy of which is attached as **Exhibit C**. Shortly thereafter, the bill was given House Bill Number 4878 and Senate Bill Number 2831 (Collectively the "Bill"), true and accurate copies of which are attached as **Exhibit D**. As of the date of this Complaint, the Bill remains pending, but if enacted into law, the Plaintiffs reserve the right to amend this Complaint to challenge the constitutionality of the Bill.

24.     On or about July 22, 2020, the Governor formally extended the term of the Act through October 18, 2020.

### EOHED Regulations

25.     Pursuant to the directive in the Act, the Executive Office of Housing and Economic Development (EOHED) has issued regulations to ensure compliance with the Act. See 400 C.M.R. 5.0: COVID-19 Emergency Regulations.  The new regulations mandate that if a landlord communicates with a tenant with respect to outstanding rent owed, said landlord must use specific language in a new type of notice for a late or missing rent payment, called a "Notice of Rent Arrearage."  The new notice must contain the following special language and reference to certain government agency websites:

"THIS IS NOT A NOTICE TO QUIT.  YOU ARE NOT BEING EVICTED, AND YOU DO NOT HAVE TO LEAVE YOUR HOME. An emergency law temporarily protects tenants from eviction during the COVID-19 emergency. The purpose of this notice is to make sure you understand the amount of rent you owe to your landlord."

"For information about resources that may help you pay your rent, you can contact your regional Housing Consumer Education Center. For a list of agencies, see https://www.masshousinginfo.org/regional-agencies.  Additional information about resources

for tenants is available at https://www.mhp.net/news/2020/resources-for-tenants-during-covid-19-pandemic."

"You will not be subject to late fees or a negative report to a credit bureau if you certify to your landlord in writing within 30 days from the missed payment that your non-payment of rent is due to a financial impact from COVID-19. If possible, you should use the approved form at: https://www.mass.gov/lists/moratorium-on-evictions-and-foreclosures-forms-and-other-resources. If you cannot access the form on this website, you can ask your landlord to provide the form to you. You may also send a letter or email so long as it contains a detailed explanation of your household loss in income or increase in expenses due to COVID-19."

26.     When the reader clicks on the link above ( https://www.mhp.net/news/2020/resources-for-tenants-during-covid-19-pandemic."), it takes them to a webpage, where the reader is instructed to click on a second webpage (link "**English**") titled "MHP resources for Massachusetts tenants during the COVID-19 pandemic."[18]  That page contains the following information:

> If you are dealing with an eviction that was already in progress, here is a good source of legal information about when cases can proceed in housing court: https://www.masslegalhelp.org/covid-19/eviction-court-updates. They also have information about how to find a lawyer if you think you need one.
>
> If your landlord is threatening to lock you out or evict you, or is turning off the utilities in your unit, you can find information here https://www.masslegalhelp.org/health-mental-health/covid-19-illegal-eviction about your rights and how to get legal help.
>
> You might also contact City Life/Vida Urbana, which is a tenant advocacy group. Ask them if they can help you or give you a referral. English (617) 934-5006 Español (617) 397-3773.

---

[18] This webpage can be found at: https://www.mhp.net/writable/resources/documents/Resources-for-tenants_updated_6-12-20.pdf

27.    The link for "masslegalhelp.org/covid-19/eviction-court-updates" above pulls up a website with the following information:



### Changes to eviction cases in Housing Court and District Court during Coronavirus pandemic

On April 20, 2020 Massachusetts passed an emergency law to stop evictions and foreclosures during the COVID-19 state of emergency.

Landlords cannot file any new eviction cases in court, including:

- Non-payment of rent, or
- No-fault/no cause.

Courts can only schedule hearings if the case is an emergency.

Courts cannot enter judgments, including agreements for judgment and default judgments.

Courts cannot issue orders to evict, "executions."

Landlords may still go to court to remove tenants in an emergency. Emergencies involve criminal activity or lease violations that endanger the health and safety of others.

### How long does the moratorium last?

The moratorium is in effect until August 18, 2020 **or** until 45 days after the Governor lifts the state of emergency, whichever comes first.

The Governor can extend the end date of the moratorium so that it does not end before the end of the state of emergency.

### What if I already had a non-emergency eviction case in court before the moratorium was passed?

- All deadlines in your case are paused as long as the moratorium is in effect.
- No court hearings can be scheduled unless they involve an emergency.
- Courts cannot enter judgments, including agreements for judgment, or issue orders to evict (called "executions").
- Sheriffs and movers cannot move you out of your home.

**Additional Resources**
If you get an eviction notice, a court complaint, or any other papers related to an eviction, contact your local legal aid office.
MassCourts.org - view your case information
City Life Vida Urbana - tenant advocacy group
English (617) 934-5006
Español (617) 397-3773

See the full text of the moratorium law, Chapter 65 of the Acts of 2020.

**Find Legal Aid**
You may be able to get free legal help from your local legal aid program. Or email a question about your own legal problem to a lawyer.
→ Find Legal Aid
→ Mass Legal Answers Online

**Ask a Law Librarian**
If it's
Monday-Friday
between
9am and 4pm
→ Talk to a law librarian now!

**Court Service Centers Offer Chat**
If it is
Monday-Friday
between
9am and 12 pm
→ Chat with the Court Service Center now!
to get help with legal information, forms completion, and legal and community referrals

28.    Accordingly, the state mandated notice that a landlord must send to a tenant contains:  (a) links to three state-endorsed legal/lawyer referral sites which, if used, would likely undermine a landlord's legal position and litigation efforts, and (b) two state-endorsed suggestions to contact City Life/Vida Urbana, an organization notoriously hostile to housing providers and a proposed intervenor in this case which has been actively opposing the Plaintiffs' legal positions in this very case.

## New Housing Court Standing Order

29. After the enactment of the Eviction Moratorium, the Massachusetts Housing

Court issued a new Standing Order to put their operations into compliance with the Act.  See

Housing Court Standing Order 5-20: Further Modifications to Housing Court Operations Due to

the Coronavirus (COVID-19) Outbreak (May 1, 2020).  The new Standing Order provides, in

pertinent part:

> (2)  Until such time as the Moratorium Legislation expires, the Housing Court shall not
> accept and docket any filing(s), decisions, orders, and other documents in "non-essential
> eviction" (summary process) matters, including such filings, decisions, orders, and other
> documents that are not expressly prohibited by the Moratorium Legislation. The
> following filings in summary process cases, however, shall be accepted and allowed by
> the court: (1) motions to continue; (2) motions to vacate a default judgment entered since
> March 1, 2020; (3) motions to vacate a dismissal for failure to appear entered since
> March 1, 2020; and (4) motions to stay an execution. In addition, the court shall accept
> and, where necessary, docket the following filings in summary process cases: (1) a notice
> of appearance; (2) original summonses and complaints in previously electronically-filed
> cases; (3) a notice of voluntary dismissal; (4) a satisfaction of judgment; and (5) original
> executions. As set forth in the Moratorium Legislation, "a deadline or time period for
> action by a party to a non-essential eviction . . ., whether such deadline or time period
> was established before or after [April 20, 2020], including, but not limited to, a date to
> answer a complaint, appeal a judgment or levy upon an execution for possession or a
> money judgment, shall be tolled" until such time as the Moratorium Legislation expires..
> . . Until further order, each Clerk-Magistrate, in consultation with the respective First
> Justice, may advance, schedule, and conduct proceedings, by virtual means only, in any
> case type, except in a non-essential eviction action, as defined by the Moratorium
> Legislation.

## Impact to the Plaintiff Rental Property Owners

## Marie Baptiste

30. Baptiste is the owner of the rental property located at 30 Country Club Drive,

Randolph, MA ("Baptiste Property").  Emigrating from Haiti in 1985, Baptiste worked in the

nursing industry for 10 years to save money to buyer her first home.  She purchased the Baptiste

Property on or about June 9, 1995. Baptiste later moved out and began renting the Baptiste Property.

31.     In or around September 2015, Stanley Chukwu and Blessing Chukwu ("Tenants") moved into the Baptiste Property as tenants, paying $2,100.00 in monthly rent.

32.     Over the years, the Tenants have frequently paid rent late, provided Baptiste with checks that have bounced, and as of October 2019, have not paid rent at all. Despite this, Baptiste has never increased the Tenants' rent since they moved in five years ago.

33.     On January 30, 2020, with the Tenants owing Baptiste $6,300.00 in unpaid rent, she served them with a 14 Day Notice to Quit for Non-Payment of Rent in compliance with Massachusetts law.

34.     On or about March 9, 2020, Baptiste, through counsel, served the Tenants with a new 14 Day Notice to Quit for Non-Payment of Rent, at which point the Tenants owed $10,500.00 in back rent.

35.     Due to the Covid-19 crisis and once the Act went into effect, Baptiste was unable to file a non-payment summary process action against the Tenants. Under the Act, such an action would fall under a "non-essential eviction," and would be prohibited.

36.     As of this date, Baptiste has not received any rent from her Tenants. They owe her $18,900.00 in unpaid rent from November 2019 through July 1, 2020.

37.      Baptiste is a Registered Nurse at the Charlton Hospital in Fall River, MA where she has worked for 16 years. Her income covers only the mortgage for her primary residence in Avon, MA, but does not cover any of the other expenses for her home nor does it cover any expense on the Baptiste Property.

38.     Without receiving rental income from the Tenants, Baptiste has and will continue to struggle to pay the mortgage, taxes and property expenses on her rental property, including the cost of the water that the tenants continue to use, and the expenses on her primary residence. Because of this deficit, Baptiste has twice needed to borrow from her retirement funds, thereby incurring a penalty for using these hard-earned funds.

39.     Baptiste has no expectation of receiving any rental payments from the Tenants. They have not communicated with her whatsoever since January 2020.

40.     Baptiste has also considered issuing the state-mandated "Notice of Rent Arrearage" form, however, she objects to sending this form because it provides links to her tenants for lawyer referral services and to various pro-tenant organizations like CityLife/Urbana Vida, which she believes would undermine her attempts to ensure that her tenants pay the rent owed, or vacate the premises voluntarily.

### Mitchell Matorin

41.     Matorin is the owner of the rental property located at 162 Ingleside Avenue #A (First Floor), Worcester, Massachusetts ("162 Ingleside").  Matorin purchased 162 Ingleside on or about September 27, 2019, at which time he assumed, as lessor, an existing tenancy at will lease agreement between the prior owner, A&A Realty LLC, and two tenants.

42.     Matorin's two tenants repeatedly paid their $1,200/month rent late before making their last payment for January 2020, also late.  When the tenants did not make their rental payment on February 1, 2020, on February 19, 2020, Matorin had a constable deliver a 14-day notice to quit to the tenants for non-payment of rent.

43.     With the rent remaining unpaid, on March 9, 2020, a constable served the two tenants with a Summary Process Summons and Complaint for non-payment of rent, which was

filed with the Central (Worcester) Housing Court on March 11, 2020 against Respondent John Doe and the other tenant. The original trial date of March 26, 2020 was rescheduled by the Housing Court under its applicable COVID-19 Standing Order.

44. Pursuant to the operation of the Eviction Moratorium Act, Matorin's non-payment summary process case falls within the definition of a "non-essential eviction," and is thus indefinitely suspended until the expiration of the Act. To that end, the Housing Court on April 27, 2020 issued a notice reflected on the case docket that the case was "Suspended COVID-19 Reschedule TBD." Matorin has not received any rent from his tenants and is currently owed $7,200.00 through July 1, 2020.

45. Also pursuant to the operation of the Eviction Moratorium Act, Matorin is prohibited from sending any notice containing a "request or demand" that his tenant vacate 162 Ingleside. Matorin has also considered issuing the state-mandated "Notice of Rent Arrearage" form, however, he objects to sending this form because informs his tenant that he cannot be evicted and it provides links to his tenants for lawyer referral services and to various pro-tenant organizations like CityLife/Urbana Vida, which he believes would undermine his attempts to ensure that his tenants pay the rent owed, or vacate the premises voluntarily.

