# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MARIE BAPTISTE, MITCHELL MATORIN, and JONATHAN DAPONTE

                          Plaintiffs,

                    v.

MIKE KENNEALY, in his official capacity as Secretary of the EXECUTIVE OFFICE OF HOUSING AND ECONOMIC DEVELOPMENT, and CHARLES BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,

                          Defendants.

C.A. No. 1:20-CV-11335-MLW

## DEFENDANTS' SUPPLEMENTAL BRIEF
## FILED IN RESPONSE TO THE COURT'S AUGUST 5, 2020 ORDER

Defendants Secretary of the Commonwealth of Massachusetts's Executive Office of Housing and Economic Development ("EOHED") and the Governor of Massachusetts (collectively, "Commonwealth") hereby supplement EOHED's earlier Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opposition") (Dckt. 30), as required by the Court's Order dated August 5, 2020 (Dckt. 50).  Specifically, the Court in its August 5 Order directed the parties to address "the legal issues concerning the facts the court should consider" and to include "discussion and legal authority" concerning:  (1) "the distinction between adjudicative and legislative facts;" (2) the means by which legislative facts may be found by the Court; and (3) the "degree of deference" the Court must give to legislative facts.  (Dckt. 50, ¶ 4).  These three inquiries are addressed in Sections I, II, and III set forth below.  Section IV below describes the

relatively limited legislative history – which is just one type of legislative fact – associated with the Act.  The Appendix attached hereto reproduces the source material referenced in Part IV.

## I.      Legislative Facts Compared to Adjudicative Facts.

"Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case." *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (defining "legislative facts" as "facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case"); *Menora v. Ill. High School Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982) ("Legislative facts are those general considerations that move a lawmaking or rulemaking body to adopt a rule, as distinct from the facts which determine whether the rule was correctly applied."); *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966) ("Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion.").

There is no Federal Rule of Evidence dealing with "legislative" facts, and this omission is deliberate, resulting from "fundamental differences between adjudicative facts and legislative facts."  Fed. R. Evid. 201, Advisory Committee's Note to Subdivision (a).  "Adjudicative facts are simply the facts of the particular case.  Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."  *Id.* "Whether a fact is adjudicative or legislative depends not on the nature of the fact . . . but rather on the use made of it[,] . . .  and the same fact can play either role depending on context."  *Id.*

As most relevant here, "[l]egislative facts are useful in certain instances when a court rules on the constitutionality of legislative action by providing the necessary context to decipher [legislative] intent and the purpose of the statute in question." *San Luis & Delta Mendota Water Authy. v. U.S. Dep't of Interior*, 984 F. Supp.2d 1048, 1063 (E.D. Cal. 2013); *see also Daggett v. Comm'n on Gov't Ethics and Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) ("'legislative facts' . . . go to the justification for a statute . . . ."). In particular, legislative facts "are facts of which courts take particular notice when . . . considering whether [a legislative body] has acted within its constitutional authority. For example, courts frequently take judicial notice of legislative history, including committee reports . . . [and also of] historical facts, commercial practices and social standards . . . ." *Korematsu v. United States*, 584 F. Supp. 1406, 1414 (N.D. Cal. 1984). As a result, in constitutional cases, where the issues presented are "legal in character," those issues may be "informed by background information as to legislative purpose and 'legislative facts' bearing upon the rationality or adequacy of distinctions drawn by statutes." *Massachusetts v. U.S. Dep't Health & Human Servs.*, 682 F.3d 1, 7 (1st Cir. 2012).

## II.     How Legislative Facts May Be Shown and Credited By the Court.

While "[t]he usual method of establishing *adjudicative* facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses," legislative facts "are quite different." Fed. R. Evid. 201, Advisory Committee Note to Subdivision (a) (emphasis supplied). For adjudicative facts, the usual fact-finding method of live witness testimony may be disregarded as unnecessary and judicial notice invoked *only* if the facts are "outside of reasonable controversy" and a "high degree of indisputability" is present. *Id.* In contrast, "'[f]acts most needed in thinking about difficult problems of law and policy [*i.e.*, legislative facts] have a way of being outside the domain of the clearly indisputable.'" *Id.*, quoting Kenneth

Davis, *A System of Judicial Notice Based on Fairness and Convenience*, in Perspectives of Law 69, 82, 83 (1964).  This view of legislative facts "renders inappropriate any limitation in the form of indisputability, any formal requirements of notice other than those already inherent in affording opportunity to hear and be heard and exchanging briefs, and any requirement of formal findings at any level.  It should, however[,] leave open the possibility of introducing evidence through regular channels in appropriate situations."  *Id.*

