UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIE BAPTISTE, MITCHELL MATORIN,
and JONATHAN DAPONTE,

      Plaintiffs,

    v.

MIKE KENNEALY, in his official capacity as
Secretary of the EXECUTIVE OFFICE OF
HOUSING AND ECONOMIC DEVELOPMENT,
and CHARLES BAKER, in his official capacity as
Governor of the Commonwealth of Massachusetts,

      Defendants.

CIVIL ACTION
NO. 1:20-CV-11335-MLW

## DEFENDANTS' SURREPLY IN SUPPORT OF THEIR
## OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to the Court's Order dated August 18, 2020 (Dckt. 64) at ¶ 1(b)(ii), Defendants

Secretary of the Commonwealth's Executive Office of Housing and Economic Development

("EOHED") and Governor of Massachusetts (collectively, "Commonwealth") hereby submit this

Sur-reply to the Plaintiffs' Reply in Support of Plaintiffs' Motion for Preliminary Injunction (Dckt.

57) ("Reply"). For all the reasons set forth herein and those set forth in the Commonwealth's

principal brief in opposition to the Plaintiffs' Motion for Preliminary Injunction (Dckt. 2), the

pending Motion must be denied.

## I.   FACTS OFFERED IN SUR-REPLY

With their Reply, Plaintiffs Marie Baptiste, Mitchell Matorin, and Jonathan DaPonte (the

"Landlords") filed the Affidavit of Emil G. Ward (Dckt. 6). The primary contention of the Ward

Affidavit appears to be that because the Massachusetts Housing Court[1] is experiencing a large backlog of cases due to the Act's[2] temporary moratorium on "non-essential" residential evictions, its summary process eviction procedures will be slowed substantially even if the moratorium is prematurely lifted. Attorney Ward claims that he can say "with great certainty" that "there will be absolutely no 'tsunami' of eviction move-outs, and correspondingly, no marked increase in the incidence of homelessness caused by evictions, if the Act is lifted." Ward Aff. (Dckt. 56) at ¶ 21.

Setting aside that the Ward Affidavit is rife with speculation[3] and unreliable hearsay,[4] it is inconsistent with common sense insofar as it suggests that lifting an eviction moratorium will not result in an increase in the number of evictions. In response to the Ward Affidavit, the Commonwealth has amassed additional evidence in the form of affidavits making clear that, if and when the moratorium is lifted, a significant increase in displacement of Massachusetts

---

[1]    The Housing Court is just one Massachusetts Trial Court department having jurisdiction over residential eviction cases in "summary process" sessions under Mass. G.L. c. 139. The State's District Court and the Boston Municipal Court also have jurisdiction over these cases and run dedicated summary process sessions. The Superior Court has jurisdiction over these cases as well, but it does not run regular summary process sessions and rarely (if ever) hears residential eviction matters.

[2]    Defined terms used in the Commonwealth's principal brief will be used herein. The Act is codified at Mass. St. 2020, c. 65.

[3]    For example, Ward claims, "I have no doubt that Housing Court judges will consider and grant for good cause many requests for stays of execution by tenants who have been impacted by the crisis. Housing Court judges are well aware of what is happening outside the courthouses, and I assume they will be sensitive to the pandemic within the bounds of the law." Ward Aff. (Dckt. 56) at ¶ 17.

[4]    For example, Ward says, "my understanding from speaking recently to court personnel and fellow attorney colleagues is that when the Moratorium is lifted, the cases will be heard on a 'first come, first served' basis, and that any and all cases that were paused by the Moratorium will be heard first." Ward Aff. (Dckt. 56) at ¶ 13.

residents from their homes almost certainly *will* occur – resulting in an increase in overcrowded housing conditions and homelessness, two significant risk factors in the spread of COVID-19.

### A.    The Commonwealth's Eviction Cases.

As the Supreme Judicial Court observed in *Adjartey v. Central Division of the Housing Court Department*, "summary process cases are complex, fast-moving, and generally litigated by landlords who are represented by attorneys and tenants who are not." 481 Mass. 830, 834 (2019) (citing Housing Court Department Fiscal Year 2018 Statistics). Unsurprisingly, "[t]he complexity and speed of summary process cases can present formidable challenges to individuals facing eviction, particularly where those individuals are not represented by an attorney." *Id.* at 831. The *Adjartey* Court noted that "fewer than seven weeks might elapse between the time that the defendant is served with a notice to quit and the time that he or she is removed from his or her residence, provided that neither party requests discovery. Even if a discovery request is filed, the process can take fewer than nine weeks." *Id.* at 837.

