UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARIE BAPTISTE, MITCHELL MATORIN, and JONATHAN DAPONTE,<br><br>  Plaintiffs,<br><br>v.<br><br>MIKE KENNEALY, in his official capacity as Secretary of the EXECUTIVE OFFICE OF HOUSING AND ECONOMIC DEVELOPMENT, and CHARLES BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,<br><br>  Defendants. | C.A. No. 1:20-cv-11335-MLW |

## AFFIDAVIT OF ESME CARAMELLO

I, Esme Caramello, hereby declare as follows:

1. I am a Clinical Professor of Law at Harvard Law School and the Faculty Director of the Harvard Legal Aid Bureau, where I am both a practitioner and a supervisor of law students in landlord-tenant cases. Prior to joining the Bureau in 2009, I supervised clinical students in housing cases at Harvard Law School's Legal Services Center (2006-2008) and Suffolk Law School's Housing and Consumer Protection Clinic (Spring-Summer 2009). In these clinics, and in my work as a Chesterfield Smith Community Service Fellow and Litigation Associate at Holland & Knight LLP (2001-2006), I have handled hundreds of eviction cases in the Eastern Housing Court, the Superior Court, the Boston Municipal Court, and the Chelsea, Cambridge, and Somerville District Courts. I have regularly volunteered at the Boston Bar Association's Attorney for the Day table at the Eastern Housing Court[1] since 2006 and have provided limited assistance to tenants and homeowners facing eviction and foreclosure at my office and in community-based settings. I have also represented both tenants and homeowners, as well as housing-focused nonprofit groups, in a variety of cases before the Massachusetts Appeals Court and the Supreme Judicial Court.

---

[1] The Boston Bar Association's "Lawyer for the Day" program is held at the Eastern Housing Court each Thursday, the day that most summary process cases have historically been called. The Lawyer for the Day table offers legal assistance to unrepresented tenants and landlords. The Harvard Legal Aid Bureau is one of many legal services organizations, law firms, and sole practitioners that partner with the BBA to maintain this program.

2. As a member of the Harvard Law School faculty, I teach a number of courses covering various aspects of housing law and practice as well as access to justice topics, including Housing Law and Policy; seminars that train Legal Aid Bureau students in landlord-tenant practice and professional responsibility; and a variety of reading groups, including one focused on Matthew Desmond's Pulitzer Prize-winning book *Evicted: Poverty and Profit in the American City*. My research and writing have all focused on evictions and access to justice in eviction cases. I have delivered dozens of presentations and trainings on housing law and access to justice to a wide variety of audiences.

3. I am a member of the Massachusetts Access to Justice Commission, co-chair of its Housing Working Group, and a member of its Access to Attorneys Committee. I am a co-founder and member of the leadership team of the Commission's COVID-19 Task Force, where I have led the housing work.

4. I write to provide relevant information, based on my personal experience and research, that clarifies and in a few instances contradicts the description of summary process proceedings and other forms of forced displacement from housing offered in the Affidavit of Emil Ward, Esq. Except where indicated otherwise, I make this affidavit based on my personal knowledge.

**The Summary Process Timeline**

5. Many if not most summary process cases—especially nonpayment of rent cases—are concluded in a little over a month.

6. A summary process case for nonpayment of rent begins with a "notice to quit" terminating the tenancy in at least 14 days, or as provided in the lease. *See* G. L. c. 186, §§ 11, 12. Immediately upon expiration of the notice to quit, the landlord can serve a Summons and Complaint and, on the next Monday that is at least seven days later (the "entry day"), file it with the Court. *See* Uniform Summary Process Rules, Rules 2(b) and 2(d). Absent filing and service of discovery requests or a motion that requires a continuance,[2] the case typically goes to trial on the very first hearing date, 10 days later, with judgment entering the following (11th) day.[3] *See* Uniform Summary Process Rules, Rules 2(c), 3; G. L. c. 239, §

---

[2]   If the defendant files an answer and requests a jury trial, the parties will still be required to report to court on the second Thursday after the entry day. As a practical matter, however, it is unlikely a jury trial will go forward on that date, and the case will be continued to accommodate the jury demand. In my experience, however, as I explain in more detail below, very few summary process defendants file an answer with a jury demand.

