UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIE BAPTISTE, MITCHELL MATORIN, and JONATHAN DAPONTE,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>MIKE KENNEALY, in his official capacity as Secretary of the EXECUTIVE OFFICE OF HOUSING AND ECONOMIC DEVELOPMENT, and CHARLES BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,<br><br>　　　　　　　　　　Defendants. | CIVIL ACTION<br>NO.  1:20-CV-11335-MLW |

## AFFIDAVIT OF KELLY TURLEY

I, Kelly Turley, do hereby declare as follows:

1. I am the Associate Director of the Massachusetts Coalition for the Homeless ("MCH"). Except where otherwise specified, I make this affidavit based upon my personal knowledge.

2. MCH is a not-for-profit Massachusetts corporation that was founded in 1981 with the mission of eradicating homelessness from the Commonwealth of Massachusetts. MCH advocates for people either experiencing or at risk of homelessness through policy work, direct services and programs; community organizing; and providing public education about the problem of homelessness and its solutions. MCH also partners with many national organizations, such as the National Low Income Housing Coalition, the National Alliance to End Homelessness, and the National Coalition for the Homeless.

3. I have worked at MCH since 2002 in various positions. I assumed my current role as Associate Director in 2017. Prior to my role as Associate Director, I was MCH's Director of Legislative Advocacy, the Senior Policy Advocate, and the Benefits Policy Coordinator. Before working at MCH, I served as an advocate with the permanent housing program at Rosie's Place, a sanctuary for women experiencing homelessness and poverty in Boston, and as an advocate/team member at the St. Francis Inn, a soup kitchen and multiservice program for people experiencing homelessness and poverty in Philadelphia. I have served as an advocate with and for people experiencing homelessness and poverty for the last twenty-three (23) years. I hold two master's degrees from Boston College, in Social Work and in Pastoral Ministry.

1

4. In my capacity as Associate Director, I coordinate MCH's public policy advocacy campaigns, and I lead MCH's public policy efforts to increase funding to state-funded homelessness, housing, and benefits programs. I also monitor the implementation of state-funded programs providing services to families, youth, and unaccompanied adults experiencing or at risk of homelessness in Massachusetts. In monitoring state-funded programs, I regularly review information about the causes leading to homelessness and the risk of homelessness among families, youth, and unaccompanied adults.

**Definition of Homelessness and Federal Efforts to Quantify Homelessness**

5. Following the loss of stable housing, and without the ability to afford another rental apartment, families and individuals experiencing homelessness have to make difficult choices. The potential options available to people who are recently unhoused generally include Emergency Assistance shelter for families with children (who can meet the narrow eligibility criteria for that program), state-funded shelters for unaccompanied adults, privately operated non-profit shelters, staying with family or friends (known as "doubling up" or "couch surfing"), living out of a car, staying on the street, spending the night at the emergency room, and sleeping in other places not meant for human habitation. MCH advocates for families with children, adults, and unaccompanied youth experiencing homelessness in all of these forms.

6. The federal definition of homelessness used by the U.S. Department of Urban Development ("HUD"), states that experiencing homelessness may mean:

> (1) an individual or family who lacks a fixed, regular, and adequate nighttime residence; (2) an individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, airport, or camping ground; (3) an individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including hotels and motels paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations, congregate shelters, and transitional housing); (4) an individual who resided in a shelter or place not meant for human habitation and who is exiting an institution where he or she temporarily resided; (5) an individual or family who—(A) will imminently lose their housing, including housing they own, rent, or live in without paying rent, are sharing with others, and rooms in hotels or motels not paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations. […] (B) has no subsequent residence identified; and (C) lacks the resources or support networks needed to obtain other permanent housing; and (6) unaccompanied youth and homeless families with children and youth defined as homeless under other Federal statutes who—(A) have experienced a long term period without living independently in permanent housing, (B) have experienced

    persistent instability as measured by frequent moves over such period, and (C) can be expected to continue in such status for an extended period of time because of chronic disabilities, chronic physical health or mental health conditions, substance addiction, histories of domestic violence or childhood abuse, the presence of a child or youth with a disability, or multiple barriers to employment.

