UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIE BAPTISTE and MITCHELL MATORIN, and JONATHAN DAPONTE, <br><br> Plaintiffs, <br><br> v. <br><br> MIKE KENNEALY, in his official capacity as Secretary of the Executive Office of Housing and Economic Development, and CHARLES BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts, <br><br> Defendants. | C.A. No. 1:20-CV-11335-MLW |

**BRIEF OF AMICI CURIAE BOSTON MEDICAL CENTER CORPORATION, THE CHILDREN'S HOSPITAL CORPORATION, HEALTH LAW ADVOCATES, HEALTH CARE FOR ALL, THE PUBLIC HEALTH LAW WATCH AND UMASS MEMORIAL HEALTH CARE, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

HEALTH LAW ADVOCATES

Justin J. Lowe (BBO # 624857)
1 Federal Street, Fifth Floor
Boston, MA  02110
(617) 275-2981 (Voice)
E-mail: jlowe@hla-inc.org

*Attorneys for Amici Curiae Boston Medical Center Corporation, The Children's Hospital Corporation, Health Law Advocates, Health Care For All, the Public Health Law Watch, a project of the George Consortium, and UMass Memorial Health Care, Inc.*

Date: August 20, 2020

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1

II.   INTEREST OF AMICI CURIAE......................................................................................... 2

III.  ARGUMENT....................................................................................................................... 6

  A.  The Act Safeguards Public Health Beyond Preventing Further SARS-CoV-2 Transmission

  By Ensuring that Thousands of Individuals with Chronic Medical Conditions Can Continue to

  Access the Care They Need ...................................................................................................... 6

  B.  HLA's Clients .................................................................................................................. 10

  C.  The Commonwealth's Police Powers Operate to Protect the Health of All ...................... 12

IV.   CONCLUSION.................................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015). 6

Auracle Homes, LLC v. Lamont, No. 3:20-CV-00829 (VAB), 2020 WL 4558682 at *1 (D.

    Conn. Aug. 7, 2020) ........................................................................................... 16

Block v. Hirsh, 256 U.S. 135, 155 (1921) .................................................................. 13

Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242, 245 (1922)................................. 13

Finch v. Commonwealth Health Ins. Connector Auth., 459 Mass. 655 (2011) (Finch I) .............. 4

Finch v. Commonwealth Health Ins. Connector Auth., 461 Mass. 232 (2012) (Finch II) ............ 4

Harmon v. Kimmel, 566 U.S. 962 (2012)..................................................................... 15

In re Abbott, 954 F.3d 772, 784 (5th Cir. 2020)........................................................... 14

Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 38 (1905) ................................ 13, 14

Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 199 (1921) ........................................ 13

Nken v. Holder, 556 U.S. 418, 435 (2009) .................................................................... 6

S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1614 (2020) ...................... 2, 13

TJM 64, Inc. v. Harris, No. 220CV02498JPMTMP, 2020 WL 4352756, at *3 (W.D. Tenn. July

    29, 2020)........................................................................................................ 15

World Gym, Inc. v. Baker, No. 20-CV-11162-DJC, 2020 WL 4274557, at *1 (D. Mass. July 24,

    2020)............................................................................................................. 15

Xponential Fitness v. Arizona, No. CV-20-01310-PHX-DJH, 2020 WL 3971908, at *7 (D. Ariz.

    July 14, 2020) ............................................................................................ 15-16

Yee v. City of Escondido, 503 U.S. 519 (1992) ........................................................... 15

**Statutes**

CARES Act, 15 U.S.C. §§ 9057-9058........................................................................... 15

Tenant Safe Harbor Act, 2020 N.Y. Laws, ch. 127....................................................... 15

**Executive Orders and Other Documents**

Ariz. Exec. Order No. 2020-14 (March 24, 2020)........................................................ 14

Charlie Baker, Foreclosures and Evictions Moratorium Extension July 21 2020,

    https://www.mass.gov/doc/foreclosures-and-evictions-moratorium-extension-july-21-2020.. 12

Conn. Exec. Order No. 7DDD (June 29, 2020). ....................................................... 15

La. Exec. Order No. KBB 2005-32 (September 6, 2005)............................................ 15

N.J. Exec. Order No. 106 (March 19, 2020)............................................................... 15

NYC Housing Authority, NYCHA Housing Court and Eviction Moratorium (Nov. 23, 2012),

    https://www1.nyc.gov/site/nycha/about/press/pr-2012/housing-court-and-eviction-moratorium-

    11-23-12.page.......................................................................................................... 15

**Scientific Research Reports and Papers**

American Cancer Society, Survey: COVID-19 Affecting Patients' Access to Cancer Care,

