UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | ) |  |
|---|---|---|
| MARIE BAPTISTE, MITCHELL MATORIN and JONATHAN DAPONTE | )<br>)<br>) |  |
| Plaintiff, | )<br>) | C.A. No. 1:20-cv-11335 |
| v. | )<br>)<br>) |  |
| MIKE KENNEALY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE EXECUTIVE OFFICE OF HOUSING AND ECONOMIC DEVELOPMENT, and CHARLES BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts | )<br>)<br>)<br>)<br>)<br>)<br>) |  |
| Defendants. | )<br>)<br>) |  |

## **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS II, III, AND V OF THE AMENDED COMPLAINT**

**MARIE BAPTISTE, MITCHELL MATORIN, and JOHN DAPONTE**

By their attorneys:

Richard D. Vetstein
Vetstein Law Group, P.C.
945 Concord St
Framingham, MA 01702
Phone: (508) 620-5352
Fax: (888) 448-1344
Email: rvetstein@vetsteinlawgroup.com

Jordana R. Greenman, Esq. (BBO# 667842)
134 Main Street
Watertown, MA 02472
Tel: (617) 379-6669
Fax: (617) 379-6669
Email: jordana@jrglegal.com

Dated: August 25, 2020

# ARGUMENT

I. **Count II States a Claim for Relief for Violation of Plaintiffs' First Amendment Right to Free Speech.**

The Commonwealth argues that Count II of the First Amended Complaint does not state a claim for relief because, in its view, Section 3(a)(ii) bars only two things—termination of tenancy and issuance of a formal Notice to Quit—both of which are in its view "conduct" rather than "speech." The Commonwealth is wrong on both scores.

   A. **The Act Prohibits All Speech that "Requests" or "Demands" a Tenant Vacate or Notifies a Tenant of Unpaid Rent, Not Just the Termination of a Tenancy or the Service of a Formal Notice to Quit.**

First, the Act does not simply prohibit rental property owners from terminating a tenancy or sending a formal Notice to Quit that would be required before initiating summary process; the Act prohibits "any" communication "including" such a notice, that "requests" or "demands" that a tenant vacate the premises:

> SECTION 3. (a) … a landlord or owner of a property shall not, for the purposes of a non-essential eviction for a residential dwelling unit: (i) terminate a tenancy; or (ii) send **any** notice, **including a notice to quit**, requesting or demanding that a tenant of a residential dwelling unit vacate the premises.

Mass. St. 2020, c. 65, § 3(a) (emphasis added). *See* AG Br. at 6 (arguing that the Act bars only the "legal acts" of terminating a tenancy or "(2) sending a notice to quit, *including* the notices to quit required by Mass. G.L. c. 186, §§ 11 and/or 12, which are, in most cases, prerequisites for bringing a summary process action.")(emphasis added). It also bars property owners from sending notices of missed rent—such as an invoice showing the amount past-due—without including language offensive to property owners.

Section 3(a) of the Act bars not only serving a formal Notice to Quit sufficient to commence a summary process proceeding, but also categorically bans *any* speech[1] by which a property owner might try to get a non-paying or otherwise breaching tenant to vacate short of a formal eviction.[2] For example, Plaintiff Matorin understands that he cannot request that his tenant vacate in a "cash-for-keys" arrangement:

> 4. I have considered offering my tenants a "cash for keys" arrangement in order to encourage them to move out without having to go through the eviction process, but understand that doing so would violate the Eviction Moratorium Act, because it would contain a "request or demand" that the tenants vacate. Thus, I am unable even to try to voluntarily resolve the situation.

Matorin Supplemental Affidavit ¶ 4 (Aug. 11, 2020) (Dkt. 59.) The Act also bars Matorin from telling his tenant orally or in writing that his brother cannot live with him in the apartment as an unauthorized occupant under the tenancy agreement, because such would constitute a "request"

---

[1] While the Attorney General seems to take the position that only legally-operative *written* communications are banned (*see* AG Br. at 6, n.10) ("The Act does not forbid any *oral* communications between landlords and tenants"), there is nothing in the Act that supports this limitation.

