**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| MARIE BAPTISTE, MITCHELL MATORIN, and JONATHAN DAPONTE,<br><br>                Plaintiffs,<br><br>      v.<br><br>MIKE KENNEALY, in his official capacity as Secretary of the EXECUTIVE OFFICE OF HOUSING AND ECONOMIC DEVELOPMENT, and CHARLES BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,<br><br>                Defendants. | C.A. No. 1:20-CV-11335-MLW |

**DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
COUNTS II, III, AND V OF THE AMENDED COMPLAINT**

Defendants Secretary of the Commonwealth of Massachusetts's Executive Office of Housing and Economic Development ("EOHED") and Governor of Massachusetts (collectively, "Commonwealth") respectfully submit this Reply Memorandum in further support of Defendants' Motion to Dismiss Counts II, III, and V of the Amended Complaint ("Motion") (Dckt. 69). As discussed below, nothing in the Plaintiffs' opposition can rescue the fatal defects in these claims, which are all subject to dismissal under Fed. R. Civ. P. 12.[1]

**I.**    **The Prohibitions in Section 3(a) of the Moratorium Act Are Very Narrow, and Ban Specific Verbal Acts, Not First Amendment Protected Speech.**

The Commonwealth has moved to dismiss Count II of the Amended Complaint on the ground that its Free Speech Clause challenge to Section 3(a) of the Act fails as a matter of law.

---

[1]    Capitalized terms in this memorandum have the same meaning that is assigned to them in Defendants' Memorandum in Support of their Motion to Dismiss Counts II, III and V (Dckt. 70), unless otherwise indicated.

Defendants' Memorandum in Support of Motion to Dismiss ("Defs. Memo.") (Dckt. 70), pp. 5-8.  The Commonwealth's argument is that Section 3(a)'s prohibitions on terminating non-essential residential tenancies and on sending any notices (including notices to quit) that such tenants vacate the premises fall outside the First Amendment in that they are directed at non-speech verbal acts – *i.e.*, at conduct, rather than speech.  *Id.*  To rebut this contention, the Landlords resort to a classic "straw person" fallacy:  they contend that Section 3(a) prohibits far more than it in fact does, and they then assert that Section 3(a), as they have vastly enlarged it, reaches protected speech.  *See* Plaintiffs' Opposition to Motion to Dismiss (Dckt. 88) ("Pls. Opp.") pp. 1-9.  As with any "straw person" argument, this attempted misdirection cannot salvage their Free Speech Clause claim.

### A.    The Landlords Grossly Misread Section 3(a)'s Reach.

Count II of the Amended Complaint challenges Section 3(a) of the Act, and only Section 3(a), as violative of the Free Speech Clause.  *See* Amended Complaint (Dckt. 58) ¶ 66.  In their Opposition, the Landlords assert that Section 3(a) prohibits "a myriad of oral and written communications dealing with vital tenancy issues," Pls. Opp. p. 4, including, among others, "sending notices of missed rent," *id.* p. 1, and "hav[ing] a conversation with a tenant about . . . moving out," *id.* p. 3.  These exaggerations have no basis in the actual text of the statute.  Section 3(a) provides:

> (a) Notwithstanding chapter 186 or chapter 239 of the General Laws or any other general or special law, rule, regulation or order to the contrary, a landlord or owner of a property shall not, **for the purposes of a non-essential eviction for a residential dwelling unit**: (i) **terminate a tenancy**; or (ii) **send any notice**, including a notice to quit, **requesting or demanding that a tenant of a residential dwelling unit vacate the premises**.

Mass. St. 2020, c. 65, § 3(a) (emphasis added).  The Landlords misread this language in two basic respects.

