UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | | |
|---|---|---|
| MARIE BAPTISTE and | ) | |
| MITCHELL MATORIN, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-11335 |
| | ) | |
| COMMONWEALTH OF MASSACHUSETTS | ) | |
| and EXECUTIVE OFFICE OF | ) | |
| HOUSING AND ECONOMIC | ) | |
| DEVELOPMENT, | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF AMICUS CURIAE OF PACIFIC LEGAL FOUNDATION IN
SUPPORT OF PLAINTIFFS' CONTRACT CLAUSE CLAIM AND
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................3

ARGUMENT ..................................................................................4

   I.   The Contract Clause Is an Essential Provision of the United States
       Constitution Designed for Times of Economic Distress ................................5

   II.   The Eviction Moratorium Act Tears Out the Key Enforcement Mechanism
       for Every Residential Lease Agreement in the Commonwealth ....................8

   III.   The Moratorium Goes Well Beyond the Narrow Holding In *Blaisdell* and Is
       Unreasonably Restrictive in Achieving Its Objectives..................................12

     a.   Longstanding precedent establishes that governments cannot force
         landlords to keep tenants who are in material breach of a lease without, at
         minimum, adequate safeguards for compensation. ...................................13

     b.   The Act extends well beyond what's necessary to support public health
         and assist renters facing hardship. ..........................................................17

CONCLUSION ...............................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ................................17

*Armstrong v. United States*, 364 U.S. 40 (1960) ........................................................1

*Barnitz v. Beverly*, 163 U.S. 118 (1896) ................................................7, 10, 14–16

*Block v. Hirsh*, 256 U.S. 135 (1921) .......................................................................15

*Bronson v. Kinzie*, 42 U.S. 311 (1843) ...........................................................9, 10, 14

*Edwards v. Kearzey*, 96 U.S. 595 (1877) ................................................................11

*Fletcher v. Peck*, 10 U.S. 87 (1810) ..........................................................................8

*Green v. Biddle*, 21 U.S. 1 (1823) ...........................................................................10

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) ..............................................1, 9, 14–16, 20–21

*Howard v. Bugbee*, 65 U.S. 461 (1860) ...................................................................14

*Lynch v. United States*, 292 U.S. 571 (1934) .............................................................9

*Marbury v. Madison*, 5 U.S. 137 (1803) .................................................................22

*McCracken v. Hayward*, 43 U.S. 608 (1844) ...........................................................11

*Ex parte Milligan*, 71 U.S. 2 (1866) ........................................................................2

*Pennsylvania Coal Co. v. Mahon*,
   260 U.S. 393 (1922) ...............................................................................16

*Sturges v. Crowninshield*, 17 U.S. 122 (1819) ..........................................................8

*United Auto., Aerospace, Agric. Implement Workers of America Int'l
   Union v. Fortuno*, 633 F.3d 37 (1st Cir. 2011) ....................................4, 13, 19, 21

*The W. Maid*, 257 U.S. 419 (1922) .........................................................................11

*W.B. Worthen v. Kavanaugh*, 295 U.S. 56 (1935) .......................................15, 17, 20

*Walker v. Whitehead*, 83 U.S. 314 (1872) ..............................................................10

## Statutes

District of Columbia Rents Act, Ch. 80, 41 Stat. 298 § 109 (1919) .......................16

Eviction Moratorium Act, St. 2020, c. 65 ..........................3–4, 8, 10, 13–14, 21–22

## Constitutional Provision

Contract Clause, U.S. Const. art. 1, § 10, cl. 1 ...........................................................7

## Other Authorities

Bailey, Peggy, *Trump Executive Orders Likely Won't Help the Millions Struggling to Pay Rent*, Center on Budget and Policy Priorities (Aug. 8, 2020), https://www.cbpp.org/blog/trump-executive-orders-likely-wont-help-the-millions-struggling-to-pay-rent ....................................................................................................................19

COVID-19 Emergency Regulations, 400 CMR 5.03(1) ..............................11, 12, 17

Ely, James W., *The Contract Clause: A Constitutional History* (2016) ..............2, 7

Ely, James W., *Whatever Happened to the Contract Clause?*, 4 Charleston L. Rev. 371 (2010) .........................................................................7

Eviction Lab, COVID-19 Eviction Tracking System, https://evictionlab.org/eviction-tracking/ (last visited Aug. 31, 2020) .........................................................................................................18

