UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-11335

| | |
|---|---|
| MARIE BAPTISTE, MITCHELL MATORIN and JONATHAN DAPONTE | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| MIKE KENNEALY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE EXECUTIVE OFFICE OF HOUSING AND ECONOMIC DEVELOPMENT, and CHARLES BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## **PLAINTIFFS' SUPPLEMENTAL MEMORANDUM ADDRESSING NEWLY RAISED ISSUES**

Plaintiffs respectfully submit this Supplemental Memorandum addressing several issues that arose in the course of the oral arguments on Defendants' second Motion to Dismiss and on Plaintiffs' Motion for Preliminary Injunction, held on September 1 and 2, 2020, including the Courts' Orders dated August 31, 2020 (Dkt. 97), and September 1, 2020 (Dkt. 98) that the parties be prepared to discuss various issues during oral argument, including, without limitation, the standard of review to be applied to Plaintiffs' Count I claim based on the Right to Petition and the implications for that claim of *Zablocki v. Redhail*, 434 U.S. 374, 387 n.12 (1978), and *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

1

## I. The Wholesale Elimination of Plaintiffs' First Amendment Right to Access the Courts Should be Reviewed Under the "Strict Scrutiny" Standard of Review.

In its Order of August 31, 2020 (Dkt. 97), the Court ordered the parties to address the constitutional basis of Plaintiffs' Right to Access the Courts claim and the appropriate standard of review, in view of *Christopher v. Harbury*, 536 U.S. 403, 415 n. 12 (2002), *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 394 (2011), *NAACP v. Button*, 371 U.S. 415, 437-38 (1963), *Sosna v. Iowa*, 419 U.S. 393, 406, 410 (1975), and *Ad Hoc Comm. on Judicial Admin. v. Massachusetts*, 488 F.2d 1241, 1243-44 (1st Cir. 1973). During the oral argument held on September 1, 2020, the Court further adverted to Professor Chemerinsky's *Casebook on Constitutional Law* (5th ed. 2017), and the discussion therein with respect to a framework for understanding the Supreme Court's treatment of access-to-the-courts claims.[1]

Plaintiffs respectfully submit that the appropriate standard of review for Plaintiffs' Right to Access the courts claim is "strict scrutiny," and that the Moratorium Act's complete shut-down of Plaintiffs' right to access the courts cannot survive under that standard. Professor Chemerinsky observes that governmental infringement of fundamental rights such as the right to access the courts is subject to strict scrutiny review:

---

[1] During the hearing, the Court advised that Professor Chemerinsky's book was not available online, which Plaintiffs' counsel unfortunately confirmed. Moreover, because of the limited time available and the fact that law library access is limited, Plaintiffs were unable to obtain access to the specific book to which the Court referred during the hearing. However, Plaintiffs were able to obtain a Kindle electronic version of Professor Chemerinsky's treatise, *Constitutional Law: Principles and Policies* (6th ed. 2019) ("*Principles and Policies*"). Although the pagination does not match the pages the Court referenced during the hearing, it appears that the same or very similar points are discussed in Chapter 10, Sections 10.1 and 10.9 of the *Principles and Policies* book. Because we were unable to obtain the book the Court referenced, we have based our discussion here on the relevant sections of *Principles and Policies* and have attached those sections as **Exhibits 1 and 2** to this brief for the Court's reference.

> The Supreme Court has held that ***some liberties are so important that they are deemed to be "fundamental rights" and that generally the government cannot infringe upon them unless strict scrutiny is met***. This chapter examines many of these liberties, ***including*** rights protecting family autonomy, procreation, sexual activity and sexual orientation, medical care decision making, travel, voting, ***access to the courts***, and the right to bear arms.