46. Matorin recently discovered that one tenant at 162 Ingleside moved out and that the remaining tenant has, without authorization, moved an unauthorized occupant into the unit, apparently his brother. The tenancy agreement explicitly bars occupancy by anyone other than the named tenants. Matorin understands that he must serve a separate Notice to Quit and serve a separate Summary Process Summons and Complaint on the unauthorized occupant, but that doing so would violate the Eviction Moratorium Act, because evicting the unauthorized occupant would be considered a "non-essential" eviction situation.

## Jonathan DaPonte

47.     Jonathan DaPonte ("DaPonte") is the owner of the premises located at 108 Hamlet Street, #1 West, Fall River, Massachusetts ("108 Hamlet"), which is currently occupied by tenants Jose Diaz and Jean Carlos Rivera Ayala.

48.     As of April 1, 2020, DaPonte's tenants ceased paying rent and when DaPonte contacted the tenants regarding the unpaid rent, Ayala stated "you can't evict me so I am not paying shit."

49.     As of August 2020, the total rent arrears owed by Diaz and Ayala to DaPonte is $4,075.00.

50.     DaPonte is currently working overtime as a Funeral Director in order to make ends meet but cannot afford to continue to pay the expenses of 108 Hamlet indefinitely.

51.     Pursuant to the operation of the Eviction Moratorium Act, DaPonte desires to, but is prohibited from, serving a 14-day Notice to Quit for Non-Payment of Rent.

52.     DaPonte also considered issuing the state-mandated "Notice of Rent Arrearage" form, however, he objects to sending this form because it provides links to his tenants for lawyer referral services and to various pro-tenant organizations like CityLife/Urbana Vida, which he believes would undermine his attempts to ensure that his tenants pay the rent owed, or vacate the premises voluntarily.

## Impact to Massachusetts All Rental Property Owners

53.     In terms of overall impact to rental property owners statewide, statistics for Fiscal Year 2019 show that 30,614 summary process cases were filed in the Housing Court.[19]  An

---

[19] See https://www.mass.gov/doc/housing-court-trends-by-fiscal-year-2/download.

additional 8,370 summary process cases were filed in the District Courts in Fiscal Year 2019.[20] The total for Fiscal Year '19 summary process filings in the entire state is nearly 39,000 cases.[21]

54.     The Housing and District Court do not keep statistics on the type of summary process case filed, such as non-payment, no-fault, or for cause.  However, the reasonable inference from the nature of the COVID-19 crisis and its associated financial impact, together with the devastatingly dramatic rise in the unemployment rate, is that non-payment cases would be the most affected type of case subject to the Eviction Moratorium Act.

55.     The Act, however, will also apply to termination of tenancies at will, holdover tenants who stay past their lease expiration, and many "for cause" cases which do not fall within the limited exception, a number of which would have constituted "for cause" but for the Act. This provision not only affects landlords but can result in homelessness for individuals with plans to move into a rental property where the current tenant refuses to leave and the landlord cannot obtain possession.

56.     Extrapolating from the court statistics, at least 20,000 or more pending eviction cases could be impacted by the Act, and thousands more as-yet-filed eviction cases.

## CLAIMS

### Count I – Declaratory Judgment (28 U.S.C. § 2201) – First Amendment Right to Petition

57.     Plaintiffs reallege and incorporate by reference all prior allegations.

58.     An actual and live controversy exists between the parties as to the constitutionality of Chapter 65 of the Acts of 2020.

---

[20] See https://www.mass.gov/doc/total-filings-by-court-location-18/download.

[21] The Superior Court also retains jurisdiction over summary process cases under G.L. c. 239, however, it does not track summary process case statistically, and upon information and belief, its eviction caseload is quite small.

59.     The First Amendment of the United State Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  The First Amendment applies to the states through the Fourteenth Amendment of the U.S. Constitution.  DeJonge v. Oregon, 299 U.S. 353 (1937).

60.     Chapter 65 of the Acts of 2020, Sections 1, 3, 6, and 7, read together, operate as a wholesale prohibition on the filing and prosecution of the vast majority of summary process cases in the Commonwealth of Massachusetts, including Mr. Matorin's existing case, and a future summary process case filed by Plaintiff Linda Smith.

61.     Pursuant to 28 U.S.C. § 2201, this Court should issue a binding declaratory judgment that Chapter 65 of the Acts of 2020, Sections 1, 3, 6, and 7 are unconstitutional in violation of the right to petition under the First Amendment of the United States Constitution.

### Count II – Declaratory Judgment (28 U.S.C. § 2201) – First Amendment Free Speech (Eviction Moratorium Act)

62.     Plaintiffs reallege and incorporate by reference all prior allegations.

63.     An actual and live controversy exists between the parties as to the constitutionality of Chapter 65 of the Acts of 2020.

64.     The First Amendment applies to the states through the Fourteenth Amendment of the U.S. Constitution.  DeJonge v. Oregon, 299 U.S. 353 (1937).

65.     Content-based restrictions are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve a compelling state interest.  A restriction on speech is "content based" if it "applies to particular speech because of the topic discussed or the idea or message expressed."  Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2224 (2015).

66. The Act prohibits rental property owners and property owners such as the Plaintiffs from (1) terminating any tenancy, or (2) sending "any notice, including a notice to quit, requesting or demanding that a tenant of a residential dwelling unit vacate the premises." See Act, §3(a)(ii). The Act's ban on the issuance of legal notices such as a notice to quit or notice of tenancy termination is an infringement on Plaintiffs' constitutional right to free speech.

67. Pursuant to 28 U.S.C. § 2201, this Court should issue a binding declaratory judgment that Chapter 65 of the Acts of 2020, Sections 1, 3, 6, and 7 are unconstitutional in violation of the Free Speech Clause of the First Amendment of the United States Constitution.

**Count III – Declaratory Judgment (28 U.S.C. § 2201) – First Amendment Free Speech (EOHED Regulations)**

68. Plaintiffs reallege and incorporate by reference all prior allegations.

69. An actual and live controversy exists between the parties as to the constitutionality of the EOHED Regulations.

70. The right to free speech under the First Amendment also includes the right to refrain from speaking. Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31, 138 S. Ct. 2448, 2463 (2018).

71. With all non-payment notices to quit prohibited, the EOHED Regulations mandate a government approved notice and language for any rental property owner who opts to send a "missed rental notice" to a tenant.

72. By "compelling individuals to speak a particular message," the Commonwealth is engaged in content-based regulation of speech. National Inst. of Family & Life Advocates v. Becerra, 138 S. Ct. 2361, 2371 (2018).

73. Pursuant to 28 U.S.C. § 2201, this Court should issue a binding declaratory judgment that 400 C.M.R. 5.0 is unconstitutional in violation of the First Amendment.

## Count IV – Declaratory Judgment (Impairment of Contracts)

74.     Plaintiffs reallege and incorporate by reference all prior allegations.

75.     Article 1, Section 10, Clause 1 of the U.S. Constitution states: "No State shall. . . pass any. . . . Law impairing the Obligation of Contracts."

76.     The Act unconstitutionally impairs the Plaintiffs' lease agreements with their tenants.  The Act does so by *unconditionally* and *indefinitely* delaying their established right to timely pursue an eviction against a breaching tenant, and by prohibiting a rental property owner from sending a notice to quit or termination of tenancy for any number of material breaches of a lease; which notice does not, under any circumstances, allow a property owner to remove a tenant from his or her apartment without due process.

77.     As a matter of law, the right to evict and the right to declare a contractual default are core to every residential lease contract in Massachusetts, and any material legislative with those rights and remedies is a substantial impairment of that contract.

78.     Pursuant to 28 U.S.C. § 2201, this Court should issue a binding declaration that the Act is unconstitutional in violation of the Contracts Clause of the United States Constitution.

## Count V –Taking Under Fifth Amendment

79.     Plaintiffs reallege and incorporate by reference all prior allegations.

80.     The Fifth Amendment, Takings Clause, of the U.S. Constitution provides: "private property [shall not] be taken for public use, without just compensation."  The Takings Clause applies to the states through the Fourteenth Amendment.  See Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226 (1897).

81.     The Act operates as both a physical taking and a "regulatory taking" under Fifth Amendment jurisprudence.

82. While the Act is in effect, rental property owners such as the Plaintiffs have no legal recourse or enforcement remedies to remove a non-paying or a tenant who otherwise breaches a lease.

83. The Act seeks to "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." <u>Armstrong v. United States</u>, 364 U.S. 40, 49 (1960).

84. The operation of the Act on the Plaintiffs and others similarly situated so deprives the Plaintiffs and others similarly situated that it operates as a physical and regulatory taking in violation of the Fifth Amendment for which just compensation is due.

85. Pursuant to 28 U.S.C. § 2201, this Court should issue a binding declaration that the Act is unconstitutional in violation of the Takings Clause of the United States Constitution.

86. As a result of the taking effected by the Act, the Plaintiffs are also entitled to "just compensation," and all damages allowed by law.

WHEREFORE, the Plaintiffs request the following relief:

1. Pursuant to Count I and in accordance with 28 U.S.C. § 2201, that this Court enter a binding declaratory judgment that Chapter 65 of the Acts of 2020, Sections 1, 3, 6, and 7 are unconstitutional in violation of the Plaintiffs' right to petition under the First Amendment of the United States Constitution.

2. Pursuant to Count II and in accordance with 28 U.S.C. § 2201, that this Court issue a binding declaratory judgment that Chapter 65 of the Acts of 2020, Sections 1, 3, 6, and 7 are unconstitutional in violation of the Free Speech Clause of the First Amendment of the United States Constitution.

3. Pursuant to Count III and in accordance with 28 U.S.C. § 2201, that this Court issue a binding declaratory judgment that 400 C.M.R. 5.0 is unconstitutional in violation of the First Amendment.

4. Pursuant to Count IV and in accordance with 28 U.S.C. § 2201, that this Court issue a binding declaration that the Act is unconstitutional in violation of the Contracts Clause of the United States Constitution.

5. Pursuant to Count V and in accordance with 28 U.S.C. § 2201, that this Court issue a binding declaration that the Act is unconstitutional in violation of the Takings Clause of the United States Constitution.

6. Pursuant to Counts I, II, III, and IV, that this Court issue a binding declaratory judgment that Plaintiff Matorin may proceed with his pending summary process action.

7. Pursuant to Counts I, II, III, and IV, that this Court issue a binding declaratory judgment that Plaintiff Matorin may effectuate service of a notice to vacate and serve a Summary Process Summons and Complaint on the unauthorized occupant at 162 Ingleside.

8. Pursuant to Counts I, II, III, and IV, that this Court issue a binding declaratory judgment and order that Plaintiff Baptiste may proceed with a summary process action against her tenants under G.L. c. 239.

9. Pursuant to Counts I, II, III, and IV, that this Court issue a binding declaratory judgment and order that Plaintiff DaPonte may effectuate service upon his tenants of a 14-day notice to quit for non-payment of rent, and after, serve a Summary Process

Summons and Complaint and commence a summary process action under G.L. c. 239.

10. Pursuant to all Counts, and in accordance with Fed. R. Civ. P. 65, that this Court enjoin the enforcement and application of the Act and Regulations by the Secretary.

11. Pursuant to Fed. R. Civ. P. 65, that this Court issue a preliminary and permanent injunction, enjoining the Secretary and all agencies and departments under his control from enforcing the provisions of the Act with respect to summary process actions under G.L. c. 239 in any court of the Commonwealth.

12. Pursuant to Fed. R. Civ. P. 65, that this Court issue a preliminary and permanent injunction, enjoining the Governor to rescind his most recent extension of the Act to October 17, 2020 and/or to refrain from extending the duration of the Act for any further period of time.