Thus, unlike adjudicative facts, legislative facts "usually are not proved through trial evidence but rather by material set forth in the briefs." *Daggett*, 172 F.3d at 112; *see also U.S. Dep't HHS*, 682 F.3d at 7 (legislative facts are "normally noticed by courts with the assistance of briefs, records and common knowledge"); *IMS Health, Inc. v. Ayotte*, 550 F.3d 42, 55 (1st Cir. 2008) ("state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest") (internal quotation marks omitted), *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).  In "constitutional litigation" in particular, both appellate and trial courts thus "have the ability to go beyond the formal rules of evidence and examine . . . 'legislative facts.'" *Democratic Party of the U.S. v. National Conservative Political Action Comm.*, 578 F. Supp. 797, 830 (E.D. Pa. 1983), *rev'd in part on other grounds in Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480 (1985).

The sources of legislative facts may take many forms.  For example, writings of social science experts, which are *not* put through the *Daubert* scrutiny that the Landlords seemingly demand here, are instead "often considered and cited by the Supreme Court with or without introduction into the record or even consideration by the trial court." *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 748 n.8 (5th Cir. 1983) (collecting cases).  Indeed, legislative facts "are

often considered by appellate courts from publicly available primary sources even if not developed in the record." *See Isaacson v. Horne*, 716 F.3d 1213, 1220 n.7 (9th Cir. 2013) (collecting cases). "In seeking to determine the rationality of a given measure in meeting permissible goals, the court may examine scholarly articles not formally submitted or may guide its conclusions by reasonable exercise of its deductive powers." *Id.* Given the leeway that courts have in this regard, "ordinary limits on judicial notice hav[e] no application to legislative facts," *Daggett*, 172 F.3d at 112, and there is no need for an adjudicatory-fact-type trial on the subjects covered by the Commonwealth's extensive legislative-fact submissions.

In addition to extra-record material, "a statute or ordinance challenged on constitutional grounds can sometimes be upheld on the basis of evidence presented in cases involving challenges to similar statutes or ordinances." *Minutello v. Hartford Life and Acc. Ins. Co.,* 964 F. Supp. 2d 491, 503 (W.D. Pa. 2013). Even "general knowledge" may supply legislative facts, *see Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n*, 627 F.2d 1151, 1163 n.24 (D.C Cir. 1979), and affidavits are also acceptable sources.[1] *See Miller v. Krawczyk,* 414 F. Supp. 998, 1002 (E.D. Wis. 1976) (in considering constitutional challenge, court states, "various . . . substantial rational bases for the questioned [governmental] rules are evidenced by the [defendants'] affidavits."); *Central Soya Co., Inc. v. United States*, 15 C.I.T. 35, 40-41 (Ct. Int'l Trade 1991) (noting legislative facts established by affidavit); *Connolly v. Matanuska-Susitna Borough*, 2001 WL 34818280, *1 (Alaska 2001) (discussing "affidavits . . . describ[ing] legislative facts" in the context of a constitutional challenge).

---

[1]     The Commonwealth has chosen to use affidavits with attachments and webpage links as an efficient organizational means of presenting the relevant legislative facts, rather than as a suggestion that they ultimately need to be established via an adjudicatory-fact-type trial.

III.     **The Degree of Deference this Court Must Give Legislative Facts.**

As discussed above, the Court has considerable leeway in determining which legislative facts (either in the form of record or extra-record evidence) are most relevant to the legal issues before it, and in crediting and highlighting individual legislative facts as it deems appropriate.  In constitutional challenges, the relevance of legislative facts and the degree to which the Court should defer to them in the sense of taking notice of them differs depending on the constitutional theory in play.  Where a constitutional principle has given rise to a specific test, standard, or a set of factors, legislative facts become relevant in varying degrees to application of that test, standard, or factors.  The sections below describe, claim by claim, the legal significance of legislative facts and the types of legislative facts the court should credit in this case.[2]

A.     *In a Takings Claim, Legislative Facts Go To* Penn Central*'s Character Prong*.

In *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005), the Supreme Court retired the test described in *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980), which had stated that an unconstitutional taking may be found where a governmental action "does not substantially advance legitimate state interests" or "denies an owner an economically viable use of his land."[3] The excision of the *Agins* test from takings jurisprudence relegated legislative facts to a narrower role in takings cases.  *See Lingle*, 544 U.S. at 529; *see also Rose Acre Farms, Inc. v. United*

---

[2]     The August 5, 2020 Order requests that the parties address the "degree of deference to be given to legislative facts by the court."  (Dckt. 50)  In the Commonwealth's view, the Court need not "defer" to any particular evidence of a specific legislative fact, other than to legislative history proffered as evidence of statutory intent.  It should, however, consistent with the Advisory Committee Notes to Fed. R. Evid. 201, generously take notice of legislative facts themselves, where information supporting such facts is provided by the parties or is otherwise available.