Empirical data reveal an even faster timeline than described in *Adjartey*, with most cases disposed of within only 45 days. Affidavit of Annette Duke, ¶ 6. In 2011, the median length of an eviction proceeding from filing to disposition, including a default, dismissal, agreement, or judgment after trial on the merits, was only 16 days; it was only 15 days in 2014. *Id.* In most cases – 84 % in 2011 and 86 % in 2014 – the court issued a disposition in 30 days or fewer after the landlord had filed the action. *Id.* And in 90 % of cases in 2011, and 92 % in 2014, the court issued a disposition by 45 days from the date of filing. *Id.*

As for representation, in 2011 only 7 % of tenants had counsel, compared to 61% of landlords. Duke, ¶ 10. These statistics were nearly identical in 2014. *Id.* Accordingly, while a

tenant represented by counsel may take advantage of certain procedural rights that extend the eviction process, the vast majority of tenants are not represented by counsel and hence unlikely to know what steps they might take to slow the process down.[5] Tellingly, a striking number of cases (25%) end in outright tenant defaults. Duke, ¶ 8. In sum, for most tenants, summary process actions proceed quickly to disposition.

**B.** **Displacement *Throughout* the Eviction Process.**

The Landlords also focus, perhaps selectively, on the relatively small number of summary process cases that proceed all the way to issuance of an execution and levy thereon by a constable or sheriff, who physically removes the tenants' belongings and places them in storage. But, many people facing eviction leave their homes long before the constable or sheriff is at the door, and sometimes before a summary process action is even filed. For example, merely serving a notice to quit on a tenant may cause a tenant to leave, even though receipt of a notice to quit does not legally require the tenant to move. *Adjartey*, 481 Mass. at 850.[6] One study conducted in Milwaukee demonstrated that nearly one-half (48%) of involuntary displacement out of rental housing happened before a formal eviction action had even been filed.

---

[5]    The Supreme Judicial Court thus recognized in *Adjartey*, 481 Mass. at 837:

"The swiftness of this process reflects the purpose of eviction proceedings – to provide just, speedy, and inexpensive resolution of summary process cases. But it leaves little room for error. A defendant facing eviction is required to understand, in the time between compressed deadlines, the meaning of a notice to quit; the filing requirements for an answer, including those relating to defenses and counterclaims; the method for requesting and providing discovery; the workings of a trial or mediation; and the options available after a judgment has issued."

[6]    "Because the document's title – 'notice to quit' – does nothing to clarify its meaning, a tenant may reasonably misunderstand the legal force of a notice to quit. . . . [A] tenant may reasonably – but incorrectly – believe the notice to quit to mean that he or she must move out before the deadline." *Id.*

Moreover, it is widely recognized that displacement in connection with eviction proceedings, regardless of when during the proceedings the displacement occurs, leads to unstable housing situations for families and individuals. *See* Affidavit of Kelly Turley, ¶ 11. When displacement happens, a former tenant often will have trouble finding a new apartment to rent; in such cases, the former tenant's options may include Emergency Assistance shelter provided by the Commonwealth's Department of Housing and Community Development (DHCD) for qualified families with children; state-funded shelters for unaccompanied adults; privately operated non-profit shelters; staying with family or friends (known as "doubling up" or "couch surfing"); living out of a car; staying on the street; spending the night in a hospital's emergency room; or sleeping in other places unfit for human habitation. Turley, ¶ 5. Many families who face homelessness do not go to a shelter upon first being displaced, instead moving in with family or friends, living out of a car or in other informal, temporary, and unstable circumstances. *Id.* at ¶ 13. These are precisely the types of overcrowded or less sanitary living conditions that can exacerbate one's risk of exposure to COVID-19. Affidavit of Joshua Barocas, M.D., ¶¶ 23-26; Affidavit of Mark Melnik, ¶¶ 9-12; Affidavit of Jessie M. Gaeta, M.D., ¶¶ 17-20, 23.

A 2011 report by the Massachusetts Interagency Council on Housing and Homelessness on its Regional Networks to End Homelessness Pilot Project indeed stated that 45% of respondents who were homeless or at risk of homelessness identified eviction as the reason for their housing situation. Turley, ¶ 14. Critically, eviction for purposes of this report was not limited to those who had been physically moved out by a sheriff or constable. *Id.* at ¶ 15. The Massachusetts Coalition for the Homeless ("MCH") similarly undertook a survey of 309

residents at twelve Massachusetts family shelters in 2010 and found that 28.1% of the residents who had not entered the shelters *directly* from eviction still had been primary tenants in the preceding five years and had lost their tenancy due to non-payment of rent. *Id.*, ¶ 16. These data show a clear route from eviction to homelessness, even where displaced tenants do not enter a shelter immediately after the eviction.