[3]   There are slight variations, amounting to fewer than 7 days, in certain court locations where the summary process session is not or cannot be held on Thursday. In Eastern Housing Court, for example, public housing cases are called on Wednesdays.

3.[4]  Therefore, a nonpayment case in which the landlord takes prompt action and the tenant does not file discovery or a jury demand will ordinarily, absent a settlement, go to judgment on or about the 32nd day after service of the notice to quit and the 11th day after the filing of the complaint.

7. A tenant who timely serves and files discovery requests postpones the trial by two weeks. *See* Uniform Summary Process Rules, Rule 7.  Discovery requests can be a crucial tool for a tenant-defendant in a summary process case, because factual disputes are common, and relevant information and documents are often in the exclusive possession of the landlord.  Under Massachusetts law, the question in a nonpayment of rent case is not solely how much rent is unpaid, but also whether the tenant has cured the arrearage as permitted by law.  *See* G.L. c. 186, §§ 11 and 12.  Tenants also may defend against the landlord's claim to possession by presenting counterclaims based on unlawful apartment conditions of which the landlord had prior notice, discrimination, retaliation, violations of the security deposit statute, or other violations of law.  If the value of the tenant's counterclaims exceeds the amount of rent owed, or if the tenant pays the difference between what is owed and what was awarded on the counterclaims within 7 days, the tenant retains possession of the apartment. G. L. c. 239, § 8A.  *See generally Adjartey v. Central Div. of the Housing Court*, 481 Mass. 830, 854 (2019); *Meikle v. Nurse*, 474 Mass. 207 (2016).  Discovery is often critical in enabling tenants to develop the proof necessary to support their counterclaims and retain possession.

8. As a practical matter, very few tenants assert counterclaims and affirmative defenses except in the minority of cases in which they are assisted by counsel.

9. Similarly, few tenants actually serve discovery requests.  To secure a two-week continuance of the trial date with discovery, the tenant must know what discovery is, know that there is a right to take discovery, know how to draft discovery requests, draft and serve those requests in a manner that ensures that they are received by the landlord just seven days after the complaint is filed, and then also file a copy with the court by the same deadline.  In my experience at the Attorney for the Day table at the Eastern Housing Court[5], I have provided advice and limited-assistance representation to hundreds of tenants, and I cannot recall a single occasion on which a pro se tenant had ever secured a discovery postponement without legal assistance.  And very few tenants have such legal assistance.  According to Housing Court statistics, in 2019, fewer than 9 percent of tenants statewide had counsel *at any stage*

---

[4]  There is a further limit that executions for judgment in summary process proceedings must be issued within three months of the judgment date, excluding any time periods during which the execution was stayed. G. L. c. 235, § 23.

[5]  The Eastern Housing Court, located at the Edward Brooke Courthouse, was referred to previously as the Boston Housing Court.  The change to the court name was a part of the statewide expansion of housing court jurisdiction.

of a summary process case; these numbers are roughly consistent year-to-year.[6] Another small fraction of tenants receive assistance at a pro se clinic like the one we run at the Harvard Legal Aid Bureau or at a Court Service Center. But the vast majority of tenants receive no legal assistance before the discovery request deadline (the first Monday after the entry date), and they and have their cases scheduled for trial on the first hearing date, 10 days following service of the complaint.

10. Equally rare are jury demands, which extend a case beyond the original (10-day) trial date. As a general rule and with no exceptions of which I am aware, tenants without legal assistance are usually not aware of either their right to claim a jury or the means by which to do it, and consequently they do not file jury demands. As with discovery requests, in my 14 years at the Attorney for the Day table, where I meet tenants whose answer, discovery, and jury demand deadlines have passed, I have never met a pro se tenant who without assistance from a lawyer or Court Service Center actually claimed a jury. Attorney Ward seems to agree with this analysis, stating only that "virtually every tenant represented by Legal Services[sic] or a private attorney will" claim a jury.[7] But fewer than 9 percent of tenants have such representation, and the rest almost always proceed quickly to a bench trial.