42 U.S.C. § 11302

7. A similarly broad definition of homelessness is used in the definition of "Homeless Children and Youths," as defined in the McKinney-Vento Homeless Assistance Act, which protects educational access for children and youth experiencing homelessness. This definition includes children and youth staying in double-up situations. 42 U.S.C. § 11434a(2).[1]

8. Each year, HUD and the federal Department of Education (acting through the Massachusetts Department of Elementary and Secondary Education) gather data to determine the number of individuals, families, and children experiencing homelessness.

9. HUD's annual survey, termed the "Point-in-Time Count," attempts to capture a snapshot of homelessness in each state by counting and gathering data on the number of people experiencing homelessness on one particular night during the year. Unfortunately, HUD's Point-in-Time Count results in a significant undercount of those experiencing homelessness, because it counts only those already connected to the shelter system and those visibly staying in places not meant for human habitation, and, as such, it fails to capture both those families and individuals who are doubled up or couch surfing and those who are in hidden locations. Even with this notable undercount, the 2019 HUD Point-in-Time Count, which took place on January 23, 2019 in Massachusetts, reported

---

[1] "(2)The term 'homeless children and youths'"—(A) means individuals who lack a fixed, regular, and adequate nighttime residence (within the meaning of section 11302(a)(1) of this title); and (B)includes—(i) children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations; are living in emergency or transitional shelters; or are abandoned in hospitals; (ii) children and youths who have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings (within the meaning of section 11302(a)(2)(C) [1] of this title); (iii) children and youths who are living in cars, parks, public spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings; and (iv) migratory children (as such term is defined in section 6399 of title 20) who qualify as homeless for the purposes of this part because the children are living in circumstances described in clauses (i) through (iii)." 42 U.S.C. § 11434a(2).

that 18,471 people in Massachusetts were found to be experiencing homelessness that day.[2]

10. The Department of Education's separate methodology, which requires each school district to report the number of children experiencing homelessness, as defined by the McKinney-Vento Homeless Assistance Act (see paragraph 7, above), provides a more complete capture of the number of children who are experiencing homelessness, because it also includes children whose families are in a doubled up or couch surfing situation. The McKinney-Vento numbers are still considered to be a significant undercount, however, because many families may not admit to housing instability due to both the stigma associated with experiencing homelessness and concerns that disclosing their situation may risk removal of their children by the Department of Children and Families. Even with such undercounting, the Massachusetts Department of Elementary and Secondary Education reported that 24,777 children enrolled in Massachusetts schools in the 2018-2019 academic year were experiencing homelessness.[3]

### Eviction Leads to Homelessness

11. Through my work with families, youth, and individuals experiencing homelessness, both as an advocate and through my role in managing MCH programs, I am familiar with the circumstances that lead to homelessness. Eviction is widely recognized as leading to informal and unstable housing situations for families and individuals, as well as leading directly to shelter and street homelessness. I have found in my work that eviction is an "upstream" cause for the displacement and homelessness of families and individuals with whom we advocate, and whom we support through our programs.

12. The Massachusetts Department of Housing and Community Development (DHCD) administers the Emergency Assistance (EA) family shelter program and tracks the most recent reason for shelter entrance. In EA statistics, recent evictions are tracked as a reason for homelessness and shelter entrance. *See e.g. Commonwealth of Massachusetts Emergency Assistance, HomeBASE, and RAFT Programs Fiscal Year 2019, Fourth Quarterly Report*, Department of Housing and Community Development at 4, https://www.mass.gov/doc/fy2019-q4-ea-report/download (For fiscal year 2019, 12

---

[2] *Point-in-Time Count 2019*, United States Interagency Council on Homelessness, https://files.hudexchange.info/reports/published/CoC_PopSub_State_MA_2019.pdf.

[3] Massachusetts Department of Elementary and Secondary Education Homeless Student Program Data 2018-2019, https://mahomeless.org/wp-content/uploads/2020/08/Ed_Stability_Data_Report_2018-19-1.pdf. This number is based on the cumulative data reported by the school districts and may include some duplication due to student mobility. Some students were enrolled and received services in more than one district during the academic year.

percent of families entering EA shelter were eligible due to eviction, with an additional 2 percent of families eligible due to threatened eviction).