    Cancer Action Network (Apr. 15, 2020), https://www.fightcancer.org/releases/survey-covid-

    19-affecting-patients%E2%80%99-access-cancer-care........................................... 8

Ana R. Quiñones, et al., Racial/ethnic differences in multimorbidity development and chronic

    disease accumulation for middle-aged adults, 14 PLoS One e0218462 (2019)......... 9

Daniel Newman, Michelle Tong, Erica Levine, and Sandeep Kishore, Prevalence of multiple

    chronic conditions by U.S. state and territory, 2017, 15 PLoS One e0232346 (2020)............. 8

Danya E. Keene, Mariana Henry, Carina Gormley, Chima Ndulmele, 'Then I Found Housing

    and Everything Changed': Transitions to Rent-Assisted Housing and Diabetes Self-

    Management, 20 Cityscape 107 (2018)................................................................... 8

David L. Maness, Care of the Homeless: An Overview, 89 Am Fam Physician 634 (Apr. 15,

    2014)......................................................................................................................... 9

Giorgione G. Cabral, Ana C. Dantas de Souza, Isabelle R. Barbosa, Javier Jerez-Roig, & Dyego

    L.B. Souza, Multimorbidity and Its Impact on Workers: A Review of Longitudinal Studies, 1-

    Safety and Health at Work 393 (2019)..................................................................... 9

Massachusetts Department of Public Health, Dashboard of Public Health Indicators (August 19, 2020), https://www.mass.gov/doc/covid-19-dashboard-august-19-2020/download. .............. 14

National Health Care for the Homeless Council, Adapting Your Practice: Treatment and Recommendations for Patients who are Homeless with Diabetes Mellitus (2013), https://nhchc.org/wp-content/uploads/2019/08/2013DiabetesGuidelines_FINAL_20130612.pdf. ............................ 8

Seena Fazel, John R. Geddes, & Margot Kushel, The health of homeless people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations, 384 Lancet 1529 (2015). ............................................................................ 9

S. Hutchins, B. Truman, T. Merlin, and S. Redd, Protecting Vulnerable Populations From Pandemic Influenza in the United States: A Strategic Imperative, 99 Am J Public Health S243 (2009). ....................................................................................................................................... 1

The Partnership to Fight Chronic Disease, What is the Impact of Chronic Disease on Massachusetts?, https://www.fightchronicdisease.org/sites/default/files/download/PFCD_MA_FactSheet_FINAL1.pdf. ....................................................................................................................................... 8

**News Reports**

Karen Weise, Mike Baker & Nicholas Bogel-Burroughs, The Coronavirus Is Forcing Hospitals to Cancel Surgeries, N.Y. Times, Mar. 16, 2020, https://www.nytimes.com/2020/03/14/us/coronavirus-covid-surgeries-canceled.html. ............. 7

Matthew Goldstein, Landlords Jump the Gun as Eviction Moratorium Wanes, N.Y. Times, Jul. 23, 2020, https://www.nytimes.com/2020/07/23/business/evictions-moratorium-cares-act.html. ........................................................................................................................................ 12

**Other Resources**

City Life/Vida Urbana, <u>Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color</u>, https://www.bostonevictions.org/.......................................................... 9

Honorable Fern Fisher-Brandveen, Legal Information and Resource Guide For Owners and Tenants Affected By The World Trade Center Disaster (2001), available at https://www.nytimes.com/2001/11/11/realestate/postings-a-civil-court-guide-on-sept-11-issues-for-owners-and-tenants.html. ........................................................................ 15

J.H. Powell, <u>Bring out your dead: the great plague of yellow fever in Philadelphia in 1793</u> (1949). ..................................................................................................................... 13

National Law Center on Homelessness and Poverty, <u>Protect Tenants, Prevent Homelessness</u>, 7 (2018), https://nlchp.org/wp-content/uploads/2018/10/ProtectTenants2018.pdf...................... 10

Wendy Parmet, <u>Rediscovering Jacobson in the Era of COVID-19</u>, 100 B.U. L. Rev. Online 117 (2020). ................................................................................................................. 14

I.      INTRODUCTION

Since at least the early 1900s, the law has recognized that the exercise of individual liberty is subject to the safety and well-being of the community at large. The twin maxims *sic utere tuo ut alterum non laedas* (use that which is yours so as not to injure others) and *salus publica suprema lex est* (public well-being is the supreme law), demonstrate that individual rights, including property rights, have always been subject to the state's police power when it seeks to protect the health and safety of its citizens. And, in this time of pandemic, the obligation of the state to exercise its police powers to preserve the greater good is of critical importance. Not only does society have a moral duty to care for those whose health is particularly at risk, preserving the health of those most vulnerable to SARS-CoV-2 and its collateral aftermath is squarely aligned with the goal of ensuring the health of all of the Commonwealth's communities. As public health experts have long argued, failing to protect the health and health care of individuals experiencing housing, food and economic insecurity increases the risk of infection for the general population.[1]