[2] Outside the confines of this litigation, the Attorney General appears to agree that the Act bars more than sending formal Notices to Quit, as she has stated that "notices to vacate that are not labeled as such" are illegal:

> Since the eviction moratorium went into effect, the AG's Office has received more than 130 complaints from across the state of violations of the law including of illegal evictions. The AG's Office has heard about instances of landlords threatening to change the locks, *sending tenants notices to vacate that are not labeled as such*, and attempting to use a minor violation of a lease and deeming it as a health and safety risk that would fall under the moratorium's exemption and would thus allow them to evict the tenant.

Press Release, *AG Healey Calls for Extension of Eviction and Foreclosure Moratorium*, July 17, 2020, available at https://www.mass.gov/news/ag-healey-calls-for-extension-of-eviction-and-foreclosure-moratorium (last visited Aug. 22, 2020) (emphasis added) (attached as Exhibit A hereto.)

or "demand" that his brother vacate; nor can he make such a demand/request on the brother, or serve a formal Notice to Quit on him.³

Similarly, Plaintiff Baptiste stated that she cannot communicate with her tenants because they refuse to communicate by phone and if she wants to communicate in writing, she must include the state-mandated language:

> 5. I feel it is impossible to communicate with my tenants because they do not answer the phone and if I want to communicate in writing, I am required to use a state mandated form which requires me to provide contact information for the very tenant organizations that seek to cancel rent for one year.

Baptiste Supplemental Affidavit ¶ 5 (August 11, 2020) Dkt. 60.)

Thus, the Commonwealth's argument is premised on a fundamentally wrongheaded and artificially constricted view of what the Act *actually* prohibits. First, the Act prohibits any landlord from terminating a tenancy for any "non-essential" eviction. Mass. St. 2020, c. 65, § 3(a). The Act then goes on to target and prohibit any and all speech that could even be construed as a "request" or "demand" to vacate, whether or not it is a formal Notice to Quit. A landlord may want to have a conversation with a tenant about terminating his tenancy or moving out, but this is prohibited if the subject matter can be construed as the termination or a "request" or "demand" to vacate.⁴ Such speech could also be in the form of a less formal but certainly more popular medium of a text message, e-mail, or even a social media direct message, all of which are prohibited. The Court need go no further to deny the Commonwealth's Second Motion to

---

³ Matorin's other tenants include a young mother of a 3-year old girl and a young woman who lives with her teenage sister. Matorin has no idea whether the unauthorized tenant presents any danger to his other tenants because he did not screen him and does not even know who he is; or for that matter, even whether he actually is his tenant's brother. Yet, the Moratorium bars him from taking any steps to remove the unauthorized tenant.

⁴ That there might be proof issues does not change the fact that the conversation is banned.

3

Dismiss as to Count II, because the Commonwealth's argument wrongly assumes that the Act only bans legally operative written notices, but it is far broader than that, catching within its web, a myriad of oral and written communications dealing with vital tenancy issues.

### B. The Act Bars Protected Speech Not Conduct.

Although as noted above the Court need not even consider this argument to deny the Commonwealth's Second Motion to Dismiss, the Commonwealth's contention that the Act's prohibition on speech actually applies to "conduct" is equally wrong.