1.      There is nothing in Section 3(a)'s text that prohibits communications that are simply about missed rent – the language quoted immediately above does not address that topic. The Landlords recognize as much in the two paragraphs in their Amended Complaint describing Section 3(a), which make no mention of missed-rent notices.  *See* Amended Complaint (Dckt. 58)  ¶¶ 20, 66.  The Landlords' present Opposition, however, states that the statute "bars property owners from sending notices of missed rent – such as an invoice showing the amount past due – without including language offensive to property owners."  Pls. Opp. p. 1.  While the Opposition then repeats the contention twice, *id*. pp. 5, 7, there again is not the slightest support for this newfound assertion in Section 3(a)'s actual language.  Saying that something is so, no matter how many times repeated, simply does not make it so.[2]

2.      The Landlords also read Section 3(a) far too broadly on the subject that it actually does address:  evictions.  Section 3(a) by its terms is limited to "non-essential eviction[s] for . . . residential dwelling unit[s]."  Mass. St. 2020, c. 65, § 3(a).  The statute then imposes two specific prohibitions, separated into two statutory subsections, relating to such evictions.  First, Section 3(a)(i) states that "a landlord . . . shall not, for the purposes of . . . eviction . . . (i) terminate a tenancy."  *Id*. § 3(a)(i).  Second, Section 3(a)(ii) provides that "a landlord . . . shall not, for the purposes of . . . eviction . . . (ii) send any notice, including a notice to quit, requesting or

---

[2]      The EOHED regulations do address missed-rent notices, *see* 400 Code Mass. Regs. § 5.03(2), but the Landlords separately challenge those in Count *III* of their Verified Complaint. It is Section 3(a) alone that Count II challenges, Amended Complaint ¶ 66, and Section 3(a) itself says nothing whatsoever about missed rent.  The provision in the Act relevant to the Regulations states, "[EOHED] shall issue emergency regulations as necessary to implement this section." *See* Mass. St. 2020, c. 65, § 3(g).  The Regulations are consistent with Section 3(a) of the Act because they provide a safeguard against tenants mistakenly believing that notices of missed rent they may receive are actually notices to quit or demands that they vacate.  But the Act itself does not mandate the disclosure requirements set forth in the Regulations in the event that a landlord chooses to send a notice of missed rent.

demanding that a tenant . . . vacate the premises."  *Id.* § 3(a)(ii).  Section 3(a)(ii)'s carefully

constructed language builds multiple restrictions into the subsection's scope:

> a.  Section 3(a)(ii) reaches only communications that are made "for the
> purposes of . . . *eviction*."

> b.  The sole form of communication that falls within Section 3(a)(ii)'s ban is
> "send[ing] any notice."  Both the phrase "any notice"[3] and, in particular, the verb "send"
> indicate that *written* communications are what is prohibited.  (It is hard to see how the act
> of "sending" something can be accomplished by an oral communication.)

> c.  The only "notice[s]" barred under Section 3(a)(ii) are those that "request[]
> or demand[] that a tenant . . . vacate the premises."  That is strong language, suggesting a
> landlord-desired "vacat[ing]" that is presumptively involuntary on the tenant's part.  The
> statute's express inclusion of the traditional phrasing "notice to quit" – a document which
> typically "states that a tenant may be evicted if he or she fails to vacate the premises
> within a certain period of time"[4] – reinforces the conclusion that the prohibited
> communication is by its nature an unwelcome one.

The Act is a Massachusetts statute that must be interpreted under Massachusetts statutory-

construction standards, and the Supreme Judicial Court has repeatedly ruled that it "construe[s] a

statute 'as written, in keeping with its plain meaning, so as to give effect to each word.'"  *In Re*

*Globe Newspaper Co*., 461 Mass. 113, 118 (2011) (quoting *Stop & Shop Supermarket Co. v.*

*Urstadt Biddle Props., Inc.,* 433 Mass. 285, 289 (2001)).  This Court should similarly "give

---

[3]  Section 3(a)(ii) of the Moratorium Act is limited to "notices."  Section 3(a)(i) is not, but *see generally* Defs. Memo. (Dckt. 70) p. 6 n.10 ("highly unlikely that that the termination of a tenancy could be accomplished by a notice that is delivered orally").

[4]  *Adjartey v. Cent. Div. of Hous. Ct. Dep't*, 481 Mass. 830, 850 (2019).

effect to each word" in Section 3(a), and accord the statute only the narrow reach its language indicates.

## B. The Limited Events That Section 3(a)'s Prohibitions Do Address Are Verbal Acts (*i.e.*, Conduct) That Fall Outside the First Amendment's Reach.