Eviction Lab, Eviction Tracking for Cincinnati, Ohio, https://evictionlab.org/eviction-tracking/cincinnati-oh/ (last visited Aug. 31, 2020) ..................................................................................19

Eviction Lab, Eviction Tracking for Houston, Texas, https://evictionlab.org/eviction-tracking/houston-tx/ (last visited Aug. 31, 2020) ..................................................................................19

Furth, Salim, *When the Moratorium Expires: Three Quick Steps to Reduce Eviction*, Mercatus Center (June 19, 2020), https://www.mercatus.org/publications/covid-19-economic-recovery/when-moratorium-expires-three-quick-steps-reduce-eviction....................................................................................................20

Letter from Governor Charlie Baker extending moratorium (July 21, 2020), https://www.mass.gov/doc/foreclosures-and-evictions-moratorium-extension-july-21-2020....................................................3

Rivkin, David B., Jr. & Luttig, J. Michael, *Coronavirus, Contracts, and the Constitution*, The Wall St. J., Aug. 17, 2020, https://www.wsj.com/articles/coronavirus-contracts-and-the-constitution-11597705464?mod=opinion_lead_pos7 .........................................8

Safer-at-Home Advisory, Massachusetts Department of Public Health
(May 18, 2020), https://www.mass.gov/news/safer-at-home-
advisory ............................................................................................................18

Schuer, Jenny, *Halting evictions during the coronavirus crisis isn't as
good as it sounds*, Brookings Institute (March 25, 2020),
https://www.brookings.edu/blog/the-avenue/2020/03/25/halting-
evictions-during-the-coronavirus-crisis-isnt-as-good-as-it-sounds/ ...................21

Pacific Legal Foundation, serving as Amicus Curiae, writes to address the merits of Marie Baptiste's Contract Clause claim. Because the Eviction Moratorium Act guts the primary enforcement mechanism for tenant violations of lease agreements, Ms. Baptiste is likely to succeed on the merits. Pacific Legal Foundation therefore respectfully asks the Court to grant Ms. Baptiste's Motion for Preliminary Injunction.

## INTRODUCTION

Marie Baptiste, a Haitian immigrant and registered nurse, rents out a single-family home in Massachusetts. While her state scrambles to assist other individuals and small businesses through this difficult time, it has selected her and other landlords to bear the burden of the pandemic's economic fallout. This injustice does not comport with constitutional guarantees. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ([T]he government may not "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").

Emergencies test our commitment to the rule of law. Governments enjoy flexibility in addressing crises, but crises do not justify an expansion of power: "While emergency does not create power, emergency may furnish the occasion for the exercise of power." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934). Yet lawmakers, with or without goodwill, often press the boundaries of that

1

power. Hence, courts that gatekeep the safeguards designed to survive peace and crises alike must watch for abuses of emergency powers, lest such powers result in permanent erosion of our nation's fundamental compact. Our courts have long recognized the danger lurking in emergency power: "No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government." *Ex parte Milligan*, 71 U.S. 2, 76 (1866). Courts must guard against the overzealous exercise of emergency power, lest it become the norm during times of calm as well.

The Commonwealth of Massachusetts, like all its siblings, faces a serious crisis. No one questions the authority of the state legislature to wield its police power in defense of the health and safety of its citizens. But even in times like these— perhaps especially in such times—constitutional limits on power remain in effect. Courts must uphold checks against expanding powers in times of crisis.

One such check is the Constitution's Contract Clause, which the framers adopted specifically to prevent states from canceling debts or mandating forbearance even when—perhaps, especially when—faced with economic upheavals. *See* James W. Ely, *The Contract Clause: A Constitutional History* 8 (2016). Concerns about the creeping nature of power specifically animated the creation and interpretation of the Contract Clause. As James Madison argued in the Clause's defense: "[Americans] have seen, too, that one legislative interference is but the first

2

link of a long chain of repetitions, every subsequent interference being naturally produced by the effects of the preceding." The Federalist No. 44 (James Madison).

The Massachusetts Legislature's ban on evictions, indefinitely renewable by the governor, guts the primary enforcement mechanism for every residential lease agreement in the state. The desire to help struggling families stay housed during a pandemic is understandable, but the state cannot lawfully do so by impairing contracts. This is not the first emergency wracking our nation that has prompted government to suspend evictions and foreclosures. The courts have upheld some efforts to delay foreclosure or eviction and struck down others. The moratorium at issue here is more like the latter than the former.