*Principles and Policies*, Section 10.1.1, at p. 856 (emphasis added). Under the strict scrutiny test, "the government must justify its interference by proving that its action is necessary to achieve a compelling government purpose." *Id.*

Professor Chemerinsky goes on to note that the Supreme Court has variously analyzed fundamental rights such as the right to access the courts under the Due Process Clauses of the 5th and 14th Amendments, and/or the 14th Amendment Equal Protection Clause; sometimes under one, sometimes under another, sometimes under more than one, and sometimes the Justices themselves disagree as to which protects a fundamental right. *Cf. Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (noting the "unsettled" basis of the constitutional right of access and citing cases basing it on various constitutional provisions). For example, Professor Chemerinsky notes that in *Zablocki v. Hail*, 484 U.S. 374 (1978), the majority found the right to marry fundamental under the Due Process Clause, but the concurring opinion found it fundamental under the Equal Protection Clause. However, the precise source of the constitutional protection is irrelevant to the level of scrutiny the infringement of a fundamental right receives:

> Relatively little depends on whether the Court uses due process or equal protection as the basis for protecting a fundamental right. Under either provision, the Court must decide whether a claimed liberty is sufficiently important to be regarded as fundamental, even though it is not mentioned in the text of the Constitution. ***Also, once a right is deemed fundamental, under due process or equal protection, strict scrutiny is generally used***.

*Policies and Procedures*, Section 10.1.1 at 857 (emphasis added).

Professor Chemerinsky lays out a four-part framework for analyzing individual rights: 1) is the right fundamental; 2) is the right infringed; 3) is the government's action justified by a sufficient purpose; and 4) are the means sufficiently related to the goal sought? *Id.* at 858. The first step of this framework determines the appropriate standard of review:

> If a right is deemed fundamental, the government usually will be able to prevail only if it meets strict scrutiny; but if the right is not fundamental, generally only the rational basis test is applied. This is the framework for judicial review articulated in the famous *Carolene Products* footnote 4 more than a half century ago: The judiciary will defer to the legislature unless there is discrimination against a "discrete and insular" minority or infringement of a fundamental right.

*Id.* at 859.

### A. The Right to Access the Courts is a Fundamental Right[2]

The right to access the courts is an aspect of the Petition Clause explicitly set out in the First Amendment:

> This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."

---

[2] To be clear, the right at issue is Plaintiffs' right to access the courts, a right that derives from the Petition Clause of the First Amendment and that has long and consistently been recognized as a fundamental right that receives strong protection under the Constitution. That is the right that Plaintiffs explicitly assert the Moratorium Act infringes in Count I of the Amended Complaint. Plaintiffs have not, as the Commonwealth seems to assert at times, claimed that they have a constitutional right to evict; they have a contractual and statutory right to evict, and Plaintiffs have argued that interference with that right violates *inter alia* the Contracts Clause and the Takings Clause. The right to access the courts is what gives meaning to the contractual and statutory right to evict—because self-help is illegal in Massachusetts, the only way to regain possession of rental property is to exercise the constitutional right to access the courts, i.e, make use of the Housing Court to obtain a judgment and execution if the Housing Court's mediation process does not obviate the need for it.

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 896–897 (1984)); *see also BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513 (1972). The guarantee of the right of access to the courts is "among the most precious of the liberties safeguarded by the Bill of Rights." *ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2020 WL 2198366, at *9 (D. Mass. May 6, 2020)(quoting *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n***,** 389 U.S. 217, 222 (1967); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed ... one aspect of the right of petition."); *NAACP v. Button,* 371 U.S. 415, 433 (1963) (right to petition is "delicate and vulnerable, as well as supremely precious in our society" and therefore demands exacting protection).

Professor Chemerinsky agrees that the right of access to the courts is a fundamental right. *See Policies and Procedures*, Section 10.1.1, at 856, *supra*. In the section of his treatise addressing the right of access to the courts specifically, Professor Chemerinsky observes that:

> The Supreme Court has spoken of "the fundamental constitutional right of access to the courts." The Court long has said that the right to be heard in court is an essential aspect of due process.

*Policies and Procedures*, Section 10.9, "Constitutional Protection For Access To Courts," at 982.

Accordingly, there can be no doubt that Plaintiffs' claim that the Moratorium Act's complete shutdown of their right to access the courts in order to regain possession of their property from tenants who have no legal right to possession violates Plaintiff's fundamental right to access the courts and that the Court must "strictly scrutinize" this infringement.