13. Enter an order awarding the Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. §1983 or any other applicable statute or law;

14. For such further relief including attorneys' fees, interest and costs, as is equitable and just.

**<u>PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS AND ISSUES SO TRIABLE</u>**

**MARIE BAPTISTE, MITCHELL
MATORIN, and JOHN DAPONTE**

By their attorneys,

_____/s/ Richard D. Vetstein_____
Richard D. Vetstein, Esq. (BBO 637681)
Vetstein Law Group, P.C.
945 Concord Street
Framingham, MA 01701
Phone: (508) 620-5352
Fax:    (888) 448-1344
Email: rvetstein@vetsteinlawgroup.com

/s/ Jordana R. Greenman
Jordana R. Greenman, Esq.
BBO# 667842
134 Main Street
Watertown, MA 02472
Tel: (617) 379-6669
Fax: (617) 379-6669
Email: jordana@jrglegal.com

Dated: August 11, 2020

**<u>VERIFICATION</u>**

I, Mitchell Matorin, state under the pains and penalties of perjury that I have reviewed the factual allegations of this complaint and attest that they are true and accurate to the best of my knowledge, and as to such allegations as are made upon information and belief, I believe them to be true and accurate.


____/s/ Mitchell Matorin_____
Mitchell Matorin


**<u>VERIFICATION</u>**

I, Marie Baptiste, state under the pains and penalties of perjury that I have reviewed the factual allegations of this complaint and attest that they are true and accurate to the best of my knowledge, and as to such allegations as are made upon information and belief, I believe them to be true and accurate.


____/s/ Marie Baptiste_____
Marie Baptiste


**<u>VERIFICATION</u>**

I, Jonathan DaPonte, state under the pains and penalties of perjury that I have reviewed the factual allegations of this complaint and attest that they are true and accurate to the best of my knowledge, and as to such allegations as are made upon information and belief, I believe them to be true and accurate.


____/s/ Jonathan DaPonte_____
Jonathan DaPonte

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 11, 2020.

/s/ Richard D. Vetstein

# EXHIBIT A

# HOUSE . . . . . . . . . . . . . . No. 4647

## The Commonwealth of Massachusetts

_____

The committee of conference on the disagreeing votes of the two branches with reference to the Senate amendment (striking out all after the enacting clause and inserting in place thereof the text contained in Senate document numbered 2631) of the House Bill providing for a moratorium on evictions and foreclosures during the COVID-19 Emergency (House, No. 4615), reports recommending passage of the accompanying bill (House, No. 4647). April 15, 2020.

| Aaron Michlewitz | Brendan P. Crighton |
| Kevin G. Honan | Michael J. Rodrigues |

# HOUSE . . . . . . . . . . . . . . . No. 4647

## The Commonwealth of Massachusetts

_____

**In the One Hundred and Ninety-First General Court**
**(2019-2020)**

_____

An Act providing for a moratorium on evictions and foreclosures during the COVID-19 Emergency.

*Whereas,* The deferred operation of this act would tend to defeat its purposes, which are to establish forthwith a moratorium on evictions and foreclosures during the governor's COVID-19 emergency declaration, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

1    SECTION 1. As used in this act, the following words shall, unless the context clearly

2 requires otherwise, have the following meanings:

3    "COVID-19 emergency", the state of emergency concerning the novel coronavirus

4 disease outbreak declared by the governor on March 10, 2020.

5    "Non-essential eviction", an eviction: (i) for non-payment of rent; (ii) resulting from a

6 foreclosure; (iii) for no fault or no cause; or (iv) for cause that does not involve or include

7 allegations of: (a) criminal activity that may impact the health or safety of other residents, health

8 care workers, emergency personnel, persons lawfully on the subject property or the general

9 public; or (b) lease violations that may impact the health or safety of other residents, health care

10 workers, emergency personnel, persons lawfully on the subject property or the general public;

11    provided, however, that a non-essential eviction shall not include an eviction for a small business

12    premises unit on account of the expiration of the term of a lease or tenancy or a default by the

13    tenant of a small business premises unit under the terms of its lease or tenancy that occurred

14    before the declaration of the COVID-19 emergency.

15    "Small business premises unit", a premises occupied by a tenant for commercial

16    purposes, whether for-profit or not-for-profit; provided, however, that a small business premises

17    unit shall not include a premises occupied by a tenant if the tenant or a party that controls, is

18    controlled by or is in common control with the tenant: (i) operates multi-state; (ii) operates multi-

19    nationally; (iii) is publicly traded; or (iv) has not less than 150 full-time equivalent employees.

20    SECTION 2. Notwithstanding section 7A of chapter 167E of the General Laws, section

21    65C1/2 of chapter 171 of the General Laws or any other general or special law to the contrary,

22    from the effective date of this act until the termination of the COVID-19 emergency, due to the

23    outbreak of the 2019 novel coronavirus, also known as COVID-19, written certification from a

24    counselor with a third-party organization that a mortgagor has received counseling via a

25    synchronous, real-time video conference or by telephone in lieu of counseling in person shall

26    satisfy the requirements of clause (ii) of subsection (b) of said section 7A of said chapter 167E or

27    clause (ii) of subsection (b) of said section 65C1/2 of said chapter 171; provided, however, that

28    the third-party organization shall have been approved by the executive office of elder affairs for

29    purposes of such counseling.

30    SECTION 3. (a) Notwithstanding chapter 186 or chapter 239 of the General Laws or any

31    other general or special law, rule, regulation or order to the contrary, a landlord or owner of a

32    property shall not, for the purposes of a non-essential eviction for a residential dwelling unit: (i)

33    terminate a tenancy; or (ii) send any notice, including a notice to quit, requesting or demanding

34    that a tenant of a residential dwelling unit vacate the premises.

35        (b) Notwithstanding chapter 186 or 239 of the General Laws or any general or special

36    law, rule, regulation or order to the contrary, a court having jurisdiction over an action for

37    summary process pursuant to said chapter 239, including the Boston municipal court department,

38    shall not, in a non-essential eviction for a residential dwelling unit or a small business premises

39    unit: (i) accept for filing a writ, summons or complaint; (ii) enter a judgment or default judgment

40    for a plaintiff for possession of a residential dwelling unit or small business premises unit; (iii)

41    issue an execution for possession of a residential dwelling unit or small business premises unit;

42    (iv) deny, upon the request of a defendant, a stay of execution, or upon the request by a party, a

43    continuance of a summary process case; or (v) schedule a court event, including a summary

44    process trial.

45        (c) A deadline or time period for action by a party to a non-essential eviction for a

46    residential dwelling unit or small business premises unit, whether such deadline or time period

47    was established before or after the effective date of this act, including, but not limited to, a date

48    to answer a complaint, appeal a judgment or levy upon an execution for possession or a money

49    judgment, shall be tolled.

50        (d) A sheriff, deputy sheriff, constable or other person shall not enforce or levy upon an

51    execution for possession for a non-essential eviction of a residential dwelling unit or small

52    business premises unit.

53        (e) A landlord shall not impose a late fee for non-payment of rent for a residential

54    dwelling unit or a small business premises unit or furnish rental payment data to a consumer

55  reporting agency, as defined in section 50 of chapter 93 of the General Laws, related to the non-

56  payment of rent if, not later than 30 days after the missed rent payment, the tenant provides

57  notice and documentation to the landlord that the non-payment of rent was due to a financial

58  impact from COVID-19.

59      The executive office of housing and economic development shall develop forms and

60  recommendations for the provision of notice and documentation to a landlord that the non-

61  payment of rent was due to a financial impact from COVID-19.

62      (f) Nothing in this section shall relieve a tenant from the obligation to pay rent or restrict

63  a landlord's ability to recover rent.

64      (g) The executive office of housing and economic development shall issue emergency

65  regulations as necessary to implement this section.

66      SECTION 4. (a) Notwithstanding section 15B of chapter 186 of the General Laws or any

67  other general or special law to the contrary, in order to address disruptions caused by the

68  outbreak of the 2019 novel coronavirus, also known as COVID-19, or the COVID-19

69  emergency, a lessor who received rent in advance for the last month of tenancy pursuant to said

70  section 15B, may access and utilize the funds received from said last month's rent in advance. A

71  lessor may utilize such funds to pay for expenses, which may include, but shall not be limited to,

72  mortgage payments, utilities, repairs and required upkeep; provided, however, that a lessor shall

73  not deduct from said last month's rent in advance any amount to account for the tenant's

74  nonpayment of rent; provided further, that the lessor shall notify the tenant in writing that: (i) the

75  lessor utilized such funds before the last month of the tenancy; (ii) the lessor remains obligated to

76  apply said rent in advance to its intended application as rent for the last month of tenancy; and

77    (iii) the tenant is entitled to the same amount of interest from the lessor under said section 15B of

78    said chapter 186 that would have accrued had the lessor not utilized such funds before the last

79    month of the tenancy.

80        (b) Nothing in this section shall be construed to relieve a lessor of their obligations to

81    apply said rent in advance to its intended application as rent for the last month of tenancy and to

82    pay to the tenant any interest due as required pursuant to said section 15B of said chapter 186;

83    provided, however, that the interest due to the tenant pursuant to said section 15B of said chapter

84    186 shall be calculated as though the lessor had not utilized such funds before the last month of

85    the tenancy.

86        (c) The executive office of housing and economic development shall issue emergency

87    regulations and guidance as necessary to implement this section and shall promulgate a standard

88    form for the notification of tenants under subsection (a).

89        SECTION 5. (a) Notwithstanding chapter 239 or chapter 244 of the General Laws or any

90    other general or special law to the contrary, a creditor, mortgagee or person having estate in the

91    land mortgaged, a person authorized by a power of sale pursuant to section 14 of said chapter

92    244 or right of entry or the attorney duly authorized by a writing under seal or the legal guardian

93    or conservator of such mortgagee or person acting in the name of such mortgagee or person shall

94    not, for the purposes of foreclosure of a residential property as defined in section 35B of said

95    chapter 244 that is not vacant or abandoned: (i) cause notice of a foreclosure sale to be published

96    pursuant to said section 14 of said chapter 244; (ii) exercise a power of sale; (iii) exercise a right

97    of entry; (iv) initiate a judicial or non-judicial foreclosure process; or (v) file a complaint to

98    determine the military status of a mortgagor under the federal Servicemembers Civil Relief Act,

99    50 USC sections 3901 to 4043, inclusive.

100        (b) A creditor or mortgagee shall grant a forbearance to a mortgagor of a mortgage loan

101    for a residential property as defined in said section 35B of said chapter 244 if the mortgagor

102    submits a request to the mortgagor's servicer affirming that the mortgagor has experienced a

103    financial impact from COVID-19. The forbearance shall be for not more than 180 days. Fees,

104    penalties or interest beyond the amounts scheduled and calculated as if the mortgagor made all

105    contractual payments on time and in full under the terms of the mortgage contract shall not

106    accrue during the period of forbearance granted under this subsection. A payment subject to the

107    forbearance shall be added to the end of the term of the loan unless otherwise agreed to by the

108    mortgagor and mortgagee. Nothing in this subsection shall prohibit a mortgagor and mortgagee

109    from entering into an alternative payment agreement for the payments subject to the forbearance.

110    The mortgagee shall not furnish negative mortgage payment information to a consumer reporting

111    agency related to mortgage payments subject to forbearance under this act.

112        (c) Nothing in this section shall be construed to relieve a mortgagor from the obligation

113    to pay their mortgage or restrict the ability of a creditor, mortgagee or person having estate in the

114    land mortgaged, or a person authorized by a power of sale or right of entry, or attorney duly

115    authorized or person acting in the name of such mortgagee or person from recovering mortgage

116    payments.

117        SECTION 6. Sections 3 and section 4 shall expire 120 days after the effective date of this

118    act or 45 days after the COVID-19 emergency declaration has been lifted, whichever is sooner;

119    provided, however, that the governor may postpone such expiration in increments of not more

120    than 90 days; provided further, that the governor shall not postpone such expiration to later than

121    45 days after the COVID-19 emergency declaration has been lifted; and provided further, that

122    any deadline or time period for action that is tolled under subsection (c) of said section 3 shall

123    begin to run upon the expiration of said section 3.

124          SECTION 7. Subsection (a) of section 5 shall expire 120 days after the effective date of

125    this act or 45 days after the COVID-19 emergency declaration has been lifted, whichever is

126    sooner; provided, however, that the governor may postpone such expiration in increments of not

127    more than 90 days; provided further, that the governor shall not postpone such expiration to later

128    than 45 days after the COVID-19 emergency declaration has been lifted.