[3]     Because of the use of the disjunctive "or" in *Agins*, the "substantially advance[s]" prong had evolved as a stand-alone prerequisite for constitutionality.  In *Lingle*, the Court concluded "that this formula prescribes an inquiry in the nature of a due process, not a takings, test, and . . . it has no proper place in our takings jurisprudence."  *Id.*

*States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009) (under *Lingle*, courts considering a takings claim "can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill").

After *Lingle*, a regulation's health and safety purpose still remains relevant to the "character" prong of *Penn Central*.[4]  *See Rose Acre*, 559 F.3d at 1279 ("We think it is clear that *Lingle* neither addressed nor disturbed *Penn Central*'s consideration of the health and safety aspect of the regulations.").  Accordingly, in determining under *Penn Central* whether a "regulatory taking" has occurred, "[t]here is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation."  *Id.*  Accordingly, legislative facts pertaining to the health and safety nature of the Act, found primarily in the affidavits submitted by the Commonwealth and the attachments thereto and sources cited therein, are highly relevant to the "character" prong of the *Penn Central* analysis on the question whether a regulatory taking has occurred, and should therefore be considered by the Court in analyzing this issue.

B.     *Legislative Facts Are Relevant to Contract Clause Analysis When They Show The State Action Accomplishes a Legitimate Public Purpose.*

"Even a state law that creates a substantial impairment does not transgress the Contract Clause as long as it is appropriate for, and necessary to, the accomplishment of a legitimate public purpose."  *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999).  "'The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests. . . .'  Health and safety are two

---

[4]     *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 125 (1978) ("in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests").

mainstays of the police power." *Houlton*, 175 F.3d at 191 (1st Cir. 1999), quoting *Energy Res. Grp., Inc. v. Kansas Power & Light Co*., 459 U.S. 400, 413 (1983).

Accordingly, the legislative facts presented in and through the Commonwealth's affidavits are not only relevant insofar as they show that the Act is an appropriate exercise of the Commonwealth's police power; they also are more than sufficient to resolve the main inquiry before the Court on the Landlords' Contract Clause claim. Here, as in *Houlton*, the Act "fit[s] well within the category of remedies for 'broad and general social or economic problem[s]' that the Supreme Court has stated will meet its criteria of legitimacy in a Contract Clause context." *Houlton*, 175 F.3d at 191, quoting *Energy Res.,* 459 U.S. at 412. And where, as here, "the contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests[,] a court properly may defer to the legislature's judgment." *Houlton*, 175 F.3d at 191.

Courts have indeed frequently held that contracts are impliedly limited by, and subject to, the implicit authority of the state to exercise its "police power." *See Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Com. of Mass*., 666 F.2d 618, 639 (1st Cir. 1981) (collecting cases). "Thus, the courts have interpreted the [C]lause so as to harmonize the state's need to legislate in the interests of its citizens with the need to protect investors and other contracting parties against repudiation of a debt or obligation. In doing so . . . they have struck down state laws only infrequently." *Id.* Ultimately, "[a] court's task is 'to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'" *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño,* 633 F.3d 37, 41 (1st Cir. 2011), quoting *Mercado–Boneta v. Administracion del Fondo de Compensacion al Paciente,* 125 F.3d 9, 14 (1st Cir. 1997).

Notably, although the legislative facts advanced by the Commonwealth are relevant to the inquiry whether any substantial impairment on contracts is "an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018) (citations and internal quotation marks omitted omitted), *quoting Energy Res.* 459 U.S. at 411–412, it is the Landlords (not the Commonwealth) who bear the burden on this issue on a Contract Clause claim. *Id.* "[T]he state will not be held liable for violating the Contracts Clause . . . unless plaintiffs produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct." *Id.* at 44, *quoting Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 365 (2d Cir. 2006). Of course, the Landlords have not done so and cannot do so here.