C.    **Challenges in Finding New Housing**

Once displaced, evicted tenants face challenges in finding affordable new housing, increasing the likelihood that they will "double up," sleep in a shelter, or remain unsheltered. In Massachusetts, this problem is exacerbated by escalating housing costs. Turley, ¶ 21. Over recent years, the cost of an apartment in Massachusetts at fair market rent has increased disproportionately in comparison to wages. *Id.* In the Out of Reach 2020 report released in July by the National Low Income Housing Coalition, Massachusetts in fact ranked as the *third* least affordable state in the nation for renters, behind only Hawaii and California.[7] *Id.*, ¶ 25. Thus, forcibly displaced families and individuals whose earnings have not kept up with Massachusetts housing costs are more likely to experience obstacles to obtaining new housing, resulting in "doubling up" with family or friends, sleeping in a shelter, or remain unsheltered. These same

---

[7]        The Out of Reach 2020 study relied on data pre-dating the COVID-19 pandemic. *Id.*, ¶ 27.

populations are already, even in the absence of eviction, at heightened risk of contracting COVID-19.  Melnik, ¶¶ 7-8, 15.

### D.    Displacement and COVID-19

Displaced renters forced to live in overcrowded homes, shelters, and other congregate facilities are unable to safely socially distance from others or to self-isolate.  Affidavit of Rafael Mares, ¶¶ 8, 12, 16; Melnik, ¶¶ 9-12; Gaeta, ¶¶ 17-20.  Tenants who are evicted face housing shortages, shrinking income due to pandemic-related unemployment, and a lack of shelter space in attempting to obtain new housing.  There is little doubt these circumstances are likely to lead to homelessness and overcrowded housing, both of which increase the risk of COVID-19 viral spread.  Mares, ¶¶ 8, 12, 16; Barocas, ¶¶ 23-26; Melnik, ¶¶ 9-12; Gaeta, ¶¶ 17-20, 33.

## II.    <u>ARGUMENTS IN SUR-REPLY</u>

### A.    The Landlords Cannot Calculate Precisely the Date They Presumably Should Have Gained Possession

The Landlords claim that they can calculate "to the day" (Pl. Reply, Dckt. 57, p. 2) the delay in their claims for possession that is attributable to the Moratorium Act is belied by their own evidence.  Landlords engage in a series of dramatic percentage calculations purporting to show the exact amount of delay at issue.  Reply (Dckt. 57) at pp. 2-3, 5 (emphasis in original). These bold statements and inflated calculations, however, are directly undermined by their own affidavits.  In fact, the Ward Affidavit describes a high level of variability among summary process cases in terms of how quickly they move to resolution, even *before* the COVID-19 pandemic.  *See* Ward Aff.  (Dckt.  ) at ¶¶12, 14.  As Ward explains, "Several factors influence

this, including a tenant's right to discovery and a jury trial,[8] the existing large caseload in the Housing Court, the high ratio of cases per judge, and the overall inefficiencies in a system that was not designed to process 35,000 cases per year in one court system, spread out over the entire state, often borrowing other district court facilities."[9] *Id.* at ¶11; *see also id.* at ¶ 14. As is obvious from the Ward affidavit alone, there is no way the Landlords can pinpoint the time when they would have obtained a judgment for possession (assuming *arguendo* that they are legally entitled to one) in the absence of the Act, let alone calculate that timing "to the day." There is, in fact, no way for the Landlords (or anyone else) to tell what *would have* happened in any given summary process case if the Legislature did not temporarily suspend evictions by adopting the Act.

**B.** **A Landowner's Right to Possession is Not "Constitutional" or "Fundamental."**

The Landlords' incorrect suggestion (Dckt. 57, pp. 5, 7-8, 9) that their right to regain possession of premises is a "constitutional" or "fundamental" right amounts to nothing more than a distraction. A fee simple landowner's right to regain possession of premises after a tenancy has been terminated is not in any way a *constitutional* right or a *fundamental* right – it is, instead,

---

[8] As Ward admits, a jury trial is "constitutionally available to every tenant" in summary process cases. *Id.* ¶ 14.

[9] The two-week delay of trial where a summary process defendant is sophisticated enough (or advised by counsel) to serve and file discovery is a function of the plain language of the applicable rules. *See* Uniform Summary P. Rule 7(b).

a *common law* right, and, in the case of Massachusetts eviction procedure, a *statutory* right that

has modified prior common-law practice.  See Mass. G.L. c. 239.

"Property interests, of course, are not created by the Constitution.  Rather they are created

and their dimensions are defined by existing rules or understandings that stem from an

independent source such as state law."  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564,

577 (1972); *see also Regents of University of Michigan v. Ewing*, 474 U.S. 214, 229, (1985)

(Powell, J., concurring) (asserting common law rights not equivalent to fundamental rights and

hence not directly protected by the constitution); *Rubinovitz v. Rugato*, 60 F.3d 906 (1st Cir.

1995) (the constitution establishes no "fundamental right to evict" tenants);[10] *see also Kentner v.