11. My experiences described above – of the speed at which summary process proceeds – are consistent with a review of court data published by the Massachusetts Law Reform Institute in 2016. *See Updated Review of Summary Process Actions in Housing Courts Statewide, in 2011 and 2014*; Massachusetts Law Reform Institute (April 25, 2016). They are also consistent with similar empirical research I have myself performed in connection with my committee work at the Access to Justice Commission. The unweighted range of 3 to 24 months for "completion" of a summary process case offered by Attorney Ward is inconsistent with both that research and my personal experiences.

**Mediation and Court-Based Settlement Negotiations**

12. As Attorney Ward explains, many eviction cases settle before trial, a process he describes as "amicable" and "voluntary" and guided by experienced mediators.

13. Attorney Ward is correct to extol the skill and neutrality of the Housing Specialists who assist with mediations in the Housing Court. But many tenants do not ever meet with a mediator. In the Eastern Housing Court, for example, many agreements, especially those in cases brought by large landlords, are negotiated in the hallway between a landlord's lawyer and a pro se tenant, and not in mediation with a Housing Specialist. Moreover, summary process cases also proceed in the District Courts and the Boston Municipal Court, and while

---

[6] *See* Housing Court Department, Fiscal Year 2019 Statistics, Housing Court: Self Represented Litigants by Location, https://www.mass.gov/doc/2019-housing-court-self-represented-represented-litigants-by-court-location/download

[7] To the extent the Plaintiffs maintain that jury demands result in delayed proceedings without rental payments, landlords have a mechanism to request ongoing rental payments pre-trial. *See Davis v. Comerford*, 483 Mass. 164 (2019).

these courts do their best to partner with nonprofit mediation programs, they generally lack staff mediators, and mediation is therefore less available.

14. Regardless of whether a nonpayment eviction has been mediated by a neutral mediator or negotiated in the hallway between the parties, where the tenant is pro se, the case is generally resolved with an "Agreement for Judgment" granting the landlord possession of the premises.  In some Agreements for Judgment, the tenant has agreed to move out on a certain date, and in others the tenant has agreed to move out only if she fails to comply with the terms of a specified repayment plan.  Either way, the tenant has surrendered the right to possession, and only in some cases may win it back through compliance with all material terms of the agreement.

15. Attorney Ward's description of such Agreements for Judgment as "amicable" and "voluntary," while technically true, elides the fact that they are generally negotiated in the shadow of an eviction trial that will likely occur that day, and at which the tenant (almost certainly unrepresented) will likely lose against an experienced lawyer.[8]  Even where a mediator is involved, time is short, and it can be difficult for the mediator to effectively reduce fear and anxiety, earn trust, elicit all relevant facts, and craft a tailored solution.

16. Attorney Ward implies that this pressure is not a factor, and that tenants who sign moveout agreements do so because they "have already secured new housing" or will easily be able to do so by the required date.  To the extent that none of Attorney Ward's agreements have ever resulted in a tenant's becoming homeless, I have had a different experience over the last 19 years.  My colleagues and I have assisted or represented many tenants who signed agreements for judgment (prior to our involvement) with which they knew or should have known they could not comply, as well as tenants who did in fact become homeless after signing an unrealistic court agreement with their landlord.

17. In the many conversations I have had at the Attorney for the Day table with tenants who are considering signing or have previously signed such Agreements for Judgment in nonpayment cases, I have learned that people sign infeasible agreements because they are afraid a judge will order them to leave their homes that very day, and a few weeks of additional time sounds like a better deal.  They sign because they were too anxious that day to calmly think through their budgets and figure out what they could pay.  They sign because they think maybe they will find some money somewhere, even if they do not know where.  They sign because they have to get out of the courthouse to pick up a young child from school, and signing is the only way to leave without causing a default.  Over the years, I have on many, many occasions been asked for help by a pro se tenant who has signed an unrealistic repayment agreement and is now facing imminent physical eviction for failure to comply.  I have also on many occasions been asked to represent a tenant who has agreed to move out by a certain date and—often predictably—been unable to find new housing.