13. The numbers of families displaced and forced into homelessness by eviction are not captured in the EA data alone. EA shelter assistance is available for only those families deemed by the State to be in the most dire circumstances, under strict guidelines. As mentioned above, many families who face homelessness do not go to a shelter upon first being displaced, instead moving in with family or friends, or living out of their car or in other informal, temporary, and unstable circumstances. Even though families that are evicted may ultimately end up in an EA shelter, the effect of the eviction will not appear in EA data if there are intervening informal housing arrangements before entering shelter.[4] Moreover, there is no regular tracking by the state of families and individuals who are evicted and as a result experience homelessness, other than those families that immediately enter the EA system.

14. Various initiatives and studies in Massachusetts have attempted to complete the picture of the original causes of homelessness. In 2011, the Massachusetts Interagency Council on Housing and Homelessness, for which I sit on the advisory board, issued a report on its Regional Networks to End Homelessness Pilot Project. In the course of the pilot project, participants were asked the question: "If homeless or at risk of homelessness, why?" Eviction was identified by 45 percent of respondents as a reason for their homelessness or risk of homelessness.[5]

15. In this study, respondents identifying eviction as the primary cause of their homelessness or risk of homelessness were not limited to those who had been physically moved out by a sheriff or constable. They also included respondents who had moved out upon receipt of a notice to quit or summons, after signing an agreement for judgment in which they had agreed to move out, or after being ordered out of their homes by a judge.[6]

16. MCH itself undertook a survey of 309 residents of 12 Massachusetts family shelters in Fall 2010 as part of a campaign to re-establish a statewide program focused on clearing rental arrearages. In that survey, we found that 28.1% of the residents who did not enter

---

[4] Additionally, not all families experiencing homelessness are eligible for EA shelter. This includes most families evicted in the past three years from subsidized housing for non-payment of rent.

[5] *Regional Networks to End Homelessness Pilot Final Evaluation Report,* Massachusetts Interagency Council on Homelessness at 76, http://westernmasshousingfirst.org/wp-content/uploads/2011/03/wmn-icch-final-report-complete.pdf.

[6] In my experience, eviction encompasses many forms of landlord action that lead to tenant displacement. DHCD also recognizes that evictions are not limited to a levy actually occurring. *See* 760 CMR 67.06(1)(e)(2) (DHCD places eligible families in its EA family shelter program when a 48-hour notice has been served, *prior to* a levy actually occurring).

shelter directly from eviction still had been primary tenants in the past five years and had lost their tenancy due to non-payment of rent. While some of these shelter residents may have moved out on their own instead of going through a summary process eviction proceeding, it is more likely the actual number of families evicted is even higher than the reported 28.1%, since non-payment of rent is only one reason for eviction.[7]

17. This link between evictions and homelessness has also been demonstrated by local studies in other parts of the country, as well as by at least one longstanding national study. *See e.g. Protect Tenants, Prevent Homelessness*, National Law Center on Homelessness & Poverty, 2018, https://nlchp.org/wp-content/uploads/2018/10/ProtectTenants2018.pdf ("Numerous studies establish evictions as a primary cause of homelessness.").[8]

18. Additionally, a national survey of both people experiencing homelessness themselves and providers serving people experiencing homelessness conducted in 1996 found that "forced displacement frequently results in outright homelessness." Martha R. Burt, *Homeless Families, Singles, and Others: Findings from the 1996 Survey of Homeless Assistance Providers and Clients*, Housing Policy Debate 12(4): 737-80 (2001). The survey found that "two out of five homeless persons who used homeless assistance programs came to be homeless via involuntary displacement." Chester Hartman & David Robinson, *Evictions: The Hidden Housing Problem*, Housing Policy Debate 14(4): 461-501, https://www.innovations.harvard.edu/sites/default/files/10950.pdf, citing to Burt (2001).

19. Similarly, a study tracking individuals with an eviction action filed against them in the New York Housing Court showed a 14-percentage point increase in applications for emergency shelter in the 1-2 years after an eviction was filed. Robert Collinson and Davin Reed, *The Effects of Evictions on Low-Income Households*, (2018),

---

[7] I also am aware of a survey conducted by law students at two shelters that housed unaccompanied adults in the North Shore, as referenced in a March 2012 report from the Boston Bar Association Task Force Civil Right to Counsel. In this survey, the law students asked shelter residents where they were living prior to entering the shelter. Of the 18 residents interviewed, 12 were either evicted or moved out when they could not pay the rent due to a loss of a job or ill health. Specifically, four residents left when they could no longer pay rent, five left when they received notices to quit, and three left were asked to leave by people they doubled up with. *The Importance of Representation in Eviction Cases*, Boston Bar Association Task Force on the Civil Right to Counsel, 2012, https://bostonbar.org/docs/default-document-library/bba-crtc-final-3-1-12.pdf.