The risk of increased COVID transmission is not the only threat to public health that the Commonwealth's temporary suspension of evictions guards against. Indeed, thousands of Massachusetts residents with chronic health conditions will be irreparably impacted by the sudden loss of housing. Public health data and the lived experience of many of the individuals we serve – individuals who contend each day with chronic disease amid the increasing stress of housing instability and economic insecurity during the pandemic – illustrate the precarious circumstances of many Massachusetts residents and the grave health consequences that would

---

[1] S. Hutchins, B. Truman, T. Merlin, and S. Redd, <u>Protecting Vulnerable Populations From Pandemic Influenza in the United States: A Strategic Imperative</u>, 99 Am J Public Health S243 (2009).

result if Plaintiffs' preliminary injunction is allowed. Unleashing a wave of evictions at this moment will predictably accelerate the rate of SARS-CoV-2 infections and exacerbate existing chronic health conditions especially in communities of color – the very same communities that have already been hardest hit by the pandemic. Particularly during a pandemic when scarce health care resources must be conserved for the sickest among us, sound public health policy, like the Commonwealth's temporary suspension of evictions, prevents further illness *and* preserves the ability of hospitals to maintain adequate emergency capacity to care for others.

While Plaintiffs' challenge raises important questions regarding the exercise of individual property rights, states necessarily retain broad authority to respond and protect the health and safety of the public during times of catastrophe.[2] As the Commonwealth continues to grapple with a public health crisis that has already cost the lives of over 8,000 Massachusetts residents in just a few short months, special consideration must be given to those who are especially at risk of infection and those whose chronic disease will be made unmanageable with the loss of stable housing.

For these reasons, *Amici Curiae* Boston Medical Center Corporation, the Children's Hospital Corporation, doing business as Boston Children's Hospital, Health Law Advocates, Health Care For All, the Public Health Law Watch, a project of the George Consortium, and UMass Memorial Health Care, Inc., respectfully join with the defendants in opposing Plaintiffs' Motion for Preliminary Injunction.

II.    INTEREST OF AMICI CURIAE

Boston Medical Center Corporation (BMC) is a private, not-for-profit 514–bed academic medical center located in Boston's South End. BMC provides a comprehensive range of

---

[2] See South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring).

inpatient, clinical, and diagnostic services in more than 70 medical specialties and is the primary teaching affiliate for Boston University School of Medicine. BMC is the largest safety-net hospital and busiest trauma and emergency services center in New England. More than half of BMC's patients come from underserved populations, such as the low-income and elderly, who rely on government payers such as Medicaid, the Health Safety Net, and Medicare for their coverage. Many of BMC's patients have different – and unequal – access to safe housing, education, income, health care, fresh food, and other needs that influence their health outcomes. BMC is vested in working with its patients and their families who struggle to maintain stable housing and works with the Boston Housing Authority, Boston Public Schools, MetroHousing Boston, and Family Aid Boston to decrease housing instability. BMC has a direct interest in limiting the displacement of people from housing during the current pandemic because loss of housing sharply increases a person's susceptibility for contracting COVID and the complications that occur when patients have chronic conditions.

The Children's Hospital Corporation, which does business as Boston Children's Hospital ("Boston Children's Hospital"), is one of the largest non-profit pediatric medical centers in the United States. Boston Children's Hospital has more than 40 clinical departments and 258 specialized clinical programs and is dedicated to improving and advancing the health and well-being of children around the world. Boston Children's Hospital treats more children with rare diseases and complex conditions than any other hospital. Many of these children present with multiple chronic conditions that can only be addressed through comprehensive care regimens including inpatient, outpatient, in-home therapies, and medication management. Often, the families and guardians of patients with these complex conditions struggle to manage both the demanding care routines for these patients and their other personal commitments. For these

families and guardians, the loss of stable housing would be particularly disruptive, and would

likely lead to increased challenges regarding adherence to the prescribed medical regimen,

potentially including missed office visits, decreased medication adherence, and poorer health

outcomes overall. Boston Children's Hospital has a direct interest in this action and in ensuring

that its patients are protected from the significant foreseeable and avoidable health impacts

related to increased evictions and housing insecurity.