The Commonwealth cites *U.S. v. Sayer*, 48 F.3d 425, 433 (1st Cir. 2014), for the proposition that "[i]t has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." (AG Br. at 7.) *Sayer* is inapposite. There, the court rejected the argument that the federal cyberstalking statute, which criminalized *inter alia* using interactive computer services "in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of … death … or serious bodily injury" was unconstitutionally overbroad under the First Amendment because the criminalized conduct "involved speech, or online communications." 48 F.3d at 433. *Sayer* in turn was quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). In *Giboney*, the Court held that enjoining otherwise protected picketing did not violate the First Amendment where the "sole purpose of the picketing was to force a company to enter an unlawful agreement restraining trade in violation of a state criminal statute." *Sayer*, 748 F.3d at 433, *citing Giboney*, 366 U.S. at 501-02. Thus, in both *Sayer* and *Giboney*, statutes criminalized *conduct*, and the fact that the conduct in some way involved speech did not mean that criminalizing that conduct infringed the First Amendment. This is hardly a surprising conclusion, since otherwise the First Amendment would bar the criminalization of any conduct involving speech, *e.g.*, bank robbery where the criminal

4

obtains money by demanding it verbally. Thus, for example, in *United States v. Chardon-Sierra*, No. CR 19-153 (FAB), 2019 WL 3211256, at *5 (D.P.R. July 16, 2019), *appeal dismissed*, No. 19-1809, 2019 WL 7945953 (1st Cir. Aug. 28, 2019), the court rejected a First Amendment challenge to a statute criminalizing harassing telephone calls:

> "Prohibiting harassment is not prohibiting speech, because harassment is not a protected speech." *Thorne* [*v. Bailey*, 846 F.2d 241 (4th Cir. 1988)], at 243 (citation omitted). "Harassment is not communication, although it may take the form of speech," and "thus is not protected merely because it is accomplished using a telephone." *Id*. (emphasis added) (citation omitted); *see, e.g., United States v. Sayer*, 748 F. 3d 425, 433 (1st Cir. 2014) (internal quotation marks omitted) (*quoting Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)) ("[I]t has never been deemed an abridgment of freedom of speech ... to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.")

2019 WL 3211256, at *5.

Here, by contrast, the statute bars legal and protected speech: telling a tenant that his lease is terminated, "demanding" or "requesting" that a tenant vacate the premises, or even telling a tenant unquestionably true information—that rent is still owed, that it has not been paid, and how much is past due.[5]

This is true *whether or not* a property owner ultimately serves a formal Notice to Quit and files a summary process proceeding. The Act prohibits a property owner from communicating (orally or in writing, whether on paper, via e-mail or even a text message) to a tenant: "You have not paid rent and now owe $8,400. Because you have not paid me rent, you

---

[5] Unless, as discussed below, the property owners also provide information offensive to them and that serves directly to undermine their ability to recover the unpaid rent.

5

can no longer live here." The Act *also* bars providing the formal written notice that is necessary to commence an eviction proceeding.

The "conduct" that the Commonwealth suggests is properly prohibited is not criminalized conduct that is independent of and only incidentally involves speech as in *Sayer*, *Giboney*, and *Chardon-Sierra*. Rather, the Act directly targets *the content of the speech itself*, and does so by *singling out property owners* for disparate treatment: there is no bar, for example, on a tenant offering to leave in exchange for money, but a property owner cannot make that same offer. There is no question that the prohibited speech is perfectly legal and protected. The Act simply prohibits property owners from speaking, based on the content of that speech. This is a clear restriction on speech, not on "conduct."

The Commonwealth's reliance on *Homeaway.com, Inc. v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019), is also misplaced.[6] There, a local ordinance barred certain short-term rentals and prohibited online rental reservation providers from completing transactions for such illegal rentals. 918 F.3d at 680. The court rejected a First Amendment challenge brought by the reservation providers, holding that it banned not speech but conduct: "completing booking transactions for unlawful rentals." *Id.* at 686. That the ordinance targeted conduct rather than speech was shown by the fact that other websites such as Craigslist were not barred from advertising those rentals because they did not complete booking transactions. *Id.* The court finally held that to the extent that the ordinance incidentally chilled speech advertising unlawful rentals, "[a]ny First Amendment interest … is altogether absent when the commercial activity

---

[6] The Commonwealth's reliance on *Rentberry, Inc. v. Seattle*, 374 F. Supp. 3d 1056, 1063 (W.D. Wash. 2019) (AG Br. at 7), was presumably a mistake: that decision was vacated as moot and remanded with instructions to dismiss more than two weeks before the Commonwealth filed its brief in this court. *Rentberry, Inc. v. City of Seattle*, 814 F. App'x 309 (9th Cir. July 30, 2020).