The Landlords do not dispute – to the contrary, they quote – the longstanding principle established in *Giboney v. Empire Storage & Ice Co.,* 336 U.S, 490, 502 (1949), that "it has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *See* Pls. Opp. p. 5. But that is all that Section 3(a) does: "make a course of conduct" that is "in part initiated . . . or carried out by means of language" temporarily "illegal." *Id*. Section 3(a) therefore should not, as a matter of law, be "deemed an abridgement of freedom of speech," *id*., with the result that Count II must be dismissed.

The Landlords contest this on several asserted grounds, but none is valid. They initially contend that the only statutes "mak[ing] a course of conduct . . . carried out by means of language" "illegal" that can fall outside the First Amendment are *criminal* ones. Pls. Opp. pp. 4-6. The argument that the *Giboney* principle is limited to criminal statutes is wholly unsupported, and also illogical as it cannot be the case that a broader exception to First Amendment protection exists for criminal laws than for civil laws, as the former arguably threaten to chill protected speech far more than the latter. Indeed, a time-honored Supreme Court decision, *NLRB v. Gissel Packing Co*., 395 U.S. 575 (1969), holds squarely that an employer's "threat of retaliation" prohibited under Section 8 of the National Labor Relations Act – a civil statute – is "without the protection of the First Amendment." *Id*. at 618 (considering 29 U.S.C. §§ 158(a)(1), (c)).

The Landlords additionally maintain that Section 3(a) "prohibits pure speech." Pls. Opp. p. 7; *see also id*. pp. 5-7. But they provide no supporting argument whatsoever regarding the

first of Section 3(a)'s prohibitions: Section 3(a)(i), which bars "terminat[ing] a tenancy" "for the purposes of . . . eviction." *See* Pls. Opp. p. 7. The Landlords' lack of any argument here is understandable, since the phrase "terminat[ing] a tenancy" is on its face directed at a specific action or conduct. The mere fact that this the conduct may be "carried out by means of language" does not bring it within the First Amendment. *Giboney*, 336 U.S. at 502; *accord Gissel Packing*, 395 U.S. at 618 (prohibition against "threats of retaliation" in labor dispute).

The same holds for Section 3(a)(ii)'s separate prohibition of "send[ing] any notice, including a notice to quit, requesting or demanding that a tenant . . . vacate the premises." The phrase "send[ing] a[ ] notice" is also on its face directed at an act. *See* Pocket Oxford American Dictionary 754 (2nd ed. 2008) (defining "send" as to "cause something to go or be taken to a destination"). Section 3(a)(ii) bars the specific act of "send[ing] a[ ] notice" for the purposes described in the statute, and the fact that language may be required to carry out this conduct is of no First Amendment moment. *Giboney*, 336 U.S. at 502.[5]

The Landlords make up no ground with their final argument that the specific notices prohibited by Section 3(a)(ii) are not "verbal acts" or "legally operative words." Pls. Opp. p. 7. *Compare King v. Fed. Bureau of Prisons*, 415 F.3d 634, 637 (7th Cir. 2005) ("order to sell stocks" "not the kind of verbal act that the First Amendment protects"). While the Landlords

---

[5]    The Landlords' attempt to distinguish *Homeaway.com, Inc. v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019), *see* Pls. Opp. pp. 6-7, actually proves the Commonwealth's point. The Landlords assert that *Homeaway.com* is inapposite because the municipal ordinance at issue there "banned not speech but conduct: 'completing booking transactions for illegal rentals.'" Pls. Opp. p. 6. But if "completing [a] booking transaction[ ]" is conduct, why is not "terminat[ing] a tenancy" or "send[ing] a[ ] notice"? After all, "completing a booking transaction" involves communication and the use of language – there, an online exchange between short-term renter and landlord – just as much as "terminat[ing] a tenancy" or "send[ing] a[ specific] notice" does. But the Ninth Circuit nevertheless held that "completing a booking transaction," despite its inherently language-based nature, "consists only of nonspeech, nonexpressive conduct," such that a local law prohibiting it "does not implicate the First Amendment." 918 F.3d at 685. There is no meaningful distinction between the conduct-based nature of the ordinance at issue in *Homeaway.com* and the conduct-directed focus of Section 3(a) here.