## BACKGROUND

The Eviction Moratorium Act prohibits any "non-essential evictions," expansively defined to include nonpayments of rent, post-foreclosure holdovers, "no-fault" cases, and all "for-cause" evictions. St. 2020, c. 65, § 3(a)(i) (excepting only the few that involve criminal activity or lease violations that jeopardize health and safety). The Act had an original sunset date of August 18, 2020. *Id.* § 7. The governor, however, has authority under the Act to extend the moratorium by 90-day increments indefinitely. *Id.* He recently exercised that authority, extending the Act well into October of this year. *See* Letter from Governor Charlie Baker extending

moratorium (July 21, 2020), https://www.mass.gov/doc/foreclosures-and-evictions-moratorium-extension-july-21-2020.

For Marie Baptiste and many other landlords, the Eviction Moratorium Act may spell financial ruin. Marie, a Haitian immigrant who now rents out the first home she purchased in the United States, has two tenants who have not paid rent since October 2019. P.s' Complaint at 13. She is now paying a severe price for her patience, as she cannot evict them under the Act, an action she could have taken before the law came into effect. *Id.* Now, Marie, unemployed due to injury, is dipping into her retirement savings to pay for basic necessities, including the mortgage on her rental house, while her tenants decline to pay for the essential service she provides. *See* P.s' Motion for Preliminary Injunction at 8–9.

## ARGUMENT

The Contract Clause analysis follows a two-pronged test: (1) "whether the state law has operated as a substantial impairment of a contractual relationship" and (2) "whether the impairment was reasonable and necessary to serve an important government purpose." *United Auto., Aerospace, Agric. Implement Workers of America Int'l Union v. Fortuno*, 633 F.3d 37, 41 (1st Cir. 2011) (cleaned up). The reasonableness inquiry looks to reasonableness in light of "surrounding circumstances," while the necessity inquiry looks to whether the government

4

"imposed a drastic impairment when an evident and more moderate course would serve its purpose equally well." *Id.* at 45–46 (cleaned up).

Here, under well-settled law, the Act's imposed delay on eviction constitutes a substantial impairment of contractual obligations because it strips away a key remedy for lease violations. Nor is the Commonwealth's impairment reasonable and necessary to serve an important government interest because it fails to safeguard landlords' rights to a reasonable return, restricts landlord rights beyond what is necessary to achieve the state's interests, and fails to place a certain end date to the Act's restrictions. Ms. Baptiste's Contract Clause claim is therefore likely to succeed on the merits.

## I.    The Contract Clause Is an Essential Provision of the United States Constitution Designed for Times of Economic Distress

Those who drafted and ratified the United States Constitution viewed few provisions with as much esteem as the Contract Clause. *See* Ely, *supra*, at 15. Post-revolutionary America faced severe economic hemorrhaging as the break with Great Britain threw prior economic structures and arrangements into chaos. *Id.* The resulting economic stagnation immediately following independence prompted state lawmakers to pass a flurry of debt-relief laws, such as staying debt collection, requiring installments, and authorizing commodity payments. *Id.* at 8. One glaring example was South Carolina's Pine Barren Act of 1785, which allowed debtors to pay off outstanding debts with valueless wilderness. *Id.*

5

Such measures aroused concerns of both justice and economic stability. Noah Webster expressed the growing sentiment in 1786: "But remember that past contracts are sacred things; that Legislatures have no right to interfere with them; they have no right to say, a debt shall be paid at a discount, or in any manner which the parties never intended. It is the business of justice to fulfil the intention of parties in contracts, not to defeat them." *Id.* Later, Alexander Hamilton—the likely writer of the Clause—exclaimed in the Federalist Papers that laws interfering with private contract were "atrocious breaches of moral obligation and social justice." *See* Ely, *supra*, at 13; The Federalist No. 7 (Alexander Hamilton).