## B. The Moratorium Act "Directly and Substantially" Infringes Plaintiffs' Right to Access the Courts.

Moving to the second step of Professor Chemerinsky's analytical framework, the question is when a restriction on a fundamental right is sufficiently severe as to trigger strict scrutiny. In this step, the Supreme Court has suggested that "[t]he directness and substantiality of the interference" are relevant factors to consider. *Policies and Procedures*, Section 10.1.1, at 860, *citing Zablocki v. Redhail*, 434 U.S. 374, 387 n.12 (1978), *and Lyng v. Castillo*, 477 U.S. 635, 638 (1986). But as Professor Chemerinsky notes, "there has been surprisingly little discussion of what constitutes a direct and substantial interference with a right." *Policies and Procedures*, Section 10.1.1, at 860.

In *Zablocki*, the Court stated that not every regulation relating to marriage requires strict scrutiny, but rather "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." 434 U.S. at 386. However, the restrictions at issue in that case did in fact require strict scrutiny. In *Zablocki*, a statute required that any person with a non-custodial minor child for which he was required to pay child support could not get married without first obtaining court permission, after showing that he was in compliance with his support obligations and the children were not likely to become public charges. *Id.* at 375. The Court held that because marriage and the right to privacy were fundamental rights and the statute would absolutely prevent some people from ever being able to marry and would coerce others into giving up their right to marry, strict scrutiny was required. *Id.* at 387.

By contrast, in *Lyng*, the Court held that the statutory classification of a "household" for purposes of food stamp eligibility did not "directly and substantially interfere with family living

6

arrangements and thereby burden a fundamental right" and was likely to have no real effect at all. 477 U.S. at 638. Because the statute did not interfere with a fundamental right, rational basis scrutiny was all that was required.

        i.    <u>The Moratorium Act "Directly" Burdens Plaintiffs Fundamental Right to Access the Courts.</u>

Here, the fundamental right at issue is Plaintiffs constitutional right under the First Amendment to access the courts. It is beyond dispute that if the Moratorium Act directly and substantially burdens this fundamental right, strict scrutiny is required. There does not appear to be any serious dispute that the Moratorium Act "directly" infringes that fundamental right. There is no doubt that Plaintiffs have been completely shut out from the entire court system in any action to vindicate their property rights as a result of the Act's provisions. To recapitulate, the Act forces a total shutdown of the entire court system to one class of litigants and thereby denies Plaintiffs any ability to regain possession of their property. The shutdown is comprehensive.

Plaintiffs may not file—and the Housing Courts are not permitted to receive—any summary process filings whatsoever. The Act also operates as a total and comprehensive stay of all court events in eviction cases. Plaintiff Matorin, who had served and filed a summary process complaint well before the advent of the COVID pandemic arising out of non-payment that even further predated the pandemic, and who had received a hearing date to determine his right to possession, suddenly found that hearing indefinitely postponed—first to May, then to August, now to October, and who knows from that point. Plaintiff Matorin has been deprived not only of the right to obtain a hearing to determine possession but also has been denied use of the Housing Court's pre-trial mediation services by which the vast majority of summary process actions are

resolved. And the other Plaintiffs have been deprived of their right to serve Notices to Quit and then to file summary process proceedings themselves.

        ii.       The Moratorium Act "Substantially" Burdens Plaintiffs' Fundamental Right to Access the Courts.

As to whether the Moratorium Act "substantially" infringes on Plaintiffs' fundamental rights, the parties do disagree. The Commonwealth has argued that because the complete denial of access to the courts is purportedly "temporary," the impingement on Plaintiffs' constitutional right to access the courts is not "substantial." This court in *ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2020 WL 2198366, at *9 (D. Mass. May 6, 2020), rejected this specific argument that because "[a]ll state statutes of limitation have been tolled, … no creditor will find itself without legal recourse for recovery of alleged debts" and that the effect of the moratorium on debt collection lawsuits was "merely to delay a creditor's day in court, while temporarily protecting consumers from a method of debt collection that is uniquely threatening under the circumstances of the pandemic." There, of course, the delay was simply to the collection of money owed. Here, it is regaining possession of property, a far more fundamental right.