129          SECTION 8. Notwithstanding any general or special law to the contrary, a creditor or

130    mortgagee shall not be required to grant a forbearance to a mortgagor of a mortgage loan for a

131    residential property under subsection (b) of section 5 if the mortgagor's request for such

132    forbearance is made after the expiration date in section 7.

# EXHIBIT B

**400 CMR 5.00:  COVID-19 Emergency Regulations**

<u>Preamble</u>

Chapter 65 of the Acts of 2020, *An Act providing for a moratorium on evictions and foreclosures during the COVID-19 Emergency*, requires the Executive Office of Housing and Economic Development (EOHED) to promulgate emergency regulations as necessary to implement section 3 of the Act, which addresses non-essential evictions, and section 4 of the Act, which addresses a landlord's rights and responsibilities with respect to an advance payment of rent for the last month of tenancy.  The Act also requires EOHED to (1) develop forms and recommendations for the provision of notice and documentation to a landlord that a non-payment of rent was due to a financial impact from COVID-19, and (2) promulgate a standard form for the notification of tenants under subsection (a) of section 4 of the Act.

5.01    <u>Purpose and Scope</u>.

The purpose of these emergency regulations is to comply with the mandates in sections 3(g) and 4(c) of the Act, to ensure that certain provisions in the Act are implemented consistently, and to otherwise advance the stated purposes of the Act.  These regulations shall apply to all tenancies under a lease, sublease, written tenancy agreement or a tenancy at will.

5.02    <u>Definitions</u>.  All words and phrases defined in the Act shall have the meanings ascribed to them in the Act, and the following additional words and phrases shall have the meanings set forth below:

"Act" means chapter 65 of the Acts of 2020.

"Advance rent payment" means money paid by a tenant and received by landlord to cover rent for the last month of tenancy pursuant to section 15B of chapter 186 of the General Laws.

"Approved form of notice of non-payment of rent" means, for a residential tenancy, the form of notice referenced in section 5.04(2), and for a tenant in a small business premises unit, the form of notice referenced in section 5.04(3).

"EOHED website" means the following URL: https://www.mass.gov/lists/moratorium-on-evictions-and-foreclosures-forms-and-other-resources

"Financial impact from COVID-19" means a loss of income or additional expense that (1) is caused directly or indirectly by the COVID-19 pandemic or by the local, state or federal response to the pandemic, and (2) is of a magnitude that makes it impossible or impractical for a tenant to make a payment of rent on the date such payment is due.

"Landlord" or "Lessor" means the lessor under a lease, a sublease, or tenancy at will for a residential dwelling unit or small business premises unit, and for the purposes of any provision in these regulations related to the delivery of a notice to a tenant, or receipt of a notice from a tenant, shall include any management agent or other third party acting as agent for the landlord.

"Leased premises" means either a residential dwelling unit or a small business premises unit, as the context shall require.

"Residential dwelling unit" means a house or building, or portion thereof, occupied as a home or residence of one or more persons.

"Small business" means a business that qualifies as a small business under the size standards established by the federal Small Business Administration at 13 C.F.R. Part 12; provided, that neither the business nor any party that controls, is controlled by or is in common control with the business: (i) operates multi-state; (ii) operates multi-nationally; (iii) is publicly traded; or (iv) has 150 or more full-time equivalent employees.

"Tenant" means a tenant in possession of a residential dwelling unit or small business premises unit under a lease, sublease, or tenancy at will.

5.03    Obligation to Pay Rent; Notice of Rent Arrearage.

(1)      Throughout the period during which these emergency regulations are in effect, every tenant shall remain obligated to pay rent on the date due if and to the extent the tenant has the means to do so.

(2)      In order to minimize the risk that a tenant will face eviction for an accumulated non-payment of rent once the Act expires, and to promote the prompt resolution of such situations without resorting to the court system, landlords should provide tenants of residential dwelling units a written notice of each missed rent payment.  If a landlord delivers such a notice, the notice must include the following statements, prominently displayed on the first page:

"THIS IS NOT A NOTICE TO QUIT.  YOU ARE NOT BEING EVICTED, AND YOU DO NOT HAVE TO LEAVE YOUR HOME.  An emergency law temporarily protects tenants from eviction during the COVID-19 emergency.  The purpose of this notice is to make sure you understand the amount of rent you owe to your landlord."

"For information about resources that may help you pay your rent, you can contact your regional Housing Consumer Education Center.  For a list of agencies, see https://www.masshousinginfo.org/regional-agencies.  Additional information about resources for tenants is available at https://www.mhp.net/news/2020/resources-for-tenants-during-covid-19-pandemic."

"You will not be subject to late fees or a negative report to a credit bureau if you certify to your landlord in writing within 30 days from the missed payment that your non-payment of rent is due to a financial impact from COVID-19.  If possible, you should use the approved form at: https://www.mass.gov/lists/moratorium-on-evictions-and-foreclosures-forms-and-other-resources.  If you cannot access the form on this website, you can ask your landlord to provide the form to you.  You may also send a letter or email so long as it contains a detailed explanation of your household loss in income or increase in expenses due to COVID-19."

The notice may also include other information that will promote the prompt and non-judicial resolution of such matters, such as the total balance due, the months remaining and the total of lease payments expected to be made on a lease for a term of years, information on how to contact the landlord to work out a revised payment arrangement, and a reminder that after the state of emergency ends the tenant may face eviction if rent remains unpaid.

(3)     If a landlord knows that the tenant is not proficient in English, the landlord should use reasonable efforts to deliver the notice in a language that the tenant understands.  Landlords are encouraged to include with the notice a statement that the notice is important and should be translated, a form of which is available on the EOHED website.

5.04     Late Fees and Credit Reporting; Notice of Financial Hardship.

(1)     Under subsection (e) of section 3 of the Act, a landlord shall not impose a late fee for non-payment of rent for a residential dwelling unit or a small business premises unit or furnish rental payment data to a consumer reporting agency, as defined in section 50 of chapter 93 of the General Laws, related to the non-payment of rent if, not later than 30 days after the missed rent payment, the tenant provides notice and documentation to the landlord that the non-payment of rent was due to a financial impact from COVID-19.

(2)     A residential tenant may provide notice to the landlord that the non-payment of rent was due to a financial impact from COVID-19 by completing, signing and delivering to the landlord the form entitled "FORM OF NOTICE AND CERTIFICATION FROM RESIDENTIAL TENANT - FINANCIAL HARDSHIP RELATED TO COVID-19", as posted on the EOHED website.  If a tenant requests a copy of this form from the landlord, the landlord shall provide a copy within 5 days.  A tenant may also deliver an alternative form of written notice as provided in section 5.04(5).

(3)     A small business tenant may provide notice to the landlord that the non-payment of rent was due to a financial impact from COVID-19 by completing, signing and delivering to the landlord the form entitled "FORM OF NOTICE AND CERTIFICATION FROM SMALL BUSINESS TENANT - FINANCIAL HARDSHIP RELATED TO COVID-19", as posted on the EOHED website.

(4)     A tenant who misses multiple rent payments due to a financial impact from COVID-19 is required to provide a separate notice to the landlord for each such missed payment. Notices shall be effective if sent within 30 days of the due date of the missed rent payment. Notices shall be sent to the landlord in accordance with the notice provisions of the lease or in accordance with the parties' prior customs and practice.  If the lease does not contain any notice provisions, or if a tenancy is not subject to a written lease, or if the landlord has communicated with the tenant via email, then notice shall be sent either to the same address as the landlord has designated for the payment of rent, or, if applicable, to the most current email address used by the landlord to communicate with the tenant.  A notice from a residential tenant shall also be deemed effective if sent to the landlord address set forth in a notice pursuant to 105 CMR 410.481.

(5)    The use of an alternative written form of notice by a residential tenant shall be deemed effective and timely if such alternative written notice includes a statement that the tenant has experienced a financial impact from COVID-19, and states in reasonable detail the cause of such financial impact. Such alternative form of notice shall be deemed to include the certification provided in the approved form of notice of non-payment of rent.

(6)    If a court shall determine that any notice provided by a tenant under section 5.04(2), 5.04(3) or 5.04(5) is fraudulent or contains a material misrepresentation by the tenant, then the landlord may impose late fees pursuant to the lease and may furnish rental payment data to a consumer reporting agency.

5.05    <u>Landlord Utilization of an Advance Payment of Rent.</u>

(1)    A landlord who received rent in advance for the last month of tenancy pursuant to said section 15B, may access and utilize the advance rent payment. A landlord may utilize the advance rent payment to pay for expenses incurred by the landlord that are related to the residential dwelling unit or small business premises unit leased to the tenant who made the advance rent payment.  Such expenses may include, but shall not be limited to, mortgage payments, utility costs, maintenance costs and other operating expenses incurred by the landlord for the leased premises or for the property in which the leased premises is located.  The landlord shall not use the advance rent payment to pay expenses that are not related to the tenant's premises, and the landlord shall not deduct from said last month's rent in advance any amount to account for the tenant's nonpayment of rent, unless the landlord and tenant shall agree in writing that some or all of the advance rent payment may be applied to the missed rent payment.

(2)    If a landlord shall access and utilize the advance rent payment, the landlord shall notify the tenant in writing that: (a) the landlord utilized such funds before the last month of the tenancy; (b) unless the tenant otherwise agrees in writing, the landlord remains obligated to apply said rent in advance to its intended application as rent for the last month of tenancy; and (c) the tenant is entitled to the same amount of interest from the landlord under said section 15B of said chapter 186 that would have accrued had the landlord not utilized such funds before the last month of the tenancy.  The form of such notice shall be in the form entitled "NOTICE TO TENANT - USE OF ADVANCE RENT PAYMENT" as posted on the EOHED website. Such notice must be sent by the landlord not more than five business days after the date on which the landlord used the advance rent payment for the purposes set forth in subsection 1.

(3)    Notices required by section 5.05(2) shall be sent to the tenant in accordance with the notice provisions of the lease or in accordance with the parties' prior customs and practice.  If the lease does not contain any notice provisions, or if a tenancy is not subject to a written lease, then notice shall be provided to the address of the leased premises, or to the current email address used by the tenant to communicate with the landlord.

(4)    The interest due to the tenant pursuant to said section 15B of said chapter 186 shall be calculated as though the landlord had not utilized such funds before the last month of the tenancy.  Where the landlord is unable to establish with certainty the rate of interest that would have been paid on the advance rate payment, the rate of interest shall be deemed to be the greater

of (a) the rate of interest received from the bank where the deposit has been held for the month immediately preceding the landlord's utilization of such funds, or (b) the rate of interest received by the landlord during the last month of the tenancy from the bank where the landlord maintains the tenant's security deposit

5.06    Additional Guidance; Expiration

(1)    EOHED may from time to time issue additional guidance as necessary or helpful in the application, implementation, or interpretation of the Act or of this emergency regulation.

(2)    Pursuant to the Act, this emergency regulation shall expire 120 days after the effective date of the Act, or 45 days after the state of emergency has been lifted, whichever is sooner, unless further extended by the secretary of EOHED.

**EXHIBIT C**

# HOUSE . . . . . . . . . . . . . . . No.

## The Commonwealth of Massachusetts

_____

PRESENTED BY:

### *Mike Connolly and Kevin G. Honan*

_____

*To the Honorable Senate and House of Representatives of the Commonwealth of Massachusetts in General Court assembled:*

The undersigned legislators and/or citizens respectfully petition for the adoption of the accompanying bill:

An Act to guarantee housing stability during the COVID-19 emergency and recovery.