At this low level of scrutiny, a statute is barred only where it is "utterly lacking in rational justification." *Flemming v. Nestor*, 363 U.S. 603, 611 (1960) (Due Process Clause protects against arbitrary government actions). And where, as in the Contract Clause context, a constitutional inquiry is in the nature of rational-basis review,[5] "it is, of course, constitutionally irrelevant" whether the rational basis provided for the legislative decision was its actual predicate "in fact." *Id.*, at 612. "'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political

---

[5]    *See Chicago Bd. of Realtors, Inc. v. City of Chicago,* 819 F.2d 732, 737 (7th Cir. 1987) (upholding ordinance against Contracts Clause challenge where ordinance "represent[ed] a rational allocation of rights and responsibilities between landlords and tenants . . . [and] an allocation that the city rationally could have believed would lead to improved public health and welfare."); *Zogenix, Inc. v. Baker*, 2015 WL 1206354 at *6 (D. Mass. 2015) (Zobel, J.) (citing approvingly to Erwin Chemerinsky, Constitutional Law § 8.3.3 (4th ed. 2011), which "analogiz[es] Contracts Clause analysis to rational basis review where government is not a contracting party."); *Golden Rule Ins. Co. v. Stephens*, 912 F. Supp. 261, 268 (E.D. Kent. 1995) (under Contracts Clause analysis, "the court has no power to second guess the legislature as long as the Act has a rational basis.").

branch has acted.'" *Fed Commc'ns, Inc. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314, (1993), *quoting Vance v. Bradley,* 440 U.S. 93, 97 (1979) (footnote omitted).

     C.     *Where Commercial Speech Is Burdened, Legislative Facts Are Relevant*
          *To the Government's Interest and the Statute's Fit to that Interest.*

Where, as here, a free speech claim involves commercial speech, "intermediate scrutiny" applies, under the framework set forth in *Central Hudson Gas & Elc. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). Speech that is misleading (*e.g.*, ordering a tenant to quit premises when evictions have been suspended by the Legislature) may be freely regulated. *Id.* If, however, the commercial speech at issue is not misleading and does not concern unlawful activities, a three-pronged test applies. "First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'" *Id.* at 624.

To be clear, in order to reach this three-pronged inquiry, the Court would first have to conclude both that the verbal acts restrained by the Act are actually "speech" for First Amendment purposes, and that they would not be misleading in their context. In the unlikely event that the Court reaches both of these conclusions, the Commonwealth would carry the burden of proof on the second and third prongs of the *Central Hudson* standard – but it could satisfy that burden simply by pointing to legislative facts. "Indeed, in other First Amendment contexts . . . litigants [have been permitted] to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether . . . or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Florida Bar*, 515 U.S. at 628, *quoting Burson v. Freeman*, 504 U.S. 191, 211 (1992).

Moreover, "the nature and quantity of any showing required by the government to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.  Even when applying strict scrutiny[,] . . . the government may . . . carry its burden by relying solely on history, consensus, and simple common sense. Thus, while the government must carry its burden to establish the fit between a regulation and a governmental interest, it may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (citations and quotations omitted).

> D.     *In A "Compelled Speech" Claim, Legislative Facts*
>         *Are Relevant to the Rational Basis for the Government's Action.*

Disclosure requirements aimed at protecting consumers from misleading speech need be only "reasonably related to the State's interest in preventing deception."  *Zauderer v. Office of Disciplinary Counsel of the Supreme Court*, 471 U.S. 626, 651, (1985).  This is a "rational basis" standard.  *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 558 (6th Cir. 2012) (referring to invalidation of disclosure requirement where it "lacked a rational basis"); *accord id.* at 554-58 (developing at length); *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) ("[d]isclosure requirements aimed at misleading commercial speech need only survive rational basis scrutiny"); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114–15 (2d Cir. 2001) (in commercial disclosure cases, "[t]he [First] Amendment is satisfied . . . by a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose.").

Moreover, even where a disclosure regulation is aimed not at tempering misleading statements but, instead, is meant "to better inform consumers," the same reasonable-relationship rule set forth in *Zauderer* applies.  *New York State Restaurant Ass'n v. New York City Bd. of*

-11-

*Health*, 556 F.3d 114, 133 (2009).  Thus, *if* the Landlords' compelled speech claim survives the

Commonwealth's renewed standing challenge, the legislative facts available to this Court

(including the information presented in the affidavits already filed and their attachments) will be

more than adequate to show a rational basis for the Regulations' disclosure requirement.

> E. *If (and Only If) the Act Infringes on the Right to Petition,*
> *The Court Should Apply the Same Heightened Scrutiny Test as Would*
> *Apply to Commercial Speech to Determine Whether a Sufficient*
> *Government Purpose Exists and the Act Property Fits that Purpose.*

There is little jurisprudence concerning the level of scrutiny applied where a statute

impairs the First Amendment's Petition Clause, perhaps because so few cases raise viable

Petition Clause claims.  This right, which includes a right of access to the courts, is

"fundamental."  *Hall v. Callahan*, 727 F.3d 450, 456 (6th Cir. 2013).  Accordingly, the level of

scrutiny applied should be consistent with that employed under the Petition Clause's sibling, the

Free Speech Clause.  *See Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 789 (6th Cir.