City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014) ("Fundamental rights are those rights

created by the Constitution . . . 'Property interests, of course, are not created by the Constitution[,

but rather] … by existing rules or understandings that stem from an independent source such as

state law'"), *quoting Board of Regents*, 408 U.S. at 577; *DeKalb Stone, Inc. v. County of DeKalb,

Ga.*,106 F.3d 956, 960 (11th Cir.1997) ("[P]roperty rights have been important common law

rights throughout history and […] they are protected in many situations by procedural due

process. Nevertheless, common law rights are not equivalent to fundamental rights, which are

---

[10]     "[T]he Rubinovitzes argue that defendants sought to punish them for the exercise of fundamental
constitutional rights. First, . . . the Rubinovitzes appear to allege that defendants punished them for
exercising their 'right to evict' Lussier.  The Rubinovitzes rely on language from . . . *Board of Regents v.
Roth*, 408 U.S. 564, 577 . . . (1972) . . . , holding that, in a deprivation-of-due-process analysis, protected
property interests 'stem from an independent source such as state law.'  Even assuming that a right to evict
a tenant would be a protected property interest under *Roth* for purposes of a [procedural] due process
claim, it does not follow that there is a fundamental right to evict, the exercise of which is protected by
the Equal Protection Clause.  *In fact, the Constitution establishes no such fundamental right*."

*Id.* at 910-11 (emphasis added).

created only by the Constitution itself."); *Fragopoulos v. Rent Control Bd.*, 408 Mass. 302, 306 (1990) (use of lawfully regulated property as one wishes never classified as fundamental right).[11]

### C. The Legislature Can Modify Eviction Rights or Remedies, Particularly During an Emergency, Without Running Afoul of the Petition Clause.

In its Opposition, the Commonwealth cites the well-engrained principle that, "[w]hile it is true that the right of petition includes access to the courts . . . that right is 'ancillary to the underlying claim.'" *Doherty v. Merck & Co., Inc.*, 892 F.3d 493, 499 (1st Cir. 2018) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Thus, when a legislature restricts or curtails a certain cause of action, *see City of New York v. Beretta U.S.A. Corp.,* 524 F.3d 384, 397 (2d Cir. 2008), or modifies "a particular form of relief," *see Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 660 (1ˢᵗ Cir. 1997), a plaintiff does not have a viable Petition Clause argument arising from an inability to thereafter pursue such cause of action or form of relief. This black letter law has direct applicability here, as the Massachusetts Legislature has modified the rights of landlords to seek summary process via Mass. Gen. Laws c. 239 for certain types of evictions, for a temporary period of time, during an emergency.

Plaintiffs' response to this Supreme Court-grounded precedent is not to confront it head-on, but rather to argue that "[t]his simply cannot be the case" (Reply at 7), because in eliminating

---

[11] *See also Commonwealth v. Alger*, 61 Mass. 53, 84-85 (1851):

"All property in this commonwealth, as well that in the interior as that bordering on tide waters, is derived directly or indirectly from the government, and held subject to those general regulations, which are necessary for the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient."

an "eviction remedy" for nonpayment of rent "the Legislature cannot simply statutorily remove a constitutional right." (Reply, Dckt. 57, at 7-8). In other words, they seem to assert, because property rights are "constitutional," they cannot be eliminated, altered, or suspended without violating the Petition Clause. The fatal flaw in this argument, however, is that, as seen in Part II.B, *supra*, the Landlords are incorrect in their assertion that property rights are "constitutional." They point to no authority supporting the proposition that eviction rights are so constitutionally "fundamental" that they are immune from statutory alteration, and the First Circuit has held to the contrary. *Rubinovitz*, 60 F.3d at 910-11. Taken together, the cases cited above and those amassed in the Commonwealth's principal brief (not to mention the lack of supporting authority cited in the Plaintiffs' Reply) manifestly demonstrate that this contention is incorrect.

Moreover, just within the last two months, three courts have upheld eviction moratoria that have prevented evictions during the COVID-19 emergency even in cases of nonpayment of rent. *See Elmsford Apt. Assocs., LLC v. Cuomo*, 20-cv-4062 (S.D.N.Y. June 29, 2020); *Auracle Homes, LLC v. Lamont*, 2020 WL 4558682 (D. Conn. 2020); *JL Properties Group B LLC v. Pritzker*, 20-CH-601 (Ill. Cir. Ct. 2020). These courts thus obviously reached the conclusion that there is nothing so sacrosanct about a property owner's right to eviction (even for nonpayment) that it cannot be disturbed by state action.

Additionally, Plaintiffs themselves effectively acknowledge that the Commonwealth can suspend the right to evict – even for nonpayment – by suggesting that "lawmakers could have" hypothetically passed legislation "staying executions (move-out orders) where a particular tenant adequately demonstrated to the judge that COVID-19 had prevented the tenant from paying rent." (Reply at p. 9). Thus, Plaintiffs concede that legislative curtailment of *some* eviction

rights, including in cases of nonpayment, is permissible – which leaves their argument that this particular curtailment is nevertheless impermissible as just a matter of degree.[12]

### D. No Injunction is Available Under the Supreme Court's *Knick* Decision.

As described in more detail in the Commonwealth's principal brief (Dckt. 30 at pp. 38-39) and in its Memorandum in support of its Motion to Dismiss Counts II and V of the Amended Complaint, filed herewith (*see* Part II.C, pp. 8-11), the declaratory and injunctive relief the Landlords seek on their Takings Clause claim is foreclosed because, like most states, Massachusetts "provide[s] just compensation remedies to property owners who have suffered a taking." *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019). Notwithstanding the Landlords' attempts at a retort to this proposition, they are simply wrong in asserting that no monetary remedy would be available in State court if their takings claims were substantively viable.