---

[8]      In an empirical study of several years of Housing Court records I did for the Access to Justice Commission's Access to Attorneys Committee, I found that 98 percent of the judgments went to landlords.  http://www.massa2j.org/a2j/wp-content/uploads/2017/12/Access-to-Attorneys-Final-Report-5.19.17-UPDATED.pdf

**Execution and Levy**

18. Following an entry of judgment by the court awarding possession to the landlord, a tenant seeking to appeal the judgment must file a notice of appeal within ten days of the judgment's entry. After the ten-day time period to file an appeal expires, the landlord may return to the courthouse for an execution for possession, to be served by a constable or a sheriff. G. L. c. 239, § 3.[9]

19. Attorney Ward is likely correct that actual sheriff evictions are rare, because tenants will go to extreme lengths to avoid them. When a constable or sheriff is given an execution for possession, he provides the tenant with 48 hours' notice of the levy. *See* G.L. c. 239, § 3. At the expiration of those 48 hours, the sheriff arrives at the home with a moving company chosen by the landlord and proceeds to escort the tenant out of the home, change the locks, and load the tenant's belongings onto the truck one by one until the home is vacant. Once they have received a 48-hour notice, or even before that, tenants often will put their things in storage themselves, sometimes with relatives, and then stay in their car or on a friend's couch or at a homeless shelter before they will succumb to a forcible eviction by sheriff's levy. But that does not mean that they have moved "voluntarily" or that they have a safe or lasting place to go. The subset of tenants who are physically removed pursuant to an execution is a very small proportion of those who are displaced into unstable or overcrowded housing or forced into shelters or even street homelessness in the wake of an eviction.

20. Finally, Attorney Ward suggests that judges can and will prevent tenants from becoming homeless due to the pandemic by exercising their equitable authority under G.L. c. 239, §§ 9 and 10. While judges do have inherent equitable powers in housing cases, such powers are substantially restricted in nonpayment cases, to which the post-judgment stay statutes cited by Attorney Ward do not apply. *See* G.L. c. 239, § 9 (authorizing stays "except [after] a notice to quit for nonpayment of rent") and § 10. The court's equitable authority is also substantially curtailed after an agreement for judgment is reached. *See BHA v. Cassio,* 428 Mass. 112 (1998) (reversing Housing Court's equity-based denial of motion to issue execution and as judge lacked power to alter parties' bargained-for terms). Regardless, no tenant is entitled to a stay of execution, and when granted such stays are almost always conditioned on the tenant's continued payment of use and occupancy. If the tenant cannot make the payment, the stay will be lifted and the constable eviction initiated.

**The Scope of Forced Displacement**

21. Evictions through summary process do not represent the full scope of forced displacement faced by tenants. Tenants move out after being told they are required to vacate, either orally

---

[9] In a situation where the tenant and landlord enter into an agreement for judgment, the issuance of the execution is governed by terms of the agreement itself.

or in writing.[10]  It can be difficult to understand that a notice to quit is not an order to vacate. Notices to quit often use language like "you are hereby notified to deliver up the premises now occupied by you" on a particular date.  I have had cases with notices that in writing "ordered" a tenant to vacate at the end of the notice period.  While some notices to quit or vacate contain language towards the end advising the tenant that they have a right to defend themselves in court, others simply say that if the tenant does not vacate, the landlord "will use due course of law to evict you."  Regardless, the document can be so incomprehensible and scary that tenants will leave even if (or because) they know that a court case will follow. That a tenant may believe he or she needs to leave after receiving a notice to quit was recently recognized by the Supreme Judicial Court, in *Adjartey v. Central Division of Housing Court Department*, 481 Mass. 830, 851 (2019): "Because the document's title -- 'notice to quit' -- does nothing to clarify its meaning, a tenant may reasonably misunderstand the legal force of a notice to quit."  As the *Adjartey* Court clarified, "Receipt of a notice to quit, however, does not legally require the tenant to move out of his or her home."