[8] *See also On the Map: The Dynamics of Family Homelessness in New York City*, Institute for children, Poverty & Homelessness (2017), www.icphusa.org/new_york_city/map-dynamics-family-homelessness-new-york-city-2017; *Santa Cruz County Homelessness Census & Survey 2017 Comprehensive Report*, Applied Survey Research (2017), http://www.appliedsurveyresearch.org/s/2017-SantaCruzCounty-Final.pdf.

> https://www.law.nyu.edu/sites/default/files/upload_documents/evictions_collinson_reed.pdf.

20. Finally, we put our understanding of the link between eviction and homelessness into the program structure of MCH's homelessness prevention program, known as HomeLink. One of HomeLink's primary strategies to prevent homelessness is to provide interventions to families and individuals on the brink of housing instability, including specific interventions aimed at stabilizing housing and preventing displacement through eviction as a result of financial distress. HomeLink advocates help families and individuals in negotiating with their landlords, accessing legal assistance, securing funds to clear rental arrearages, and relocating to alternative housing.

**<u>Challenges to Obtaining Housing in Massachusetts After Eviction</u>**

21. When families or individuals lose their housing in Massachusetts, it is even more difficult than in most states for them to secure new housing that is safe, affordable, and permanent. Over the years, the cost to rent an apartment at fair market rent in Massachusetts has increased year after year, and wages of lower income households have not kept pace.

22. In the Out of Reach 2020 report released in July by the National Low Income Housing Coalition (NLIHC), Massachusetts thus ranked as the third least affordable state in the nation for renters, behind only Hawaii and California.[9] For 2020, NLIHC calculated a "state housing wage" of $35.52 per hour for Massachusetts. This means that a renter in Massachusetts would have to earn $35.52 per hour and work 40 hours per week, 52 weeks per year, in order to afford a two-bedroom apartment at the statewide fair market rent of $1,847 per month. The calculation is based on a tenant paying 30% of their income on rent, so that the remaining funds can be available for other necessities.

23. The enormity of the problem becomes even clearer when it is recognized that the Out of Reach report was looking at all rental housing, rather than just at *available* rental housing. When one narrows the focus to *available* rentals, the percentage that are priced above fair market rent, and therefore even *less* affordable, is even higher.

24. These data make clear that households in Massachusetts that are forced to leave their homes, in an eviction or otherwise, cannot always move on to another apartment. If they were unable to afford their prior apartment, it is increasingly unlikely that they will be

---

[9] *Out of Reach: The High Cost of Housing*, The National Low Income Housing Coalition (2020), https://reports.nlihc.org/sites/default/files/oor/OOR_2020.pdf.

    able to afford another available apartment, because the housing wage continues to increase.[10]

25. The Out of Reach 2020 study relied on data pre-dating the COVID-19 pandemic. With the economic instability brought by the COVID-19 crisis, families and individuals who have seen a drop in their household income likely will face even greater challenges immediately finding replacement housing while their earnings remain depressed.

26. Once displaced from a home through an eviction or otherwise, and then unable to afford an available apartment, these households may have no choice but to avail themselves of the various informal housing arrangements captured in the federal definitions of homelessness – such as staying with family or friends for a week or a night and then staying in the emergency room for a night, before moving on to the next family member's couch or friend's floor, before finally potentially ending up in an EA family shelter, state-funded shelter for unaccompanied adults, or private shelter.

27. The conditions faced with this type of transient living result in poorer physical and mental health – putting people without secure housing at even greater risk of serious health problems should they become infected with COVID-19.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on August 18, 2020.

                        /s/ Kelly Turley
                        Kelly Turley

---

[10] The Out of Reach housing wage has been increasing steadily each year in Massachusetts, from $24.64/hour in 2015 to $35.52/hour in 2020. For more details, see https://mahomeless.org/basic-facts/.

**CERTIFICATE OF SERVICE**

    I certify that this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

|  |  |
|---|---|
| August 18, 2020 | */s/ Jennifer E. Greaney* <br> Jennifer E. Greaney <br> Assistant Attorney General |