Health Law Advocates (HLA) is a Massachusetts-based public interest law firm helping

individuals facing economic insecurity overcome barriers to accessing health care. Founded in

1995, HLA provides no-cost legal services to individuals having difficulty accessing health care,

particularly those who are most likely to encounter barriers to health care coverage or services

due to their income level, race, gender, disability, age, immigration status, or geographic

location. HLA was counsel of record in the leading Massachusetts case on immigrant access to

state health benefits, Finch v. Commonwealth Health Ins. Connector Auth., 459 Mass. 655

(2011) (Finch I) and 461 Mass. 232 (2012) (Finch II), and has assisted thousands of

Massachusetts health care consumers navigate a system of scarce resources in order to access the

care they need. HLA also advocates for public policy reforms, working with consumers and

policy makers at the state and federal levels to strengthen our health care delivery system and

infrastructure. HLA has a direct interest in preserving access to health care coverage and services

for Massachusetts communities and individuals experiencing increased health care insecurity

during the COVID-19 pandemic.

Health Care For All (HCFA) is a non-profit consumer health advocacy organization that

advocates for health justice in Massachusetts by promoting health equity and ensuring coverage

and access for all. HCFA advocates for policies and practices to advance access to quality,

affordable health coverage and care for consumers in Massachusetts, including for immigrants and communities of color. HCFA operates a toll-free HelpLine that assists Massachusetts residents in English, Spanish, and Portuguese to apply for, enroll in, and troubleshoot health coverage issues. The HelpLine receives 20,000 calls per year and assists many immigrants and persons of color from communities throughout the Commonwealth hardest hit by the pandemic. HCFA has a direct interest in preserving and improving access to high quality health care in Massachusetts especially during this period of heightened need.

The Public Health Law Watch (PHLW) is a project of the George Consortium, a nationwide network of over sixty public health law scholars, academics, experts, and practitioners who are dedicated to advancing public health through law. PHLW's goals are to increase visibility and understanding of public health law issues, identify ways to engage on these issues and provide legal analysis and commentary. The statements expressed in this brief do not necessarily represent the views of any individuals or institutions affiliated with PHLW.

UMass Memorial Health Care, Inc. ("UMass Memorial") is a private, non-profit, charitable health care system based in Worcester, Massachusetts. UMass Memorial is the largest health care provider in Central Massachusetts and provides more care to the poor and underserved than any other provider in Central Massachusetts. UMass Memorial is one of only two "Essential MassHealth Hospital" systems in the state, based upon its provision of a disproportionate share of services to vulnerable populations. At the same time, UMass Memorial is an academic medical center that provides highly complex medical services unavailable elsewhere in Central New England. UMass Memorial is committed to addressing the social determinants of health and improving the environmental, financial and physical health of the diverse communities of Central Massachusetts as an Anchor Mission organization.  UMass

Memorial has a direct interest in avoiding significant housing instability and disruption during the current COVID public health crisis.  Loss of stable housing and the potential resulting increase in homelessness and density within existing housing units will impede public health efforts to both reduce the spread of COVID and to support patients with chronic conditions who are at greatest risk for poor outcomes, including death, if they contract COVID. Further, unmanaged chronic conditions lead to additional health care utilization at a time when the pandemic threatens to strain medical capacity and available medical resources.

III.   ARGUMENT

Plaintiffs are not likely to succeed on the merits of their constitutional claims, particularly when considering the public interest. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015); Nken v. Holder, 556 U.S. 418, 435 (2009). In addition to the arguments enumerated in the Commonwealth's papers, Plaintiffs ignore that the exercise of individual property rights has long been limited by the public interest, especially, but not exclusively, during public health emergencies. If the Commonwealth's temporary suspension of evictions is enjoined, the number of COVID-19 infections throughout the Commonwealth will rise, thousands of individuals will no longer be able to manage chronic medical conditions as a result of the sudden loss of stable housing, and hospital capacity will be further strained as demand for emergency services unnecessarily increase.

A.   The Act[3] Safeguards Public Health Beyond Preventing Further SARS-CoV-2 Transmission By Ensuring that Thousands of Individuals with Chronic Medical Conditions Can Continue to Access the Care They Need

As the Commonwealth's papers demonstrate, the current health care crisis requires coordinated action to meet the threat of a highly transmissible and deadly virus for which there is

---

[3] The "Act" refers to the Act of April 20, 2020, ch. 65, § 6, 2020 Mass. Acts, which is the subject of this lawsuit.

presently no vaccine or cure. Opp.[4] p. 1. Enjoining the Act would result in a wave of evictions that will further strain the Commonwealth's emergency housing system. Opp. pp. 9-10. Increasing the numbers of unhoused in Massachusetts will increase the number of SARS-CoV-2 infections, while critically decreasing the capacity of our health care system and risking the health of others.[5] Opp. p. 2. These facts, alone, provide sufficient grounds for the state's temporary exercise of police power to suspend evictions, reduce homelessness and prevent further sickness and death.