6

itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Id.* Here, there is no illegal conduct. Nonpaying tenants unquestionably owe the rent and telling them how much they owe is not illegal; and since tenants are free to leave on their own, asking a tenant to leave is not incidental to any illegal activity. The Act prohibits pure speech: advising a tenant of a termination, "requesting" or "demanding" that the tenant vacate, advising a tenant of missed rent (without also providing offensive information), as well as serving a formal Notice to Quit.

For similar reasons, the Commonwealth's analogizing of the prohibited speech to "verbal acts" or "legally operative words" falls flat. "Requesting" or "demanding" that a tenant vacate the premises has no legal effect and does not operate to remove the tenant. Nor does notifying a tenant that rent must be paid and of the amount past due. Rather, the prohibited speech advises the tenant that there is a problem and the tenancy is at risk and that unless that problem is cured an eviction may take place in the future. Serving a formal Notice to Quit also has no legally operative effect. *See, e.g., Adjartey v. Cent. Div. of Hous. Court Dep't*, 481 Mass. 830, 850, 120 N.E.3d 297, 316 (2019)("Receipt of a notice to quit, however, does <u>not</u> legally require the tenant to move out of his or her home.")(emphasis in original). Rather, it is a prerequisite to commencing a summary process proceeding that may eventually lead to an eviction or—much more frequently—to a negotiated resolution. The Act targets property owners based on the content of their speech, not conduct, and not mere "verbal acts" or "legally operative words."

Accordingly, the Act violates Plaintiffs' rights under the First Amendment.

### C. The Act Is a Content Based Regulation on Landlords' Speech, and Therefore Subject to Strict Scrutiny.[7]

---

[7] We recognize that there is some inconsistency on the standard of review. *Compare Barr* (strict scrutiny) with *ACA Int'l v. Healy*, 2020 WL 2198366, at *5-6 (D. Mass. May 6, 2020) (intermediate scrutiny). We note that *ACA* was decided exactly one month before *Barr*, so it

7

As the Supreme Court's most recent decision on the regulation of content-based speech held, a law is subject to strict scrutiny if it is content-based, *i.e*, if "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2346 (July 6, 2020). That description applies to a law that "singles out specific subject matter for differential treatment." *Id.* In *Barr*, the Court applied strict scrutiny to strike down a ban on robocalls to mobile phones, except those to collect a debt owed to or guaranteed by the federal government. The Court reasoned that that government generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content," and could not favor one group of speakers (political robocallers) versus others (federal loan robocallers). *Id.* at 2335.

*Barr* applies here. The Act is a content-based regulation of speech based on the message a speaker (landlord) conveys, and singles out only one group—landlords—for restriction. That message is any and all speech *by landlords* relating to the termination of a tenancy in a "non-essential" eviction, any oral or written notice requesting or demanding that a tenant vacate a

---

does not reflect the Court's latest teaching. But even under intermediate scrutiny, the Act must be struck down. Under intermediate scrutiny, the government must show that the Act's prohibition on landlord's speech is "no more than necessary" to advance a substantial government interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566 (1980); *ACA* at *5-6. The government does not even attempt to make the case that it does, glossing over it in their briefing. (*See* AG Brief Oppo. P's Prelim. Inj. at 19.) The Act's prohibition on virtually all speech relating to tenancies is far more than necessary to advance any possible interest. There are myriad solutions other than banning speech which could address the risk of COVID-19 spread, such as already-enacted social distancing and mask requirements, increased testing and contact tracing, school and business capacity restrictions, etc. Since none of the banned speech actually forces tenants to move out, nobody will be rendered homeless or forced into shelters or camped housing or any of the other parade of horribles the Commonwealth postulates. Housing Court Judges already have authority to temporarily stay executions if necessary due to COVID-19 issues. The restrictions on landlords' speech are overkill—and raise the likelihood that they are motivated by tenants' rights organizations' desires to achieve long-standing policy goals more than anything else.