now claim that Section 3(a)(ii)'s prohibited notices "ha[ve] no legal effect," Pls. Opp. p. 7, they earlier acknowledged that "[a] notice to quit or to terminate a tenancy is . . . a *legal notice* that a lease or tenancy is being terminated." Memorandum in Support of Motion for Preliminary Injunction (Dckt. 6) p. 14 (emphasis added). As with their shifting positions on whether Section 3(a) addresses missed-rent notices, *see* Section IA *supra*, the Landlords had it right the first time – why would one send a "legal notice" if it is to have "no legal effect"?[6] The Landlords' argument just does not add up, and Section 3(a) falls outside the First Amendment's ambit.

### C.     Plaintiffs' Arguments About the Level of Scrutiny That Applies to Their Claims Under Count II Are Not Only Nonresponsive, They Are Also Wrong.

Finally, the Landlords launch into a discussion of the appropriate standard that should govern their claims under Count II, assuming that the Court ultimately concludes that Section 3(a) of the Act regulates "speech" for purposes of the First Amendment. Pls. Opp. at 7-9. The Commonwealth's Motion, however, does not put this issue in play. Thus, the Landlords' discussion on this point is nothing more than a transparent effort to provide yet more briefing on a substantive issue raised by their Motion for Preliminary Injunction, even though they have already filed a memorandum (Dckt. 6) and a reply brief in support of that motion (Dckt. 57). Accordingly, the argument on pages 7 through 9 of Plaintiffs' Opposition should be disregarded.

This said, since Landlords have made certain affirmative statements about the appropriate level of "scrutiny" that should govern their claims under Count II, the Commonwealth feels constrained to point out, briefly, some glaring flaws in their arguments. First, the Landlords

---

[6]     The Landlords even go so far as contend that "a formal Notice to Quit . . . has no legally operative effect." Opposition p. 7. This flies in the face of the statement in *Adjartey v. Cent. Div. of Hous. Ct. Dep't*, 481 Mass. 830 (2019), that a "'*legally effective* notice to quit is a condition precedent to a summary process action and part of the landlord's prima facie case.'" *Id*. at 850 (quoting *Cambridge St. Realty, LLC v. Stewart*, 481 Mass. 121, 122 (2018)); s*ee also* Mass. G.L. c. 186, § 11.

argue that the Supreme Court's recent decision in *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), compels the conclusion that their First Amendment challenge to Section 3(a) of the Act is subject to "strict scrutiny" because it is allegedly "content-based." Pls. Opp. at 8-9. Thus, they essentially posit that the four-Justice plurality decision in *Barr* tacitly overrules or supersedes the well-established and oft-employed rule in *Central Hudson Gas & Elec. Corp. v. Pub. Svc. Comm'n of N.Y.*, 447 U.S. 557, 561-64 (1980) that commercial speech restrictions are reviewed in accordance with an "intermediate scrutiny" standard. This is an untenable argument. The plurality in *Barr* (a) said nothing about *Central Hudson*, (b) did not hold that the legislation at issue in that case regulated "commercial speech,"[7] and (c) most importantly, proclaimed that "[o]ur decision . . . fits comfortably within existing First Amendment precedent . . . [and] is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity." *Id.* at 2347. Thus, *Barr* should not be viewed as altering the applicability or scope of the traditional *Central Hudson* standard.[8]

---

[7]    Indeed, the plaintiffs in *Barr* were "political and nonprofit organizations that want[ed] to make political robocalls," and they argued that the legislation "unconstitutionally favors debt-collection speech over political and other speech." *Barr*, 140 S. Ct. at 2343.