Lawmakers of the period also understood the importance of contractual stability to the growth of the eighteenth century economy—a stability that could be severely undermined if legislatures had free rein to arbitrarily interfere with contracts. *See* Ely, *supra*, at 14. Two constitutional convention delegates wrote in 1787 that protections for private contract were "necessary as a security to commerce." *Id.* That same year, the Confederation Congress incorporated a predecessor of the Contract Clause into the Northwest Ordinance to encourage commercial development in unsettled territories: "And, in the just preservation of rights and property, it is understood and declared, that no law ought ever to be made or have force in the said territory, that shall, in any manner whatever, interfere with or affect private contracts, or engagements, bona fide, and without fraud previously

6

formed." *Id.* at 11. This presaged what became the Contract Clause in the newly formed Constitution: "No State shall . . . pass any . . . Law impairing the Obligations of Contract." U.S. Const. art. 1, § 10, cl. 1.

Many viewed the Contract Clause as a keystone of the founding document. Constitutional delegate Charles Pinckney referred to it as the "soul of the constitution." Ely, *supra*, at 15. During the ratification debates, the importance of the Clause was so well-recognized that many anti-federalists expressly endorsed it, despite their other concerns for the Constitution's impairment of state sovereignty. Ely, *supra*, at 16–17. The need to protect contracts enjoyed nigh unanimous recognition.

The early republic's reliance on the Contract Clause demonstrates its significance to founding-era statesmen and jurists. It was the font of most federal judicial review of the states prior to ratification of the Fourteenth Amendment. Ely, *supra*, at 1. Indeed, no provision in the Constitution saw more litigation in the nineteenth century than the Contract Clause. *See Barnitz v. Beverly*, 163 U.S. 118, 121 (1896) ("No provision of the constitution of the United States has received more frequent consideration by this court than that which provides that no state shall pass any law impairing the obligation of contracts."); James W. Ely, *Whatever Happened to the Contract Clause?*, 4 Charleston L. Rev. 371, 371 (2010). These early cases laid the foundation for a robust and strict interpretation of the constitutional

7

guarantee. *See, e.g.*, *Sturges v. Crowninshield*, 17 U.S. 122, 133 (1819) ("The prohibition is plain and unequivocal—needs no comment, and is susceptible of no misinterpretation."); *see also* Ely, *supra*, at 23, 34. Chief Justice Marshall, who set the tenor for so much of our constitutional jurisprudence, called the Clause a "bill of rights for the people of each state," and a determination by the people "to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed." *Fletcher v. Peck*, 10 U.S. 87, 138 (1810).

The volume of Contract Clause litigation declined as the Fourteenth Amendment opened additional avenues for the people to protect their constitutional rights against states' deprivations. *See* David B. Rivkin, Jr. & J. Michael Luttig, *Coronavirus, Contracts, and the Constitution*, The Wall St. J., Aug. 17, 2020, https://www.wsj.com/articles/coronavirus-contracts-and-the-constitution-11597705464?mod=opinion_lead_pos7. The Contract Clause, however, while perhaps dusty, still maintains its luster, and the high regard the founding generation and the nineteenth century courts held for it should prompt careful application of the Clause to the moratorium at issue in this matter.

## II.   The Eviction Moratorium Act Tears Out the Key Enforcement Mechanism for Every Residential Lease Agreement in the Commonwealth

The Act substantially impairs every residential lease agreement in the state by removing the key remedy for violations of the contract. While the moratorium

doesn't technically remove an obligation to pay rent—it nonetheless accomplishes a crippling impairment by removing the primary remedy for failure to pay or other material breaches of the lease that do not involve criminal activity or a serious risk to health or safety. Courts have refused to allow states to escape the clear terms of the Contract Clause through such legerdemain.

Courts therefore clearly hold that an obligation is unconstitutionally impaired when, as here, enforcement of that obligation is severely constrained. "Contracts between individuals or corporations are impaired within the meaning of the Constitution whenever the right to enforce them by legal process is taken away or materially lessened." *Lynch v. United States*, 292 U.S. 571, 580 (1934). Otherwise, governments would have an easy end-run around this key constitutional provision: rather than directly interfere with the terms of the contract, simply undermine the enforcement mechanism. After all, "it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether." *Bronson v. Kinzie*, 42 U.S. 311, 317 (1843).