Plaintiffs argue that the Moratorium is hardly "temporary" in any meaningful sense, because it is explicitly indefinite, can be extended endlessly until the Governor in his sole discretion decides not to, and because it is tied to the Governor's Declaration of Emergency, which may not be rescinded for a substantial amount of time given that substantial federal funding is tied to the existence of the state of emergency.³ Moreover, "temporary" or not, the

---

³ *See Gov. Baker Declares State of Emergency In Massachusetts as Coronavirus Cases Spike*, Boston Herald, March 10, 2020 found at https://www.wbur.org/news/2020/03/10/massachusetts-state-of-emergency-coronavirus (accessed Sep. 3, 2020) ("Baker said the state of emergency gives his administration more flexibility, from accessing federal funds, to canceling large events.")

deprivation of Plaintiffs' fundamental constitutional right to access the courts has already not only eviscerated Plaintiffs' fundamental right to regain possession of their property, but has also imposed on them economically devastating burdens that should properly be borne by society as a whole, and for which there will never receive any remedy. Plaintiffs presumably *someday* will regain possession of their property, but the Commonwealth's insistence that in the meantime tenants are "required" to continue paying rent (if they, in their own determination, believe they can) and that Plaintiffs can incur additional legal costs to assert claims for money damages against their judgment-proof tenants that will never lead to financial recovery, is simply illusory gimmickry.

*Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir. 1989), demonstrates that even truly temporary delays on the right to regain possession of rental property impose substantial burdens on a landlord's constitutional rights. In *Morrison*, the landlord obtained a judgment entitling him to take possession of his property but the judge delayed the writ of restitution for 14 days. In the meantime, the Chief Judge of the court "declared a moratorium on the issuance of writs of restitution" for 18 days, from December 15, 1985 through January 2, 1987, for the holidays. *Id.* at 464. The district court rejected the landlord's claim that the moratorium violated his constitutional rights, but the Court of Appeals reversed, holding that even the short delay at issue substantially burdened the landlord's rights:

> We believe that the defendants, as well as the district court, misunderstood both the nature of Morrison's right to judicial process for the recovery of his property and the potential seriousness of the burden the moratorium places on that right. **The defendants seem to interpret the provision of a judicial process for the recovery of property a favor that the government grants its citizens, rather than a right to which they are entitled. In other words, the state has free rein to decide if and when it will allow citizens to obtain judicial orders to recover their property**.

9

> This view is contrary to both the avowed principles and the spirit of the American polity. It is a prime tenet of our American political philosophy that government has a responsibility to protect the lives, liberties, and property of its citizens, and part of that responsibility includes the provision of courts where individual citizens can seek the vindication of their rights. **Morrison has the right to go to court to recover his property; it is not a privilege that can be granted or denied him at the government's whim. It is this right to vindicate one's rights in court that is the heart of the constitutional right to due process of law**. … This principle is also expressed in the Supreme Court's holding that the due process clause of the fourteenth amendment prevents states from "denying potential litigants use of established adjudicatory procedures, when such an action would be 'the equivalent of denying them an opportunity to be heard upon their claimed right[s].'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429–30 (1982), quoting *Boddie v. Connecticut*, 401 U.S. 371, 380 (1971).
>
> Thus, **any state attempt to limit the right of individuals to go to court to have their rights vindicated is a matter of serious import**. While no doubt a state can reasonably regulate the operation of the courts by, for example, limiting the hours in which a judge is available or even by closing the courts for a regular holiday or an extemporaneous one, such as the assassination of a President, **it is doubtful that it could simply choose to close down its courts for a lengthy period of time, forestalling all attempts by citizens to enforce their legal rights**. There is a plausible argument that this moratorium is not a reasonable regulation of the judicial system but is rather a deprivation of the putative litigant's right to due process. …
>
> We are also concerned by the fact that this moratorium, unlike a general closing of courts for the legislated holiday of Christmas, **excluded only a particular class of cases from the courts, a class brought by an unpopular group in our society, landlords**. If Morrison, who is a Black landlord, had been excluded from the courts because he is Black, there would be no doubt that his rights to equal protection and due process under the fourteenth amendment were violated. **These rights are not relinquished because he is a landlord**.