_____

PETITION OF:

| NAME: | DISTRICT/ADDRESS: |
| --- | --- |
| Mike Connolly | 26th Middlesex |
| Kevin G. Honan | 17th Suffolk |
| Nika C. Elugardo | 15th Suffolk |
| Patricia D. Jehlen | Second Middlesex |
| David Paul Linsky | 5th Middlesex |
| Peter Capano | 11th Essex |
| Daniel J. Ryan | 2nd Suffolk |
| Christine P. Barber | 34th Middlesex |
| Michael F. Rush | Norfolk and Suffolk |
| Elizabeth A. Malia | 11th Suffolk |
| Kay Khan | 11th Middlesex |
| Tami L. Gouveia | 14th Middlesex |
| Jack Patrick Lewis | 7th Middlesex |
| James K. Hawkins | 2nd Bristol |
| Michael J. Moran | 18th Suffolk |
| Gerard J. Cassidy | 9th Plymouth |
| Steven Ultrino | 33rd Middlesex |
| Sal N. DiDomenico | Middlesex and Suffolk |

| | |
|---|---|
| Louis L. Kafka | 8th Norfolk |
| Carmine Lawrence Gentile | 13th Middlesex |
| Jay D. Livingstone | 8th Suffolk |
| Andres X. Vargas | 3rd Essex |
| Adrian C. Madaro | 1st Suffolk |
| Mindy Domb | 3rd Hampshire |
| Lindsay N. Sabadosa | 1st Hampshire |
| Tommy Vitolo | 15th Norfolk |
| Tricia Farley-Bouvier | 3rd Berkshire |
| Liz Miranda | 5th Suffolk |
| Denise Provost | 27th Middlesex |
| Tram T. Nguyen | 18th Essex |
| Natalie M. Higgins | 4th Worcester |
| Alan Silvia | 7th Bristol |
| Linda Dean Campbell | 15th Essex |
| Denise C. Garlick | 13th Norfolk |
| Paul McMurtry | 11th Norfolk |
| Jon Santiago | 9th Suffolk |
| Stephan Hay | 3rd Worcester |
| Sonia Chang-Diaz | Second Suffolk |
| James B. Eldridge | Middlesex and Worcester |
| Jason M. Lewis | Fifth Middlesex |
| Joseph W. McGonagle, Jr. | 28th Middlesex |
| Frank A. Moran | 17th Essex |
| Mary S. Keefe | 15th Worcester |
| Joanne M. Comerford | Hampshire, Franklin and Worcester |
| Daniel Cahill | 10th Essex |
| Ruth B. Balser | 12th Middlesex |
| Antonio F. D. Cabral | 13th Bristol |
| David M. Rogers | 24th Middlesex |
| Natalie M. Blais | 1st Franklin |
| James J. O'Day | 14th Worcester |
| David Henry Argosky LeBoeuf | 17th Worcester |
| Marjorie C. Decker | 25th Middlesex |
| Sean Garballey | 23rd Middlesex |
| Jonathan Hecht | 29th Middlesex |
| Thomas M. Stanley | 9th Middlesex |
| Paul J. Donato | 35th Middlesex |
| Rebecca L. Rausch | Norfolk, Bristol and Middlesex |

| | |
|---|---|
| Maria Duaime Robinson | 6th Middlesex |
| Michelle L. Ciccolo | 15th Middlesex |
| Daniel R. Cullinane | 12th Suffolk |
| Paul F. Tucker | 7th Essex |
| Daniel J. Hunt | 13th Suffolk |
| Kate Lipper-Garabedian | 32nd Middlesex |
| Carol A. Doherty | 3rd Bristol |
| Paul R. Feeney | Bristol and Norfolk |
| William J. Driscoll, Jr. | 7th Norfolk |
| Marcos A. Devers | 16th Essex |
| José F. Tosado | 9th Hampden |
| Christina A. Minicucci | 14th Essex |
| Susannah M. Whipps | 2nd Franklin |
| Danillo A. Sena | 37th Middlesex |
| Michelle M. DuBois | 10th Plymouth |
| Daniel R. Carey | 2nd Hampshire |
| Patrick Joseph Kearney | 4th Plymouth |
| John H. Rogers | 12th Norfolk |
| John J. Lawn, Jr. | 10th Middlesex |
| Paul W. Mark | 2nd Berkshire |
| Kathleen R. LaNatra | 12th Plymouth |
| Russell E. Holmes | 6th Suffolk |
| Chynah Tyler | 7th Suffolk |
| Christopher Hendricks | 11th Bristol |
| Lori A. Ehrlich | 8th Essex |
| Christopher M. Markey | 9th Bristol |
| Joseph A. Boncore | First Suffolk and Middlesex |
| Anne M. Gobi | Worcester, Hampden, Hampshire and Middlesex |
| Nick Collins | First Suffolk |
| Bud L. Williams | 11th Hampden |

# HOUSE . . . . . . . . . . . . . . . No.

By Messrs. Connolly of Cambridge and Honan of Boston, a petition (subject to Joint Rule 12) of Mike Connolly, Kevin G. Honan and others relative to the housing market during the COVID-19 emergency and recovery.  Housing.

## The Commonwealth of Massachusetts

_____

**In the One Hundred and Ninety-First General Court
(2019-2020)**

_____

An Act to guarantee housing stability during the COVID-19 emergency and recovery.

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to establish forthwith ongoing stabilization of the housing market for renters and homeowners during the COVID-19 emergency and recovery, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety and convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

1     SECTION 1.

2     "Eviction", an action, without limitation, by an owner or lessor or manager of a housing

3     accommodation which is intended to actually or constructively evict a tenant or otherwise

4     compel a tenant to vacate such housing accommodation.

5     "Housing accommodation", a building or structure, or part thereof or land appurtenant

6     thereto, and any other real or personal property used, rented or offered for rent for living or

7     dwelling purposes, together with all services connected with the use or occupancy of such

8     property.

9    "Just cause", one of the following: (1) the tenant has failed to pay the rent and is not

10   subject to the protections of Section 2, below; (2) the tenant has materially violated an obligation

11   or covenant of the tenancy or occupancy, other than the obligation to surrender possession upon

12   proper notice, and has failed to cure such violation within 30 days after having received written

13   notice thereof from the owner; (3) the tenant is committing a nuisance in the unit, is permitting a

14   nuisance to exist in the unit, is causing substantial damage to the unit or is creating a substantial

15   interference with the quiet enjoyment of other occupants; (4) the tenant is using or permitting the

16   unit to be used for any illegal purpose.

17   "Tenant", a person or group of persons who is entitled to occupy a housing

18   accommodation pursuant to a lease or tenancy or a tenancy at will, or a former homeowner

19   residing in a property that has been foreclosed on.

20   SECTION 2.

21   (a) Notwithstanding chapters 186 or 239 of the General Laws or any other general or

22   special law to the contrary, no plaintiff in a non-payment eviction action may recover possession

23   of a residential dwelling unit at any time on the basis of any rent or use and occupancy payments

24   due and payable during the period from the Governor's March 10, 2020 emergency declaration

25   designated as executive order number 591 ("Emergency Declaration") until 12 months after the

26   Emergency Declaration is rescinded, nor shall such rent or use and occupancy payments be

27   recoverable in any proceeding under chapter 239, where the failure to pay such rent or use and

28   occupancy resulted from a loss of income or other change in economic circumstances caused in

29   any way, directly or indirectly, by the conditions and/or events described in the Emergency

30   Declaration.

31        (b) In any proceeding under chapter 239 where the plaintiff's complaint for possession

32    and/or rent due is based upon any rent or use and occupancy due and payable during the period

33    from March 10, 2020 until 12 months after the Emergency Declaration is rescinded, it shall be a

34    rebuttable presumption that the tenant or occupant was unable to pay such rent or use and

35    occupancy payments because of such lost income or other change in economic circumstances,

36    and such presumption shall be rebutted only by clear and convincing evidence that the failure to

37    pay rent was not based in whole or in part upon such lost income or other change in economic

38    circumstances.

39        (c) No person shall initiate, file or threaten to file a negative credit report to a credit

40    reporting agency due to the nonpayment of rent or use and occupancy referred to in this section.

41    SECTION 3.

42        (a) Notwithstanding any general or special law to the contrary, during the state of the

43    Emergency Declaration and for 12 months after the Emergency Declaration is rescinded, no

44    person shall (1) attempt to commence, or commence, an eviction, except for just cause; or (2)

45    charge or collect rent or use and occupancy payments in excess of the agreed-upon amount as of

46    March 10, 2020, except that housing authorities and landlords with tenants whose rent payments

47    are partially or fully subsidized shall be excluded from the rent change provision of subsection

48    (2), above. Any waiver of any provision of this section shall be against public policy and void.

49    This section shall not be applicable to owner-occupied buildings composed of four or fewer

50    rental units.

51        (b) A city or town may provide that the just cause eviction protections of this chapter be

52    extended beyond the expiration of Section 3(a), and for any duration, by legislative enactment in

53    the manner provided in section 4 of chapter 4 of the General Laws, and may, in like manner,

54    terminate such extension.

55        SECTION 4.

56        Notwithstanding any general or special law, rule, or regulation to the contrary, no court

57    having jurisdiction of a summary process action or any other trial court department shall make

58    public or publish, in any manner, the name or other identifying information, such as the person's

59    address, of any person named as a party to a summary process or civil action where the plaintiff

60    seeks non-payment of rent from a period beginning with the commencement of the Emergency

61    Declaration until 12 months after its termination; provided, further, that such information shall

62    be impounded and shall remain permanently unavailable for public inspection or publication,

63    except to the parties to the action or their attorney, or as ordered by the court for good cause

64    shown.

65        SECTION 5.

66        Notwithstanding any general or special law or rule or regulation to the contrary, a

67    creditor, mortgagee or person having estate in the land mortgaged, a person authorized by a

68    power of sale pursuant to section 14 of said chapter 244 or right of entry or the attorney duly

69    authorized by a writing under seal or the legal guardian or conservator of such mortgagee or

70    person acting in the name of such mortgagee or person shall not, for the purposes of foreclosure

71    of a residential property as defined in section 35B of said chapter 244 that is not vacant or

72    abandoned: (i) cause notice of a foreclosure sale to be published pursuant to said section 14 of

73    said chapter 244; (ii) exercise a power of sale; (iii) exercise a right of entry; (iv) initiate a judicial

74    or non-judicial foreclosure process; or (v) file a complaint to determine the military status of a

75    mortgagor under the federal Servicemembers Civil Relief Act, 50 USC sections 3901 to 4043,

76    inclusive, on the basis of mortgage payments due and payable from the Emergency Declaration

77    until 12 months after the Emergency Declaration is rescinded, or the end of any forbearance

78    period granted pursuant to Section 5(b) of Chapter 65 of the Acts of 2020. Any foreclosure

79    actions taken in violation of this statute shall be against public policy and void.

80    SECTION 6.

81    (a) Section 5(b) of Chapter 65 of the Acts of 2020 is amended and replaced in full with

82    the following paragraph:

83    A creditor or mortgagee shall grant forbearance to a mortgagor of a mortgage loan for a

84    residential property as defined in said section 35B of said chapter 244 if the mortgagor submits a

85    request to the mortgagor's servicer affirming that the mortgagor has experienced a financial

86    impact from COVID-19. The request may be made in any form, written or oral, and the

87    forbearance shall be granted regardless of the mortgagor's delinquency status.  The forbearance

88    shall last 180 days, although at the mortgagor's request, the period of forbearance may begin in

89    an increment shorter than 180 days and then extended at the mortgagor's request. The

90    forbearance shall be extended for an additional 180 days at the mortgagor's request. Fees,

91    penalties or interest beyond the amounts scheduled and calculated as if the mortgagor made all

92    contractual payments on time and in full under the terms of the mortgage contract shall not

93    accrue during the period of forbearance granted under this subsection. A payment subject to the

94    forbearance, including any escrow payments required to be paid in the mortgage contract, shall

95    be added to the end of the term of the loan unless otherwise agreed to by the mortgagor and

96    mortgagee. Nothing in this subsection shall prohibit a mortgagor and mortgagee from entering

97    into an alternative payment agreement for the payments subject to the forbearance. The

98    mortgagee shall not furnish information to a consumer reporting agency related to mortgage

99    payments subject to forbearance under this act. Nothing in this Act reduces a mortgagor's rights

100   under the CARES Act as applied to federally backed mortgage loans.