2007) ("In this and other circuits, a 'cause of action for violation of the Petition Clause is subject

to the same analysis applied to a claim arising under the Speech Clause.'"), *quoting Valot v.*

*Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir. 1997).  "The legitimacy

of a statute's purpose is important in a First Amendment analysis whether the appropriate test is

strict scrutiny (requiring a determination of the state's compelling interest) or some lesser form of

scrutiny (requiring a determination of the state's substantial interest)."  *SKF USA, Inc. v. U.S.*

*Customs & Border Prot.*, 556 F.3d 1337, 1350 (Fed. Cir. 2009).

"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of

legislative judgments," as stated *supra*, "var[ies] up or down with the novelty and plausibility of

the justification raised."  *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000).  Thus,

to the extent it is unclear whether interference with the right of petition requires the government

to have "compelling" or merely "substantial" interest, Free Speech Clause standards should provide guidance, and a sliding scale should apply to differentiate acts of petitioning that have a commercial purpose from those that do not – with the lower level of scrutiny applying to the former, just as occurs under the Free Speech Clause.  Here, the relationship between residential landlords and tenants is undeniably commercial in nature.  *See Underwood v. Risman*, 414 Mass. 96, 97 (1993).  Thus, under the *Central Hudson* "commercial speech" test, governmental interference with a First Amendment right is permissible where, *inter alia*, the government's interest is "substantial," the regulation "directly advances the governmental interest asserted," and the regulation is "'not more extensive than is necessary to serve that interest.'"  *Id.* at 1355, *quoting Central Hudson*, 447 U.S. at 566.  This test "does not require perfect correspondence of means and ends."  *Id.* at 1358.  Instead, the "not more extensive than is necessary" portion of the *Central Hudson* test requires "a fit that is not necessarily perfect, but reasonable" and "leave[s] . . . to governmental decisionmakers to judge what manner of regulation may best be employed."  *Id.*, quoting *Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989).  A similar standard should govern the Landlords' Petition Clause here.

Even were the more demanding standard of strict scrutiny to apply, however, the government's burden in justifying a statute can nonetheless still be satisfied by reference to "'[a] long history, a substantial consensus, and simple common sense."  *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 183-85 (W.D. Pa. 2012), *quoting Burson v. Freeman*, 504 U.S. 191, 211 (1992); *see also Florida Bar*, 515 U.S. at 628.  As this Court has explained:

> "What constitutes a compelling interest is [a] matter of law. . . . True, the particular contours of a compelling state interest arise from a discrete factual context. . . . Such a determination involves a consideration of what are known as 'legislative facts'—those facts which themselves determine the legal rule, rather than 'adjudicative facts'—those facts which determine whether an established legal rule applies in a particular instance. . . . As such, this determination is one

for the Court to make . . . . Such an approach, of course, carries with it the benefit of plenary review by higher courts."

*Cotter v. City of Boston*, 193 F.Supp.2d 323, 341 n.8 (D. Mass. 2002), *rev'd in part on other grounds in same case*, 323 F.3d 160 (1st Cir. 2003).

Thus, if the Court were to find that the Act implicates the Landlords' right to petition, *but see* Opposition (Dckt. 30) at pp. 11-14, legislative facts derived from the full panoply of permissible sources should inform the Court's resulting inquiry about the nature of the government's purpose in engaging in such interference during a pandemic, as well as the "fit" between that purpose and the Act.

## IV.    Legislative History Associated with the Act.

Legislative history is a source of legislative facts, but it is only one among many.  *See Korematsu v. United States*, 584 F. Supp. 1406, 1414 (N.D. Cal. 1984); *Commonwealth v. Edison Co. v. United States*, 46 Fed. Cl. 158, 160 n.3 (Ct. Fed. Claims 2000) (courts may take judicial notice of "legislative facts embodied in legislative history").[6]  Legislative history itself

---

[6]    A "time-honored principle of constitutional law reminds us that judicial second-guessing of a legislature's motives is 'generally unwarranted' 'absent some reason to infer antipathy.'"  *Waterman v. Farmer*, 183 F.3d 208, 214 (3rd Cir. 1999), *quoting Vance v. Bradley*, 440 U.S. 93, 97 (1979).  Consequently, the fact that a statute's "legislative history does not mention" a particular topic is, generally, irrelevant.  *Id.*  Where there is "scanty" legislative history, "extensive resort to judicial notice is required to appraise the factual basis for its action."  *See Campbell v. Board of Educ.*, 310 F. Supp. 94, 95 (E.D.N.Y. 1970).  As explained by Justice Brandeis in his dissent in *Jay Burns Baking Co. v. Bryan*, 264 U.S. 504, 533-34 (1924):