As a threshold matter, the right against confiscation of private property for public use without "just compensation" is enumerated not only in the United States Constitution but also in the Commonwealth's Declaration of Rights. *See* Art. 10, Mass. Const. ("And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."). Additionally, the Commonwealth's eminent domain statute, Mass. G.L. c. 79, provides:

---

[12] Finally, and relatedly, Plaintiffs' remonstrations that the Legislature cannot "simply eliminate" eviction rights or "indefinitely eliminate the property owner's [sic] rights in their property," Reply at 6, is a red herring. The Act is effective for a limited period of time (a matter of months to date); it is tied to an ongoing public health emergency; and landlords' rights to pursue eviction remedies are tolled and will continue in full force and effect upon the expiration of the moratorium. Thus, there is no need for the Court to address the purely hypothetical question whether the Legislature could enact legislation that removes the eviction remedy *forever*. It has certainly not done so here, and accordingly this non-event should not inform the merits of Plaintiffs' claims under the Petition Clause.

> "When the real estate of any person has been taken for the public use . . . but such taking, entry or damage was not effected by or in accordance with a formal vote or order of the board of officers of a body politic or corporate duly authorized by law . . . the damages therefor may be recovered under this chapter. If the injury was caused by or on behalf of the commonwealth or of a county, city, town or district, the officer or board of officers under whose direction or control the injury was caused shall award the damages upon the petition of any person entitled thereto. . . . In case of a specific taking, entry, seizure or other act causing destruction or damage or depriving the owner of the use of his property permanently or for a definite period of time the damages shall be assessed as of the date of such taking, entry, seizure or other act and the right thereto shall vest on such date and a petition for an award of damages therefor under this section may be filed within one year thereafter . . . ."

Mass. G.L. c. 79, § 10. There is no question this statute applies not only to informal physical takings, but also to regulatory takings. *See Lopes v. City of Peabody*, 430 Mass. 305, 312 (1999) ("We conclude that G.L. c. 79, §§ 12 and 35A, apply to temporary regulatory takings . . . ."); *Cayon v. City of Chicopee*, 360 Mass. 606, 609 (1971).

The Plaintiffs claim, however, that statute does not provide them with an avenue to pursue damages, because they are currently unable to determine the end date of the moratorium. Thus, they say, there is no "definite period of time" in which damages can be assessed. (Reply, Dckt. 57, pp. 17-18. *See* Mass. G.L. c. 79, § 10. Moreover, they say they will be unable to meet the one-year limitations deadline included in the statute. *Id.* These contentions do not, however, jibe with either the actual language of the statute or with the facts. Plaintiff Matorin has already filed and is prosecuting a takings claim pursuant to Mass. G.L. c. 79, § 10, in Massachusetts Superior Court. He points to no reason for doubt that his suit is timely, having been filed within just six weeks of the Act's effective date. The fact that it is impossible for him to know now when, precisely, the moratorium will be lifted is of no moment. Eventually that date will be

known, and in the event the Landlords meet their burden of proving that there has been a taking (which there has not), damages can then be calculated.

Moreover, even if the Court questions whether the precise language of c. 79 provides an adequate method for recovery of damages arising from a regulatory taking, there is no doubt that such takings are compensable under Article 10 of the Declaration of Rights. *See Municipal Light Co. of Ashburnham v. Commonwealth*, 34 Mass. App. Ct. 162, 168-69 (1992) (where no formal taking occurred under G.L. c. 79, §1, "[i]f there is a taking claim it must rest upon G.L. c. 79, § 10 . . . or constitutional requirements of just compensation under . . . art. 10 of the Declaration of Rights of the Massachusetts Constitution"). Thus, there is simply no question that Massachusetts is among the vast majority of states that adequately provide a mechanism for obtaining compensation for takings. Accordingly, *Knick* bars the injunctive relief the Landlords seek. *See Knick*, 139 S. Ct. at 2176 ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.").