22. The scholarship in the area of evictions has noted the underlying challenge in determining the number of families who leave before an eviction action is filed, upon receipt of a notice to quit, or even without a notice to quit due to other circumstances (such as pressure from the landlord) that cause tenants to move out involuntarily – as opposed to on account of their own life plans or on their own volition. *See e.g.* Desmond, Matthew, Shollenberger, Tracey, *Forced Displacement from Rental Housing: Prevalence and Neighborhood Consequences,* Demography, Vol. 52, No. 5, p. 1751-1772 (October 2015).

23. Scholars Matthew Desmond and Tracey Schollenberger conducted the Milwaukee Area Renters Study (MARS), a survey of 1,086 tenants in Milwaukee's private rental housing sector, designed to collect data on the previous two-year rental history of the tenants surveyed. *Id.*  Households were selected through a multistage stratified sampling, which included assessing census data for high and low poverty rates and racial composition, and then blocks were randomly selected for interviews conducted in person.  Through these recognized and additional statistical analyses, the survey was carefully designed to provide a representative review of the renting population.

24. The MARS survey questions went beyond just "have you been evicted" to elicit specifically the reasons for leaving a property and to identify forced moves, where tenants might otherwise not identify as an eviction.  As they wrote, "Asking why someone moved is no simple task. Tenants often provide an explanation for a move that maximizes their own volition, and asking about involuntary displacement comes with its own set of complications

---

[10]    *See, e.g.*, Forced from Home: A Human Rights Assessment of Displacement and Evictions in Boston's Chinatown, Displacement Research and Action Network, Massachusetts Institute of Technology (MIT), at 55-57, https://dusp.mit.edu/news/boston%E2%80%99s-chinatown-forced-home.

because tenants tend to have strict conceptions of eviction." *Id.* at 1758.[11]  The survey responses were analyzed and categorized as forced moves (including informal and formal eviction by a landlord or the city), responsive moves (moves responsive to, *e.g.*, neighborhood conditions or a rent increase), and voluntary moves (to be near family, or for a new job, etc).

25. The MARS Study found nearly one-half (48%) of all forced moves experienced by renters in the prior two years were informal evictions – where no case had yet been filed. These findings are an important quantification of the prevalence of tenant displacement as a result of the threat of eviction, even before a landlord files a court proceeding.[12]

       I declare under the penalty of perjury that the foregoing is true and correct.

       Executed on August 18, 2020.

                               /s/ Esme Caramello
                                 Esme Caramello

---

[11]     Some of the questions used in the MARS survey include "Did you . . . . [leave after receiving] an eviction notice? Did you move away from this place because your landlord told you . . . to leave? Did you move away from this place because you . . . missed a rent payment and thought that if you didn't move, you would be evicted?" M. Desmond, T. Shollenberger, *Forced Displacement,* at 1758.

[12]     In 2017, the American Housing Survey, a national survey sponsored by the U.S. Department of Housing and Urban Development (HUD) and conducted by the Census Bureau, developed a new eviction module based on the MARS survey, and in consultation with Matthew Desmond.  Results are not yet published, but the module is intended to develop estimates that include formal, informal, and illegal evictions in the US.
U.S. Dep't of Housing and Urb. Dev., Measuring Housing Insecurity in the American Housing Survey, PD&R EDGE, https://www.huduser.gov/portal/pdredge/pdr-edge-frm-asst-sec-111918.html.

## **CERTIFICATE OF SERVICE**

  I certify that this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

|  |  |
|---|---|
| August 18, 2020 | */s/ Jennifer E. Greaney*<br>Jennifer E. Greaney<br>Assistant Attorney General |