However, the Act does not only prevent further transmission of SARS-CoV-2. It also protects the health of thousands of Massachusetts residents who, even with housing of their own, struggle on a daily basis to manage their chronic disease. If these individuals also suddenly lose access to stable housing during the pandemic due to temporary job loss, the inability to access unemployment benefits, or protracted illness, their ability to effectively manage their chronic conditions will be greatly disrupted. As even simple interactions with health care providers have been made much more difficult by the pandemic[6], the additional effects of eviction and homelessness during the crisis will be especially harsh. Every aspect of their care, from carrying out regular treatment regimens, attending scheduled physicians' visits, securing transportation to

---

[4] "Opp." hereinafter refers to the Commonwealth's Opposition to Plaintiff's Motion for Preliminary Injunction (Docket No. 30).

[5] As many states, including Massachusetts, have witnessed first-hand, the allocation of scarce medical resources to respond to rising COVID-19 infections often means that fewer resources are available to treat other conditions. See Karen Weise, Mike Baker & Nicholas Bogel-Burroughs, The Coronavirus Is Forcing Hospitals to Cancel Surgeries, N.Y. Times, Mar. 16, 2020, https://www.nytimes.com/2020/03/14/us/coronavirus-covid-surgeries-canceled.html.

[6] For example, cancer patients are experiencing difficulty accessing and affording necessary treatments during the pandemic. See American Cancer Society, Survey: COVID-19 Affecting Patients' Access to Cancer Care, Cancer Action Network (Apr. 15, 2020), https://www.fightcancer.org/releases/survey-covid-19-affecting-patients%E2%80%99-access-cancer-care.

and from health care providers, and maintaining medication routines, will become significantly more burdensome. This is so because of both the complications that COVID-19 has caused for the Massachusetts health care delivery system, generally, and also the heightened risk that COVID-19 poses to individuals with one or more comorbid conditions.

Approximately four million Massachusetts residents live with at least one chronic disease[7], while 45.4% of the population has multiple chronic conditions.[8] Individuals managing chronic conditions, such as diabetes, will be especially harmed by the loss of housing because access to basic necessities such as healthy meals or refrigeration for their insulin supply will be made more difficult.[9] On the other hand, stabilizing housing can help facilitate control over an environment allowing people to manage their chronic conditions, including regulating diabetes routines.[10] By stabilizing housing and preventing homelessness, these individuals will be more able to manage their chronic conditions and focus on their health, rather than the basics for survival: food, water, and shelter. Additionally, in the face of further health decline, individuals with chronic disease who already suffer from lower rates of gainful employment, will also be

---

[7] The Partnership to Fight Chronic Disease, What is the Impact of Chronic Disease on Massachusetts?, https://www.fightchronicdisease.org/sites/default/files/download/PFCD_MA_FactSheet_FINAL1.pdf.

[8] Daniel Newman, Michelle Tong, Erica Levine, and Sandeep Kishore, Prevalence of multiple chronic conditions by U.S. state and territory, 2017, 15 PLoS One e0232346 (2020).

[9] National Health Care for the Homeless Council, Adapting Your Practice: Treatment and Recommendations for Patients who are Homeless with Diabetes Mellitus (2013), https://nhchc.org/wp-content/uploads/2019/08/2013DiabetesGuidelines_FINAL_20130612.pdf.

[10] Danya E. Keene, Mariana Henry, Carina Gormley, Chima Ndulmele, 'Then I Found Housing and Everything Changed': Transitions to Rent-Assisted Housing and Diabetes Self-Management, 20 Cityscape 107 (2018).

less likely to regain their financial footing and secure replacement housing especially as the state's job market remains impacted.[11]

The deleterious effect of homelessness on health is also well-documented. Those who lack housing are three to six times more likely to become ill than the general population.[12] One out of every two homeless people has high blood pressure.[13] One out of five have HIV, and 30% have hepatitis B.[14] Coupled with the fact that communities of color are, on the one hand, likely to suffer both from high rates of eviction[15] and high rates of chronic disease[16], and they are also the very same communities hardest hit by the pandemic, it is all the more imperative for policymakers to address these confluent health threats.

If emergency department utilization rises because individuals lose their housing and are consequently unable to effectively manage their chronic conditions, the state's health care resources will be diverted away from the response to COVID-19 and other unavoidable health emergencies. By temporarily stabilizing housing for the chronically ill at a time when the process of finding replacement housing is made all the more difficult by the pandemic, the Act helps hospitals and providers conserve needed medical resources during the crisis and affords

---

[11] Giorgione G. Cabral, Ana C. Dantas de Souza, Isabelle R. Barbosa, Javier Jerez-Roig, & Dyego L.B. Souza, Multimorbidity and Its Impact on Workers: A Review of Longitudinal Studies, 1- Safety and Health at Work 393 (2019) (finding that chronic disease inhibited individuals' work productivity and employability).