leased premises, and any communication about past-due rent. There is no equivalent prohibition on such speech *by tenants or housing advocates* who may freely encourage tenants *not to* pay rent because they cannot be evicted even if they can pay ("rent strikes").[8] Only landlords are singled out for such content-based restriction on their speech. As *Barr* held, such a content based restriction must be analyzed under a strict scrutiny. *Id*. at 2347. As with virtually all restrictions on speech subject to strict scrutiny, the Act cannot survive. The prohibition on virtually all speech relating to termination of tenancies, requests to vacate, and notices of past-due rent is not narrowly tailored to address the purported compelling state interest of stopping the spread of Covid-19. First, prohibiting speech generally relating to the termination of any tenancy is incredibly overbroad, and cannot be considered narrowly tailored under any formulation of the test. How does banning a landlord even talking to, or emailing, a tenant about terminating a tenancy or moving out, suggesting a mutually-agreeable resolution of a failed tenancy, or even about the amount of past-due rent, decrease the spread of Covid-19 or address supposed displacement? Second, a formal notice to quit does not legally require a tenant to move out. *Adjartey*, 481 Mass. at 850. The ban does nothing to promote the purported purpose. Again, as counsel argued at the hearing on August 24th, the only arguably effective mechanism to prevent displacements through evictions is to give Housing Court judges authority to temporarily stay executions for Covid-19 related issues—a power they already have, so even that would not be narrowly tailored so as to justify the restrictions on landlords' speech. Accordingly, the Act must be struck down as violating Plaintiffs' First Amendment Rights.[9]

---

[8] *See, e.g*, http://bostonreview.net/class-inequality/mordecai-lyon-COVID-19-rent-strike (found on August 25, 2020), attached hereto as Exhibit B.

[9] According to Plaintiffs' notes of the hearing held on August 24, 2020, the Court indicated that, if the Act violates the First Amendment (or otherwise is unconstitutional), then that would

## II. Count V of the Amended Complaint States a Claim for Relief under the Takings Clause.[10]

The Commonwealth argues that Plaintiffs' request for equitable relief for the Act's violation of the Takings Clause is barred under *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019). The reverse is true. In *Knick*, the Supreme Court held that a taking occurs when the government takes property without compensation, even though there may be a post-taking remedy for damages. And because the post-taking remedy does not mean that a taking *did not occur*, a plaintiff can immediately file a Takings claim in federal court without first seeking damages in state court. The Court then held that because "almost all" states have a damages remedy and damages are all a plaintiff is entitled to in a Takings case, equitable relief is "generally" unavailable "as long as" there is an "adequate" state remedy for damages. As discussed in Plaintiffs' Reply in Support of their Motion for Preliminary Injunction (Dkt. 57 at 19-25), the state damages remedy *in this context* is not adequate. For the sake of brevity, Plaintiffs incorporate by reference their arguments as to why the Massachusetts damages remedy is inadequate here.

Not only does the "general" unavailability of equitable relief for a Takings claim apply here because the damages remedy is unavailable in this context, the clear import of *Knick* is that where there is no "adequate" state damages remedy, federal courts *must* provide equitable relief because otherwise there is no remedy whatsoever for a Takings violation. *Knick* does not make sense otherwise: why would the Court hold that a plaintiff may immediately file a federal

---

necessarily indicate that it was not a reasonable and appropriate limitation of Plaintiffs' contract rights and it therefore would violate the Contracts Clause. Plaintiffs respectfully request that the Court consider this in its analysis of Plaintiffs' Contracts Clause claim.