[8]    The Landlords also argue that "strict scrutiny" is required in this case because the Act "singles out only one group – landlords – for restriction," again citing *Barr*. Pls. Opp. at 8. Again, however, the *Barr* plurality's discussion of "speaker-based" distinctions says nothing about the continued vitality of the *Central Hudson* "intermediate scrutiny" standard governing commercial speech restrictions, and it should not be read as somehow abrogating that standard *sub silentio*, particularly when the plurality opinion said explicitly that it was not intending to change any aspect of "existing First Amendment doctrine." 140 S. Ct. at 2347. Rather, the *Barr* plurality refers to the earlier case of *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015), in discussing speaker-based restrictions. *Barr*, 140 S. Ct. at 2347. This is not helpful to Plaintiffs, since at least two Circuit Courts have concluded that *Reed*'s discussion of content-based and speaker-based distinctions was *not* meant to disrupt the traditional *Central Hudson* "intermediate scrutiny" framework governing commercial speech. *See Contest Promotion, LLC v. City and County of San Francisco*, 874 F.3d 579, 601 (9th Cir. 2017); *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1246, 1249 (11th Cir. 2015). Indeed, there are innumerable forms of commercial speech regulation focused on one type of speaker, while saying nothing about other speakers that are irrelevant to the

Straying even further from the issues raised in the Commonwealth's Motion, the Landlords go on to conduct their own "strict scrutiny" analysis of the Act. Pls. Opp. at 9. In doing so, the Landlords again baselessly assert that the Act's prohibition on the sending of Notices to Quit to tenants "does nothing to promote the purported purpose" of the Act in "decreas[ing] the spread of COVID-19 or address[ing] supposed displacement." *Id.* The Landlords claim that the "only arguably effective mechanism to prevent displacements through evictions is to give Housing Court judges the authority to temporarily stay executions for COVID-19 related issues. . . ." *Id.* The Massachusetts Supreme Judicial Court, however, has recognized that the opposite is true; *i.e.*, that a notice to quit may, in and of itself, lead to involuntary displacement. *See Adjartey v. Central Division of the Housing Court Department*, 481 Mass. 830, 850 (2019) ("Because the document's title – 'notice to quit' – does nothing to clarify its meaning, a tenant may reasonably misunderstand the legal force of a notice to quit. . . . [A] tenant may reasonably – but incorrectly – believe the notice to quit to mean that he or she must move out before the deadline."). Indeed, the Commonwealth's affidavit evidence explains that displacements frequently occur simply as the result of a landlord providing a Notice to Quit to a tenant. Such a notice, which tells a tenant that he or she is required to vacate the premises, may regularly lead to displacement even in the absence of a formal eviction proceeding (so-called "informal evictions"). *See* Affidavit of Esme Caramello (Dckt. 72-1), ¶¶ 21-25; Affidavit of Annette Duke (Dckt. 72-2), ¶ 11. *See also Matorin, et al. v. Commonwealth of Massachusetts, et al.*, C.A. No. 2084-cv-01334 (Decision on Motion for Preliminary Injunction dated August 26,

purpose of the regulation. *See, e.g., Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 8 (1st Cir. 2007) (legislation specifically aimed at Rhode Island Class A liquor license holders analyzed under *Central Hudson* standard); *New England Accessories Trade Ass'n, Inc. v. City of Nashua*, 679 F.2d 1, 3-4 (1st Cir. 1982) (legislation aimed at New Hampshire drug paraphernalia dealers analyzed under *Central Hudson* standard).

2020), p. 32 ("According to studies by several amici, the commencement of an eviction lawsuit –

indeed, even the receipt of a notice of default, a notice to quit, or a notice of lease termination

that precedes the filing of an eviction lawsuit – often causes tenants to bow to the inevitable by

moving out.  Without economic resources, many of these tenants will be unable to find other

housing.  Even those lucky enough to have some place to move will inevitably increase their

potential exposure to COVID, by the mere fact of searching for housing, moving their

possessions, and, often, doubling up in overcrowded apartments.").  As a result, the prohibition

clearly advances the Act's purpose of preventing displacements during a deadly pandemic and,

therefore, would survive the applicable standard of scrutiny.

## II.    Plaintiffs' Takings Claim (Count V) Should Be Dismissed Because All Forms of Relief in Federal Court are Foreclosed.