In *Bronson v. Kinzie*, for instance, the Supreme Court invalidated an Illinois law that delayed foreclosures by extending mortgagors' redemption periods in response to the depression of the late 1830s. *See Bronson*, 42 U.S. at 312; *Blaisdell*, 290 U.S. at 431 (noting that the statute in *Bronson* "had been enacted for the relief of debtors in view of the seriously depressed conditions of business, following the

panic of 1837"). The Court stated that laws, such as statutes of limitations, that affect contractual remedies do not inevitably run afoul of the Contract Clause. *Bronson*, 42 U.S. at 315. But any change to the remedy that effectively impairs contractual obligations offends the Contract Clause because "it is immaterial whether [impairment of a contract] is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the Constitution." *Id.* at 316. The extended redemption period was thus an unlawful impairment of contract. *Id.*

Changes to a contracting party's remedy stray into this prohibited territory whenever they "change the nature and extent of existing remedies as materially to impair the rights and interests of the owner." *Green v. Biddle*, 21 U.S. 1, 17 (1823); *see also Barnitz*, 163 U.S. at 131 ("[T]he change of remedy [can be] detrimental to such a degree as to amount to an impairment of the plaintiff's right . . . ."); *Walker v. Whitehead*, 83 U.S. 314, 317–18 (1872) ("[N]othing is more material to the obligation of a contract than the means of its enforcement. The ideas of validity and remedy are inseparable, and both are parts of the obligation which is guaranteed by the Constitution against impairment[.]").

The Eviction Moratorium Act insists that it does not "relieve a tenant from the obligation to pay rent or restrict a landlord's ability to recover rent." St. 2020, c. 65, § 3(f). Yet it removes the primary enforcement mechanism for nonpayment of rent or other contractual breaches. And in the legal landscape of contracts, "nothing is

more important than the means of enforcement." *Edwards v. Kearzey*, 96 U.S. 595, 600 (1877). While the Act pays lip service to the obligation to continue paying rent, it in fact abrogates that and other lease obligations by strangling the core remedy, "the breath of [the lease's] vital existence." *Id.* In fact, regulations enforcing the Act confirm the meaninglessness of the Act's nod to rent obligations with this telling language: "Throughout the period during which these emergency regulations are in effect, every tenant shall remain obligated to pay rent on the date due *if and to the extent that the tenant has the means to do so*." COVID-19 Emergency Regulations, 400 CMR 5.03(1) (emphasis added). As Justice Holmes said almost a century ago, "Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." *The W. Maid*, 257 U.S. 419, 433 (1922). Like the Pine Barren Act in South Carolina, the statute's claim that renters must continue payment is an empty promise.

While landlords may seek eviction for nonpayment if and when the governor decides against extending the moratorium, the enforcement delay imposed on landlords itself constitutes a substantial contractual impairment. After all, "[i]f a State may stay the remedy for one fixed period, however short, it may for another, however long." *Edwards*, 96 U.S. at 602. *See also McCracken v. Hayward*, 43 U.S. 608, 614 (1844) ("[F]or if the power can be exercised to any extent, its exercise must be a matter of uncontrollable discretion, in passing laws relating to the remedy which

are regardless of the effect on the right of the plaintiff."). Although technically rent will someday be due and eviction will someday be feasible, the ability to collect rent in a timely manner and enforce that obligation in a timely manner is the crux of the rental business model.

The availability of an action to seek lost rent in state court does not make the impairment here less substantial. Eviction remains an essential remedy in order to halt ongoing injury and achieve at least some relief where a tenant is judgment-proof. Plus, the eviction moratorium's regulation forbids rent recovery where the tenant lacks the means to pay. 400 CMR 5.03(1). Moreover, the prohibition on nonessential evictions prevents eviction for material breaches of a lease agreement unrelated to nonpayment and for which no remedy save eviction can suffice to relieve the property owner.[1]

### III. The Moratorium Goes Well Beyond the Narrow Holding In *Blaisdell* and Is Unreasonably Restrictive in Achieving Its Objectives

As the Eviction Moratorium Act causes a substantial impairment of contractual obligations, the next question is whether the Act is reasonable and necessary. Some nonexhaustive factors that the First Circuit considers in making these inquiries include: "whether the act (1) was an emergency measure; (2) was one

---

[1] While landlords no longer can access the primary enforcement mechanism for breach of contract, tenants have full access to all remedies for contractual breaches by the landlord.

to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." *United Auto., Aerospace, Agric. Implement Workers of America Int'l Union*, 633 F.3d at 46 (citation omitted). The Eviction Moratorium Act fails at least the last three factors.