877 F.2d at 467–68 (emphasis added). *Cf. Green v. Biddle*, 21 U.S. 1, 75-76 (1823) ("[n]othing, in short, can be more clear, upon principles of law and reason, than that a law which denies to the owner of land a remedy to recover the possession of it …; or to recover the profits received from

10

it by the occupant; or which clogs his recovery of such possession and profits, by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to, and interest in, the property. If there be no remedy to recover the possession, the law necessarily presumes a want of right to it.").

In *Morrison*, the landlord's right to regain possession was delayed for a mere 18 days. Here, of course, Plaintiffs have been subjected to at least a six month delay simply to get through the court's doors, with no end in sight other than the *possible* but unlikely lifting of the moratorium in mid-October, at which point the delay will be more than *seven months*, and likely significantly longer than that. Plaintiff Matorin had a hearing scheduled for May 6 before the moratorium went into effect and froze him out. Absent the moratorium, he likely would have regained possession by mid-May. Instead, he continues to bear the burden and costs of providing free housing to his tenant for the foreseeable future. Plaintiffs Baptiste and Daponte have been completely blocked from getting through the courthouse doors and will remain blocked for the foreseeable future. The Moratorium Act is unquestionably imposing a "substantial" burden on Plaintiffs fundamental constitutional right to access the courts.

Cases cited by the Commonwealth and referred to by the Court with respect to "temporary" burdens are not on point. In *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 706 (9th Cir. 1992), the court drew a sharp distinction between the right of access to the courts, which it described as "the right to pass through the courthouse doors and present one's claim for judicial determination," and the right asserted by the plaintiffs there to a judicial determination within a specific period of time. *Id.* at 706. The court specifically distinguished several cases that in fact involved the **literal right to get into the courthouse**. *Id.*, citing *Boddie v. Connecticut*, 401 U.S. 371, 382 (1971) ("the Due Process Clause of the Fourteenth Amendment

11

requires that these appellants be afforded an opportunity *to go into court* to obtain a divorce") (emphasis added); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) ("The right of access to the courts ... assures that no person will be denied the opportunity *to present to the judiciary* allegations concerning violations of fundamental constitutional rights.") (emphasis added). Similarly, in *Ad Hoc Comm. on Judicial Admin. v. Com. of Mass.*, 488 F.2d 1241 (1st Cir. 1973), the plaintiffs had full access to the courts, they simply complained that it took too long to litigate a case. The court held that delay *per se* was not unconstitutional, that there was no way to determine what delay would be "too long" because of the many factors that play into litigation delays, and there was no way to "fix" the delays by requiring additional resources that might in turn just invite additional litigation that would in turn cause more delays. *Id.* at 1244-45. The plaintiffs were, in fact, able to access the courts without delay, and the delays in obtaining a judicial determination did not substantially burden that access because they were the result of many factors and could not be addressed.

Here, in sharp contrast, the doors of the courts have been entirely closed to Plaintiffs solely because of the class of litigants to which they belong. The delays are imposed not by individual factors of Plaintiffs cases or by an overburdened court system, but by the Moratorium Act itself. Absent the Moratorium Act, Plaintiffs would be free to exercise their fundamental constitutional right to access the courts and would proceed with their summary process actions according to the Housing Courts' normal, albeit now modified, procedures.

As the *Morrison* court held, a landlord's right to regain possession of his property is a fundamental right that cannot be withheld even for a short period of time, let alone for many months with no foreseeable end. By blocking Plaintiffs from even accessing the courthouse to vindicate their fundamental property rights, the Moratorium Act certainly "substantially"

burdens Plaintiffs fundamental constitutional right to access the courts. Therefore, there is no doubt that under the second step of Professor Chemerinsky's analytical framework, the Moratorium Act infringes Plaintiffs' fundamental right to access the courts.

### C. The Government's Action Had (Past Tense) an Important Purpose.

This aspect of the framework focuses on the nature of the government purpose that purports to justify the infringement of the fundamental right to access the courts. As discussed above, where, as here, a fundamental right is involved, strict scrutiny is required. Thus, under strict scrutiny, the "sufficient purpose" test is satisfied only where there is a "compelling government purpose."