101         (b) Notwithstanding any general or special law, rule, or regulation to the contrary, a

102   creditor or mortgagee shall grant forbearance to a mortgage loan for residential property owned

103   by a nonprofit entity (or an affiliate or agent of such non-profit entity) or where the mortgagor

104   (including affiliates and agents) owns 15 or fewer residential apartments, if the mortgagor

105   submits a request to the mortgagor's servicer affirming that the mortgagor has experienced a

106   financial impact from COVID-19. The forbearance shall last 180 days, although at the

107   mortgagor's request, the period of forbearance may begin in an increment shorter than 180 days

108   and then extended at the mortgagor's request, may be extended an additional 180 days at the

109   mortgagor's request, and shall be offered on the same terms and conditions as those specified at

110   Section 5(b) of Chapter 65 of the Acts of 2020, as amended by Section 6(a) of this statute and

111   must be requested on or prior to the date specified at Section 7 of Chapter 65 of the Acts of 2020.

112         (c) A mortgagor who has requested and received mortgage forbearance under this section

113   or under Section 5(b) of Chapter 65 of the Acts of 2020, as amended by this statute, must, for

114   each month of the mortgage forbearance period, waive and forever hold tenants harmless from

115   the obligation to pay that month's rent for each rental unit located on the property that is secured

116   by the mortgage and which is occupied by a household who resided lawfully in the unit as of

117   March 10, 2020, except where the mortgagor demonstrates by clear and convincing evidence that

118   the tenant's failure to pay rent did not result from a loss of income or other change in economic

119    circumstances caused directly or indirectly by the conditions and/or events described in the

120    Emergency Declaration.

121        SECTION 7.

122        The commissioner of banks and/or the office of the Attorney General, to the extent

123    feasible and practicable in facilitating the timely implementation of this act, may develop and

124    promulgate regulations and standardized forms for the written documentation required in section

125    6; provided, however, that the absence of such forms shall not render the provisions of this act

126    inoperable.

127        SECTION 8.

128        (a) There shall be established and set upon the books a COVID-19 Housing Stability and

129    Recovery Fund (Fund) to be administered by the department of housing and community

130    development, to provide assistance to owners of residential units who were unable to pay

131    housing and housing-related costs for reasons related directly or indirectly to the conditions or

132    events described in the Emergency Declaration. Priority for such funds shall be given to owner-

133    occupant landlords, elderly landlords on fixed incomes, non-profit landlords, and Massachusetts-

134    based commercial landlords owning 15 or fewer units, with oversight from an Oversight and

135    Advisory Board.

136        (b) The said Fund shall consist of public and private sources such as revenue from

137    appropriations or other monies authorized by the general court and specifically designated to be

138    credited to the fund, funds from the federal government, and all other sources. Money remaining

139    in the fund at the end of a fiscal year shall not revert to the general fund.

140      (c) An Oversight and Advisory Board shall be comprised of members of the Legislature's

141    coronavirus working groups, who will select no fewer than 8 people from communities hardest

142    hit by the COVID-19 pandemic, assessed by the rate of COVID-19 cases in municipalities and

143    neighborhoods and informed by the fact that there are disparities in COVID-19 infection rates by

144    race, ethnicity, and income. The Oversight and Advisory Board shall monitor and evaluate the

145    use of funds to ensure they are equitably distributed, with priority given to low- and middle-

146    income renters and homeowners affected by the COVID-19 crisis, and shall make

147    recommendations regarding the administration of the fund. The Oversight and Advisory Board

148    shall pursue all federal, state, and other funds available to assist renters and homeowners.

149      SECTION 9.

150      Notwithstanding any general or special law to the contrary, the Housing Court shall have

151    sole and exclusive jurisdiction over all civil claims for rent or mortgage payments due and

152    payable during the period running from March 10, 2020 until 12 months after the date the

153    Emergency Declaration is rescinded.

154      SECTION 10.

155      Violations of this chapter shall constitute unfair or deceptive acts or practices as that term

156    is defined under G.L. c. 93A, § 2 and/or 940 C.M.R. 3.00 et seq., and shall be enforceable by the

157    Attorney General as well as by aggrieved tenants, homeowners, or other occupants in the same

158    manner and to the same extent as other violations of c. 93A. All the remedies of G.L. c. 93A

159    shall be available for violations of all sections of this chapter.

160      SECTION 11.

161        If any provision or provisions of this chapter is or are declared unconstitutional or

162        inoperative by a final judgment, order or decree of the supreme court of the United States or of

163        the supreme judicial court of the commonwealth, the remaining parts of said chapter shall not be

164        affected thereby.

**EXHIBIT D**

# HOUSE . . . . . . . . . . . . . . . No. 4878

## The Commonwealth of Massachusetts

_____

PRESENTED BY:

### *Mike Connolly and Kevin G. Honan*

_____

*To the Honorable Senate and House of Representatives of the Commonwealth of Massachusetts in General Court assembled:*

The undersigned legislators and/or citizens respectfully petition for the adoption of the accompanying bill:

An Act to guarantee housing stability during the COVID-19 emergency and recovery.

_____

PETITION OF:

| NAME: | DISTRICT/ADDRESS: |
|---|---|
| Mike Connolly | 26th Middlesex |
| Kevin G. Honan | 17th Suffolk |
| Nika C. Elugardo | 15th Suffolk |
| Patricia D. Jehlen | Second Middlesex |
| David Paul Linsky | 5th Middlesex |
| Peter Capano | 11th Essex |
| Daniel J. Ryan | 2nd Suffolk |
| Christine P. Barber | 34th Middlesex |
| Michael F. Rush | Norfolk and Suffolk |
| Elizabeth A. Malia | 11th Suffolk |
| Kay Khan | 11th Middlesex |
| Tami L. Gouveia | 14th Middlesex |
| Jack Patrick Lewis | 7th Middlesex |
| James K. Hawkins | 2nd Bristol |
| Michael J. Moran | 18th Suffolk |
| Gerard J. Cassidy | 9th Plymouth |
| Steven Ultrino | 33rd Middlesex |
| Sal N. DiDomenico | Middlesex and Suffolk |

| | |
|---|---|
| Louis L. Kafka | 8th Norfolk |
| Carmine Lawrence Gentile | 13th Middlesex |
| Jay D. Livingstone | 8th Suffolk |
| Andres X. Vargas | 3rd Essex |
| Adrian C. Madaro | 1st Suffolk |
| Mindy Domb | 3rd Hampshire |
| Lindsay N. Sabadosa | 1st Hampshire |
| Tommy Vitolo | 15th Norfolk |
| Tricia Farley-Bouvier | 3rd Berkshire |
| Liz Miranda | 5th Suffolk |
| Denise Provost | 27th Middlesex |
| Tram T. Nguyen | 18th Essex |
| Natalie M. Higgins | 4th Worcester |
| Alan Silvia | 7th Bristol |
| Linda Dean Campbell | 15th Essex |
| Denise C. Garlick | 13th Norfolk |
| Paul McMurtry | 11th Norfolk |
| Jon Santiago | 9th Suffolk |
| Stephan Hay | 3rd Worcester |
| Sonia Chang-Diaz | Second Suffolk |
| James B. Eldridge | Middlesex and Worcester |
| Jason M. Lewis | Fifth Middlesex |
| Joseph W. McGonagle, Jr. | 28th Middlesex |
| Frank A. Moran | 17th Essex |
| Mary S. Keefe | 15th Worcester |
| Joanne M. Comerford | Hampshire, Franklin and Worcester |
| Daniel Cahill | 10th Essex |
| Ruth B. Balser | 12th Middlesex |
| Antonio F. D. Cabral | 13th Bristol |
| David M. Rogers | 24th Middlesex |
| Natalie M. Blais | 1st Franklin |
| James J. O'Day | 14th Worcester |
| David Henry Argosky LeBoeuf | 17th Worcester |
| Marjorie C. Decker | 25th Middlesex |
| Sean Garballey | 23rd Middlesex |
| Jonathan Hecht | 29th Middlesex |
| Thomas M. Stanley | 9th Middlesex |
| Paul J. Donato | 35th Middlesex |
| Rebecca L. Rausch | Norfolk, Bristol and Middlesex |

| | |
|---|---|
| Maria Duaime Robinson | 6th Middlesex |
| Michelle L. Ciccolo | 15th Middlesex |
| Daniel R. Cullinane | 12th Suffolk |
| Paul F. Tucker | 7th Essex |
| Daniel J. Hunt | 13th Suffolk |
| Kate Lipper-Garabedian | 32nd Middlesex |
| Carol A. Doherty | 3rd Bristol |
| Paul R. Feeney | Bristol and Norfolk |
| William J. Driscoll, Jr. | 7th Norfolk |
| Marcos A. Devers | 16th Essex |
| José F. Tosado | 9th Hampden |
| Christina A. Minicucci | 14th Essex |
| Susannah M. Whipps | 2nd Franklin |
| Danillo A. Sena | 37th Middlesex |
| Michelle M. DuBois | 10th Plymouth |
| Daniel R. Carey | 2nd Hampshire |
| Patrick Joseph Kearney | 4th Plymouth |
| John H. Rogers | 12th Norfolk |
| John J. Lawn, Jr. | 10th Middlesex |
| Paul W. Mark | 2nd Berkshire |
| Kathleen R. LaNatra | 12th Plymouth |
| Russell E. Holmes | 6th Suffolk |
| Chynah Tyler | 7th Suffolk |
| Christopher Hendricks | 11th Bristol |
| Lori A. Ehrlich | 8th Essex |
| Christopher M. Markey | 9th Bristol |
| Joseph A. Boncore | First Suffolk and Middlesex |
| Anne M. Gobi | Worcester, Hampden, Hampshire and Middlesex |
| Nick Collins | First Suffolk |
| Bud L. Williams | 11th Hampden |

# HOUSE . . . . . . . . . . . . . . . No. 4878

By Messrs. Connolly of Cambridge and Honan of Boston, a petition (subject to Joint Rule 12) of Mike Connolly, Kevin G. Honan and others relative to the housing market during the COVID-19 emergency and recovery.  Housing.

## The Commonwealth of Massachusetts

_____

**In the One Hundred and Ninety-First General Court**
**(2019-2020)**
_____

An Act to guarantee housing stability during the COVID-19 emergency and recovery.

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to establish forthwith ongoing stabilization of the housing market for renters and homeowners during the COVID-19 emergency and recovery, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety and convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

1       SECTION 1.

2       "Eviction", an action, without limitation, by an owner or lessor or manager of a housing

3   accommodation which is intended to actually or constructively evict a tenant or otherwise

4   compel a tenant to vacate such housing accommodation.

5       "Housing accommodation", a building or structure, or part thereof or land appurtenant

6   thereto, and any other real or personal property used, rented or offered for rent for living or

7   dwelling purposes, together with all services connected with the use or occupancy of such

8   property.

9       "Just cause", one of the following: (1) the tenant has failed to pay the rent and is not

10    subject to the protections of Section 2, below; (2) the tenant has materially violated an obligation

11    or covenant of the tenancy or occupancy, other than the obligation to surrender possession upon

12    proper notice, and has failed to cure such violation within 30 days after having received written

13    notice thereof from the owner; (3) the tenant is committing a nuisance in the unit, is permitting a

14    nuisance to exist in the unit, is causing substantial damage to the unit or is creating a substantial

15    interference with the quiet enjoyment of other occupants; (4) the tenant is using or permitting the

16    unit to be used for any illegal purpose.

17    "Tenant", a person or group of persons who is entitled to occupy a housing

18    accommodation pursuant to a lease or tenancy or a tenancy at will, or a former homeowner

19    residing in a property that has been foreclosed on.