> "[Although,] [t]he evidence contained in the record in this case is . . . ample to sustain the validity of the statute[,] [t]here is in the record some evidence in conflict with it. The Legislature and the lower court have, doubtless, considered that.  But with this conflicting evidence we have no concern.  It is not our province to weigh evidence.  Put at its highest, our function is to determine, in the light of all facts which may enrich our knowledge and enlarge our understanding, whether the measure, enacted in the exercise of an unquestioned police power and of a character inherently unobjectionable, transcends the bounds of reason; that is, whether the provision as applied is so clearly arbitrary or capricious that legislators acting reasonably could not have believed it to be necessary or appropriate for the public welfare."

includes "'[t]he background and events leading to the enactment of a statute, including hearings, committee reports, and floor debates.'" *Michelle Hug, Henstock, Inc. v. City of Omaha*, 749 N.W.2d 884, 889 (Neb. 2008), *quoting* Black's Law Dictionary 919 (8th Ed. 2004).  In this case, as is often true in Massachusetts, the legislative history related to the Act is relatively sparse. *See, e.g.*, *Powell v. Tompkins*, 926 F. Supp. 2d 367, 390 (D. Mass. 2013) ("[M]ore often than not, bills are passed by the [Massachusetts Legislature] and signed into law by the governor with nary a mention of the reasons informing the particular legislative action taken.… [But] courts are permitted to reach beyond legislative history and probe other relevant materials—including earlier iterations of a statute's text and even rigorous empirical data—to divine legislative intent.").  The Massachusetts Supreme Judicial Court routinely, however, cites State House News Service as a source of legislative history.  *See, e.g.*, *Wallace W. v. Commonwealth*, 482 Mass. 789, 795 (2019); *Commonwealth v. Pon*, 469 Mass. 296, 307-08 (2014).  Moreover, although there are "limitations on the extent to which courts appropriately may rely on the statements of individual legislators to color the meaning of statutory language . . . contemporaneous statements by a sponsor, although far from conclusive, are generally entitled to respect." *United States v. Meade*, 175 F.3d 215, 219 (1st Cir. 1999).  Below, the Commonwealth supplies the Court with the relevant details of the Act's legislative history, as described in the documents attached to the Appendix (App.) hereto.

> A.    *Origins of the Act.*

On March 10, 2020, Governor Baker declared a state of emergency "to support the Commonwealth's response to the outbreak of Coronavirus." Governor's Press Release (Mar. 10, 2020) (App., Ex. 1). On March 12, 2020, Councilor Lydia Edwards, Chair of the Boston City Council Committee on Housing and Community Development sent a letter to the Governor and

the Chief Justice of the Housing Court urging that a moratorium be placed on evictions

proceedings, "[i]n light of the public health emergency regarding COVID-19[.]"  Councilor

Edwards Letter (Mar. 12, 2020) (App., Ex. 2).[7]  On March 13, 2020, State Representatives Kevin

Honan and Mike Connolly filed House Bill 4624, *An Act Providing for a Moratorium on*

*Evictions and Foreclosures During the COVID-19 Emergency*.[8]  *See* 2020 House Doc. No.

4935;[9] H4624 (App., Ex. 6).[10]  The Legislature published a copy of bill on its website; any

member of the public could review it and provide relevant commentary to legislators.  *See id.*[11]

---

[7]     Greater Boston Legal Services (GBLS) also wrote to the Housing Court on March 11, 2020, asking, "given Governor Baker's urging to refrain from large meetings during the outbreak," that the Housing Court stay all non-essential evictions…until the outbreak is over." GBLS Letter (Mar. 11, 2020) (App., Ex. 3). The City of Boston's Office of Housing Stability, a division of the Department of Neighborhood Development, sent a similar letter on March 11, 2020, urging the housing court to "stay all non-essential evictions" due to the "COVID-19 Threat to elder persons required to appear in court," and other reasons. City of Boston DND-OHS Letter (Mar. 11, 2020) (App., Ex. 4).

[8]     The City of Somerville separately enacted its own evictions moratorium on March 27, 2020.  *See* Somerville Eviction Moratorium (Mar. 27, 2020) (App., Ex. 5).

[9]     *See* https://malegislature.gov/Bills/191/H4624.