**E.     The Landlords Effectively Concede There Is No Regulatory Taking – And Any Claim of A Physical Taking Cannot Lie Where the Occupants Are Tenants.**

In their Reply, the Landlords focus their efforts related to the substance of their Takings Clause claim on their theory that a "physical" taking has occurred – essentially conceding that they cannot show a regulatory taking under the *Penn Central* factors. See Reply (Dckt. 57) at pp. 20-24. The Landlords' physical taking theory is, however, absolutely foreclosed by the Supreme Court's decision in *Yee v. Escondido*, 503 U.S. 519 (1992), where the Court expressly distinguished physical takings as described in *Loretto v. Teleprompter*, 458 U.S. 419, 439 (1982) from takings arising from regulations. A physical taking under the reasoning of *Loretto* simply

cannot occur where the subject property has been occupied by *agreement* – as is the case in a landlord-tenant relationship. The Supreme Court is clear that "'element of required acquiescence is at the heart of the concept of occupation.'" *Yee*, 503 U.S. at 527. "Thus whether the government floods a landowner's property . . . or does no more than require the landowner to suffer the installation of a cable, [as in] *Loretto, supra,* the Takings Clause requires compensation if the government authorizes a compelled physical invasion of property." *Id.* at 527-28. But, where landlords have "voluntarily rented their land" to tenants, "no government has required any physical invasion of [their] property. [Landlords'] tenants were invited by the [landlords], not forced upon them by the government." *Id.* at 528. Moreover, "[b]ecause [Landlords] voluntarily open[ed] their property to occupation by others, [Landlords] cannot assert a *per se* right to compensation based on their inability [now] to exclude particular individuals." *Id.* at 531. As in *FCC v. Florida Power Corp.*, 480 U.S. 245 (1987), where the Supreme Court found no taking arising from a government-mandated reduction in rent for space on utility poles voluntarily leased to cable television companies, it was "'the invitation, not the rent'" that "ma[de] the difference[,]" and the line separating that case from *Loretto* "'[wa]s the unambiguous distinction between a . . . lessee and an interloper with a government license.'" *Yee*, 503 U.S. at 532, *quoting FCC*, 480 U.S. at 252-53. The "invitation" that Plaintiffs extended to their tenants similarly "makes the difference" here. *See id.* As is obvious from *Yee*, the

Landlords cannot claim a physical taking based on leasehold interests or tenancies they granted willingly, and no amount of citation to *Loretto* can change that.[13]

### F.  To the Extent the Landlords Still Claim a Regulatory Taking, The Act is "Temporary" On Its Face and By its Plain Language.

Insofar as the Landlords veer into regulatory takings theory, while insisting simultaneously that a physical taking has occurred, they misguidedly assert that "the Supreme Court has made clear that 'temporary' takings are just as subject to reasonable compensation as permanent takings," citing *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty. Cal.*, 482 U.S. 304 (1987), where the Supreme Court recognized a right to compensation for a categorical or *per se* regulatory taking (*i.e.*, where a regulation denies "a landowner all use of his land") for the time between the date a statute is effective and the date of

---

[13]    To be sure, in *Yee* the Court suggested in *dicta* that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain *in perpetuity* from terminating a tenancy." *Yee*, 503 U.S. at 528 (emphasis supplied). The Act, however, does no such thing. *See* n.13, *supra*. By its plain language, the Act cannot be extended beyond 45 days after the Commonwealth's state of emergency ends. *See* Mass. St. 2020 c. 65, § 6. It also includes a tolling provision to protect all affected landlords' ability to recover possession when the emergency recedes, stating:

> "A deadline or time period for action by a party to a non-essential eviction for a residential dwelling unit or small business premises unit, whether such deadline or time period was established before or after the effective date of this act, including, but not limited to, a date to answer a complaint, appeal a judgment or levy upon an execution for possession or a money judgment, shall be tolled."

*Id.* at § 3(c). Moreover, any insinuation that Massachusetts officials such as the Governor will attempt to extend the moratorium perpetually or beyond the parameters set forth in the Act's plain language cannot be credited by the Court. *See Road and Highway Builders, LLC v. U.S.*, 702 F.3d 1365, 1368 (Fed. Cir. 2012) ("Government officials are presumed to discharge their duties in good faith."); *Bridge v. U.S. Parole Comm'n*, 981 F.2d 97, 106 (3rd Cir. 1992) ("Government officials are presumed to act in good faith."); *Tilton v. Richardson*, 403 US 672, 679 (1971) ("A possibility always exists, of course, that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement. There is nothing new in this argument. But judicial concern about these possibilities cannot, standing alone, warrant striking down a statute as unconstitutional.").

its repeal. In considering the issue, the Court reviewed cases where the government had engaged in a temporary *physical* taking. *Id.* at 318. The Court went on to summarize jurisprudence as holding that temporary *per se* regulatory takings "are not different in kind from permanent takings." *Id.* at 318. *First English* stands for the now-unremarkable propositions that, in the decision's words, (1) where a "governmental action . . . amount[s] to a taking, the [Constitution] . . . requires that the government pay the landowner for the value of the use of the land during this period," and (2) "[i]nvalidation of the ordinance or its successor ordinance after this period of time, though converting the taking into a 'temporary' one, is not a sufficient remedy to meet [that] demand[]." *Id.*