[12] David L. Maness, Care of the Homeless: An Overview, 89 Am Fam Physician 634 (Apr. 15, 2014).

[13] Seena Fazel, John R. Geddes & Margot Kushel, The health of homeless people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations, 384 Lancet 1529 (2015).

[14] Id.

[15] City Life/Vida Urbana, Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color, https://www.bostonevictions.org/.

[16] Ana R. Quiñones, et al., Racial/ethnic differences in multimorbidity development and chronic disease accumulation for middle-aged adults, 14 PLoS One e0218462 (2019).

chronically ill patients facing eviction with a buffer of time to locate alternate housing that suits their complex medical needs.

B.  HLA's Clients

Many of the communities that the *amici* serve already face considerable challenges to accessing the health care they need. The sudden loss of housing during the pandemic would, at the very least, greatly complicate the management of existing chronic conditions and could, in some cases, lead to cascading health consequences. The following two stories of current HLA clients[17] illustrate the real-world downstream impacts that the loss of housing would have on their health and the health of their families.

M.C. is a 52-year-old Quincy, Massachusetts resident with adult onset type 2 diabetes. He lives in a rental property and is on a fixed income. M.C. relies on his Social Security Disability Insurance (SSDI) payments to pay for rent, food and immediate medical expenses. Over 50% of M.C.'s income goes toward his rent, which categorizes him as a severely burdened renter and housing insecure.[18] Complications from M.C.'s type 2 diabetes resulted in the amputation of his toes, ongoing foot ulcers, impaired vision, and kidney damage. As a result, he is disabled and unable to work. Furthermore, he has over $7,000 of outstanding medical debt associated with his diabetes care that he is unable to pay in order to maintain his ability to continue paying for other necessities, such as rent. If M.C. were to be evicted from his home, he

---

[17] The clients identified herein are represented by HLA and have consented to the disclosure of their stories for the purpose of illustrating the difficulties that they, and many like them, face in navigating the health care system. Both sets of clients are considered housing insecure and their circumstances are representative of the experiences of many individuals the *amici* have come across in their respective capacities.

[18] National Law Center on Homelessness and Poverty, Protect Tenants, Prevent Homelessness, 7 (2018), https://nlchp.org/wp-content/uploads/2018/10/ProtectTenants2018.pdf (finding that individuals with significant rent burdens are significantly more likely to be unable to face eviction, due to of a lack of financial resources to address financial emergencies or interruptions in income).

does not have the financial means to relocate quickly and it is likely that he would become homeless.

M.C. and his health care providers are currently working to get his diabetes under control, which involves regular medical appointments at least every two weeks and multiple prescription medications. If M.C. suddenly lost his housing, the impact on his health and his ability to access necessary medical care would be devastating. M.C. would likely be forced to pay increased moving expenses, including a new housing deposit and other costs, instead of paying for the medical care he needs. Moreover, M.C. fears losing access to reliable transportation to medical appointments, healthy meals, and the refrigeration needed for his insulin and other medications, all of which are important to ensure that his diabetes does not accelerate and lead to more significant damage.

K.E. and her 11-year-old son live in Dorchester. After being diagnosed with attention-deficient/hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), disruptive mood dysregulation disorder (DMDD), and oppositional defiant disorder (ODD), K.E.'s son has been receiving treatment through outpatient care and in-home services.

K.E. and her son experienced homelessness multiple times between 2015 and 2019, including living in multiple shelters that had significant and detrimental impacts on the child's health. His conditions worsened due to the instability of their living situation, harsh treatment from shelter staff, and forced interactions with people he did not know or trust. K.E. and her son were repeatedly turned away from shelters because of the child's disruptive behavior when his conditions were triggered. Moreover, because of their constant moving, K.E.'s son fell behind in school and was unable to receive consistent access to health care through his school.

Since 2019, K.E. and her son have been living in an apartment that meets their medical needs[19] and K.E.'s son is about to enroll in a therapeutic school placement nearby. However, K.E.'s tenuous financial circumstances place her at risk of not being able to make rent from month to month, and she worries about her ability to find suitable replacement housing during the pandemic. If they were forced to move and could not quickly find replacement housing in their area, K.E.'s son would lose all of his mental health services which are tied to his school placement. Furthermore, the stress of a move would exacerbate his mental health conditions, and he would likely lose any progress he has made under his current treatment plan. The temporary eviction suspension has given K.E. peace of mind in knowing that, if she were unable to pay her rent, she and her son would have more time during the pandemic to find another suitable home.