[10] After carefully considering the Commonwealth's arguments and the Court's comments concerning the availability of money damages from the state for a Takings Clause violation, Plaintiffs do not assert a claim for money damages in this proceeding.

10

Takings claim, only to hold that the plaintiff cannot get either monetary damages or equitable relief in federal court?

The Court's discussion of the history of Takings claims supports this conclusion. The Court observed that prior to the 1870's, the *only* remedy for a taking was the *equitable relief* of returning the property to the owner:

> Antebellum courts, which had no means of compensating a property owner for his loss, had no way to redress the violation of an owner's Fifth Amendment rights other than ordering the government to give him back his property.

*Knick*, 139 S. Ct. at 2176. However, state courts later began recognizing implied rights for damages and started denying equitable relief because there was an adequate remedy at law:

> Today, because the federal and **nearly all** state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is **generally** unavailable. **As long as** an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking. But that is because, as the Court explained in First English, such a procedure is a remedy for a taking that violated the Constitution, not because the availability of the procedure somehow prevented the violation from occurring in the first place.

*Knick*, 139 S. Ct. at 2176–77 (emphasis added). The Court's statement—that "*[n]early all* state governments" provide an adequate damages remedy—acknowledges that not all states do. And for those, equitable relief continues to be available as it was in the earlier years; otherwise, there would be no remedy at all for a Takings violation. The Court held that a property owner may bring a Fifth Amendment claim as soon as the government takes property without compensation, and further held that where post-taking compensation *is* available, equitable relief is "ordinarily" not appropriate:

> That does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation. Given the availability of post-taking compensation, **barring the government from**

11

> **acting will ordinarily not be appropriate**. But because the
> violation is complete at the time of the taking, pursuit of a remedy
> in federal court need not await any subsequent state action.

Knick 139 S. Ct. at 2177 (emphasis added). The Court's deliberate uses of the words and phrases "nearly all," "generally," "as long as," and "ordinarily" cannot be read as imposing a blanket ban on equitable relief for Takings violations. To the contrary, they must be read as *requiring* equitable relief when an adequate damages remedy is *not* available. A plaintiff can immediately seek equitable relief in federal court if money damages are unavailable or inadequate.

Plaintiffs have already discussed in detail why the statutory damages remedy for a Taking under Massachusetts law is inadequate *in this context*. For the sake of brevity, we incorporate that discussion by reference here. *See* Plaintiffs' Reply in Support of their Motion for Preliminary Injunction (Dkt. 57 at 16-25.) Because the statutory remedy is not available for the type of taking at issue in this case, *Knick* not only holds that the "general" rule does not apply but also *mandates* that the Court grant equitable relief to Plaintiffs because otherwise there will be no remedy at all for the Fifth Amendment Taking that has occurred.

The Commonwealth cites several cases in which other courts have seemingly read *Knick* as precluding equitable relief. One of them actually supports Plaintiffs argument above. In *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, No. CV SAG-20-1818, 2020 WL 3639991, at *3–4 (D. Md. July 6, 2020), the plaintiffs challenged restrictions on rent increases during the emergency (a restriction that is barely perceptible compared to the restrictions imposed on Plaintiffs here). The court simply recited that "as multiple courts have explained, the proper remedy for a Takings violation is not injunctive relief, but rather monetary damages." *Id.* at *3. The court then recited the language from *Knick* discussed above, and stated:

> Accordingly, monetary damages are not only adequate to compensate Plaintiffs for their alleged injuries, but are also the proper remedy in this context. **Plaintiffs have not established that monetary damages would be inadequate**, nor have they directed this Court to any case in which a court has remedied a Takings violation with a preliminary injunction — let alone with a TRO.