The Landlords have now made clear that they are not pursuing in this Court a claim for

money damages under the Takings Clause and are only seeking injunctive relief.  *See* Pls. Opp.

at 10, n. 10.  But, as Defendants explained in their initial brief, Defs. Memo at 8-10, the

Landlords are foreclosed from seeking to enjoin any part of the Act or Regulations under the

Takings Clause given the Supreme Court's decision last year in *Knick v. Township of Scott, Pa*.,

139 S. Ct. 2162 (2019).  In *Knick*, the Supreme Court held that, at its essence, a Takings claim

entails the right to seek monetary compensation as a result of governmental action, and "[s]o

long as the property owner has some way to obtain compensation after the fact, governments

need not fear that courts will enjoin their activities."  *Id*. at 2168.  Stated another way, "[a]s long

as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the

government's action effecting a taking."  *Id*.  at 2176.

Plaintiffs' primary argument in response to this binding precedent is to argue, somewhat

curiously, that the Commonwealth of Massachusetts does not in fact provide an adequate

damages remedy for their takings claim.  This argument was previously made by the Landlords in their Reply in Support of their Motion for Preliminary Injunction (Dckt. 57) at 19-25, and that discussion is cross-referenced in their Opposition.  *See* Pls. Opp. at 10.  The Commonwealth, for its part, has fully responded to this argument in its Surreply in Support of its Opposition to Plaintiffs' Motion for Preliminary Injunction (Dckt. 72) at 12-14, and – to avoid duplicative briefing – it will not repeat those arguments here.

Beyond reiterating that they do not have an adequate state remedy for their Takings claim, the Landlords emphasize in their Opposition that *Knick* "*requir[es]*" and "*mandates*" that a federal court grant equitable relief where "an adequate damages remedy is not available."  Pls. Opp. at 12.  This statement is incorrect.  *Knick* does not assert that a regulation or statute *must* be enjoined in some hypothetical circumstance where no monetary remedy is available.  The better reading of *Knick* is that, under the Fifth Amendment, compensation *must* be made available where there has been a taking.  Accordingly, if monetary damages are unavailable in federal court, they must be made available in state court.  This logic has, however, no application in Massachusetts – a state that plainly recognizes the Fifth Amendment right to "just compensation" and has not only enacted a statute designed to provide for it, but has also separately incorporated a takings provision into its State constitution.  *See* Dec. of Rights, art. 10. As *Knick* makes clear, the "adequate" remedy that must exist in order to avoid the prospect of equitable relief in a Takings Clause case need not be a *federal* remedy.  On the contrary, all that is required is that "the property owner has *some way* to obtain compensation after the fact," and this includes relief provided by "state governments."  *Knick*, 139 S. Ct. at t 2168, 2176.

Moreover, *Knick* did not involve a state defendant and did not address the subject of sovereign immunity under the Eleventh Amendment.  In the present case, the Commonwealth is

indisputably immune from a claim for money damages under the Takings Clause, because the Eleventh Amendment bars this type of retrospective relief against state defendants. *See Williams v. Utah Dept. of Corrections*, 928 F.3d 1209, 1214 (10th Cir. 2019); *Bay Point Prop., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 457 (5th Cir. 2019); *Ladd v. Marchbanks*, 2020 WL 4882885 at *2-*4 (6th Cir. 2020).[9]

For all these reasons, the Landlords have no viable claim in this Court for either money damages or injunctive relief under the Takings Clause. In addition, as discussed in the Commonwealth's principal brief, Defs. Memo at 10, they also cannot assert a Takings claim through a request for declaratory judgment. Logically, such a request for declaratory judgment could serve only two possible purposes, neither of which is permissible. The first purpose, which the Landlords expressly articulate, is to obtain a "declaration that the Act is unconstitutional in violation of the Takings Clause of the United States Constitution." *See* Amended Complaint (Dckt. 58), ¶ 85 and page 24 (Request for Relief No. 5). But such a declaration would be the functional equivalent of an injunction; the Landlords are requesting that the Court strike down the statute, so that it can no longer be enforced on a *prospective* basis. *See County of Butler v. Wolf*, 2020 WL 2769105 at *4 (W.D. Pa. May 28, 2020). Under *Knick*, this type of equitable relief is presumptively unavailable, as the essence of a Takings claim is to obtain compensation caused by certain types of governmental action, not to stop the governmental action from continuing to occur. This is exactly the conclusion reached by the