There is no question that the legislature is responding to a genuine emergency. However, the Act is not tailored to achieving its purpose because it bans all evictions for a fixed period, with no flexibility for individual circumstance. The Act is not reasonable because it asks one group, landlords, to bear the burden of the unfolding financial crisis without adequate safeguards to ensure their compensation. And the moratorium is not limited to the duration of the emergency because the governor holds freestanding authority to extend the moratorium indefinitely.

> **a.  Longstanding precedent establishes that governments cannot force landlords to keep tenants who are in material breach of a lease without, at minimum, adequate safeguards for compensation.**

This is not the first time that state governments have sought to provide temporary relief from foreclosure or eviction. The Supreme Court has upheld such measures against Contract Clause challenges only when the statutes provided safeguards and enforceable requirements that tenants or mortgagors continue making payments during the extended time period. However, where a statute, like the Act here, provided no enforcement mechanism to ensure continuing payment

13

while the tenant or mortgagor continued to possess the property, the Court struck the statute down as an unreasonable interference with contractual obligations.

This clear pattern began with *Bronson v. Kinzie* in 1843; the case invalidating Illinois's extended redemption period. The *Bronson* Court held that a law imposing a delay in the mortgagee's right to foreclose caused an unconstitutional interference with contract. *Bronson*, 42 U.S. at 319. The Court struck down similar extended redemption periods in *Howard v. Bugbee*, 65 U.S. 461 (1860), and *Barnitz v. Beverly*, 163 U.S. 118 (1896). The parallel in the rental context is clear: just as removing the remedy of foreclosure for failure to pay monthly installments on a mortgage was an unconstitutional interference, so also is a moratorium that prohibits landlords from seeking the remedy of eviction when a tenant fails to pay or otherwise commits a material breach.

The Supreme Court adopted a narrow exception for some schemes that extended redemption periods but only so long as the mortgagee's right of a reasonable return was adequately protected. In *Home Building & Loan Association v. Blaisdell*, the Court upheld a Minnesota law that allowed judges to extend contractual redemption periods. 290 U.S. at 448. But *Blaisdell* did not overrule *Bronson*, and a key distinction between the cases has direct relevance to the Eviction Moratorium Act. In *Blaisdell*, the Minnesota law required the mortgagor to continue paying the equivalent of fair-market rent during the extended redemption period as

14

a condition of the extension, thus providing some relief for the mortgagee during the period of suspended contractual enforcement. *Id.* at 425. The *Blaisdell* majority relied on this difference in distinguishing *Bronson*: "It will be observed that in the Bronson case . . . there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." *Blaisdell*, 290 U.S. at 432. The same distinction arose in *Barnitz*, where the Court noted: "[T]he act carves out for the mortgagor or the owner of the mortgaged property an estate of several months more than was obtainable by him under the former law, with full right of possession, *and without paying rent or accounting for profits in the meantime.*" *Barnitz*, 163 U.S. at 130 (emphasis added).

The Supreme Court underscored this key distinction only a year after *Blaisdell*, in *W.B. Worthen v. Kavanaugh*, where the Supreme Court struck down an Arkansas law that imposed temporary delays on foreclosure with no enforceable requirement that the mortgagor make payments. 295 U.S. 56, 61 (1935). The fatal flaw with the Arkansas law was that the mortgagor "ha[d] every incentive to refuse to pay a dollar." *Id.* at 60. That problem did not exist in *Blaisdell*, where the Minnesota statute required continuing payment.

The same distinction arises with respect to bans on evictions. In *Block v. Hirsh*, the Supreme Court dealt with a rent-control law that banned evictions during a World War I housing shortage. 256 U.S. 135 (1921). While the Court upheld the

ban against a Contract Clause challenge (among others) in a 5-4 decision, the majority noted that "[m]achinery [wa]s provided to secure to the landlord a reasonable rent" during the eviction ban, *id.* at 157, and the tenant was protected from eviction only "so long as he pa[id] the rent and perform[ed] the other terms and conditions of the lease." District of Columbia Rents Act, Ch. 80, 41 Stat. 298 § 109 (1919). The *Blaisdell* majority later found this fact directly relevant to the Contract Clause analysis, noting that "provision was made for reasonable compensation to the landlord during the period he was prevented from regaining possession." *Blaisdell*, 290 U.S. at 441–42. Even so, the Supreme Court elsewhere described *Block* as going to the "verge of the law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

This precedent reveals a telling pattern: the Court has narrowly upheld laws temporarily preventing eviction or foreclosure only where the law requires as a condition of the extension that the tenants/mortgagors continue paying installments (*Blaisdell* and *Block*). Where no such payment is required as a condition of foreclosure protection, the Court has struck down temporary foreclosure delays (*Bronson*, *Howard*, *Barnitz*, and *W.B. Worthen*).