As Plaintiffs have stated throughout this proceeding, they do not challenge the government's purpose when it enacted the moratorium: it was a reaction to the uncertainty created by the COVID-19 pandemic. At the time the Moratorium Act was enacted, little was known about the nature of COVID-19 or the spread of the virus, and the purpose of the statute was simply to "establish forthwith a moratorium on evictions and foreclosures during the governor's COVID-19 emergency declaration." Ch. 65 of the Acts of 2020, *Preamble*. Governor Baker's Emergency Declaration in turn noted that as of that time, there were more than 600 cases of COVID-19 in the United States, 25 of which had resulted in death, and that there were 91 presumed positive cases in the Commonwealth. *Declaration of a State of Emergency to Respond to COVID-19*, dated March 10, 2020. Given the transmissibility of the virus, the Legislature's purpose in establishing the moratorium at that moment was at least an important government interest if not precisely compelling given the relatively few cases at the time and the tenuous linkage between the need for a moratorium and the relatively low levels of disease; the moratorium could be justified as an effort to hold the *status quo* pending further developments.

13

Plaintiffs do of course challenge the idea that the government's purpose "justified" the Moratorium. However, this aspect is best considered in conjunction with the next step in the analytical framework, whether the government has proved that its action is "necessary" to achieve a compelling purpose.

**D. The Moratorium Is Not "Necessary" to Achieve the Government's Purpose.**

Under the strict scrutiny standard applicable to the infringement of Plaintiffs' right to access the courts, the government must demonstrate that its actions were "necessary" to achieve the government's compelling purpose. The government must prove that "it could not attain the goal through any means less restrictive of the right." *Policies and Procedures*, Section 10.1.1 at 861. Put differently, the government must "prove that no other alternative, less intrusive of the right, can work." *Id.* at 862.

Plaintiffs have argued at length both in their briefing and at oral arguments that there is a poor "fit" between the Moratorium Act's total shutdown of Plaintiffs' access to the courts and the governmental interest in reducing the spread of COVID-19. We will not repeat those arguments here. *See* Plaintiffs' Reply In Support of Plaintiff's Motion for Preliminary Injunction at 2-10 (Dkt. 57). To briefly summarize, however, not only is it not "necessary" to bar Plaintiffs from filing a summary process action in Housing Court in order to prevent the spread of COVID, there is no link at all between them. Nor is preventing the parties from taking advantage of the Housing Court's mediation services—in socially distant ways established by the Housing Courts—"necessary" to prevent the spread of COVID-19. Nor is preventing the Housing Court from holding virtual hearings in summary process cases "necessary" in order to prevent the spread—again, using the Housing Court's socially distant procedures, just as other courts have begun normal, albeit modified, operations to keep people safe. There is no reason to think, for example, that Housing Court proceedings are any more likely to lead to the spread of COVID-19

14

than proceedings in Superior Court or in this Court. All of the courts are using socially distant procedures including remote hearings and expanded cleaning services to protect the public and court personnel. Therefore, there is no link at all between the Moratorium Act's complete shut-down of all access to the Housing Court and the spread of COVID; the government certainly cannot show that it was "necessary" to take that action or that there were no less restrictive means available to achieve its goal.

Indeed, that the Moratorium Act's complete shutdown of access to the Housing Courts is not "necessary" to achieve the government's purpose is conclusively shown by the CDC Order. *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, Dept. of Health & Human Services, September 1, 2020. The CDC, charged as it is with protecting national health and drawing upon its unsurpassed experience with infectious disease and the resources it brings to bear, has just imposed a moratorium that is far less restrictive than the Moratorium. While the Moratorium prevents even the initial filing of a summary process in court as well as all hearings, mediations, etc., the CDC Order focuses only on the final step of a summary process proceeding, the actual removal of the tenant.[4] Moreover, the CDC Order only applies to non-payment evictions—other evictions may proceed—and non-payment evictions are only barred if the tenant makes less than $99,000 per year (individual), has made a good faith effort to obtain all government assistance, and has been making as much of the regular monthly rent payment as possible, all of which must be certified under penalty of perjury. Thus, although

---

[4] That this is true is evident on the face of the CDC Order, but also from the fact that it imposes a uniform national standard in the face of highly variable state eviction procedures. So, for example, while Massachusetts has a very tenant-friendly process that may in some cases ultimately lead to a physical move-out order, other states allow self-help. The CDC Order focuses on actions to physically "remove or cause the removal of a covered person" because removal is the common endpoint—either after the long Massachusetts process or the immediate self-help remedy available elsewhere.

the CDC Order expressly permits states to enact more rigid restrictions, the CDC itself does not believe *any* of those additional restrictions are "necessary" to achieve the purpose of preventing the spread of COVID-19 through evictions.