20    SECTION 2.

21    (a) Notwithstanding chapters 186 or 239 of the General Laws or any other general or

22    special law to the contrary, no plaintiff in a non-payment eviction action may recover possession

23    of a residential dwelling unit at any time on the basis of any rent or use and occupancy payments

24    due and payable during the period from the Governor's March 10, 2020 emergency declaration

25    designated as executive order number 591 ("Emergency Declaration") until 12 months after the

26    Emergency Declaration is rescinded, nor shall such rent or use and occupancy payments be

27    recoverable in any proceeding under chapter 239, where the failure to pay such rent or use and

28    occupancy resulted from a loss of income or other change in economic circumstances caused in

29    any way, directly or indirectly, by the conditions and/or events described in the Emergency

30    Declaration.

31      (b) In any proceeding under chapter 239 where the plaintiff's complaint for possession

32      and/or rent due is based upon any rent or use and occupancy due and payable during the period

33      from March 10, 2020 until 12 months after the Emergency Declaration is rescinded, it shall be a

34      rebuttable presumption that the tenant or occupant was unable to pay such rent or use and

35      occupancy payments because of such lost income or other change in economic circumstances,

36      and such presumption shall be rebutted only by clear and convincing evidence that the failure to

37      pay rent was not based in whole or in part upon such lost income or other change in economic

38      circumstances.

39      (c) No person shall initiate, file or threaten to file a negative credit report to a credit

40      reporting agency due to the nonpayment of rent or use and occupancy referred to in this section.

41      SECTION 3.

42      (a) Notwithstanding any general or special law to the contrary, during the state of the

43      Emergency Declaration and for 12 months after the Emergency Declaration is rescinded, no

44      person shall (1) attempt to commence, or commence, an eviction, except for just cause; or (2)

45      charge or collect rent or use and occupancy payments in excess of the agreed-upon amount as of

46      March 10, 2020, except that housing authorities and landlords with tenants whose rent payments

47      are partially or fully subsidized shall be excluded from the rent change provision of subsection

48      (2), above. Any waiver of any provision of this section shall be against public policy and void.

49      This section shall not be applicable to owner-occupied buildings composed of four or fewer

50      rental units.

51      (b) A city or town may provide that the just cause eviction protections of this chapter be

52      extended beyond the expiration of Section 3(a), and for any duration, by legislative enactment in

53  the manner provided in section 4 of chapter 4 of the General Laws, and may, in like manner,

54  terminate such extension.

55      SECTION 4.

56      Notwithstanding any general or special law, rule, or regulation to the contrary, no court

57  having jurisdiction of a summary process action or any other trial court department shall make

58  public or publish, in any manner, the name or other identifying information, such as the person's

59  address, of any person named as a party to a summary process or civil action where the plaintiff

60  seeks non-payment of rent from a period beginning with the commencement of the Emergency

61  Declaration until 12 months after its termination; provided, further, that such information shall

62  be impounded and shall remain permanently unavailable for public inspection or publication,

63  except to the parties to the action or their attorney, or as ordered by the court for good cause

64  shown.

65      SECTION 5.

66      Notwithstanding any general or special law or rule or regulation to the contrary, a

67  creditor, mortgagee or person having estate in the land mortgaged, a person authorized by a

68  power of sale pursuant to section 14 of said chapter 244 or right of entry or the attorney duly

69  authorized by a writing under seal or the legal guardian or conservator of such mortgagee or

70  person acting in the name of such mortgagee or person shall not, for the purposes of foreclosure

71  of a residential property as defined in section 35B of said chapter 244 that is not vacant or

72  abandoned: (i) cause notice of a foreclosure sale to be published pursuant to said section 14 of

73  said chapter 244; (ii) exercise a power of sale; (iii) exercise a right of entry; (iv) initiate a judicial

74  or non-judicial foreclosure process; or (v) file a complaint to determine the military status of a

75    mortgagor under the federal Servicemembers Civil Relief Act, 50 USC sections 3901 to 4043,

76    inclusive, on the basis of mortgage payments due and payable from the Emergency Declaration

77    until 12 months after the Emergency Declaration is rescinded, or the end of any forbearance

78    period granted pursuant to Section 5(b) of Chapter 65 of the Acts of 2020. Any foreclosure

79    actions taken in violation of this statute shall be against public policy and void.

80        SECTION 6.

81        (a) Section 5(b) of Chapter 65 of the Acts of 2020 is amended and replaced in full with

82    the following paragraph:

83        A creditor or mortgagee shall grant forbearance to a mortgagor of a mortgage loan for a

84    residential property as defined in said section 35B of said chapter 244 if the mortgagor submits a

85    request to the mortgagor's servicer affirming that the mortgagor has experienced a financial

86    impact from COVID-19. The request may be made in any form, written or oral, and the

87    forbearance shall be granted regardless of the mortgagor's delinquency status.  The forbearance

88    shall last 180 days, although at the mortgagor's request, the period of forbearance may begin in

89    an increment shorter than 180 days and then extended at the mortgagor's request. The

90    forbearance shall be extended for an additional 180 days at the mortgagor's request. Fees,

91    penalties or interest beyond the amounts scheduled and calculated as if the mortgagor made all

92    contractual payments on time and in full under the terms of the mortgage contract shall not

93    accrue during the period of forbearance granted under this subsection. A payment subject to the

94    forbearance, including any escrow payments required to be paid in the mortgage contract, shall

95    be added to the end of the term of the loan unless otherwise agreed to by the mortgagor and

96    mortgagee. Nothing in this subsection shall prohibit a mortgagor and mortgagee from entering

97    into an alternative payment agreement for the payments subject to the forbearance. The

98    mortgagee shall not furnish information to a consumer reporting agency related to mortgage

99    payments subject to forbearance under this act. Nothing in this Act reduces a mortgagor's rights

100    under the CARES Act as applied to federally backed mortgage loans.

101      (b) Notwithstanding any general or special law, rule, or regulation to the contrary, a

102    creditor or mortgagee shall grant forbearance to a mortgage loan for residential property owned

103    by a nonprofit entity (or an affiliate or agent of such non-profit entity) or where the mortgagor

104    (including affiliates and agents) owns 15 or fewer residential apartments, if the mortgagor

105    submits a request to the mortgagor's servicer affirming that the mortgagor has experienced a

106    financial impact from COVID-19. The forbearance shall last 180 days, although at the

107    mortgagor's request, the period of forbearance may begin in an increment shorter than 180 days

108    and then extended at the mortgagor's request, may be extended an additional 180 days at the

109    mortgagor's request, and shall be offered on the same terms and conditions as those specified at

110    Section 5(b) of Chapter 65 of the Acts of 2020, as amended by Section 6(a) of this statute and

111    must be requested on or prior to the date specified at Section 7 of Chapter 65 of the Acts of 2020.

112    (c) A mortgagor who has requested and received mortgage forbearance under this section

113    or under Section 5(b) of Chapter 65 of the Acts of 2020, as amended by this statute, must, for

114    each month of the mortgage forbearance period, waive and forever hold tenants harmless from

115    the obligation to pay that month's rent for each rental unit located on the property that is secured

116    by the mortgage and which is occupied by a household who resided lawfully in the unit as of

117    March 10, 2020, except where the mortgagor demonstrates by clear and convincing evidence that

118    the tenant's failure to pay rent did not result from a loss of income or other change in economic

119   circumstances caused directly or indirectly by the conditions and/or events described in the

120   Emergency Declaration.

121       SECTION 7.

122       The commissioner of banks and/or the office of the Attorney General, to the extent

123   feasible and practicable in facilitating the timely implementation of this act, may develop and

124   promulgate regulations and standardized forms for the written documentation required in section

125   6; provided, however, that the absence of such forms shall not render the provisions of this act

126   inoperable.

127       SECTION 8.

128       (a) There shall be established and set upon the books a COVID-19 Housing Stability and

129   Recovery Fund (Fund) to be administered by the department of housing and community

130   development, to provide assistance to owners of residential units who were unable to pay

131   housing and housing-related costs for reasons related directly or indirectly to the conditions or

132   events described in the Emergency Declaration. Priority for such funds shall be given to owner-

133   occupant landlords, elderly landlords on fixed incomes, non-profit landlords, and Massachusetts-

134   based commercial landlords owning 15 or fewer units, with oversight from an Oversight and

135   Advisory Board.

136       (b) The said Fund shall consist of public and private sources such as revenue from

137   appropriations or other monies authorized by the general court and specifically designated to be

138   credited to the fund, funds from the federal government, and all other sources. Money remaining

139   in the fund at the end of a fiscal year shall not revert to the general fund.

140       (c) An Oversight and Advisory Board shall be comprised of members of the Legislature's

141    coronavirus working groups, who will select no fewer than 8 people from communities hardest

142    hit by the COVID-19 pandemic, assessed by the rate of COVID-19 cases in municipalities and

143    neighborhoods and informed by the fact that there are disparities in COVID-19 infection rates by

144    race, ethnicity, and income. The Oversight and Advisory Board shall monitor and evaluate the

145    use of funds to ensure they are equitably distributed, with priority given to low- and middle-

146    income renters and homeowners affected by the COVID-19 crisis, and shall make

147    recommendations regarding the administration of the fund. The Oversight and Advisory Board

148    shall pursue all federal, state, and other funds available to assist renters and homeowners.

149    SECTION 9.

150       Notwithstanding any general or special law to the contrary, the Housing Court shall have

151    sole and exclusive jurisdiction over all civil claims for rent or mortgage payments due and

152    payable during the period running from March 10, 2020 until 12 months after the date the

153    Emergency Declaration is rescinded.

154    SECTION 10.

155       Violations of this chapter shall constitute unfair or deceptive acts or practices as that term

156    is defined under G.L. c. 93A, § 2 and/or 940 C.M.R. 3.00 et seq., and shall be enforceable by the

157    Attorney General as well as by aggrieved tenants, homeowners, or other occupants in the same

158    manner and to the same extent as other violations of c. 93A. All the remedies of G.L. c. 93A

159    shall be available for violations of all sections of this chapter.

160    SECTION 11.

161        If any provision or provisions of this chapter is or are declared unconstitutional or

162        inoperative by a final judgment, order or decree of the supreme court of the United States or of

163        the supreme judicial court of the commonwealth, the remaining parts of said chapter shall not be

164        affected thereby.

# SENATE . . . . . . . . . . . . . . . No. 2831

## The Commonwealth of Massachusetts

_____

PRESENTED BY:

### *Patricia D. Jehlen*

_____

*To the Honorable Senate and House of Representatives of the Commonwealth of Massachusetts in General Court assembled:*

The undersigned legislators and/or citizens respectfully petition for the adoption of the accompanying bill:

An Act to guarantee housing stability during the COVID-19 emergency and recovery.

_____

PETITION OF:

| NAME: | DISTRICT/ADDRESS: | |
|---|---|---|
| *Patricia D. Jehlen* | *Second Middlesex* | |
| *Sal N. DiDomenico* | *Middlesex and Suffolk* | *6/30/2020* |
| *Jason M. Lewis* | *Fifth Middlesex* | *7/1/2020* |
| *James B. Eldridge* | *Middlesex and Worcester* | *7/1/2020* |
| *Sonia Chang-Diaz* | *Second Suffolk* | *7/1/2020* |
| *Joanne M. Comerford* | *Hampshire, Franklin and Worcester* | *7/1/2020* |
| *Elizabeth A. Malia* | *11th Suffolk* | *7/2/2020* |
| *Mike Connolly* | *26th Middlesex* | *7/2/2020* |
| *Thomas M. Stanley* | *9th Middlesex* | *7/3/2020* |
| *Rebecca L. Rausch* | *Norfolk, Bristol and Middlesex* | *7/6/2020* |
| *Nick Collins* | *First Suffolk* | *7/7/2020* |
| *Anne M. Gobi* | *Worcester, Hampden, Hampshire and Middlesex* | *7/8/2020* |
| *James T. Welch* | *Hampden* | *7/13/2020* |
| *Harriette L. Chandler* | *First Worcester* | *7/13/2020* |
| *Joseph A. Boncore* | *First Suffolk and Middlesex* | *7/13/2020* |
| *Cindy F. Friedman* | *Fourth Middlesex* | *7/28/2020* |

SENATE DOCKET, NO. 2992     FILED ON: 6/30/2020

# SENATE . . . . . . . . . . . . . . . No. 2831

By Ms. Jehlen, a petition (accompanied by bill, Senate, No. 2831) (subject to Joint Rule 12) of Patricia D. Jehlen, Sal N. DiDomenico, Jason M. Lewis, James B. Eldridge and other members of the General Court for legislation to guarantee housing stability during the COVID-19 emergency and recovery.  Housing.