[10]     In his announcement of HB4624, Representative Connolly wrote, "A moratorium on evictions and foreclosures and related legal proceedings will protect public health and safety by keeping vulnerable residents sheltered, by reducing crowding within the courts and in shelters, and by helping to limit further disruptions and additional strain on our already-fractured social safety net." https://www.repmikeconnolly.org/moratorium_evictions_foreclosures_coronavirus_emergency_connolly _honan.  Representative Honan similarly wrote, in his announcement of the filing, that the "legislation would put a moratorium on evictions and foreclosures while Massachusetts remains in a state of emergency," and that "[t]hreats to public health disproportionately impact our most vulnerable residents." https://twitter.com/RepKevinHonan/status/1238508900363747328.

[11]     *See* https://malegislature.gov/Bills/191/H4624; *see also* https://malegislature.gov/Search/FindMyLegislator (enabling state residents to identify their legislators and access legislators' contact information).

B.      *Public Response.*

MassLandlords, a trade association representing "over 1,800 landlording businesses across the Commonwealth,"[12] published on its worldwide web site a letter to the Commonwealth's Speaker of the House of Representatives advocating an alternative proposal for responding to COVID-19.  *See* MassLandlords Letter (Mar. 17, 2020) (App., Ex. 7).[13] Subsequently, the association published a note on why it did not support House Bill 4624.[14] After the legislation was filed, a housing advocacy organization and local elected officials wrote to the Legislature in support of an eviction moratorium. The letters cited to the public health risks associated with removing people from their homes during a pandemic, among other concerns.  *See, e.g.*, App., Exs. 8, 9, 10, 11.

C.      *Committee Vetting*

On March 31, 2020, the Senate Ways and Means Committee (SWM) reported out a separate evictions moratorium bill that was similarly available for public inspection and comment.  *See* S. 2621, 191st Gen. Court (Mass. 2020),[15] (App., Ex. 12).  On April 2, 2020, the House Ways and Means Committee redrafted House Bill 1279, *An Act Relative to Housing Service Coordinators* filed by Rep. Honan, as to which the Joint Committee on Housing had already held a hearing, and replaced the content of the bill with the evictions and foreclosure moratorium language, giving it a new title: *An Act Providing for a Moratorium on Evictions and*

---

[12]      MassLandlords, About (last visited August 12, 2020), https://masslandlords.net/about/.

[13]      *See* https://masslandlords.net/letter-to-the-speaker-of-the-house-a-proposal-from-masslandlords/.

[14]      *See* Quattrochi, Ten Reasons Why HD.4935 Eviction Moratorium Should Not Pass As Written (Mar. 19, 2020), https://masslandlords.net/ten-reasons-why-hd-4935-eviction-moratorium-should-not-pass-as-written/.

[15]      *See* https://malegislature.gov/Bills/191/S2621/CommitteeVote.

*Foreclosures During the COVID-19 Emergency*.[16]   The House of Representatives assigned a new bill number: H4615.[17]   The House engrossed[18] H4615 and sent it to the Senate.  *See id.*; *see also* Journal of the House, at 8 (Apr. 2, 2020) (App., Ex. 14).

D.      *Growing Support for the Legislation.*

On April 5, 2020, a coalition of over 200 Massachusetts-based organizations — including public health associations, housing advocates, community groups, city councils, labor unions, faith-based and other affinity organizations, and legal services — sent a letter to Governor Baker, the Senate President, and the Speaker of the House of Representatives calling upon them "to pass a clear moratorium on evictions and foreclosures NOW and support renters and homeowners across the Commonwealth during this global COVID-19 pandemic." *See* Coalition Letter (Apr. 5, 2020) (App., Ex. 15).  On April 6, 2020, the Senate referred H4615 to SWM.[19]  On April 9, 2020, SWM redrafted H4615 into S2631.[20]  The Senate engrossed S2631 and sent the legislation to the House of Representatives.  *See* Journal of the Senate, at 5 (Apr. 9, 2020) (App., Ex. 16). Both chambers conducted this business in informal sessions.[21]

---

[16]      *See* https://malegislature.gov/Bills/191/H1279.

[17]      *See also* https://malegislature.gov/Bills/191/H4615.  (App., Ex. 13).

[18]      The 191st General Court of the Commonwealth of Massachusetts Glossary defines "Engrossed Bill or Resolve" as the "[f]inal version of a bill or resolve as passed by the House or Senate." *See* https://malegislature.gov/StateHouse/Glossary#E.

[19]      *See* https://malegislature.gov/Bills/191/H4615.

[20]      *See* https://malegislature.gov/Bills/191/H4615; https://malegislature.gov/Bills/191/S2631.