Here, unlike in *First English*, there has been neither a physical taking nor a categorical or *per se* regulatory taking. Moreover, the regulation at issue is not "temporary" in the sense that it has been invalidated by a Court, *see First English*, 482 U.S. at 310; it instead is "temporary" by its own plain terms. Accordingly, *First English* is inapposite to the case before this Court. The far more applicable line of cases are those regulatory-taking decisions that consider temporary moratoria on certain uses of property – or on any development of unimproved land at all – and refuse to find a "categorical" taking in that circumstance. Those cases instead make clear that "the duration of the restriction is one of the important factors that a court must consider" in assessing whether a taking has occurred in the first instance. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 342 (2002). For example, in *Tahoe-Sierra*, the Court rejected the idea that a plaintiff can focus narrowly on economic impact during the discrete window of time affected by the regulation, rather than the "entirety" of the "term of years that describes the temporal aspect of the owner's interest." *Id.* at 331-32. The

Court ultimately found no taking had occurred even where a moratorium on property development "temporarily deprived [owners] of *all* economically viable used of their land" and lasted thirty-two months. *Id.* at 341-42 (emphasis supplied) (categorical rule expressly rejected; *Penn Central* analysis instead must be undertaken); *see also W.R. Grace & Co. v. Cambridge City Council*, 56 Mass. App. Ct. 559 (2002) (no taking where "zoning amendments adopted by the City of Cambridge . . . effectively froze Grace's development plans for a period of twenty-three months."); *cf. Appolo Fuels, Inc.*, 381 F.3d at 1351-52 (finding that "[d]elay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary" and finding that "the eighteen-month delay here is far short of extraordinary" (citing cases)). Here, as in the above-cited cases, any delay inserted into the eviction process is far from "extraordinary." Thus, there is no taking.

### G. There *Is* a Categorical Rule that Individual Premises Within a Building Cannot Be "Taken" Separately from the Whole Parcel, Unless the Government Physically Occupies The Premises.

The Plaintiffs are also incorrect when they assert there is no categorical rule that landlords who own multifamily dwellings do not have a takings claim when only one or a portion of their tenants are not paying rent. *See* Reply (Dckt. 57) at 24. Leading cases in this area – *Tahoe-Sierra*, *Keystone*, and *Penn Central* – could not be clearer that, in considering a takings claim, the Court must consider the diminution in the value of the property owner's property as a *whole*, even where the owner has lost all rental income from one or more units in a multi-unit dwelling. *See Tahoe-Sierra*, 535 U.S. at 327 ("even though multiple factors are relevant in the analysis of regulatory takings claims, in such cases we must focus on 'the parcel as a whole'"); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)

(regulatory takings analysis requires comparing the value remaining in the property as a whole). The Court in *Penn Central* itself was explicit that "the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." 438 U.S. 104, 130 (1978).  The Court there emphasized that Takings Clause jurisprudence does not divide a single parcel into discrete segments in an attempt to determine whether rights in a particular segment have been entirely abrogated.  *Id*.  Instead, the Court must focus on the character of the government's action and on the nature and extent of the interference with rights in the parcel as a whole.  *Id.* at 130-31.  Accordingly, loss of income from one or some portion of the rental units in a multi-unit dwelling does *not* give rise to a takings claim.

> **H.     There Can Be No Contract Clause Violation Unless the Act Serves _No_ Legitimate Government Purpose**

Determining whether a government regulation violates the Contracts Clause requires application of *both* parts of a two-part test.  If a statute operates "as a substantial impairment of a contractual relationship," then "the inquiry turns to the means and ends of the legislation."  *Sveen v. Melin*, 138 S.Ct. 1815, 1821-22 (2018), *quoting Allied Structural Steel v. Spannaus,* 438 U.S. 234, 244 (1978).  This "means and ends" analysis asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Id.* at 1822, *quoting Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–12 (1983).  As a result, even if legislation substantially impairs contracts, it will not be held

violative of the Contracts Clause unless it also fails the means and ends test by not advancing a significant and legitimate public purpose.

In their Reply, the Landlords ignore the second prong, focusing only on whether the Act substantially impairs contracts. *See* Reply (Dckt. 57) at pp. 25-30. The Landlords' apathy toward the second part of the analysis is understandable, since it involves the lowest and most forgiving level of constitutional scrutiny, *i.e.*, rational-basis review. An analysis under the Constitution's impairment of contracts and substantive due process provisions "amounts to much the same thing," because "it is basic that the State reserves police powers that may in particular predicaments enable it to alter or abrogate even conventional contractual rights." *Opinion of the Justices*, 364 Mass. 847, 864 (1973). As stated by the First Circuit, "Even a state law that creates a substantial impairment does not transgress the Contract Clause as long as it is appropriate for, and necessary to, the accomplishment of a legitimate public purpose." *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999). This "'requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests. . . .' Health and safety are two mainstays of the police power." *Id.*, 175 at 191, quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983). Ultimately, "[a] court's task is 'to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'" *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 41 (1st Cir. 2011), *quoting Mercado–Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 14 (1st Cir. 1997).