C. The Commonwealth's Police Powers Operate to Protect the Health of All

State police power jurisprudence, rooted in the social compact, dates back to at least the 1800s when local governments struggled to contain ravaging outbreaks of malaria, yellow fever,

---

[19] K.E. receives housing benefits through the federal Section 8 program and currently benefit from temporary federal eviction protections. However, these protections expired on July 25, 2020 (see CARES Act, 15 U.S.C. § 9058(b)), and certain regions are already seeing an increase in the number of evictions. See Matthew Goldstein, Landlords Jump the Gun as Eviction Moratorium Wanes, N.Y. Times, Jul. 23, 2020, https://www.nytimes.com/2020/07/23/business/evictions-moratorium-cares-act.html.

In response to local conditions, Governor Charlie Baker recently extended protections in Massachusetts under the Act through October 17, 2020. See Charlie Baker, Foreclosures and Evictions Moratorium Extension July 21 2020, https://www.mass.gov/doc/foreclosures-and-evictions-moratorium-extension-july-21-2020. Given the highly localized effects of the pandemic, locally elected officials who are accountable to their respective constituents are in the best position to assess appropriate policy responses. See South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring) (finding that the judiciary should not interfere with the police power of elected officials "in areas fraught with medical and scientific uncertainty" especially where "local officials are actively shaping their response to changing facts on the ground.").

cholera, and typhoid.[20] Then, as now, the fact remains that individual rights, including property rights, are not absolute and are inherently subordinate to the preservation of the common good. South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (May 29, 2020) (Roberts, C.J., concurring); Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 38 (1905).

Indeed, the application of state police powers to individual rights, including property rights, is hardly novel. In a series of decisions in the 1920s relating to limitations on a landlord's ability to evict or raise rents, the United States Supreme Court repeatedly vindicated the authority of local governments to protect the public interest through their inherent police power. See Block v. Hirsh, 256 U.S. 135, 155 (1921)[21]; Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242, 245 (1922); and Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 199 (1921).

Even when considering the right of individuals to be free from government intrusion into matters of their own bodies, Courts have consistently upheld the state exercise of police powers. In Jacobson v. Commonwealth of Massachusetts, Justice Harlan considered the Constitutionality of a Massachusetts state law that mandated vaccination against smallpox. Ultimately upholding the state action, Justice Harlan grounded his decision in the social compact:

> But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be

---

[20] J.H. Powell, Bring out your dead: the great plague of yellow fever in Philadelphia in 1793 (1949).

[21] In Block, the Court held, "[b]ut the notion that [property rights] are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay."

confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state. . . .

Jacobson at 26.[22]

The historical context in which Jacobson was decided is significant. The determinations that the vaccine mandate at issue in the cases was reasonable under the circumstances should not be separated from the context of the smallpox epidemic in Massachusetts which, by that time, had resulted in more than 2,300 cases and 284 deaths.[23] Accordingly, in his decision, Justice Harlan repeatedly returns to the "paramount necessity" of protecting Massachusetts residents against an epidemic of disease. Jacobson at 27.

The Act is also not without more modern precedent. States and local governments around the country have taken emergency actions that provide limited protections to tenants during the current COVID-19 pandemic. See Ariz. Exec. Order No. 2020-14 (March 24, 2020) (delaying evictions for individuals who cannot pay their rent due to COVID-19 until October 31, 2020); Conn. Exec. Order No. 7DDD (June 29, 2020) (delaying evictions until August 22, 2020); N.J. Exec. Order No. 106 (March 19, 2020) (delaying evictions for up to two months after the end of

---

[22] In a particularly striking articulation of judicial deference in the wake of Jacobson, the Fifth Circuit recently upheld Texas' COVID-related emergency ban on abortion. There, the Court held that judicial review of emergency state action abridging constitutional rights was only available "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has *no real or substantial relation to those objects*, or is *beyond all question, a plain, palpable invasion of rights secured by the fundamental law*." In re Abbott, 954 F.3d 772, 784 (5th Cir. 2020) (quoting Jacobson) (emphasis added by the Fifth Circuit).

[23] Wendy Parmet, Rediscovering Jacobson in the Era of COVID-19, 100 B.U. L. Rev. Online 117 (2020). For perspective, the present pandemic has resulted in over 115,000 cases and 8,600 deaths in Massachusetts since the first confirmed case in March. See Massachusetts Department of Public Health, Dashboard of Public Health Indicators (August 19, 2020), https://www.mass.gov/doc/covid-19-dashboard-august-19-2020/download.

the New Jersey state of emergency); Tenant Safe Harbor Act, 2020 N.Y. Laws, ch. 127

(prohibiting evictions for individuals who experienced financial hardship for non-payment of

rent that accrues or becomes due during the COVID-19 period). See also CARES Act, 15 U.S.C.