*Id.* at *4 (emphasis added). The Court then went on to hold in the context of the plaintiffs' "vested rights" claim that "Plaintiffs have not explained why damages would be inadequate or difficult to quantify for this count either. If Plaintiffs successfully prove that the Acts unlawfully deprived them of rental income that they had negotiated with their tenants, then their damages should be readily calculable." *Id.* Unlike *Willowbrook*, here Plaintiffs have in fact shown that they will be unable to obtain adequate monetary damages for the Taking under the relevant Massachusetts statute, M.G.L. c. 79, §10.

In *Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 WL 3971908 (D. Ariz. July 14, 2020), the plaintiffs argued that the Governor's executive order deprived them of the fundamental right to do business, as to which the court expressed skepticism that this was a protectible constitutional right. *Id.* at *5. The court nevertheless considered the various claims and brushed off the Takings claim with no analysis at all but simply a brief reference to *Knick* and the conclusion that damages are the proper remedy. *Id.* at *9. There was no indication that the plaintiffs challenged the adequacy of the Arizona monetary damages remedy.

Finally, in *Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207 (E.D.N.C. June 8, 2020), the court rejected the plaintiffs' Takings challenge to the closure of their adult entertainment businesses in single sentence: "Likewise, plaintiffs are unlikely to prevail on their claim under the Takings Clause," citing *Knick*. *Id.* at * 12. Once again, no analysis and no indication that the plaintiffs argued the state damages remedy was inadequate.

Again, it makes no sense that the Supreme Court in *Knick* would hold that a plaintiff may bring a Fifth Amendment Takings claim in federal court the moment the taking occurs and without first exhausting any state remedies, only to hold that the plaintiff has no remedy for that taking in federal court. With due respect to the courts in the foregoing cases, Plaintiffs submit that they did not engage in any analysis at all of whether a state damages remedy was even available, let alone adequate, but rather simplistically—and incorrectly—recited that *Knick* bars equitable relief.

The Commonwealth's argument that declaratory—as opposed to injunctive—relief is unavailable is equally misplaced. The Commonwealth cites *County of Butler v. Wolf*, 2:20-cv-677, 2020 WL 2769105 (W.D. Pa. May 28, 2020), but it suffers from the same deficiency as the other cases cited above. There was no indication that the plaintiffs challenged the adequacy of the state's monetary damages remedy, and the court engaged in no analysis. It simply asserted that *Knick* "foreclosed" declaratory relief in the same way that it purportedly foreclosed injunctive relief. *Id.* at *4. *Butler* adds nothing to the analysis, because *Knick* foreclosed neither.

As for the Commonwealth's argument—relegated to a footnote—that declaratory relief would be barred by the Eleventh Amendment "where there is no occasion to issue an injunction" (AG Memo in Support of Second Motion to Dismiss at 10 n. 16), the short answer is that there *is* both reason and a requirement to issue an injunction here. The longer answer is that the Supreme Court has "held that under this [Declaratory Judgment] Act declaratory relief may be available even though an injunction is not." *Green v. Mansour*, 474 U.S. 64, 72 (1985). The Commonwealth's reliance on *Green v. Mansour*, 474 U.S. 64 (1985) and *Mills v. State of Maine*, 118 F.3d 37 (1st Cir. 1997), is not on point. In both cases, the court denied the declaratory judgment because there was "no claimed continuing violation of federal law" and

14

therefore "a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability." *Green*, 474 U.S. at 73; *Mills*, 118 F.3d at 41, 54. That is manifestly not the case here because there *is* a continuing violation of federal law and the "usefulness" of a declaratory judgment would be to put an end to that violation, in the same manner as an injunction against enforcing the Act.