---

[9]     The Landlords cite no support for the proposition that the unavailability of Takings Clause damages in *federal* court due to the Eleventh Amendment somehow causes a claim for injunctive relief to spring to life in that court, notwithstanding *Knick*. And, indeed, the corollary of this proposition – that *Knick* eviscerates a state's Eleventh Amendment defense against a Takings damages claim in federal court – has been roundly rejected by the three Circuit Courts that have considered the issue, including by the Sixth Circuit just last week. *See Williams*, 928 F.3d at 1214; *Bay Point Prop., Inc.*, 937 F.3d at 457; *Ladd*, 2020 WL 4882885 at *2-4 (August 20, 2020).

court in *County of Butler v. Wolf*, *supra*, which refused to entertain a request for a declaration that a COVID-19 measure was unconstitutional under the Takings clause, citing *Knick*. *Id*. at *4. The Landlords' only rebuttal to this argument is that the plaintiffs in *County of Butler* did not "challenge the adequacy of the state's monetary damages remedy," as the Landlords are doing here. Pls. Opp. at 14. But, for all of the reasons previously discussed, the Landlords' wholly unsupported claim that Massachusetts does not provide an adequate state remedy has no merit, and apparently this type of argument was not even attempted by plaintiffs in *County of Butler*.

The only other possible purpose of a declaratory judgment on the Landlords' Takings Clause claim is that such a judgment would be proffered by the Landlords in state court as a means of gaining retrospective, monetary relief in that forum. But, as the Commonwealth explained in its principal brief, Defs. Memo at 10, n. 16, such an "end run" around the Eleventh Amendment is foreclosed by the Supreme Court's decision in *Green v. Mansour*, 474 U.S. 64 (1985), where the Court held that "an award of declaratory judgment" against a state defendant that would be "useful . . . only if it might be offered in state-court proceedings as res judicata on the issue of liability" is prohibited. *Id*. at 73. *See also Ladd*, 2020 WL 4882885 at *5 (6th Cir. August 20, 2020) (under Eleventh Amendment, plaintiffs are not entitled to "seek a [declaratory] order they can use to require Ohio to pay them for its alleged taking of their property. . . ."). The Landlords argue, in response, that *Mansour* is "not on point" because the Court stated in that case that "[t]here [was] no claimed continuing violation of federal law, and therefore no occasion to issue an injunction." *Mansour*, 474 U.S. at 73. The Landlords read too much into this distinction, however. The Court in *Mansour* was deciding whether it was proper for the district court to have dismissed plaintiffs' claims for declaratory judgment in their entirety under the Eleventh Amendment, notwithstanding the exception in *Ex parte Young*, 209 U.S. 123 (1908),

pertaining to prospective relief. *Id.* at 67-68. The Court concluded that full dismissal was appropriate, not only because there was "no claimed continuing violation of federal law" that would allow for *prospective* declaratory relief under *Ex parte Young*, but also because of the "end run" principle barring *retrospective* relief described above.[10] *Id.* at 68-71, 73.

### III. Plaintiffs Do Not Have Standing to Pursue Count III.

The Commonwealth has argued from the outset of this case that the Landlords lack standing to prosecute Count III of their Amended Complaint because none of them has adequately alleged an "injury in fact" stemming from the Notice of Rent Arrearage provisions of the Regulations (400 Code Mass. Regs. § 5.03).[11] The Landlords acknowledge that there is no requirement that they send such a notice, and the Amended Complaint does not allege that the Landlords have any specific need, desire, or intent to send one. *See* Defs. Reply to Pls. Opp. to Defs. Motion to Dismiss (Dckt. 68) at 5-6. Thus, they have not suffered any cognizable harm or injury that would afford them standing to pursue their claims in Count III.