The Act fails to provide an enforceable requirement that tenants protected from eviction pay during the interim as a condition of their protection from eviction. It purportedly requires the ongoing obligation of rent payment, but the emergency

regulations make that obligation contingent on "the extent the tenant has the means to do so." 400 CMR 5.03(1). The regulations say nothing about who carries the burden of demonstrating means or lack thereof, what the evidentiary standard is, or how and by whom this determination is made. The Act and its regulation thus create an "incentive to refuse to pay a dollar." *W.B. Worthen*, 295 U.S. at 60.

Moreover, by removing the primary remedy for nonpayment, the obligation to pay rent affirmed in the statute (and largely undone by the regulations) has little meaning for aggrieved landlords. And finally, the statute offers not even this fig leaf for other material breaches of lease terms. Unlike the laws upheld in *Blaisdell* and *Block*, this Act offers no relief to landlords for material breaches and other harms flowing from a tenants' actions or omissions during the eviction ban.

    **b.**    **The Act extends well beyond what's necessary to support public health and assist renters facing hardship.**

A law substantially impairing a contract must be "tailored to the emergency that it is designed to meet." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978). Here, the Eviction Moratorium Act does not mention an underlying purpose, but the governor's extensions of the Act list two rationales: to promote compliance with the state's safer-at-home advisory and to help vulnerable families facing economic distress find "housing security." *See* Letter from Governor Charlie Baker extending moratorium (July 21, 2020). Assuming these are valid purposes, the moratorium here is more extensive than necessary to satisfy them.

Ostensibly, the public health rationale is that individuals can more easily comply with the safer-at-home advisory if they do not face eviction. Yet it is unlikely that making evictions available as a standard remedy for nonpayment or material breaches of a lease will aggravate the ongoing public health emergency. The safer-at-home advisory requires only high-risk populations to stay home save for essential errands. *See* Safer-at-Home Advisory, Massachusetts Department of Public Health (May 18, 2020), https://www.mass.gov/news/safer-at-home-advisory. Everyone else is already free to spend substantial amounts of time away from home "for healthcare, worship and permitted work, shopping, and activities." *Id.* And the Act does not limit itself to preventing the eviction of high-risk individuals.

Moreover, allowing aggrieved landlords to evict will not inevitably lead to substantially fewer housed people. An eviction makes a unit available for occupancy by a new tenant. So long as housing supply remains steady—and the government offers no reason to believe otherwise—evictions will not lead to increased homelessness.

Nor is it inevitable that the lack of a moratorium will lead to an eviction surge. To date, data indicate that cities without moratoria have not experienced a spike in eviction filings. *See generally* Eviction Lab, COVID-19 Eviction Tracking System, https://evictionlab.org/eviction-tracking/ (last visited Aug. 31, 2020). For example, Houston, Texas's eviction moratorium lifted on May 19, 2020. Since that time,

18

eviction filings have remained below average. *See* Eviction Lab, Eviction Tracking for Houston, Texas, https://evictionlab.org/eviction-tracking/houston-tx/ (last visited Aug. 31, 2020). Likewise, Cincinatti's eviction filings have remained below average since the end of its eviction moratorium on June 1. *See* Eviction Lab, Eviction Tracking for Cincinnati, Ohio, https://evictionlab.org/eviction-tracking/cincinnati-oh/ (last visited Aug. 31, 2020). Eviction rates do not appear to be spiking in other locations without moratoria, either. *See generally* Eviction Lab, COVID-19 Eviction Tracking System, *supra*. Hence, allowing landlords to avail themselves of their traditional contractual remedies is not likely to contribute to a public health crisis.