In short, whatever deference a court may have given to the Legislature when it enacted the Moratorium in April 2020, circumstances have changed. The course of the pandemic in Massachusetts has plummeted to much lower levels, stores and businesses have re-opened, and the Governor himself has been urging schools to re-open and business to resume operations using socially distant procedures and masks. If society as a whole can re-open without risking massive spread of COVID-19 then there is no reason to think that it is "necessary" to maintain the complete shutdown of Plaintiffs' fundamental right to access the courts. The CDC Order on its face compels the conclusion that the Moratorium Act is not "necessary" to achieve any legitimate public purpose anymore. Accordingly, under strict scrutiny, the Moratorium Act must be struck down as improperly violating Plaintiffs fundamental right to access the courts.

### E. The Cases Cited By the Court Do Not Suggest that the Court Should Apply "Rational Basis" Scrutiny Rather than "Strict Scrutiny."

As Professor Chemerinsky makes clear, any "direct and substantial" infringement of a fundamental right must be strictly scrutinized. Neither Professor Chemerinsky nor the cases cited by the Court and the Commonwealth suggest otherwise.[5] Specifically, they do not suggest that the Court should look to the nature of the claims that Plaintiffs wish to assert in court and then apply strict scrutiny only to constitutionally fundamental claims while applying rational basis review to non-fundamental claims. Such an approach would be directly contrary to

---

[5] *Christopher v. Harbury*, 536 U.S. 403, 415 n. 12 (2002), *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 394 (2011), *NAACP v. Button*, 371 U.S. 415, 437-38 (1963), *Sosna v. Iowa*, 419 U.S. 393, 406, 410 (1975); *Ad Hoc Comm. on Judicial Admin. v. Massachusetts*, 488 F.2d 1241, 1243-44 (1st Cir. 1973).

Professor Chemerinsky's clear teaching that the right to access the courts is *itself* a fundamental right, the direct and substantial infringement of which must be subjected to strict scrutiny.

Rather, these cases "all have involved challenges to particular impediments" to the fundamental right to access to the courts, and the Supreme Court has considered those impediments in three major areas: right to appeal, challenges to filing fees, and prisoners' rights of access. *Principles and Policies*, Section 10.9 at 983. The Court has analyzed them under various constitutional theories, but as noted above, Professor Chemerinsky makes clear that the particular constitutional theory is irrelevant to the standard of review: if there is a direct and substantial burden on the fundamental constitutional right of access to the courts, it must be reviewed using "strict scrutiny." *See supra*, at 3-4; *Policies and Procedures*, Section 10.1.1 at 857.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in Plaintiffs' prior briefing in this case and Plaintiffs' oral arguments, the Court should deny the Commonwealth's still-pending Motion to Dismiss Counts II, III, and V of the Amended Complaint. The Court should further grant Plaintiffs' Motion for Preliminary Injunction on all Counts of the Amended Complaint and enter an order preliminarily enjoining the operation of Chapter 65 of the Acts of 2020, the Massachusetts Eviction Moratorium Act.

Respectfully submitted,

**MARIE BAPTISTE,
MITCHELL MATORIN, and
JOHN DAPONTE**

By their attorneys:

/s/ Richard D. Vetstein
Richard D. Vetstein
Vetstein Law Group, P.C.
945 Concord St
Framingham, MA 01702
Phone: (508) 620-5352
Fax: (888) 448-1344
Email: rvetstein@vetsteinlawgroup.com

/s/ Jordana R. Greenman
Jordana R. Greenman, Esq. (BBO# 667842)
134 Main Street
Watertown, MA 02472
Tel: (617) 379-6669
Fax: (617) 379-6669
Email: jordana@jrglegal.com

Dated: September 3, 2020

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 3, 2020.

/s/ Richard D. Vetstein