## The Commonwealth of Massachusetts

_____

**In the One Hundred and Ninety-First General Court**
**(2019-2020)**

_____

An Act to guarantee housing stability during the COVID-19 emergency and recovery.

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to establish forthwith ongoing stabilization of the housing market for renters and homeowners during the COVID-19 emergency and recovery, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety and convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

1    SECTION 1. "Eviction", an action, without limitation, by an owner or lessor or manager

2  of a housing accommodation which is intended to actually or constructively evict a tenant or

3  otherwise compel a tenant to vacate such housing accommodation.

4    "Housing accommodation", a building or structure, or part thereof or land appurtenant

5  thereto, and any other real or personal property used, rented or offered for rent for living or

6  dwelling purposes, together with all services connected with the use or occupancy of such

7  property.

8        "Just cause", one of the following: (1) the tenant has failed to pay the rent and is not

9    subject to the protections of Section 2, below; (2) the tenant has materially violated an obligation

10   or covenant of the tenancy or occupancy, other than the obligation to surrender possession upon

11   proper notice, and has failed to cure such violation within 30 days after having received written

12   notice thereof from the owner; (3) the tenant is committing a nuisance in the unit, is permitting a

13   nuisance to exist in the unit, is causing substantial damage to the unit or is creating a substantial

14   interference with the quiet enjoyment of other occupants; (4) the tenant is using or permitting the

15   unit to be used for any illegal purpose.

16        "Tenant", a person or group of persons who is entitled to occupy a housing

17   accommodation pursuant to a lease or tenancy or a tenancy at will, or a former homeowner

18   residing in a property that has been foreclosed on.

19        SECTION 2. (a) Notwithstanding chapters 186 or 239 of the General Laws or any other

20   general or special law to the contrary, no plaintiff in a non-payment eviction action may recover

21   possession of a residential dwelling unit at any time on the basis of any rent or use and

22   occupancy payments due and payable during the period from the Governor's March 10, 2020

23   emergency declaration designated as executive order number 591 ("Emergency Declaration")

24   until 12 months after the Emergency Declaration is rescinded, nor shall such rent or use and

25   occupancy payments be recoverable in any proceeding under chapter 239, where the failure to

26   pay such rent or use and occupancy resulted from a loss of income or other change in economic

27   circumstances caused in any way, directly or indirectly, by the conditions and/or events

28   described in the Emergency Declaration.

(b) In any proceeding under chapter 239 where the plaintiff's complaint for possession and/or rent due is based upon any rent or use and occupancy due and payable during the period from March 10, 2020 until 12 months after the Emergency Declaration is rescinded, it shall be a rebuttable presumption that the tenant or occupant was unable to pay such rent or use and occupancy payments because of such lost income or other change in economic circumstances, and such presumption shall be rebutted only by clear and convincing evidence that the failure to pay rent was not based in whole or in part upon such lost income or other change in economic circumstances.

(c) No person shall initiate, file or threaten to file a negative credit report to a credit reporting agency due to the nonpayment of rent or use and occupancy referred to in this section.

SECTION 3. (a) Notwithstanding any general or special law to the contrary, during the state of the Emergency Declaration and for 12 months after the Emergency Declaration is rescinded, no person shall (1) attempt to commence, or commence, an eviction, except for just cause; or (2) charge or collect rent or use and occupancy payments in excess of the agreed-upon amount as of March 10, 2020, except that housing authorities and landlords with tenants whose rent payments are partially or fully subsidized shall be excluded from the rent change provision of subsection (2), above. Any waiver of any provision of this section shall be against public policy and void. This section shall not be applicable to owner-occupied buildings composed of four or fewer rental units.

(b) A city or town may provide that the just cause eviction protections of this chapter be extended beyond the expiration of Section 3(a), and for any duration, by legislative enactment in

50    the manner provided in section 4 of chapter 4 of the General Laws, and may, in like manner,

51    terminate such extension.

52         SECTION 4. Notwithstanding any general or special law, rule, or regulation to the

53    contrary, no court having jurisdiction of a summary process action or any other trial court

54    department shall make public or publish, in any manner, the name or other identifying

55    information, such as the person's address, of any person named as a party to a summary process

56    or civil action where the plaintiff seeks non-payment of rent from a period beginning with the

57    commencement of the Emergency Declaration until 12 months after its termination; provided,

58    further, that such information shall be impounded and shall remain permanently unavailable for

59    public inspection or publication, except to the parties to the action or their attorney, or as ordered

60    by the court for good cause shown.

61         SECTION 5. Notwithstanding any general or special law or rule or regulation to the

62    contrary, a creditor, mortgagee or person having estate in the land mortgaged, a person

63    authorized by a power of sale pursuant to section 14 of said chapter 244 or right of entry or the

64    attorney duly authorized by a writing under seal or the legal guardian or conservator of such

65    mortgagee or person acting in the name of such mortgagee or person shall not, for the purposes

66    of foreclosure of a residential property as defined in section 35B of said chapter 244 that is not

67    vacant or abandoned: (i) cause notice of a foreclosure sale to be published pursuant to said

68    section 14 of said chapter 244; (ii) exercise a power of sale; (iii) exercise a right of entry; (iv)

69    initiate a judicial or non-judicial foreclosure process; or (v) file a complaint to determine the

70    military status of a mortgagor under the federal Servicemembers Civil Relief Act, 50 USC

71    sections 3901 to 4043, inclusive, on the basis of mortgage payments due and payable from the

72    Emergency Declaration until 12 months after the Emergency Declaration is rescinded, or the end

73  of any forbearance period granted pursuant to Section 5(b) of Chapter 65 of the Acts of 2020.

74  Any foreclosure actions taken in violation of this statute shall be against public policy and void.

75      SECTION 6. (a) Section 5(b) of Chapter 65 of the Acts of 2020 is amended and replaced

76  in full with the following paragraph:-

77      A creditor or mortgagee shall grant forbearance to a mortgagor of a mortgage loan for a

78  residential property as defined in said section 35B of said chapter 244 if the mortgagor submits a

79  request to the mortgagor's servicer affirming that the mortgagor has experienced a financial

80  impact from COVID-19. The request may be made in any form, written or oral, and the

81  forbearance shall be granted regardless of the mortgagor's delinquency status. The forbearance

82  shall last 180 days, although at the mortgagor's request, the period of forbearance may begin in

83  an increment shorter than 180 days and then extended at the mortgagor's request. The

84  forbearance shall be extended for an additional 180 days at the mortgagor's request. Fees,

85  penalties or interest beyond the amounts scheduled and calculated as if the mortgagor made all

86  contractual payments on time and in full under the terms of the mortgage contract shall not

87  accrue during the period of forbearance granted under this subsection. A payment subject to the

88  forbearance, including any escrow payments required to be paid in the mortgage contract, shall

89  be added to the end of the term of the loan unless otherwise agreed to by the mortgagor and

90  mortgagee. Nothing in this subsection shall prohibit a mortgagor and mortgagee from entering

91  into an alternative payment agreement for the payments subject to the forbearance. The

92  mortgagee shall not furnish information to a consumer reporting agency related to mortgage

93  payments subject to forbearance under this act. Nothing in this Act reduces a mortgagor's rights

94  under the CARES Act as applied to federally backed mortgage loans.

95      (b) Notwithstanding any general or special law, rule, or regulation to the contrary, a

96      creditor or mortgagee shall grant forbearance to a mortgage loan for residential property owned

97      by a nonprofit entity (or an affiliate or agent of such non-profit entity) or where the mortgagor

98      (including affiliates and agents) owns 15 or fewer residential apartments, if the mortgagor

99      submits a request to the mortgagor's servicer affirming that the mortgagor has experienced a

100    financial impact from COVID-19. The forbearance shall last 180 days, although at the

101    mortgagor's request, the period of forbearance may begin in an increment shorter than 180 days

102    and then extended at the mortgagor's request, may be extended an additional 180 days at the

103    mortgagor's request, and shall be offered on the same terms and conditions as those specified at

104    Section 5(b) of Chapter 65 of the Acts of 2020, as amended by Section 6(a) of this statute and

105    must be requested on or prior to the date specified at Section 7 of Chapter 65 of the Acts of 2020.

106    (c) A mortgagor who has requested and received mortgage forbearance under this section

107    or under Section 5(b) of Chapter 65 of the Acts of 2020, as amended by this statute, must, for

108    each month of the mortgage forbearance period, waive and forever hold tenants harmless from

109    the obligation to pay that month's rent for each rental unit located on the property that is secured

110    by the mortgage and which is occupied by a household who resided lawfully in the unit as of

111    March 10, 2020, except where the mortgagor demonstrates by clear and convincing evidence that

112    the tenant's failure to pay rent did not result from a loss of income or other change in economic

113    circumstances caused directly or indirectly by the conditions and/or events described in the

114    Emergency Declaration.

115    SECTION 7. The commissioner of banks and/or the office of the Attorney General, to the

116    extent feasible and practicable in facilitating the timely implementation of this act, may develop

117    and promulgate regulations and standardized forms for the written documentation required in

118    section 6; provided, however, that the absence of such forms shall not render the provisions of

119    this act inoperable.

120        SECTION 8. (a) There shall be established and set upon the books a COVID-19 Housing

121    Stability and Recovery Fund (Fund) to be administered by the department of housing and

122    community development, to provide assistance to owners of residential units who were unable to

123    pay housing and housing-related costs for reasons related directly or indirectly to the conditions

124    or events described in the Emergency Declaration. Priority for such funds shall be given to

125    owner-occupant landlords, elderly landlords on fixed incomes, non-profit landlords, and

126    Massachusetts-based commercial landlords owning 15 or fewer units, with oversight from an

127    Oversight and Advisory Board.

128        (b) The said Fund shall consist of public and private sources such as revenue from

129    appropriations or other monies authorized by the general court and specifically designated to be

130    credited to the fund, funds from the federal government, and all other sources. Money remaining

131    in the fund at the end of a fiscal year shall not revert to the general fund.

132        (c) An Oversight and Advisory Board shall be comprised of members of the Legislature's

133    coronavirus working groups, who will select no fewer than 8 people from communities hardest

134    hit by the COVID-19 pandemic, assessed by the rate of COVID-19 cases in municipalities and

135    neighborhoods and informed by the fact that there are disparities in COVID-19 infection rates by

136    race, ethnicity, and income. The Oversight and Advisory Board shall monitor and evaluate the

137    use of funds to ensure they are equitably distributed, with priority given to low- and middle-

138    income renters and homeowners affected by the COVID-19 crisis, and shall make

139    recommendations regarding the administration of the fund. The Oversight and Advisory Board

140    shall pursue all federal, state, and other funds available to assist renters and homeowners.

141        SECTION 9. Notwithstanding any general or special law to the contrary, the Housing

142    Court shall have sole and exclusive jurisdiction over all civil claims for rent or mortgage

143    payments due and payable during the period running from March 10, 2020 until 12 months after

144    the date the Emergency Declaration is rescinded.

145        SECTION 10. Violations of this chapter shall constitute unfair or deceptive acts or

146    practices as that term is defined under G.L. c. 93A, § 2 and/or 940 C.M.R. 3.00 et seq., and shall

147    be enforceable by the Attorney General as well as by aggrieved tenants, homeowners, or other

148    occupants in the same manner and to the same extent as other violations of c. 93A. All the

149    remedies of G.L. c. 93A shall be available for violations of all sections of this chapter.

150        SECTION 11. If any provision or provisions of this chapter is or are declared

151    unconstitutional or inoperative by a final judgment, order or decree of the supreme court of the

152    United States or of the supreme judicial court of the commonwealth, the remaining parts of said

153    chapter shall not be affected thereby.