[21]      Even before the COVID-19 pandemic, it was not unusual for the General Court to conduct legislative business in informal sessions.  *See, e.g.,* Advances – Week of March 1, 2020, State House News Service, Feb. 28, 2020 (announcing informal sessions in House on March 2 and in Senate on March 2 and March 5); Advances – Week of Feb. 16, 2020, State House News Service, Feb. 14, 2020 (announcing informal sessions in both chambers on February 18 and February 20).

E.        *Compromise.*

A conference committee was designated on April 9, 2020 and charged with reconciling the House and Senate bills.  *See* House Journal at 6 (Apr. 9, 2020) (App., Ex.  17); *see also Remote Negotiations Underway on Housing Bill*, State House News Service, Apr. 13, 2020 (App., Ex. 18).  The Chief Executive Officer of the Greater Boston Real Estate Board sent a letter on April 10, 2020 to conference committee members, requesting changes to the notice-to-quit provisions in the bill.  *See* GBREB Letter (Apr. 10, 2020) (App., Ex. 19).  On April 11, 2020 during an interview with *El Mundo Boston*, Governor Baker said he wanted lawmakers to send him a moratorium bill he could agree to and sign "by next week."  *See* App., Ex. 18.   On April 14, 2020, the same coalition of over 200 Massachusetts organizations sent a letter to the conference committee urging rapid action to reconcile the bills and pass an eviction moratorium "during this unprecedented public health crisis."  *See* Coalition Second Letter (Apr. 14, 2020) (App., Ex. 20).  On April 15, 2020, the House signaled that the branches had resolved their differences, accepting the conference committee's report on H4647.[22]  One day later, on April 16, 2020, the Senate also accepted the conference committee report.  *See id.*; Senate Journal, at 4 (Apr. 16, 2020) (App., Ex. 21).  On that same day, Representative Shawn Dooley doubted the presence of a quorum, delaying adoption in the House of Representative of an emergency preamble[23] to the conference committee report. *See* House Journal, at 5 (Apr. 16, 2020) (App., Ex. 22).  Following that objection, Representative Mike Connolly, speaking to the purpose of the bill, said "the legislation is 'critical' to supporting the public health objective of asking people to

---

[22]        *See* https://malegislature.gov/Bills/191/H4647.

[23]        An emergency preamble allows legislation to take effect immediately upon receipt of the Governor's signature.  Mass. Const. Amend. Art. 48, Ref. Pt. 2.

stay home." Chris Van Buskirk, *Emergency Housing Bill Takes Detour in House*, State House News Service (April 16, 2020, 9:25 pm) (App., Ex. 23).

F.       *Final Version and Enactment*

On April 17, 2020 the House of Representatives approved the emergency preamble; the Senate approved the emergency preamble later that day.  *See* House Journal at 3 (Apr. 17, 2020) (App., Ex. 24); H4647 as enacted (App., Ex. 25).  That day, Senate President Karen E. Spilka[24] announced on her web page the passage of the bill with aggregated statements of Senators and Representatives affirming the importance of the legislation.  Governor Baker signed the bill into law on April 20, 2020.[25]  On July 21, 2020 by letter addressed to the Speaker of the House of Representatives and President of the Senate, Governor Baker extended the Act's effective period by 60 days, through 11:59 p.m. on October 17, 2020.  In so doing, he wrote:

> The Act's limitations on evictions and foreclosures have allowed many tenants and homeowners impacted by COVID-19 to remain in their homes during the state of emergency.  I am confident that this action, coupled with federal assistance, helped to slow the spread of COVID-19 while minimizing the impact to date on vulnerable families and on our housing market.  The extension I am declaring today will provide residents of the Commonwealth with continued housing security as businesses cautiously re-open, more people return to work, and we collectively move toward a 'new normal.'

*See* Letter dated July 21, 2020, attached as Exhibit B (Dckt. 30-2) to Opposition, at p.1.

---

[24]     *See* https://karenspilka.com/updates/2020/4/17/massachusetts-legislature-passes-moratorium-on-non-essential-evictions-and-foreclosures-amid-covid-19.  (Apr. 17, 2020) (App., Ex. 26).

[25]     *See* 2020 Mass. Acts ch. 65.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Jennifer E. Greaney
Jennifer E. Greaney (BBO No. 643337)
*Assistant Attorney General*
Pierce O. Cray (BBO No. 104630)
*Senior Appellate Counsel*
Richard S. Weitzel (BBO No. 630303)
*Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2981
Dated:  August 18, 2020                    Jennifer.Greaney@mass.gov
Pierce.Cray@mass.gov
Richard.Weitzel@mass.gov


## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jennifer E. Greaney
Jennifer E. Greaney
Assistant Attorney General

Dated:  August 18, 2020