At this low level of scrutiny, a statute is barred by the Contracts Clause only where it is "utterly lacking in rational justification." *Flemming v. Nestor*, 363 U.S. 603, 611 (1960). In other words, Contracts Clause analysis is in the nature of "rational basis" review. *See Golden Rule Ins. Co. v. Stephens*, 912 F. Supp. 261, 268 (E.D. Ky. 1995) ("the court has no power to second guess the legislature as long as the Act has a rational basis"); *see also Zogenix, Inc. v. Baker*, No. CIV.A. 14-11689-RWZ, 2015 WL 1206354, at \*6 (D. Mass. Mar. 17, 2015) (citing, with approval, Erwin Chemerinsky, Constitutional Law § 8.3.3 (4th ed.2011) for the prospect that Contracts Clause analysis may be analogized to rational-basis review where government is not a contracting party).

Thus, where rational basis review applies, "'[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.'" *Fed Commc'ns, Inc. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314, (1993), *quoting Vance v. Bradley,* 440 U.S. 93, 97 (1979) (footnote omitted). "The Supreme Court has . . . cautioned that, unless the state itself is a contracting party, '[a]s is customary in reviewing economic and social regulation . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 737 (7th Cir. 1987), *quoting United States Trust Co. v. New Jersey,* 431 U.S. 1, 22–23 (1977) (upholding landlord-tenant ordinance as "represent[ing] a rational allocation of rights and responsibilities between landlords and tenants" in a way "the city rationally could have believed would lead to improved public health and welfare). Under this rational basis analysis, the Act – which was passed to protect the residents

of Massachusetts from the public health and economic risks associated with a deadly pandemic --
readily passes constitutional muster, which undoubtedly explains why the Landlords have
ignored this part of the Contracts Clause standard.

## I.     The Curve Has Flattened, But The Future Is Unknown.

The Landlords assert that the "curve" of the pandemic has been "flattened" in
Massachusetts, and that therefore the eviction moratorium is no longer necessary to protect
public health.  (Reply, Dckt. 57, pp. 33-34)  But it remains uncertain how the pandemic will
unfold in Massachusetts in the coming months, particularly as students from other states where
infection rates are high, like California, Florida, and Texas, return to Massachusetts to resume
classes.  Because the virus continues to spread in the Commonwealth and across the country,
there remains a degree of risk in easing or ending measures, like the Act, designed to stop the
spread of COVID-19 in the Commonwealth.  Indeed, the Governor recently took measures in
response to a slight uptick in cases in Massachusetts to suppress the COVID-19 virus.  Governor
Baker has indefinitely postponed Step 2 of Phase III of re-opening,[14] decreased the number of
people who may gather indoors and outdoors,[15] and ordered that travelers into Massachusetts
from other states quarantine for fourteen days.[16]  The need for caution therefore persists.  As
described in Part I, *supra*, in the absence of the moratorium, tens of thousands of summary

---

[14]     Order Authorizing the Re-Opening of Phase III Enterprises, COVID-19 Order No. 43, available at https://www.mass.gov/doc/phase-3-order-july-2-2020/download.

[15]     Third Revised Order Regulating Gatherings Throughout the Commonwealth, COVID-19 Order No. 46, available at https://www.mass.gov/doc/revised-gatherings-order-august-7-2020/download.

[16]     Order Instituting a Mandatory 14-Day Quarantine Requirement for Travelers Arriving in Massachusetts, COVID-19 Order No. 45, available at https://www.mass.gov/doc/july-24-2020-travel-order-pdf/download.

process action cases would proceed quickly to judgment in crowded Housing Court sessions, leading to thousands of evictions and increased homelessness. Decreased stability in rental housing is, in turn, likely to lead to increased overcrowded housing as families "double up," not to mention an increase in the numbers of those living in shelters or completely unsheltered – all of which increase the risk of community spread of COVID-19. Even though the Landlords are correct in their assertion that Massachusetts has flattened its COVID-19 curve (Dckt. 57 at pp. 33-34), measures like the eviction moratorium remain critical for preserving Massachusetts' continued success in controlling the virus's spread.

By their attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Jennifer E. Greaney
Jennifer E. Greaney, BBO No. 643337
*Assistant Attorney General*
Pierce O. Cray, BBO No. 104630
*Senior Appellate Counsel*
Richard S. Weitzel, BBO No. 630303
*Assistant Attorney General*
One Ashburton Place
Boston, Mass. 02108
(617) 963-2855
jennifer.greaney@mass.gov
pierce.cray@mass.gov
richard.weitzel@mass.gov

Dated: August 18, 2020

**CERTIFICATE OF SERVICE**

     I certify that this document, filed through the Court's ECF system will be sent electronically on this day to registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jennifer E. Greaney*         
Jennifer E. Greaney
Assistant Attorney General

Dated: August 18, 2020