§§ 9057-9058. Likewise, states have taken similar temporary actions in the wake of other

calamities, such as the September 11, 2001 attacks[24], Hurricane Sandy[25], and Hurricane

Katrina[26]. Indeed, a landlord's exercise of his or her property rights has never been absolute even

outside the context of a public health emergency. One need look no further than the U.S.

Supreme Court's repeated rejection of constitutional challenges to rent control laws and other

laws regulating the use of rental property. Yee v. City of Escondido, 503 U.S. 519 (1992);

Harmon v. Kimmel, 566 U.S. 962 (2012). Even during the current health crisis, courts have

repeatedly upheld emergency orders and legislation of local governments to protect public

health. See World Gym, Inc. v. Baker, No. 20-CV-11162-DJC, 2020 WL 4274557, at *1 (D.

Mass. July 24, 2020); TJM 64, Inc. v. Harris, No. 220CV02498JPMTMP, 2020 WL 4352756, at

*3 (W.D. Tenn. July 29, 2020); Xponential Fitness v. Arizona, No. CV-20-01310-PHX-DJH,

2020 WL 3971908, at *7 (D. Ariz. July 14, 2020); Auracle Homes, LLC v. Lamont, No. 3:20-

CV-00829 (VAB), 2020 WL 4558682 at *1 (D. Conn. Aug. 7, 2020).

---

[24] Honorable Fern Fisher-Brandveen, Legal Information and Resource Guide For Owners and Tenants Affected By The World Trade Center Disaster (2001), available at https://www.nytimes.com/2001/11/11/realestate/postings-a-civil-court-guide-on-sept-11-issues-for-owners-and-tenants.html (describing rental and mortgage protections available to individuals who were impacted by the September 11, 2001 attacks).
[25] NYC Housing Authority, NYCHA Housing Court and Eviction Moratorium (Nov. 23, 2012), https://www1.nyc.gov/site/nycha/about/press/pr-2012/housing-court-and-eviction-moratorium-11-23-12.page (implementing a moratorium to protect those impacted by Hurricane Sandy).
[26] La. Exec. Order No. KBB 2005-32 (September 6, 2005) (delaying evictions until September 25, 2005).

Plaintiffs' failure to acknowledge the substantial body of authority throughout the last 100 plus years establishing and upholding the state's police powers, especially in the face of a pandemic, is puzzling. Nevertheless, these cases make clear that the exercise of individual property rights cannot be to the exclusion of the public good.

IV.    <u>CONCLUSION</u>

The Act's temporary housing protections are of paramount importance to public health, including the safety of those managing chronic illnesses who depend on access to stable housing through the pandemic, and the ability of hospitals to conserve scarce health care resources during a crisis. For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction should be denied.


HEALTH LAW ADVOCATES

By: /s/ Justin J. Lowe
    Justin J. Lowe (BBO # 624857)
    1 Federal Street, Fifth Floor
    Boston, MA 02110
    Phone: (617) 275-2981
    jlowe@hla-inc.org

Date: August 20, 2020

*Attorneys for Amici Curiae Boston Medical Center, the Children's Hospital Corporation, doing business as Boston Children's Hospital, Health Law Advocates, Health Care For All, the Public Health Law Watch, a project of the George Consortium, and UMass Memorial Health Care, Inc.*

On the brief:

BOSTON MEDICAL CENTER CORPORATION
David Beck (BBO # 558616)
Chief Legal Counsel
One Boston Medical Center Place
Boston, MA 02118
Phone: (617) 638-7901
david.beck@bmc.org

*Attorney for Amicus Curiae Boston Medical Center Corporation*

CHILDREN'S HOSPITAL CORPORATION, d/b/a
BOSTON CHILDREN'S HOSPITAL
Benjamin O. Hoerner, Esq. (BBO # 691093)
Office of the General Counsel
Boston Children's Hospital
300 Longwood Avenue
Boston, MA 02115
Phone: (617) 355-4934
Benjamin.Hoerner@childrens.harvard.edu

*Attorney for Amicus Curiae the Children's Hospital Corporation, doing business as Boston Children's Hospital*

UMASS MEMORIAL HEALTH CARE, INC.
Katharine Eshghi (BBO # 629281)
Senior Vice President & General Counsel
UMass Memorial Health Care
One Biotech Park
365 Plantation Street
Worcester, MA 01605
Phone: (508) 334-1700
katharine.eshghi@umassmemorial.org

*Attorney for Amicus Curiae UMass Memorial Health Care, Inc.*