### III. PLAINTIFFS HAVE STANDING TO CHALLENGE COMPELLED SPEECH IN COUNT III

Although the title of the Attorney General's brief in support of the Commonwealth's second Motion to Dismiss refers to Count III of the Amended Complaint, neither the body of the brief nor the conclusion refer to that Count. Instead, the Commonwealth refers to Count III in a footnote and incorporates by reference the arguments made in its opening and reply briefs in support of its first Motion to Dismiss. (AG Memo in Support of Second Motion to Dismiss at 3, n. 6.) In those briefs, the Commonwealth argues that Plaintiffs lack standing to assert the claims based on compelled speech set out in Count III of the Amended Complaint. Because those issues have already been briefed, we will not repeat those arguments here.

However, we will briefly respond to the Commonwealth's argument that Plaintiffs still lack standing to pursue Count III in light of the Amended Complaint, which argument the Commonwealth made only in its Reply in Support of its first Motion to Dismiss.[11] The Commonwealth contends that Plaintiffs continue to lack standing because none of them have indicated that they "are required to, intend to, or desire to send any 'missed rental notice' to their tenants," and that the regulations are simply "hortatory" because there is no requirement that

---

[11] Because of the overlapping filings, the Amended Complaint was filed between the filing of the first Motion to Dismiss and the Commonwealth's Reply.

15

Plaintiffs send a "missed rental notice" at all. (AG Reply in Support of first Motion to Dismiss at 5-6.) The Commonwealth therefore argues that Plaintiffs have suffered no injury.

The Commonwealth misses the point: *if Plaintiffs wish to send any notice about missed rent (including an invoice), they must include the mandatory language*. Plaintiff Baptiste has stated that she wishes to communicate in writing with her tenants, but that she cannot because she would be required to include the mandatory language to which she objects:

> 5. I feel it is impossible to communicate with my tenants because they do not answer the phone and if I want to communicate in writing, I am required to use a state mandated form which requires me to provide contact information for the very tenant organizations that seek to cancel rent for one year.

Baptiste Supplemental Affidavit ¶ 5 (August 11, 2020) Dkt. 60.) The fact that Baptiste cannot communicate because she will be required to include the mandatory language necessarily implies that the communication that she wishes to send is a notice about the past-due rent. Otherwise, she would not need to include the mandatory language. Accordingly, Baptiste has standing to assert Count III of the Amended Complaint.

Although it isn't necessary given that Baptiste has standing, Plaintiff Matorin also would state under oath that he wishes to send a bill to his tenants listing the outstanding amounts due (currently $8,400) and demanding payment but cannot do so without including the objectionable mandatory language and for that reason has not done so. Should the Court give any credence to the Commonwealth's argument with respect to Plaintiffs' standing to assert Count III of the First Amended Complaint, Plaintiffs respectfully request that the Court permit them to supplement their affidavits to make these points explicit. There is no prejudice to the Commonwealth from permitting this, especially given the Commonwealth's strained arguments to dismiss Count III and the tenet that leave to amend should be freely granted in the interests of justice.

16

Accordingly, Plaintiffs have standing to assert Count III of the Amended Complaint and the Court should deny the Commonwealth's Motions to Dismiss that Count.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in their Opposition to the Commonwealth's first Motion to Dismiss with respect to Count III, the Court should deny the Commonwealth's Motions to Dismiss Counts II, III, and V of the Amended Complaint.

Respectfully submitted,

**MARIE BAPTISTE,
MITCHELL MATORIN, and
JOHN DAPONTE**

By their attorneys:

/s/ Richard D. Vetstein
Richard D. Vetstein
Vetstein Law Group, P.C.
945 Concord St
Framingham, MA 01702
Phone: (508) 620-5352
Fax: (888) 448-1344
Email: rvetstein@vetsteinlawgroup.com

/s/ Jordana R. Greenman
Jordana R. Greenman, Esq. (BBO# 667842)
134 Main Street
Watertown, MA 02472
Tel: (617) 379-6669
Fax: (617) 379-6669
Email: jordana@jrglegal.com

Dated:  August 25, 2020

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 25, 2020.

/s/ Richard D. Vetstein