In the Landlords' Opposition, Plaintiff Baptiste first seeks to overcome this problem by pointing to paragraph 5 of her Supplemental Affidavit (Dckt. 60), where she states: "I feel it is impossible to communicate with my tenants because they do not answer the phone and if I want to communicate in writing, I am required to use [the Notice of Rental Arrearage] form . . . ."

---

[10] The "continuing violation of federal law" language thus does not pertain to the portion of *Mansour* the Commonwealth is relying on here. It is the "end run" principle in *Mansour* -- relating to backwards-looking declaratory relief -- that the Commonwealth is relying on and that is directly applicable to any potential effort by the Landlords to seek a federal declaratory judgment for use in state court (to obtain damages). Moreover, the Landlords' claim for *prospective* declaratory relief under the Takings clause is barred, not because there is no alleged ongoing violation of federal law (as was the case in *Mansour*), but for the different but equally compelling reason that such relief is unavailable under *Knick*.

[11] *See* Defs. Memorandum in Support of Motion to Dismiss or, in the Alternative to Stay (Dckt. 27) at 10-11; Defs. Reply to Pls. Opp. to Defs. Motion to Dismiss (Dckt. 68) at 5-7; Defs. Memo (Dckt. 70) at 3, n. 6.

Baptiste, however, has not identified any reason why she needs to communicate with her tenants about missed rent. She has not argued that any particular communication is necessary to reserve her right to collect rent due and owing from her non-paying tenants (or, if their tenancy was properly terminated before the Act's enactment, to bring an action for use and occupancy payments). As Superior Court Justice Wilson wrote in his decision on the motion for preliminary injunction (p. 28), "the economic effect on landlords is mitigated not only by their ability to sue non-paying tenants for breach of contract, but by the temporary nature of the moratorium." *Matorin, et al. v. Commonwealth of Massachusetts, et al*., C.A. No. 2084-cv-01334 (Decision on Motion for Preliminary Injunction dated August 26, 2020).

The Landlords' last resort is to claim in their Opposition that Plaintiff Matorin – and, apparently only Plaintiff Matorin – would state under oath that he "wishes to send a bill to his tenants listing the outstanding amounts due (currently, $8,400) and demanding payment, but he cannot do so without including the objectionable mandatory language and for that reason has not done so." Pls. Opp. (Dckt. 88) at 16. First of all, this belated "proffer" of a hypothetical statement "under oath," described in a legal brief, should be given no credit by the Court and is immaterial to the present motion. Defendants' motion to dismiss is based upon – and should be considered in light of – the actual allegations in the First Amended Complaint as pleaded. And, with regard to Matorin, the Amended Complaint itself makes clear that he views the Notice of Rent Arrearage as an optional notice that he has "considered issuing," but that has opted against. First Amended Complaint (Dckt. 58), ¶ 45; *see also* Supplemental Affidavit of Mitchell Matorin (Dckt. 59), ¶ 5 (stating Matorin "can send" the Notice, but is "not willing" to do so).

In any event, the proffered statement by Matorin, even if accepted, does not ameliorate the standing deficiencies that hobble the Landlords' claims under Count III. Even taking his

proffered statement as true, he is not injured or harmed simply because he "wishes" to do something. The bill or invoice that Matorin claims he would send if freed from the requirements of the Regulations would have no legal effect or significance. It is not a prerequisite to instituting an action to collect rent, Matorin has not waived or sacrificed any legal rights or incurred any cost by not sending it, and he does not contend otherwise.

## CONCLUSION

For the foregoing reasons, the Court should allow Defendants' Motion to Dismiss Counts II, III and V of the First Amended Complaint and dismiss those three counts, with prejudice.

<div style="margin-left: 40%">

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Jennifer E. Greaney
Jennifer E. Greaney (BBO No. 643337)
*Assistant Attorney General*
Pierce O. Cray (BBO No. 104630)
*Senior Appellate Counsel*
Richard S. Weitzel (BBO No. 630303)
*Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2981/2022/2084
Jennifer.Greaney@mass.gov
Pierce.Cray@mass.gov
Richard.Weitzel@mass.gov

</div>

DATED: August 28, 2020

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jennifer E. Greaney
Jennifer E. Greaney
Assistant Attorney General

Dated:  August 28, 2020