Even if such a risk were likely, the state has several other "more moderate courses" than banning virtually all evictions. *United Auto., Aerospace, Agric. Implement Workers of America Int'l Union*, 633 F.3d at 45–46. These include expanded rental assistance, encouraging renegotiation, offering tax credits, transferable development rights, or low-cost loans for landlords who agree to continue housing nonpayers or partial payers, and exercising the eminent domain power to temporarily commandeer hotels and other facilities for temporary housing. *See also* Peggy Bailey, *Trump Executive Orders Likely Won't Help the Millions Struggling to Pay Rent*, Center on Budget and Policy Priorities (Aug. 8, 2020), https://www.cbpp.org/blog/trump-executive-orders-likely-wont-help-the-millions-

struggling-to-pay-rent (suggesting alternative ways to help renters); Salim Furth, *When the Moratorium Expires: Three Quick Steps to Reduce Eviction*, Mercatus Center (June 19, 2020), https://www.mercatus.org/publications/covid-19-economic-recovery/when-moratorium-expires-three-quick-steps-reduce-eviction (same).

The Act has an even poorer fit with the objective of assisting vulnerable families hemorrhaging from economic upheaval. The Act expressly extends well beyond nonpayers facing financial hardship. It takes into account neither the landlord's financial hardship nor the tenants' financial well-being.

These shortcomings have a direct bearing on the moratorium's constitutionality. The Supreme Court has strongly implied that a showing of hardship is a necessity when delaying a property owner's right to repossess. In striking down a law that delayed foreclosure remedies, the Court noted: "There is not even a requirement that the debtor shall satisfy the court of his inability to pay." *W.B. Worthen*, 295 U.S. at 61. The implication is clear—the bare minimum needed to delay eviction requires a showing of hardship, and even that might not be adequate.

The Act's one-size-fits-all approach also distinguishes this law from the law in *Blaisdell*. In that case, the Minnesota statute granted judges authority to extend redemption periods on a case-by-case basis "for such additional time as [a] court may deem just and equitable." 290 U.S. at 416. Indeed, the Court distinguished

20

*Bronson* and *Howard* partially on this basis, noting that the extended redemption periods in *Bronson* and *Howard* were "unconditional," unlike the Minnesota law that did not impose an inflexible, across-the-board mandate. *Id.* at 432. The Act fails to offer similar flexibility that would reduce unnecessary interferences with contractual obligations. As written, the moratorium treats Marie Baptiste, who is living on retirement savings thanks to the Act, the same as a multimillion dollar real estate company. That does not comport with the requirement that a law be "reasonable and appropriate" to the government's objectives.[2]

Finally, the First Circuit has directed courts to consider whether a contractual impairment is "limited to the duration of the emergency." *United Auto., Aerospace, Agric. Implement Workers of America Int'l Union*, 633 F.3d at 46. By delegating to the governor the power to extend the moratorium indefinitely with no legislative oversight or backstop, the Eviction Moratorium Act fails to demonstrate reasonableness and necessity.

---

[2] A ban on evictions may also have an unintended ripple effect on the economy. *See* Jenny Schuer, *Halting evictions during the coronavirus crisis isn't as good as it sounds*, Brookings Institute (March 25, 2020), https://www.brookings.edu/blog/the-avenue/2020/03/25/halting-evictions-during-the-coronavirus-crisis-isnt-as-good-as-it-sounds/. Among many other things, rent payments go to pay local property taxes needed to help cash-strapped municipalities provide essential services. Rent also goes to fund the wages of workers such as maintenance and housekeeping staff and local contractors.

## CONCLUSION

The Eviction Moratorium Act flouts the Contract Clause by gutting the remedy for violations of residential leases across the Commonwealth. The Supreme Court's words at the inception of federal judicial review seem prescient: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Pacific Legal Foundation respectfully asks the Court to grant Ms. Baptiste's Motion for Preliminary Injunction.

DATED: September 1, 2020.

Respectfully submitted,

By: */s/MATTHEW L. FABISCH*
MATTHEW L. FABISCH
(BBO 673821)
Managing Attorney
Fabisch Law Offices
664 Pearl St.
Brockton, MA 02301
Tel: (401) 324-9344
Fax: (401) 354-7883
Email: Fabisch@Fabischlaw.com

ETHAN BLEVINS*
KATHRYN D. VALOIS*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Email: eblevins@pacificlegal.org

22

Email: kvalois@pacificlegal.org
Telephone: (916) 419-7111

*Attorneys for Amicus Curiae*
*Pacific Legal Foundation*
*\*Pro Hac Vice Pending*