UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIE BAPTISTE,<br>MITCHELL MATORIN, and<br>JONATHAN DAPONTE,<br>    Plaintiffs,<br><br>        v.<br><br>MIKE KENNEALY, in his<br>official capacity as<br>Secretary of the Executive<br>Office of Housing and<br>Economic Development, and<br>CHARLES BAKER, in his<br>official capacity as Governor<br>of the Commonwealth of<br>Massachusetts,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 1:20-cv-11335-MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER

WOLF, D.J.                                    September 25, 2020

TABLE OF CONTENTS

I.    SUMMARY.................................................. 2

II.   FACTS................................................... 18

III.  PROCEDURAL HISTORY...................................... 28

IV.   PRELIMINARY INJUNCTION STANDARD......................... 32

V.    ANALYSIS................................................ 35

      A.   Plaintiffs Are Not Likely to Prove that the Moratorium
           Violates the Contracts Clause....................... 35

      B.   Plaintiffs Are Not Likely to Prove That the Moratorium
           Violates the Takings Clause......................... 48

      C.   Plaintiffs Are Not Likely to Prove that the Moratorium
           Violates the Petition Clause........................ 59

      D.   Plaintiffs Are Not Likely to Prove that the
           Prohibition on the Termination of Tenancies and
           Sending of Certain Written Notices Violates the First
           Amendment........................................... 69

     E.    Plaintiffs Have Standing to Assert and Are Likely to Prove that the Second Paragraph Required by 400 C.M.R. §5.03(2) Violates the First Amendment............... 82

     F.    A Preliminary Injunction Will Issue If Necessary.... 98

VI.  CONCLUSION............................................... 99

VII. ORDER.................................................... 100

I.  SUMMARY

This is an unusually complex and challenging case.[1] It arises out of legislation enacted on April 20, 2020, by the Commonwealth of Massachusetts, in response to the then-emerging pandemic of coronavirus disease caused by the SARS-CoV-2 virus (COVID-19). The legislation, in pertinent part, establishes a temporary moratorium on residential evictions. This case presents issues of federal constitutional law that are not often litigated. These include whether and to what extent legislation that might ordinarily violate the United States Constitution is permissible in an emergency. The case also involves fundamental issues concerning

---

[1]    This Memorandum explains the decisions concerning plaintiffs' Motion for Preliminary Injunction which the court discussed at the hearing on September 10, 2020. The court disclosed its decisions so the parties could begin preparing for the future litigation of this case. The court also noted that, as explained in this Memorandum, changing facts, including possibly the passage of time, could render unconstitutional further extensions of the legislation enacted on April 20, 2020 in response to the then-emerging COVID-19 pandemic, even though the legislation will probably be found to have been constitutional as of the date of enactment.

the relative roles and responsibilities of elected officials and the courts generally and in an emergency particularly.

On March 10, 2020, Massachusetts Governor Charles Baker declared a State of Emergency in response to the then-recent outbreak of COVID-19. The Governor subsequently issued a series of emergency orders and advisories to cause people to stay home to the maximum extent possible. These directions were based on the growing understanding that the COVID-19 virus is transmitted from individuals to others in close proximity to them and, therefore, of the importance of persons' staying at least six feet apart -- "social distancing" -- to limit the spread of the virus.

Tenant advocacy groups, among others, were seeking a moratorium on evictions, arguing that they would result in the overcrowding of shared dwellings and homeless shelters, and more people living on the streets. Such conditions would have been injurious to the effort to limit the spread of the COVID-19 virus.

By April 20, 2020, schools were closed. Many businesses were also closed, causing many people to be unemployed. In addition, beginning in mid-March 2020, state trial courts, including the Massachusetts Housing Court, were closed to the public, except for emergency hearings that could not be conducted by telephone or videoconference. State courts were postponing other business, including non-emergency summary process eviction cases.

On April 20, 2020, Massachusetts enacted an "Act Providing for a Moratorium on Evictions and Foreclosures during the COVID-19 Emergency," 2020 Mass. Legis. Serv. Ch. 65 (H.B. 4647) (West) (the "Act" or the "Moratorium") (copy filed at Dkt. No. 67-1, at 139 of 150). Among other things, the Act prohibits all "non-essential" evictions, including residential evictions for failure to pay rent. In addition, the Act prohibits landlords from sending tenants "notices to quit," which are the first step required to obtain expedited summary process evictions.[2] The Act also prohibits landlords from sending tenants any notice demanding or requesting that a tenant who has not paid rent leave the landlord's property. Moreover, the Act prohibits the Massachusetts courts, including the Housing Court, from accepting for filing any summary process case or taking action in any pending summary process case.

Regulations promulgated pursuant to the Act encourage landlords to provide tenants with notice of how much rent they owe. However, they mandate that any such notice refer tenants to websites with information on how tenants can contact non-governmental organizations that advocated for the Moratorium and

---

[2]    A notice to quit satisfying the statutory requirements and sent for the purposes of initiating summary process eviction proceedings is sometimes referred to in this Memorandum as a "statutory notice to quit."

4

could provide legal assistance to tenants attempting to frustrate a landlord's efforts to regain possession of his or her property.

The Moratorium was scheduled to expire on August 18, 2020. However, the statute gives the Governor the authority to extend the Moratorium further for an unlimited number of periods of up to 90 days without further action by the legislature, provided the declared State of Emergency has not been terminated.

In July 2020, the Governor extended the Moratorium to October 17, 2020. In a July 21, 2020 letter notifying the legislature, the Governor stated the reasons for the extension in one paragraph:

> The Act's limitations on evictions and foreclosures have allowed many tenants and homeowners impacted by COVID-19 to remain in their homes during the state of emergency. I am confident that this action, coupled with federal assistance, helped to slow the spread of COVID-19 while minimizing the impact to date on vulnerable families and on our housing market. The extension I am declaring today will provide residents of the Commonwealth with continued housing security as businesses cautiously re-open, more people return to work, and we collectively move toward a "new normal."

Letter from Gov. Baker to House Speaker DeLeo & Sen. Pres. Spilka (July 21, 2020) (copy filed at Dkt. No. 30-2).

> In the following paragraph, the Governor stated that:

> I am aware that the extension I am declaring today will impact many small landlords who rely on rental income to pay their own expenses. I strongly encourage tenants to continue to pay rent, and homeowners to make their mortgage payments, to the extent they are able while the moratori[um] remain[s] in place.

Id. However, the Moratorium Act does not require that tenants certify that they are unable to pay rent, for COVID-19-related reasons or any others, to be protected from eviction.

Plaintiffs Marie Baptiste, Mitchell Matorin, and Jonathan DaPonte are landlords in Massachusetts. Baptiste is a nurse from Haiti who served a notice to quit before the Moratorium on tenants who had not paid rent since October 2019. She is now owed $21,000. Prior to the Moratorium, Matorin had also served a notice to quit on his tenants who did not pay rent for February 2020. They owed him $8,400 as of August 2020. DaPonte is a disabled Iraq War veteran who as of August 2020 was owed more than $4,000 rent by a tenant who told him "you can't evict me so I am not paying shit."

Plaintiffs allege that the Moratorium violates their rights under the United States Constitution in five ways. More specifically, they contend that the Moratorium: (1) violates the Contracts Clause in Article I, §10, which prohibits states from passing laws that impair the obligations of contracts; (2) takes their property without paying just compensation as required by the Fifth Amendment; (3) denies them their right to access to the courts in violation of the First Amendment; (4) violates their First Amendment right to free speech by prohibiting them from sending notices to quit and other notices; and (5) violates the First Amendment because if they want to inform tenants of how much rent they owe plaintiffs are compelled to tell their tenants how

to contact the groups that advocated for the Moratorium and will assist them in attempting to frustrate plaintiffs' efforts to regain possession of their property.

Plaintiffs moved for a declaratory judgment and a preliminary injunction on all five counts, which the defendants opposed. The court denied defendants' request that it abstain in view of a case in the courts of the Commonwealth of Massachusetts alleging that the Moratorium violates the Massachusetts constitution, specifically, Articles 10, 11 and 30 of the Massachusetts Declaration of Rights, which address, respectively, takings of real estate, access to the courts, and separation of powers.

The court explored whether the parties could engage in expedited discovery so that the hearing on the motion for preliminary injunction could be consolidated with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Both plaintiffs and defendants opposed this proposal. In contrast to the case challenging New York's COVID-19 eviction moratorium, the parties here could not agree on stipulated facts for the purpose of cross-motions for summary judgment. Compare Elmsford Apt. Assocs., LLC v. Cuomo, No. 20-cv-4062 (CM), 2020 WL 3498456, *1 (S.D.N.Y. June 29, 2020). Nor, in contrast to a case involving the Connecticut COVID-19 eviction moratorium, could they agree on a stipulated record for the purpose of the motion for preliminary injunction. Compare Auracle Homes, LLC v. Lamont, No. 3:20-cv-

00829 (VAB), 2020 WL 4558682, *9 (D. Conn. Aug. 7, 2020). In any event, the court held five days of hearings on the complex issues presented by the motion for preliminary injunction.

To obtain a preliminary injunction a plaintiff must prove a reasonable likelihood of success on the merits of the claim at issue. A failure to do so is the end of the inquiry concerning a preliminary injunction based on that claim. If plaintiffs prove a reasonable likelihood of success on the merits of a claim, the court must decide whether there is an imminent threat of irreparable harm if an injunction is not issued. If so, the court must also consider the balance of hardships and the public interest in deciding whether a preliminary injunction is justified.

The inherently challenging nature of the constitutional questions in this case has been enhanced by the evolving facts since the enactment of the Moratorium on April 20, 2020. The motion for preliminary injunction and subsequent briefing focused on conditions that existed when the Moratorium was enacted and when the related regulations at issue were promulgated soon after. When the Governor extended the Moratorium to October 17, 2020, a First Amended Complaint, with several additional paragraphs addressing the fact of the extension, was filed. Recent submissions by the parties include some information concerning developments concerning the COVID-19 pandemic and governmental responses to it, such as the federal moratorium on certain evictions ordered by the

Centers for Disease Control and Prevention (the "CDC") and the Department of Health and Human Services on September 4, 2020. See "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," 85 Fed. Reg. 55292 (copy filed at Dkt. No. 110-1) (the "CDC Moratorium"). However, the implications of changing facts concerning the impact of the pandemic on public health and the Massachusetts economy have not been adequately addressed by the parties. Therefore, in ruling on plaintiffs' motion for preliminary injunction the court is deciding only whether plaintiffs have a reasonable likelihood of succeeding on the merits of their claims that the Moratorium and regulations violated plaintiffs' rights under the United States Constitution when enacted and promulgated in April 2020.

In doing so, it is necessary for the court to resolve disputed issues concerning the standard to be applied in deciding plaintiffs' likelihood of prevailing on each of their constitutional claims. Plaintiffs generally argue that their claims require strict scrutiny of the Moratorium and that it fails that test because there were in April 2020 ways less burdensome for landlords to serve the admittedly significant state interest in combatting the pandemic. Defendants generally argue either that the Moratorium did not affect plaintiffs' rights under the relevant constitutional provisions or that only a rational basis is required to find the Moratorium constitutionally valid. As explained in

this Memorandum, distinct tests apply to each of plaintiffs' claims. None are subject to strict scrutiny.[3] Plaintiffs' claims concerning the Article I Contracts Clause, the Fifth Amendment Takings Clause, and the First Amendment Right to Petition Clause are subject to rational basis review. Their First Amendment claims concerning freedom of speech are subject to more rigorous intermediate scrutiny.

As explained in detail in this Memorandum, plaintiffs have not proven that they are reasonably likely to prevail on four of their claims that the Moratorium and related regulations were unconstitutional when enacted in April 2020. They are reasonably likely to prevail on their claim that paragraph 2 of 400 Mass. Code Regs. [C.M.R.] §5.03(2) compels plaintiffs to provide information concerning their adversaries in violation of the First Amendment. This is a form of irreparable harm. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976); Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10-11 (1st Cir. 2012). Therefore, a preliminary injunction will be entered on this issue

---

[3]    If, contrary to the court's conclusion, strict scrutiny is required, the Moratorium would probably be found to be unconstitutional when enacted. The existence of a federal eviction moratorium and various state moratoria, which are all evidently more favorable to landlords than the Massachusetts Moratorium, indicates that there were on April 20, 2020 less burdensome ways to prevent evictions in order to reduce the spread of the COVID-19 virus.

if defendants do not confirm their representation that they would comply with a declaration by this court, obviating the need for the issuance of an injunction. See Aug. 24, 2020 Tr. 9:21-11:6, 62:17-21 (Dkt. No. 108).[4]

The court's ruling on plaintiffs' motion for preliminary injunction may, as a practical matter, conclude this case. However, if the Governor extends the Moratorium beyond October 17, 2020, it may be necessary to decide the case on the merits. Therefore, as discussed at the September 10, 2020 hearing, the parties are being ordered to continue to confer and to report by October 2, 2020, at 12:00 noon, concerning how this case should proceed.

As the court explained on September 10, 2020, changing facts, including for some claims the mere passage of time, could affect the ultimate outcome of this case. As Justice Oliver Wendell Holmes wrote in addressing a rent-control ordinance originally enacted in 1919 as a World War I emergency measure, "[a] law depending upon

---

[4]    On September 17, 2020 defendants filed a notice regarding amendments to the regulations promulgated under the Act. See Dkt. No. 128. As it indicates, when promulgated, 400 C.M.R. §5.06 provided that the regulation would expire 120 days after the Moratorium was enacted, meaning on August 18, 2020. Section 5.06(2) authorizes defendant Kennealy, the Secretary of EOHED, to extend the effective period of the regulations. He did not do so until September 17, 2020. See Dkt. No. 128-1. Therefore, it appears that plaintiffs will in this case probably prove that their First Amendment rights were violated for two months by a regulation that had expired without any notice to the public that it was no longer in effect.

the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." Chastleton Corp. v. Sinclair, 264 U.S. 543, 547-48 (1924). Chief Justice Harlan Fiske Stone reiterated this principle in United States v. Carolene Products Co., 304 U.S. 144, 153 (1938), writing that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." The First Circuit said the same as recently as April 2020. See United States v. Vaello-Madero, 956 F.3d 12, 23 (1st Cir. 2020).

In deciding whether plaintiffs are likely to prove that the Moratorium was unconstitutional when enacted in April 2020, this court has been mindful of Chief Justice John Roberts' recent statement in South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613 (2020). On May 29, 2020, the Supreme Court denied an application seeking an injunction against the Governor of California's COVID-19 emergency order limiting attendance at places of worship. Id. In his concurrence, the Chief Justice noted that "[t]he Order places temporary numerical restrictions on public gatherings to address this extraordinary health emergency." Id. (emphasis added). The Chief Justice then wrote:

> The precise question of when restrictions on particular
> social activities should be lifted during the pandemic
> is a dynamic and fact-intensive matter subject to

reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." Jacobson v. Massachusetts, [197 U.S. 11, 38] (1905). When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Marshall v. United States, [414 U.S. 417, 427] (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. See Garcia v. San Antonio Metropolitan Transit Authority, [469 U.S. 528, 545] (1985).

That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground. The notion that it is "indisputably clear" that the Government's limitations are unconstitutional seems quite improbable.[5]

Id. at 1613-14 (emphases added).

As reflected in cases cited in this Memorandum, the principle that judicial deference is due to decisions of elected officials in an emergency in ruling on certain constitutional claims has a long history. However, it should be recognized that the Chief Justice noted that the emergency order at issue in South Bay was "temporary;" although "broad," there are constitutional "limits" to the authority of elected officials in an emergency; and courts

_____

[5]   The "indisputably clear" standard does not apply to the instant motion for a preliminary injunction. Instead, plaintiffs must prove only a likelihood of success on the merits to be eligible for injunctive relief.

expect that elected officials will "actively shap[e] their response to changing facts on the ground." Id.

As the Supreme Court wrote in 1905, in the seminal Jacobson case concerning the broad authority of the state to take action to protect public health, laws and regulations may be "so arbitrary and oppressive in particular cases[] as to justify the interference of the courts to prevent wrong and oppression." 197 U.S. at 38. Two judges of the United States District Court for the District of Massachusetts have found constitutional protections to have been violated by Massachusetts officials in their response to the COVID-19 pandemic. In United States v. McCarthy, while recognizing that a degree of deference is due to the Governor, Judge Douglas Woodlock preliminarily enjoined a temporary prohibition of the sale of firearms in shops because of the burden it imposed on the Second Amendment right to possess firearms. See Am. Prelim. Inj. Order (Dkt. No. 92) and May 7, 2020 Tr. 50-60 (Dkt. No. 93), United States v. McCarthy, C.A. No. 20-10701-DPW (D. Mass. May 7, 2020). In ACA International v. Healey, C.A. No. 20-10767-RGS, 2020 WL 2198366, *8-9 (D. Mass. May 6, 2020), Judge Richard Stearns found the Attorney General's regulation creating a moratorium on efforts to collect debts violated the Petition Clause of the First Amendment. Federal judges in other states have also found that elected officials have violated the Constitution in responding to the COVID-19 pandemic. See, e.g., Cnty. of Butler v. Wolf, No.

14

2:20-cv-677, 2020 WL 5647480, *3 (W.D. Pa. Sept. 22, 2020) (collecting decisions of federal courts finding invalid restrictions on religious gatherings).

In 2004, following the September 11, 2001 attacks by the al Qaeda terrorist network and the ensuing United States military action in Afghanistan, the Supreme Court rejected the President's assertion of authority to hold a United States citizen captured in Afghanistan in incommunicado detention, stating that "a state of war is not a blank check for the President." Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004). Similarly, as McCarthy, ACA, and Butler indicate, the COVID-19 pandemic is not a blank check for the Governor and other elected officials.

Rather, it should be recognized that "a public health emergency does not give Governors and other public officials carte blanche to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." Calvary Chapel Dayton Valley v. Sisolak, 140 S. Ct. 2603, 2605 (2020) (Alito, J., dissenting). See also Cnty. of Butler v. Wolf, No. 2:20-cv-677, 2020 WL 5510690, *7 (W.D. Pa. Sept. 14, 2020).

In other words, in deciding how to exercise their broad discretion in responding to the evolving COVID-19 pandemic,

elected officials have a duty to consider the limitations imposed by the Constitution, rather than merely to rely on courts to remedy any violations of it. As Justice Anthony Kennedy has written, "the very fact that an official may have broad discretion . . . makes it all the more imperative for him or her to adhere to the Constitution and to its meaning and promise." Trump v. Hawaii, 138 S. Ct. 2392, 2424 (2018) (Kennedy, J., concurring).

The degree to which future decisions by elected officials concerning the Moratorium will deserve and receive deference from the court will be influenced by the degree to which they manifest consideration of the requirements of the Constitution and also of the implications of changed relevant facts. In East New York Savings Bank v. Hahn, 326 U.S. 230 (1945), the Supreme Court upheld the continuation of a New York moratorium on foreclosures enacted in 1933 in response to the Great Depression. Justice Felix Frankfurter explained that continued deference to the judgment of the legislature concerning the need for the moratorium was justified because:

> [H]ere there was no "studied indifference to the interests of the mortgagee or to his appropriate protection." . . . The whole course of the New York moratorium legislation shows the empiric process of legislation at its fairest: frequent reconsideration, intensive study of the consequences of what has been done, readjustment to changing conditions, and safeguarding the future on the basis of responsible forecasts.

Id. at 234-35.

16

Facts concerning the COVID-19 pandemic have changed since April 2020. Then, as the Governor urged, schools, businesses, and courts were substantially closed. Now, many businesses have re-opened, and the Governor is urging schools to teach children in person.[6] Unemployment in Massachusetts is declining. The state trial courts, including the Massachusetts Housing Court, are re-opened. While state courts are continuing to address most matters virtually, they are scheduled to resume jury trials on a limited basis in late October 2020 and are already conducting some in-person proceedings. These developments are attributable to progress made in limiting the spread of the COVID-19 virus. There could, however, be a resurgence of it.

In essence, in deciding whether to extend the Moratorium beyond October 17, 2020, and perhaps further, the Governor has an obligation to consider, among other things, whether the Moratorium, which will probably prove to have been constitutionally permissible when enacted in April 2020, is in view of changed facts now still compatible with the requirements of the Constitution. The manner in which such hard decisions are made and explained, as well as the nature of them, will influence

---

[6]   For example, a headline on the front page of yesterday's Boston Globe states that Governor "Baker pushes districts to get students back to school." F. Gans & M.E. Irons, Boston Globe (Sept. 24, 2020).

the degree of deference from the courts that they deserve, and that may affect the ultimate outcome of this case.

The decisions of elected officials, and those of the courts, will also eventually be judged by history. In 1944, the Supreme Court decided that the internment of United States citizens of Japanese descent during World War II was a constitutionally permissible military measure. See Korematsu v. United States, 323 U.S. 214 (1944). In 2018, the Supreme Court wrote that Korematsu "was gravely wrong the day it was decided, has been overruled in the court of history, and -- to be clear -- 'has no place in law under the Constitution.'" Trump v. Hawaii, 138 S. Ct. at 2423 (quoting Korematsu, 323 U.S. at 248 (Jackson, J., dissenting)).

Fortunately, the rights at issue in this case do not involve the liberty of United States citizens. They are nevertheless constitutional rights. Hopefully, the decisions made during this pandemic by the elected officials of Massachusetts and the courts will not in the future, like Korematsu, be deemed "gravely wrong." Id.

II. FACTS

The following facts have been proven for the purpose of deciding plaintiffs' motion for preliminary injunction.

On March 10, 2020, the Governor of the Commonwealth of Massachusetts declared a State of Emergency in response to the then-recent outbreak of the COVID-19 virus. As of March 10, 2020,

there were 92 cases of COVID-19 reported in Massachusetts, six people were hospitalized due to the virus, and no deaths had been attributed to it. However, the potentially lethal impact of COVID-19 had been demonstrated in other countries and states.

In March 2020, it was beginning to be understood that the COVID-19 virus is often transmitted from person to person. Therefore, the Governor, among other things, directed Executive Branch employees either to cancel in-person meetings or to conduct them "virtually" by videoconference instead. The Governor urged private employers to do the same. See Dkt. No. 67-1.

Many courts in Massachusetts followed the Governor's advice. On March 17, 2020, the Supreme Judicial Court announced that state courts would be closed to the public, except to conduct emergency hearings that could not be conducted by videoconference. By late April, the state courts had extended these measures through June 1, 2020, and postponed jury trials until at least July 1, 2020.

By April 2020, it was becoming better understood that the COVID-19 virus is commonly spread by respiratory droplets expelled by coughing, sneezing, talking, and breathing. Therefore, public health officials were then recommending that people engage in "social distancing" by remaining at least six feet apart.

The Governor and the Massachusetts Department of Public Health issued a series of emergency orders and advisories closing schools and "non-essential" businesses, and advising people to

stay at home except for "essential" errands such as buying food. Many people were out of work or otherwise experiencing financial difficulty as a result of the pandemic, injuring the ability of some of them to pay their rent.

Tenant advocacy groups, including City Life/Vida Urbana, were seeking the enactment of a moratorium on evictions during the COVID-19 emergency and beyond. Concern was expressed by those groups and others that absent a moratorium on evictions, and also on the threat of evictions, there would be many people displaced, which would result in "doubling up" in shared dwellings, overcrowding of homeless shelters, and increased homelessness. Overcrowding would threaten the health of displaced tenants and everyone with whom they came in contact because people living in overcrowded housing, defined as households in which the number of people is greater than the number of rooms, were being found to be the most likely to become infected with the COVID-19 virus. See Melnik Aff. ¶¶7, 9-10 (Dkt. No. 30-13).[7] Similarly, individuals living on the streets would be particularly vulnerable to becoming

---

[7]   Defendants have also submitted evidence that communities that were most overcrowded prior to the pandemic had high concentrations of people of color and, as of July 20, 2020, they had experienced the highest rate of COVID-19 infection. Melnik Aff. ¶10 (Dkt. No. 30-13). Plaintiffs do not dispute this fact. However, racial disparity was not discussed by the parties in the hearings on the motion for preliminary injunction and, in any event, is not relevant to any of the constitutional claims at issue in this case.

infected and likely to spread the COVID-19 virus. <u>See generally</u>
Barocas Aff. (Dkt. No. 30-5); Bartosch Aff. (Dkt. No. 30-6); Bharel
Aff. (Dkt. No. 30-7); Gaeta Aff. (Dkt. No. 30-9); Reardon Aff.
(Dkt. No. 30-14).

By April 20, 2020, nearly 40,000 people in Massachusetts had
been diagnosed as infected with COVID-19, and nearly 2,000 people
had died. On that date, 3,804 people were hospitalized, and the
state reported 103 new deaths from COVID-19. In addition, for each
day the preceding week, at least 22% -- and on one day 32% -- of
those tested were positive for the virus. Mass. Dep't Pub. Health,
COVID-19          Dashboard          (Apr.          20,          2020),
https://www.mass.gov/doc/covid-19-dashboard-april-20-
2020/download.

On April 20, 2020, Massachusetts enacted the Moratorium. The
statute was designated an emergency law deemed "necessary for the
immediate preservation of the public convenience" "during the
governor's COVID-19 emergency declaration." <u>See</u> Act Pmbl. (Dkt.
No. 67-1, at 139 of 150). The Act, in pertinent part, prohibits
all terminations of tenancies for the purposes of a "non-essential
eviction" for residential dwellings. <u>Id.</u> §3(a)(i). The Act also
prohibits the Massachusetts courts from accepting a summary
process action for filing or taking any action, including
scheduling any event, for such a non-essential eviction. <u>Id.</u> §3(b).

"Non-essential evictions" include evictions for failures to pay rent. Id. §1.

The Act also prohibits landlords from sending any notice "requesting or demanding that a tenant of a residential dwelling vacate the premises," which the court finds to include a written request to vacate in exchange for a payment from the landlord. Id. §3(a)(ii). In addition, the Act prohibits a landlord from sending a tenant a "notice to quit," which is a prerequisite for initiating a statutory summary process eviction action in the Massachusetts District Courts or Housing Court. Id.

The Act states that it does not relieve a tenant from the obligation to pay rent. Id. §3(f). Nor does it restrict a landlord's right to sue for rent that is owed. Id. However, this right is largely illusory, as tenants who have not paid their rent for many months because of economic distress -- or, indeed, for any other reason -- are unlikely to pay a money judgment against them.

Following passage of the Act, legislative leaders commented on its purposes. See Press Release, Mass. Sen. Pres. Karen E. Spilka, "Massachusetts Legislature Passes Moratorium on Non-Essential Evictions and Foreclosures Amid COVID-19" (Apr. 17, 2020) (Dkt. No. 67-1, Ex. 26). The State Senate President stated, "Staying home is an essential component to ending this pandemic . . . ." Id. The House Speaker said, "We acted to

safeguard tenants and homeowners from economic insecurity during and for a period after the state of emergency ends." <u>Id.</u> Representative Kevin Honan, a sponsor of the Act, said, "[T]his is more than just a housing justice issue, it is a public health issue. In a time where our collective health and safety depends on the ability of each and every one of us to shelter in place, the need for housing stability has never been greater." <u>Id.</u>

Sponsors of the Moratorium publicly thanked tenant advocacy groups for their role in shaping and prompting passage of the legislation. For example, one of the sponsors of the Moratorium legislation, Representative Mike Connolly, posted an announcement to his website commending City Life/Vida Urbana for working with other advocates on the bill. <u>See</u> Press Release, Mass. State Rep. Mike Connolly, "Introducing legislation to halt evictions and foreclosures during COVID-19 emergency" (Mar. 13, 2020), <u>https://www.repmikeconnolly.org/moratorium_evictions_foreclosure s_coronavirus_emergency_connolly_honan</u>; <u>see also</u> Dkt. No. 67, at 16 n.10.

The Massachusetts Executive Office of Housing and Economic Development ("EOHED") promulgated regulations to implement the Moratorium. The regulations encourage landlords to send tenants notices concerning how much rent they owe. <u>See</u> 400 C.M.R. §5.03(2). The regulations require that any such notice state: "THIS IS NOT A NOTICE TO QUIT. YOU ARE NOT BEING EVICTED AND YOU DO NOT HAVE TO

LEAVE YOUR HOME." Id. In addition, the regulations require that any notice of rent arrearage include addresses for websites maintained by non-governmental organizations, which contain information on how tenants can contact other organizations, including City Life/Vida Urbana, that could provide the tenants assistance in resisting their landlord's efforts to regain possession of their property. Id.

The Act banned almost all evictions in Massachusetts until August 18, 2020. See Act §7. It provides that the Moratorium can be extended by the Governor in 90-day increments, limited only to expiration no later than 45 days after the governor lifts the COVID-19 emergency declaration. Id. In August 2020, the Governor extended the Moratorium's expiration date to October 17, 2020, with only the limited explanation quoted earlier.

The Massachusetts Moratorium is generally more favorable to tenants than moratoria enacted in other states and the recent federal moratorium ordered by the CDC. For example, the Massachusetts statute stays litigation in all cases for failure to pay rent that were initiated before the statute was enacted. At least some other moratoria brought to the court's attention do not impose such a stay. Compare, e.g., CDC Moratorium; Conn. Governor's Exec. Order 7X, "Protection of Public Health and Safety During COVID-19 Pandemic and Response - Renter Protections" (Apr. 10, 2020), available at https://portal.ct.gov/-/media/Office-of-the-

Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7X.pdf; Conn. Governor's Exec. Order 7DDD, "Protection of Public Health and Safety During COVID-19 Pandemic and Response - Extension of Eviction Moratorium" (June 29, 2020), available at https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7DDD.pdf (collectively with Order 7X, the "Conn. Moratorium"); N.Y. Governor's Exec. Order 202.28, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency" (N.Y. May 7, 2020), available at https://www.governor.ny.gov/news/no-20228-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency (the "N.Y. Moratorium"); Phila. Emergency Housing Protection Act (Bills No. 200294, 200295, 200302, 200305), Phila. City Council (2020) (the "Phila. Moratorium"). Similarly, the Massachusetts statute stays all cases regardless of a tenant's ability to pay rent. Some other moratoria require that to be protected the tenant must qualify for unemployment compensation, see N.Y. Moratorium, or provide evidence of hardship, see CDC Moratorium; N.Y. Moratorium; Conn. Moratorium; Phila. Moratorium.

Plaintiffs Baptiste, Matorin, and DaPonte own rental property in Massachusetts. They are in various stages of the process of seeking to evict tenants who failed to pay rent.

Matorin's tenants had missed two rental payments by February 2020, when he served them with a notice to quit, and then a summary process summons and complaint. His original trial date of March 26, 2020 has been postponed until at least October 18, 2020 by the Moratorium. As of August 2020, Matorin was owed $8,400. He is struggling to pay the mortgage, taxes, and expenses for his rental property. He has discovered that one of his tenants has moved out, and the remaining tenant has allowed his brother to move in. The lease prohibits occupancy by anyone other than the named tenants. However, Matorin is prevented by the Moratorium from sending a notice to quit or filing a new summary process action because he would be seeking a "non-essential" eviction.

Baptiste is a nurse who immigrated to the United States from Haiti. Her tenants have not paid rent since October 2019. She also served a notice to quit on her tenants before the Moratorium but has not been able to initiate a summary process action to evict her tenants. As of August 2020, Baptiste was owed $21,000 in unpaid rent. She has been struggling to pay her own mortgage and living expenses. Baptiste has paid a penalty and taken at least one loan from her retirement accounts to pay her bills.

DaPonte is a disabled Iraq War veteran who works as a funeral director. His tenants did not pay rent on April 1, 2020. He believes they are still working and have not suffered any COVID-19-related physical or financial hardship. In May 2020, DaPonte

26

asked why his tenants were not paying rent. One of them told him, "you can't evict me so I am not paying shit." As of August 2020, DaPonte was owed $4,075 in rent and late fees. He has been working overtime, but is struggling to pay his personal and property expenses. He has not been able to send a notice to quit to his tenants and is concerned that he will lose his property to tax foreclosure.

Each of the plaintiffs understands that they are encouraged by the regulations to send a "Notice of Rent Arrearage" to their tenants to inform them of the amount of unpaid rent that they owe. However, plaintiffs are unwilling to do that because they would be required to include addresses for websites hosted by non-governmental groups which in turn refer tenants to tenant advocacy groups including City Life/Vida Urbana. Some of these groups contributed to the enactment of the Moratorium, which the landlords oppose, and the landlords regard them as adverse to their interests. The landlords do not want to appear to be endorsing these groups, nor do they wish to facilitate efforts to frustrate their ability to regain possession of their properties.

By September 23, 2020, more than 126,000 people in Massachusetts had been diagnosed with COVID-19, an increase of nearly 90,000 since April 20, 2020. In addition, Massachusetts reported a total of 9,135 deaths among confirmed cases, an increase of more than 7,000 since the enactment of the Moratorium. However,

the rate of infection, death, and hospitalization had decreased significantly. On September 23, 2020, the state reported 542 new cases, as compared to 1,566 on April 20, 2020. In addition, the state reported 17 new deaths and that 361 people were hospitalized with COVID-19, as compared to 103 and 3,804, respectively, on April 20, 2020. Moreover, the 7-day weighted average of positive test results had decreased from a high of above 20% for much of April to below 1.0% for September 2020. Mass. Dep't Pub. Health, COVID-19 Dashboard (Sept. 23, 2020), https://www.mass.gov/doc/covid-19-dashboard-september-23-2020/download.

As a result of these developments, many businesses that were closed in April 2020 have been allowed to reopen. The unemployment rate has been dropping. The Governor has been urging schools to resume teaching in person. In addition, the Massachusetts courts are conducting many proceedings by videoconference or telephone, and certain essential proceedings at courthouses, in person.

III. PROCEDURAL HISTORY

On May 29, 2020, Matorin and another plaintiff, who is not a party here, initially filed suit in state court, as an emergency petition for relief pursuant to the Massachusetts Supreme Judicial Court's superintendence jurisdiction. See Emer. Pet., Matorin v. Sullivan, No. SJ-2020-0442, Dkt. No. 1 (Mass. May 29, 2020) (copy filed in this case at Dkt. No. 27-1). That petition asserted both claims based on state law and the federal claims asserted in the

instant case. On June 24, 2020, it was transferred by a single justice of the Supreme Judicial Court to Suffolk Superior Court for disposition and appeal in the usual course. See Order, <u>Matorin v. Sullivan</u>, No. SJ-2020-0442, Dkt. No. 12 (Mass. June 24, 2020); Compl., <u>Matorin v. Massachusetts</u>, No. 2084CV01334, Dkt. No. 2 (Mass. Super. Ct. June 25, 2020); <u>see also</u> July 23, 2020 Joint Status Report ¶2 (Dkt. No. 25) (describing procedural history of state action).

On July 15, 2020, plaintiffs filed the instant case against the Commonwealth of Massachusetts. Plaintiffs allege that the Moratorium and regulations implementing it violate their rights under the United States Constitution in five ways. More specifically, they contend that they have been: (a) denied their First Amendment right to access to the courts by being prohibited from filing and pursuing eviction cases (Count 1); (b) denied their First Amendment right to free speech by being prohibited from sending certain notices (Count 2); (c) being compelled to refer tenants to their adversaries for assistance in violation of the First Amendment (Count 3); (d) having their contracts with their tenants altered by state law in violation of the Contracts Clause, Art. I, §10, cl. 1 (Count 4); and (e) having their property taken without just compensation in violation of the Due Process Clause of the Fifth Amendment (Count 5). <u>See</u> Dkt. No. 1.

With their complaint, plaintiffs filed a Motion for
Preliminary Injunction. See Dkt. No. 2. The plaintiffs in the state
court action then dismissed their federal claims from that case.
See Dkt. No. 25 §2; Dkt. No. 27-4.

Several non-profit organizations, including City Life/Vida
Urbana, Chelsea Collaborative, Inc., Lynn United For Change, and
Springfield No One Leaves, moved to intervene in this case or, in
the alternative, to participate in an "enhanced" status as amici
curiae. See Dkt. No. 22. The court denied their motion, without
prejudice to possibly granting amici status in the future because:

> [T]he Attorney General is willing and able to
> energetically, effectively and more than adequately
> defend the constitutionality of the moratorium. The [],
> proposed amici, or intervenors, do not have any
> additional claims or defenses. The participation of the
> proposed intervenors or amici will complicate and
> possibly delay proceedings in which time is of the
> essence.
>
> The proposed intervenors can work with the Attorney
> General. They [have] been coordinating at the state
> court. They [are] willing to work with each other. The
> proposed intervenors or amici can provide advice in
> affidavits to the court through the Attorney General if
> the Attorney General thinks they would be helpful.
>
> If the proposed intervenors believe that the Attorney
> General is not raising a particular relevant issue or
> not arguing it adequately, they can prepare a brief and
> a motion, and submit it with a motion to serve as amicus
> on that particular issue. I will then decide if it
> [would] be helpful to consider the brief and, if so, to
> allow the proposed intervenors to argue or otherwise
> participate in any hearings or trial.

Aug. 4, 2020 Tr. 91:15-92:10 (Dkt. No. 53). The court subsequently
denied three motions from other organizations to serve as amici

curiae in support of defendants for substantially the same reasons. See Dkt. Nos. 79 (denying motions from MLPB, Boston Medical Center Corporation, and others), 85 (denying motion from Am. Civ. Liberties Union and others). The court is now denying a September 2020 motion of the Pacific Legal Foundation to file an amicus brief in support of plaintiffs, in part because it was untimely.

The Commonwealth moved to dismiss or stay the case, based on sovereign immunity and the Eleventh Amendment, lack of standing, and abstention doctrines. See Dkt. No. 26. In response, plaintiffs filed an Amended Complaint, in which they added an additional plaintiff, DaPonte, to resolve some standing issues, and substituted as defendants the Governor and the Secretary of EOHED. See Dkt. No. 58. Defendants acknowledged the amendment cured some of the grounds for their motion to dismiss but maintained their contention that the court should abstain in view of the related state court case. For the reasons described in detail at the hearing on August 24, 2020, the court denied without prejudice the motion to stay. See Dkt. No. 85.

Defendants also move to dismiss several counts of the amended complaint. See Dkt. No. 69. They argue that: the court should dismiss Count II because §3 of the Act does not restrain "speech" for purposes of the First Amendment; the court should dismiss Count V because plaintiffs may not seek compensatory or equitable relief for a taking in federal court; and the court should dismiss Count

III for lack of standing. <u>See</u> <u>id.</u> The court will address the Motion to Dismiss in a separate Order.

The court held hearings on the motion for preliminary injunction and the motion to dismiss the amended complaint on August 24 and 26, and on September 1, 2, and 10, 2020. <u>See</u> Dkt. Nos. 85, 89, 105, 112, 119.

IV.   PRELIMINARY INJUNCTION STANDARD

The standard for obtaining a preliminary injunction is well-established.

> Under the accepted framework, the four elements that a district court faced with a motion for a preliminary injunction must assess are the following: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, <u>i.e.</u>, the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest."

<u>Charlesbank Equity Fund II v. Blinds to Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004) (quoting <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996)); <u>see</u> <u>Teradyne, Inc. v. Mostek Corp.</u>, 797 F.2d 43, 51-52 (1st Cir. 1986).

"The burden of proof is on the plaintiff." <u>Cablevision of Boston, Inc. v. Pub. Imp. Comm'n of Boston</u>, 38 F. Supp. 2d 46, 53 (D. Mass. 1999) (citing <u>Ocean Spray Cranberries, Inc. v. Pepsico, Inc.</u>, 160 F.3d 58, 60 (1st Cir. 1998)). The likelihood of success on the merits is of "primary importance" and the "<u>sine</u> <u>qua</u> <u>non</u> for

obtaining a preliminary injunction." Id. (citing Gately v. Massachusetts, 2 F.3d 1221, 1225 (1st Cir. 1993); Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)). See also Russomano v. Novo Nordisk Inc., 960 F.3d 48, 53 (1st Cir. 2020) (quoting CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 55 (1st Cir. 2020)). "If a great showing of likely success on the merits is made by a plaintiff, a reduced showing of irreparable harm may be appropriate." Id. (citing Ross-Simons, 102 F.3d at 19; EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996)).

"[I]rreparable harm [also] constitutes a necessary threshold showing for an award of preliminary injunctive relief." Charlesbank Equity Fund II, 370 F.3d at 162. "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." Id. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Id. It "most often exists where a party has no adequate remedy at law." Id. Even in cases involving real estate, "irreparable harm is not assumed; it must be demonstrated," and "'[s]peculative injury does not constitute a showing of irreparable harm.'" Narragansett, 934 F.2d at 7-8 (quoting Pub. Serv. Co. v. W. Newbury, 835 F.2d 380, 383 (1st Cir. 1987)).

In deciding whether to issue a preliminary injunction, the court may consider documents that would be inadmissible as evidence in other proceedings. As the Ninth Circuit stated in <u>Flynt Distributing Co. v. Harvey</u>, "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright & A. Miller, <u>Federal Practice and Procedure, Civil</u> §2949 (1973)). <u>See also</u> <u>Ross-Whitney Corp. v. Smith Kline & French Labs.</u>, 207 F.2d 190, 198 (9th Cir. 1953) (preliminary injunction may be granted on affidavits).

Therefore, "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." <u>Asseo v. Pan Am. Grain Co.</u>, 805 F.2d 23, 26 (1st Cir. 1986).

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." <u>Trump v. Int'l Refugee Assistance Project</u>, 137 S. Ct. 2080, 2087

(2017). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also consider the overall public interest. In the course of doing so, a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." Id. (internal citations and quotation marks omitted).

"[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes. Thus, a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial on the merits." Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991) (internal citations omitted).

V.   ANALYSIS

   A. Plaintiffs Are Not Likely to Prove that the Moratorium
      Violates the Contracts Clause[8]

In Count IV, plaintiffs allege that the Moratorium violates the Contracts Clause by prohibiting them from serving notices to quit, initiating summary process actions, and evicting tenants who

---

[8]   Although the court is not addressing defendants' motion to dismiss in this Memorandum and Order, it has considered the arguments presented concerning it in analyzing whether plaintiffs have a reasonable likelihood of success on each of their claims.

are not paying rent. It is a close question whether the Moratorium substantially impairs the contracts that plaintiffs' leases represent -- an essential element of a Contracts Clause claim. It is also a close question whether the Moratorium is a reasonable means of addressing the undisputed significant and legitimate need to combat the spread of the COVID-19 virus. However, where, as here, the state is not an interested party, courts give deference to the judgment of elected officials as to what is reasonable and appropriate. In part because the Moratorium is temporary and scheduled to expire after six months, on October 17, 2020, the court finds that plaintiffs are not likely to prove that the Moratorium violated the Contracts Clause when it was enacted in April 2020. On the present record it is neither possible nor appropriate for the court to predict whether extensions would cause the Moratorium to violate the Contracts Clause.

The Supreme Court recently described the standards that apply to an alleged violation of the Contracts Clause in <u>Sveen v. Melin</u>, 138 S. Ct. 1815 (2018). It wrote:

> The Contracts Clause restricts the power of States to disrupt contractual arrangements. It provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., art. I, §10, cl. 1. The origins of the Clause lie in legislation enacted after the Revolutionary War to relieve debtors of their obligations to creditors. <u>See</u> <u>Keystone Bituminous Coal Ass'n v. DeBenedictis</u>, 480 U.S. 470, 502-03 (1987). But the Clause applies to any kind of contract. <u>See</u> <u>Allied Structural Steel Co. v. Spannaus</u>, 438 U.S. 234, 244-45, n.16 (1978). . . .

At the same time, not all laws affecting pre-existing contracts violate the Clause. See El Paso v. Simmons, 379 U.S. 497, 506-07 (1965). To determine when such a law crosses the constitutional line, this Court has long applied a two-step test. The threshold issue is whether the state law has "operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co., 438 U.S. at 244. In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. See id. at 246; El Paso, 379 U.S. at 514-15; Texaco, Inc. v. Short, 454 U.S. 516, 531 (1982). If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose." Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983).

Id. at 1821-22.

Therefore, to succeed on their Contracts Clause claim, plaintiffs must prove that the Moratorium (1) "operate[s] as a substantial impairment of a contractual relationship," id. at 1817 (quoting Allied Structural Steel Co., 483 U.S. at 244), and (2) is not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'" id. (quoting Energy Rsrvs. Grp., 459 U.S. at 411-12).

## 1. Substantial Impairment

The question of whether a contract has been substantially impaired "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual

relationship, and whether the impairment is substantial." <u>Gen.</u>
<u>Motors Corp. v. Romein</u>, 503 U.S. 181, 186 (1992).

Whether a statute works a substantial impairment depends on
"the extent to which [it] undermines the contractual bargain,
interferes with a party's reasonable expectations, and prevents
the party from safeguarding or reinstating his rights." <u>Sveen</u>, 138
S. Ct. at 1822.

"A contract depends on a regime of common and statutory law
for its effectiveness and enforcement." <u>Norfolk & W. Ry. Co. v.</u>
<u>Am. Train Dispatchers Ass'n</u>, 499 U.S. 117, 129-30 (1991).
Therefore, "[l]aws which subsist at the time and place of the
making of a contract, and where it is to be performed, enter into
and form a part of it, as fully as if they had been expressly
referred to or incorporated in its terms." <u>Farmers' & Merchs.'</u>
<u>Bank of Monroe v. Fed. Rsrv. Bank of Richmond</u>, 262 U.S. 649, 660
(1923). "This principle embraces alike those laws which affect its
construction and those which affect its enforcement or discharge."
<u>Id.</u>

In the instant case, the relevant contracts are the leases
that provide that the tenants may reside in the landlords' property
if they pay the agreed-upon rent and abide by other agreed-upon
conditions. The landlords and tenants agreed to the leases in the
context of Massachusetts' landlord-tenant laws, which bar
landlords from taking self-help measures to evict tenants but

provide for expedited summary process eviction if a tenant does not pay the rent required by the lease. In some cases, "fewer than seven weeks might elapse between the time that the [tenant] is served with a notice to quit and the time that he or she is removed from his or her residence" by court order. Adjartey v. Cent. Div. Hous. Ct. Dep't, 120 N.E.3d 297, 306 (Mass. 2019); see generally Mass. Gen. Laws ch. 239. Matorin's lease explicitly provides "that in the event of any breach by Tenant of this agreement, Landlord shall be entitled to pursue any and all remedies provided or recognized by applicable law," which would include the summary process laws at the time of the lease. See Matorin Aff. Ex. A (Dkt. No. 4), at 4 of 12. DaPonte's lease specifically refers to these procedures, stating, "[i]f your rent is late a '14 Day Notice to Quit' will be served and eviction procedures will begin." DaPonte Aff. Ex. A (Dkt. No. 61), at 15 of 22.

The rights to evict and recover property if a tenant does not pay rent are important elements of the contractual relationship that a lease creates. The Moratorium deprives the landlords of a remedy for a violation of these rights while it is in effect. It does not prevent a landlord from suing a tenant for rent owed. However, that remedy will often be illusory because landlords are unlikely to benefit from money judgments against tenants who are unable to pay rent during the COVID-19 pandemic or who are

39

unwilling to do so. Therefore, the Moratorium materially undermines the contractual bargain.[9]

However, this is not the end of the substantial impairment analysis. Rather, the court must consider the degree to which the Moratorium interferes with the landlords' reasonable expectations. See Sveen, 138 S. Ct. at 1822. "In this inquiry, it is especially important whether the parties operated in a regulated industry." Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 190 (1st Cir. 1999). More specifically, "[t]he reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." Sullivan v. Nassau Cnty. Interim Fin. Auth., 959 F.3d 54, 64 (2d Cir. 2020). See also Energy Rsrvs. Grp., 459 U.S. at 411.

The Supreme "Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular . . . ." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440 (1982) (citing as examples fire regulations, a mortgage foreclosure moratorium, and rent control statutes as powers the states may exercise).

---

[9]   The ability to sue for a money judgment also does not address Matorin's inability to evict a tenant for failure to comply with another condition of the lease, such as having an unauthorized occupant in the residence.

Generally, "[t]he parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." U.S. Tr. Co. of New York v. New Jersey, 431 U.S. 1, 19 n.17 (1977) (emphasis added).

Here, the parties agree that landlord-tenant relationships have historically been heavily regulated in Massachusetts and that these regulations have generally been favorable to tenants. Therefore, the court finds for present purposes that a reasonable landlord should have anticipated that there might be new laws or regulations regarding the leases in question that would be unfavorable to them. Among other things, a reasonable landlord should have anticipated that the timeline for obtaining a court-ordered eviction might be extended by legislation.

However, the court finds that a reasonable landlord would not have anticipated a virtually unprecedented event such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent. But see HAPCO v. City of Philadelphia, C.A. No. 20-3300, 2020 WL 5095496, *7-8 (E.D. Pa. Aug. 28, 2020); Auracle Homes, 2020 WL 4558682, at *17; Elmsford,

2020 WL 3498456, at *12-13; Decision on Mot. Prelim. Inj. 26-27, Matorin v. Massachusetts, No. 2084CV01334, Dkt. No. 31 (Mass. Super. Ct. Aug. 26, 2020) (copy filed in this case at Dkt. No. 92-1). Nor would a reasonable landlord have anticipated more than a brief, temporary prohibition on evictions if an unforeseen emergency developed.

However, in deciding whether plaintiffs are reasonably likely to prove a substantial impairment of their leases, the court must also consider whether the Moratorium "prevents [them] from safeguarding or reinstating [their] rights." Sveen, 138 S. Ct. at 1822. Here, the Moratorium is likely, as a practical matter, to deprive the landlords of their contractual right to receive the rent they are owed. However, their related right to evict for failure to pay rent has only been temporarily suspended and, absent new legislation, will be reinstated soon after the Moratorium ends.

It is not now clear when the Moratorium will end. Therefore, it is not possible to determine conclusively the extent of the impairment of plaintiffs' contractual right to evict caused by the Moratorium. However, this issue is not material to whether plaintiffs are reasonably likely to prevail on their Contracts Clause claim because plaintiffs are unlikely to prove that when enacted in April 2020 the Moratorium was not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and

legitimate public purpose.'" Id. (quoting Energy Rsrvs. Grp., 459
U.S. at 411-12).

### 2. Public Purpose and Reasonableness

If there is a significant impairment of a contract, "the
State, in justification, must have a significant and legitimate
public purpose behind the regulation, such as the remedying of a
broad and general social or economic problem. . . . [T]he [Supreme]
Court has indicated that the public purpose need not be addressed
to an emergency or temporary situation. . . . The requirement of
a legitimate public purpose guarantees that the State is exercising
its police power, rather than providing a benefit to special
interests." Energy Rsrvs. Grp., 459 U.S. at 411-12 (internal
citations omitted). "[T]he Supreme Court has defined 'police
power' for Contract Clause purposes, 'as an exercise of the
sovereign right of the Government to protect the lives, health,
morals, comforts, and general welfare of the people . . . .'"
Local Div. 589, Amalgamated Transit Union v. Massachusetts, 666
F.2d 618, 639 (1st Cir. 1981) (quoting Manigault v. Springs, 199
U.S. 473, 480 (1905)). However, "[t]he state's 'paramount
authority . . . is not limited to health, morals and safety. It
extends to economic needs as well.'" Id. (quoting Veix v. Sixth
Ward Ass'n, 310 U.S. 32, 39 (1940)). "[T]his 'protective power of

the state'" is another "implied condition of every contract." <u>E.
N.Y. Sav. Bank</u>, 326 U.S. at 232 (citation omitted).

Plaintiffs do not dispute that, in April 2020, combatting the
growing threat of COVID-19 was a significant and legitimate public
purpose. Rather, they assert that the Moratorium was not a
reasonable, necessary, and appropriate way to address that threat.
The court concludes that, at least if the Moratorium expires on
October 17, 2020, plaintiffs are unlikely to prove that the
Moratorium was not reasonable and appropriate when enacted.

Where, as here, a contract involves only private parties, a
claim that a state has violated the Contracts Clause will be
meritorious only if it is proven that there was not a rational
basis for the legislation at issue. <u>See</u> <u>Inmates of Suffolk Cnty.
Jail v. Rouse</u>, 129 F.3d 649, 659 (1st Cir. 1997). This means that:

> Legislation adjusting the rights and responsibilities of
> contracting parties must be upon reasonable conditions
> and of a character appropriate to the public purpose
> justifying its adoption. As is customary in reviewing
> economic and social regulation, however, courts properly
> defer to legislative judgment as to the necessity and
> reasonableness of a particular measure.

<u>U.S. Tr. Co.</u>, 431 U.S. at 22-23 (internal citation and note
omitted).[10] <u>See also</u> <u>Ass'n of Surrogates v. State of New York</u>, 940
F.2d 766, 771 (2d Cir. 1991).

---

[10] Although the Supreme Court in <u>U.S. Trust Co.</u>, 431 U.S. at 23,
used the word "necessity," the appropriate test is not strict
scrutiny, which would require that there was no less restrictive

alternative to the terms of the Moratorium. The Contracts Clause analysis as articulated in Sveen does not include a requirement that the legislation at issue be "necessary." Rather, the standard is stated as "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" Sveen, 138 S. Ct. at 1822 (quoting Energy Rsrvs. Grp., 459 U.S. at 411-12). Plaintiffs' counsel acknowledged that Sveen provides the applicable test. See Aug. 24, 2020 Tr. 79:7-84:19 (Dkt. No. 108).

The First Circuit has at times written that the state law must be reasonable and necessary. See, e.g., Houlton Citizens' Coal., 175 F.3d at 191 (Contracts Clause analysis "ordinarily involves ascertaining the reasonableness and necessity" of the law at issue). Even prior to Sveen, the Second Circuit required only that the law be "reasonable." See, e.g., Ass'n of Surrogates, 940 F.2d at 771. The First Circuit has stated that there is no difference between its test and the Second Circuit test. See United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 n.4 (1st Cir. 2011).

In any event, the court must determine whether there was a rational basis for the Moratorium when it was enacted, not whether it was necessary because there was no less burdensome way to address the impact of evictions during the pandemic. If the court were required to subject the Moratorium to strict scrutiny, it would probably violate the Contracts Clause. Terms of eviction moratoria deemed appropriate by certain other states and the CDC are less burdensome in various ways including by requiring that there be evidence of a COVID-19-related reason for a tenant's failure to pay rent. Compare, e.g., CDC Moratorium (prohibiting evictions only for eligible tenants who complete a declaration of hardship, have attempted to get financial assistance for rent, and have no other option); Conn. Moratorium (barring landlords from serving notices to quit or commencing summary process actions in all cases except for "serious nuisance," extending grace period for tenants to pay rent, and later allowing landlords to apply security deposits to outstanding rent with the tenant's consent); N.Y. Moratorium (staying only nonpayment cases where the tenant faced financial hardship due to the COVID-19 pandemic and permitting landlords with tenant's consent to apply security deposit to unpaid rent); Phila. Moratorium (prohibiting through August 31, 2020 the eviction of tenants who provide a certification of hardship due to COVID-19, requiring landlords seeking evictions through December 31, 2020 first to attend mediation, and providing

At least where, as here, the State is not a party to the contract and will not benefit from its impairment, see Energy Rsrvs. Grp., 459 U.S. at 412-13, as noted earlier courts typically defer to legislative judgments as to what is reasonable. U.S. Tr. Co., 431 U.S. at 22-23. In this case, the record includes evidence from which elected officials in April 2020 could have reasonably concluded that, among other things, many renters were losing their jobs because the COVID-19 pandemic was causing the closing of many businesses; the Governor was urging people to stay at home to stop the spread of COVID-19 to themselves or others; and evictions, or even the threat of legal action to evict, would displace tenants, cause overcrowding of dwellings and homeless shelters, and result in more people living on the streets.

Therefore, in April 2020, the legislature and Governor had a rational basis for deciding that the Moratorium was a reasonable way to address legitimate and significant economic and public health issues created by the COVID-19 pandemic. In view of the deference that this court should now give their judgment, the court finds that plaintiffs are not reasonably likely to succeed on the merits of their claim that the Moratorium violated the Contracts Clause when it was enacted as a temporary measure in April 2020.

---

for a repayment plan for tenants who did not timely pay rent and can prove a COVID-19 financial hardship).

In reaching this conclusion, the court has considered that the Supreme Court upheld a moratorium on foreclosures enacted by Minnesota in response to the Great Depression. See Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 424-31 (1934). Plaintiffs contend that this case is materially different from Blaisdell. Rather, plaintiffs argue, this case is like W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 60 (1935), where Justice Benjamin Cardozo, writing for the Court, struck down a foreclosure moratorium and distinguished Blaisdell because the Blaisdell moratorium required mortgagors to pay the equivalent of rent when the right to foreclose was postponed. However, Worthen was a case in which, as a practical matter, the state was an interested party as the foreclosures at issue were based on municipal bonds for which private homes were the security. Although in Worthen the Court did not say so, the governmental interest in the contracts at issue meant that the same degree of deference was not due as in cases where private contracts are involved. The Court later distinguished Worthen on the basis that there the state showed a "studied indifference" to the obligee. See E. N.Y. Sav. Bank, 326 U.S. at 234. The Court explained:

> [H]ere there was no "studied indifference to the interests of the mortgagee or to his appropriate protection." Here the Legislature was not even acting merely upon the pooled general knowledge of its members. The whole course of the New York moratorium legislation shows the empiric process of legislation at its fairest: frequent reconsideration, intensive study of the

consequences of what has been done, readjustment to
changing conditions, and safeguarding the future on the
basis of responsible forecasts.

Id. (citation omitted). As explained earlier, the degree of
deference to be accorded to any extension(s) of the Moratorium
will be influenced by the extent to which the same can be said in
this case.

     B. Plaintiffs Are Not Likely to Prove That the Moratorium
       Violates the Takings Clause

The Takings Clause states that "private property [shall not]
be taken for public use, without just compensation." U.S. Const.
amend. V. The Takings Clause applies to the states through the
Fourteenth Amendment. See Chicago, B. & Q.R. Co. v. Chicago, 166
U.S. 226 (1897).

"This protection is not restricted to physical invasions,
occupations, or removals of property; in some cases, overly
assiduous government regulation can create an unconstitutional
taking." Houlton Citizens' Coal., 175 F.3d at 190. Accordingly,
"[c]ase law under the Takings Clause has developed along two
parallel lines, one addressing physical invasions (sometimes
called per se takings) and the other addressing regulatory
takings." Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674
(1st Cir. 1998).

Plaintiffs now seek a declaration that the Moratorium is an
unconstitutional violation of the Takings Clause and an injunction

against the Act's enforcement on this basis.[11] Plaintiffs contend that the Act effects both a physical and regulatory taking of their rental properties. However, for the reasons explained below, plaintiffs are unlikely to prove that either a physical or regulatory taking occurred when the Moratorium was enacted in April 2020.

Moreover, the Fifth Amendment proscribes a taking only without just compensation. Massachusetts law includes adequate provisions for obtaining just compensation for any taking that might be proven. Plaintiffs, therefore, have an adequate remedy at law for their Takings Clause claim. Accordingly, an injunction would be unjustified, even if, contrary to the court's conclusion, plaintiffs were likely to prove the Moratorium constitutes a taking of their property. See Knick v. Twp. of Scott, Pa., 139 S. Ct. 2162, 2176 (2019).

  1. Physical Taking

Plaintiffs are unlikely to prove that a physical taking occurred when the Moratorium was enacted because plaintiffs voluntarily rented their properties to their tenants.

---

[11] Plaintiffs initially requested just compensation as a remedy for their Takings Clause claim. They have since indicated that they are no longer pursuing a claim for money damages. See Dkt. No. 88 at 10 n.10. In any event, Massachusetts has not waived its sovereign immunity for such claims in federal court and, therefore, they would be barred by the Eleventh Amendment. See, e.g., Citadel Corp. v. P.R. Highway Auth., 695 F.2d 31, 33 (1st Cir. 1982).

"The government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." Yee v. City of Escondido, Cal., 503 U.S. 519, 527 (1992) (emphasis in original). "This element of required acquiescence is at the heart of the concept of occupation." FCC v. Fla. Power Corp., 480 U.S. 245, 252 (1987). In contrast to such a compelled physical occupation, "[s]tates have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." Loretto, 458 U.S. at 440.

In Yee, the Supreme Court found that a rent control ordinance which limited the ability of mobile home park owners to raise rents did not constitute a taking even when considered in conjunction with a state statute restricting the ability of park owners to evict mobile home tenants. See Yee, 503 U.S. at 527. Because "[p]etitioners' tenants were invited by petitioners, not forced upon them by the government," they had not been subjected to a compelled physical invasion of their property; therefore, no physical taking had occurred. Id. at 528.

As in Yee, the Moratorium did not compel plaintiffs to rent their properties. Rather, plaintiffs voluntarily chose to rent to their tenants prior to the Act. The Moratorium temporarily prevents the termination of those tenancies. "A different case would be presented were the statute, on its face or as applied, to compel

a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." Id. This is, however, not now the case. Accordingly, plaintiffs are unlikely to prove that a physical taking occurred when the Moratorium was enacted.

## 2. Regulatory Taking

Plaintiffs are also unlikely to show that a "categorical" or "non-categorical" regulatory taking has occurred. A categorical regulatory taking occurs "where regulation denies all economically beneficial or productive use of land." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992) (emphasis added). However, "a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 332 (2002). As the Moratorium, and any prohibition on economically beneficial use it imposes, was when enacted only temporary, and plaintiffs do not contend the Act has rendered their properties valueless, no categorical regulatory taking has occurred.

"Anything less than a 'complete elimination of value,' or a 'total loss,'" may be a non-categorical taking, which is subject to the framework of Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978). Tahoe-Sierra, 535 U.S. at 330. As described by the First Circuit:

> [C]ourts apply a three-part "ad hoc, factual inquiry" to
> evaluate whether a [non-categorical] regulatory taking
> has occurred: (1) what is the economic impact of the
> regulation; (2) whether the government action interferes
> with reasonable investment-backed expectations; and
> (3) what is the character of the government action.

Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002)

(quoting Penn Central, 438 U.S. at 124). Analysis of these factors

indicates that plaintiffs are unlikely to prove that the Moratorium

when enacted caused a non-categorical taking.

The evidence concerning the first factor, the economic impact

of the challenged governmental action, does not support a finding

that a taking has likely occurred because plaintiffs have only

been temporarily deprived of income from their property. To analyze

the economic impact of the Act, the court must "compare the value

that has been taken from the property with the value that remains

in the property." Keystone, 480 U.S. at 497. In doing so, the court

must focus on the "parcel as a whole," rather than any one portion

or rental unit. Tahoe-Sierra, 535 U.S at 327; Keystone, 480 U.S.

at 497. Plaintiffs have not alleged, let alone provided evidence

of, any diminution in the value of their properties as a whole

caused by the Moratorium.[12] Accordingly, the evidence does not

---

[12]   Baptiste and Matorin own multi-unit properties. They each
allege that tenants in one unit have not paid rent that is owed.
See Villa Aff. ¶¶8, 17 (Dkt. No. 30-17). There are no allegations
regarding the number of units in plaintiff DaPonte's property.
Plaintiffs' counsel stated that the DaPonte's property is a single-
family condominium and the tenant of that unit is in arrears. See

indicate that the Moratorium has yet had a significant impact on the value of plaintiffs' property.

Moreover, the Supreme Court has held that the "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 645 (1993). Similarly, the Ninth Circuit has held that "the mere loss of some income because of regulation does not itself establish a taking." Colony Cove Props., LLC v. City of Carson, 888 F.3d 445, 451 (9th Cir. 2018).

In any event, the Moratorium only temporarily bars plaintiffs from evicting their tenants and from renting their properties to people who will pay them rent. This temporary delay in plaintiffs' ability to make economic use of their property is not sufficient to constitute a taking. As the Federal Circuit wrote in Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004), "[d]elay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary."

With regard to the second prong of the Penn Central test, the court finds for present purposes that the Moratorium does

_____

Sept. 1, 2020 Tr. 44:11-14 (Dkt. No. 123). Even assuming that DaPonte's property contains only one unit, the evidence is insufficient to make it likely that DaPonte will prove that the value of the property as a whole has as of now been significantly diminished by the Moratorium.

significantly interfere with plaintiffs' reasonable investment
backed expectations. As explained earlier, landlord-tenant
relations in Massachusetts have historically been heavily
regulated and these regulations have generally been favorable to
tenants. Therefore, a reasonable landlord would have expected that
there might be unfavorable new regulations regarding his or her
relationship with tenants. Some courts have found that a moratorium
on evictions would not interfere with reasonable investment-backed
expectations because landlord-tenant relationships in the state
were historically regulated. See, e.g., Auracle Homes, 2020 WL
4558682, at *15; Elmsford, 2020 WL 3498456, at *10-11; Decision on
Mot. Prelim Inj. 26-27, Matorin v. Massachusetts, No. 2084CV01334,
Dkt. No. 31 (Mass. Super. Ct. Aug. 26, 2020). However, again, this
court finds that a reasonable landlord would not have anticipated
a virtually unprecedented event like the COVID-19 pandemic and the
ensuing six-month ban on evicting and replacing tenants who do not
pay rent.

The final Penn Central factor -- the character of the
governmental action -- supports the conclusion that the Moratorium
is unlikely to be proved to have caused a taking to occur. The
Supreme Court has found that governmental action does not
constitute a taking where "interference with the property rights
. . . arises from a public program that adjusts the benefits and
burdens of economic life to promote the common good," and where

54

"the Government does not physically invade or permanently appropriate any of the [property] for its own use." <u>Connolly v. Pension Ben. Guar. Corp.</u>, 475 U.S. 211, 225 (1986). The Moratorium is a "public program adjusting the benefits and burdens of economic life to promote the common good." <u>Penn Central</u>, 438 U.S. at 124. Moreover, the state has not "appropriate[d] any of [plaintiffs' property] for its own use." <u>Connolly</u>, 475 U.S. at 225. The Act has burdened plaintiffs by temporarily preventing them from removing tenants for failure to pay rent. It has benefitted those tenants, who are now temporarily protected from eviction, and members of the public, who elected officials found would be at greater risk of COVID-19 infection if displaced tenants caused or contributed to the overcrowding of other dwellings and homeless shelters, or were required to live on the streets.

Balancing these factors, the court finds that plaintiffs are not likely to prove that there was a non-categorical regulatory taking of their properties when the Moratorium was enacted in April 2020.

### 3. <u>Injunctive Relief Would Be Unavailable even if a Taking Occurred</u>

Plaintiffs have withdrawn their claim for just compensation. They are now seeking only a declaration that the Act is unconstitutional in violation of the Takings Clause and an injunction against the Act's enforcement on this basis.

However, the Supreme Court recently held that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." Knick, 139 S. Ct. at 2176. See also HAPCO, 2020 WL 5095496, at *12. "Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." Knick, 139 S. Ct. at 2176. See also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." (internal note omitted)).

Massachusetts law provides a means for a property owner to obtain just compensation in state court for property that is taken by the state. Massachusetts General Laws chapter 79, §10 "expressly provides for compensation '[w]hen the real estate of any person has been taken.' . . . '[It] provides a specific statutory remedy for governmental actions which amount to a taking without formal condemnation proceedings.'" Gilbert v. City of Cambridge, 745 F. Supp. 42, 52 (D. Mass. 1990) (citations omitted). See also Lopes v. City of Peabody, 713 N.E.2d 846, 852 (Mass. 1999) ("We conclude that [Mass. Gen. Laws ch.] 79, §§12 and 35A, apply to temporary regulatory takings . . . .").

Plaintiffs contend that this remedy is inadequate because under Mass. Gen. Laws ch. 79, §10, the right to damages as the result of a taking "for a definite period of time" vests on the date of the taking, and is subject to a one-year statute of limitations. It is unclear when the Moratorium will end and when plaintiffs will regain possession of their property. Plaintiffs argue, therefore, that they may be unable to file a claim for compensation under Mass. Gen. Laws ch. 79, §10 within one year of the beginning of the taking because they may be unable to ascertain their damages within a year.

Plaintiffs have provided no authority for this proposition and the court finds it to be unmeritorious. In any event, Matorin has filed a claim for just compensation pursuant to Mass. Gen. Laws ch. 79 for the alleged temporary taking of his property in the parallel Massachusetts Superior Court action. See Dkt. No. 27-1, at 18, 81 of 120; Decision on Mot. Prelim. Inj. 18, Matorin v. Massachusetts, No. 2084CV01334, Dkt. No. 31 (Mass. Super. Ct. Aug. 26, 2020) (copy filed in this case at Dkt. No. 92-1). Article 10 of the Massachusetts Declaration of Rights provides that "whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." It has been construed "to provide property owners the same protection afforded under the

just compensation clause of the Fifth Amendment." <u>Blair v. Dep't</u> <u>Conservation & Recreation</u>, 932 N.E.2d 267, 274 (Mass. 2010).

The Superior Court found that Matorin is unlikely to prevail on his state law takings claim. <u>See</u> Decision on Mot. Prelim. Inj. 18-29, <u>Matorin v. Massachusetts</u>, No. 2084CV01334, Dkt. No. 31 (Mass. Super. Ct. Aug. 26, 2020) (copy filed in this case at Dkt. No. 92-1). However, the fact that a particular claim is unmeritorious does not mean the state remedy is inadequate.

Accordingly, even if plaintiffs could prove a taking had occurred, they would not be entitled to injunctive relief. Nor would they be entitled to a declaration that the Act is a violation of the Takings Clause. As plaintiffs have withdrawn their claim for just compensation in the form of money damages, such a declaration would be the functional equivalent of an unwarranted injunction against the enforcement of the Act. <u>See</u> <u>Cnty. of Butler</u> <u>v. Wolf</u>, No. 2:20-cv-677, 2020 WL 2769105, *4 (W.D. Pa. May 28, 2020) ("[T]he declaratory relief sought by Plaintiffs -- that the Governor's business shutdown orders effectuated an unconstitutional taking -- would be the functional equivalent of injunctive relief. The Supreme Court's decision in <u>Knick</u> forecloses such relief."); <u>HAPCO</u>, 2020 WL 5095496, at *12 & n.112 (same).

In view of the foregoing, plaintiffs are unlikely to prove that the Moratorium violated the Takings Clause when it was enacted in April 2020.

C. Plaintiffs Are Not Likely to Prove that the Moratorium Violates the Petition Clause

In Count I, plaintiffs contend that the Moratorium violates the First Amendment's Petition Clause. See Am. Compl. ¶¶57-61 (Dkt. No. 58). They argue that their right to petition has been infringed because the Moratorium bars landlords from filing and prosecuting "non-essential" summary process cases, including cases based on a failure to pay rent. Id. ¶60. Plaintiffs are not reasonably likely to prevail on this claim.

The First Amendment's Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. This provision applies to the states through the Fourteenth Amendment. See Edwards v. South Carolina, 372 U.S. 229, 235 (1963).

The Supreme Court has sometimes stated that "'[t]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'" Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 387 (2011) (quoting Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 896-97 (1984)). See also BE & K Constr. Co. v. NLRB, 536 U.S. 516, 525 (2002); Cal. Motor Transp. Co. v.

_Trucking Unltd._, 404 U.S. 508, 510 (1972). Nevertheless, the "basis of the constitutional right of access to courts" is "unsettled." _Christopher v. Harbury_, 536 U.S. 403, 415 & n.12 (2002). As the Supreme Court has recognized, its precedents have based the right in differing constitutional provisions, including the Fifth Amendment Due Process Clause. _Id._ at 415 n.12.

Plaintiffs assert that their right to access to the courts is a First Amendment right; that it is a "fundamental" right; that it is, therefore, subject to strict scrutiny; and the Moratorium fails that test because there are less restrictive ways to serve the State's compelling interest in combatting the COVID-19 pandemic, even if it wished to do so in part by reducing the risk of evictions or displacement of tenants as a result of the threat of legal action.[13] _See Reed v. Town of Gilbert, Ariz._, 576 U.S. 155, 163

---

[13] Plaintiffs rely heavily on another decision of the United States District Court for District of Massachusetts in which the Massachusetts Attorney General's moratorium on debt collection litigation was found to violate the right to petition. _See ACA_, 2020 WL 2198366, at *8-9. It is not clear what standard the court applied in reviewing the constitutionality of that regulation. In any event, the moratoria in that case and this one are materially different.

In _ACA_, the Attorney General had ordered a debt collection moratorium and stated that a violation of that moratorium would constitute a violation of Massachusetts General Laws Chapter 93A, exposing the plaintiffs to penalties for filing suit. _See id._ This made _ACA_ similar to cases like _Duryea_, 564 U.S. at 387, and _Bill Johnson's Restaurants, Inc. v. NLRB_, 461 U.S. 731, 743 (1983), in which the Supreme Court considered whether antitrust laws, employee codes of conduct, or labor anti-retaliation laws could

(2015) (statutes subject to strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"); United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." (citations omitted)). Defendants assert that plaintiffs' claim is instead an alleged denial of Due Process; that the Moratorium is, therefore, subject to rational basis review; and that there was a rational basis for its enactment in April 2020.

As explained below, the court finds that whether the right to access to the courts is a First Amendment "fundamental" right or is rooted in the Fifth Amendment guarantee of Due Process, plaintiffs' claims are subject to rational basis review. For the

---

burden a litigant's right to petition. In ACA the legislature had provided a right for debt collectors to sue, and the Attorney General had not only burdened that right but also imposed a monetary penalty for its exercise. Here, the Moratorium was enacted by the legislature, which modified the underlying rights to evict and to utilize summary process to do so. The Act did not impose penalties under Chapter 93A. As discussed below, a modification of underlying rights is not necessarily a violation of the right to petition. See Christopher, 536 U.S. at 415. Therefore, ACA is inapposite.

reasons explained in the previous Contracts Clause analysis, there was a rational basis for the Moratorium when it was enacted in April 2020. Therefore, plaintiffs are not reasonably likely to prevail on Count I.

## 1. Due Process Analysis

"[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." Duryea, 564 U.S. at 387. However, "the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher, 536 U.S. at 415. The Second Circuit has interpreted Christopher to mean that "[t]he right to petition exists in the presence of an underlying cause of action and is not violated by a statute that provides a complete defense to a cause of action or curtails a category of causes of action." City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 397 (2d Cir. 2008). The First Circuit has similarly stated that a plaintiff without an underlying claim "has no First Amendment right to petition the courts for redress of such a nonexistent claim." Doherty v. Merck & Co., 892 F.3d 493, 499 (1st Cir. 2018).

"In a nutshell, while there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief." Inmates of Suffolk Cnty. Jail, 129 F.3d at 660. This means that a legislature may,

among other things, alter rights and remedies without violating the First Amendment right to petition if doing so does not violate another guarantee of the United States Constitution. See, e.g., Doherty v. Merck & Co., No. 1:15-cv-129-DBH, 2017 WL 3668415, *2 (D. Me. Aug. 24, 2017), aff'd, 892 F.3d at 499; Beretta, 524 F.3d at 397.

In this case, the other relevant provisions of the Constitution are the Contracts Clause, the Takings Clause, and the requirement that the state action satisfy Due Process. Plaintiffs do not claim that they have a constitutional right to evict. Rather, they claim a statutory and contractual right to evict that the Moratorium interferes with in violation of the Contracts Clause and Takings Clause. See Pls. Suppl. Mem. 4 n.2 (Dkt. No. 115). They also claim that the only way to regain possession of their property is to exercise their constitutional right to access the courts by seeking summary process evictions in the Massachusetts Housing Court. Id.

Plaintiffs are not being deprived of the right of access to the courts concerning their Takings and Contracts Clause claims, as they are litigating those claims in this case. See Doherty, 892 F.3d at 499; Beretta, 524 F.3d at 397. Plaintiffs are not reasonably likely to prevail on their claim that, by temporarily removing access to the Housing Court to pursue the statutory summary procedures to evict, the Moratorium when enacted violated

their constitutional right to access the courts. With regard to the right to evict, the First Circuit has stated that, "[e]ven assuming that a right to evict a tenant would be a protected property interest . . . for purposes of a due process claim, it does not follow that there is a fundamental right to evict. . . . In fact, the Constitution establishes no such fundamental right." Rubinovitz v. Rogato, 60 F.3d 906, 910-11 (1st Cir. 1995). Cf. United States v. Kras, 409 U.S. 434, 445 (1973) (right to access Bankruptcy Court is not a fundamental right).

If viewed as a Due Process claim, plaintiffs must prove that there is no rational basis for the Moratorium's temporary prohibition on evictions and related prohibition on filing or pursuing summary process actions in the Housing Court. See Sosna v. Iowa, 419 U.S. 393, 406, 410 (1975); Kras, 409 U.S. at 446; Boddie v. Connecticut, 401 U.S. 371, 379 & n.6 (1971); see also Ad Hoc Comm. on Jud. Admin. v. Massachusetts, 488 F.2d 1241, 1243-45 (1st Cir. 1973) ("[W]hether delay is a violation of due process depends on the individual case."). Under the rational basis test, state action is constitutional if it is "rationally related to a legitimate state interest." See New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

Here, defendants argue that the Moratorium was intended to assist in the control of the COVID-19 pandemic by preventing the eviction, or displacement prompted by the threat of eviction, of

64

tenants who would then cause unhealthy overcrowding in other
dwellings by "doubling up" with friends or family, overcrowding
homeless shelters, or living on the streets. See Deft. Opp'n Mot.
Prelim. Inj. 7-9, 13-14 of 45 (Dkt. No. 30); Barocas Aff. (Dkt.
No. 30-5); Bartosch Aff. (Dkt. No. 30-6); Bharel Aff. (Dkt. No.
30-7); Gaeta Aff. (Dkt. No. 30-9); Reardon Aff. (Dkt. No. 30-14).
See also Dkt. No. 67-1 (explaining the cited economic, public
health and safety, and public welfare purposes for the Moratorium).

Preventing the spread of an epidemic is a legitimate state
interest. See Jacobson, 197 U.S. at 27-28. Plaintiffs are not
reasonably likely to demonstrate that the Moratorium was not
rationally related to this legitimate state interest when enacted
in April 2020. The essence of the Moratorium was to keep tenants
in place. As encouraging social distancing was in April 2020 a key
component of the Commonwealth's COVID-19 strategy, and evicting
tenants would reduce their ability to socially distance, the
Moratorium is likely to be found to have been rationally related
to this interest when enacted.

Therefore, under a Due Process analysis, plaintiffs are not
reasonably likely to prevail on their claim that the Moratorium
violated their constitutional right to access to the courts when
enacted.

## 2. Fundamental Rights Analysis

The Supreme Court has stated that "[t]he right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of <u>fundamental</u> constitutional rights." <u>Wolff v. McDonnell</u>, 418 U.S. 539, 579 (1974) (emphasis added). As explained earlier, however, the right to evict is not itself a constitutional right, let alone a fundamental constitutional right. It is at most a property right protected by the Due Process Clause. See <u>Rubinovitz</u>, 60 F.3d at 910-11.

However, the court recognizes that the right to access the courts to redress wrongs has at times been characterized as "an aspect of the First Amendment right to petition the government," <u>Duryea</u>, 564 U.S. at 387, and that the Supreme Court has at times characterized that right as "fundamental," <u>see</u> <u>Bounds v. Smith</u>, 430 U.S. 817, 827-28 (1977), <u>abrogated on other grounds by</u> <u>Lewis v. Casey</u>, 518 U.S. 343 (1996). Nevertheless, strict scrutiny is not, as plaintiffs contend, required in every case in which fundamental rights are implicated. See E. Chemerinsky, <u>Constitutional Law</u> 952-54 (5th ed. 2016).

In determining the applicable level of scrutiny, the court must decide whether the statute "directly and substantially" interferes with the constitutional right at issue. See <u>Lyng v.</u>

Castillo, 477 U.S. 635, 638 (1986); Zablocki v. Redhail, 434 U.S. 374, 387 & n.12 (1978); Vaughn v. Lawrenceburg Power Sys., 269 F.3d 703, 710 (6th Cir. 2001); see also Chemerinsky, supra, at 952-54. If the statute does not directly and substantially burden the fundamental right at issue, it is permissible if it is reasonable, meaning if it is rationally related to a legitimate governmental interest. See Lyng, 477 U.S. at 638-39; Zablocki, 434 U.S. at 386, 387 n.12; Vaughn, 269 F.3d at 712.[14]

In Vaughn, the Sixth Circuit stated that it "would find direct and substantial burdens only where a large portion of those affected by the rule are absolutely or largely prevented" from exercising the fundamental right at issue. Id. at 710 (emphases added). In this case, the Moratorium directly affects plaintiffs' right to go to court to evict, but not absolutely. Rather, the

---

[14]   For example, in Zablocki, the Supreme Court wrote:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter the marital relationship may legitimately be imposed.

434 U.S. at 386 (emphasis added). Similarly, in Vaughn, the Sixth Circuit wrote that "[i]n order to trigger heightened constitutional scrutiny, the challenged portion of the [statute at issue] must be shown to place a 'direct and substantial burden' on the right of marriage." 269 F.3d at 710 (citation omitted).

prohibition on exercising that right was temporary when the Moratorium was enacted, and will expire on October 17, 2020 unless extended by the Governor.

In Sosna, the Supreme Court noted that "the gravamen of [plaintiff's] claim is not total deprivation . . . but only delay." Sosna, 419 U.S. at 410. The Court went on to state that "the delay which attends the enforcement of the one-year durational residency requirement [for accessing the courts to obtain a divorce] is . . . consistent with the provisions of the United States Constitution." Id. In reaching this conclusion, the court found that the residency requirement at issue was "reasonably [] justified" because it was based "on grounds other than purely budgetary considerations or administrative convenience." Id. at 406. Accordingly, this court concludes that, in light of the Moratorium's temporary prohibition on accessing the Housing Court for summary process, plaintiffs are not reasonably likely to prove that when enacted in April 2020 the Moratorium substantially interfered with their right to access the courts, even assuming, without finding, that the right is fundamental.

Therefore, the Moratorium will not be found to violate the right to petition if it was reasonable. See Lyng, 477 U.S. at 638-39; Zablocki, 434 U.S. at 386. In other words, the Moratorium will be found constitutional if there was a rational basis for it when enacted. See Lyng, 477 U.S. at 639. This is the standard that also

applies if plaintiff's right to petition claim is viewed as a Due Process claim. See, e.g., Sosna, 419 U.S. at 406, 410.

As a result, for the reasons discussed concerning the Contracts Clause and in the Due Process analysis, even if the right to access to the courts is deemed to be a fundamental right, plaintiffs are not reasonably likely to prove that there was not a rational basis for the Moratorium in April 2020. Therefore, plaintiffs are not reasonably likely to prevail on Count I.

D. Plaintiffs Are Not Likely to Prove that the Prohibition on the Termination of Tenancies and Sending of Certain Written Notices Violates the First Amendment

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. By incorporation through the Fourteenth Amendment, "this prohibition applies [] to states and their political subdivisions." Knights of Columbus v. Town of Lexington, 272 F.3d 25, 30 (1st Cir. 2001).

Conduct must be "sufficiently imbued with elements of communication to fall within the scope of the First [Amendment]." Spence v. State of Washington, 418 U.S. 405, 409 (1974). Even a statute which only regulates conduct may implicate the First Amendment "when 'speech' and 'nonspeech' elements are combined in the same course of conduct." United States v. O'Brien, 391 U.S. 367, 376 (1968). However, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing

incidental burdens on speech." <u>Sorrell v. IMS Health Inc.</u>, 564 U.S. 552, 567 (2011).

Content-based restrictions on speech are typically subject to strict scrutiny. <u>See</u> <u>Barr v. Am. Ass'n Pol. Consultants</u>, 140 S. Ct. 2335, 2346 (2020). However, "commercial speech" -- speech "related solely to the economic interests of the speaker and its audience" -- is afforded less First Amendment protection than other forms of speech. <u>Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 557, 561 (1980). Restrictions on commercial speech are subject only to an intermediate level of scrutiny. <u>See</u> <u>id.</u>; <u>Zauderer v. Off. Disciplinary Couns. Sup. Ct. Ohio</u>, 471 U.S. 626, 637-38 (1985).

In Count II, plaintiffs contend that §3(a) of the Act violates their rights under the Free Speech Clause of the First Amendment by prohibiting them from terminating a tenancy or sending any notice requesting or demanding that a tenant vacate the premises. Plaintiffs do not have a likelihood of success on their claim that §3(a) of the Act violates the Free Speech Clause of the First Amendment.

Section 3(a) of the Act provides that "a landlord or owner of a property shall not, for the purposes of a non-essential eviction for a residential dwelling unit: (i) terminate a tenancy; or (ii) send any notice, including a notice to quit, requesting or demanding that a tenant of a residential dwelling unit vacate the

premises." As noted earlier, "[n]on-essential evictions" include evictions for failure to pay rent. Id. §1.

A "notice to quit" is a legal notice that a tenant may be evicted if he or she fails to vacate by a certain date. See Mass. Gen. Laws ch. 186, §§11-13. Service of a notice to quit is a prerequisite to the filing of a summary process eviction case. Id. A notice to quit "declares the landlord's intent to go to court to seek an eviction order if the tenant does not move out voluntarily before the stated deadline." Adjartey, 120 N.E.2d at 316.

The parties dispute the scope of §3(a)'s prohibitions. Defendants maintain that §3(a) addresses only legally operative written notices. Plaintiffs contend the subsection bans "a myriad of oral and written communications dealing with vital tenancy issues." Dkt. No. 88, at 5 of 19. Despite §3(a)'s explicit reference to a statutory notice to quit, the court finds §3(a) to also expressly cover other written notices, including text messages or emails, "requesting or demanding that a tenant . . . vacate the premises." Although the prohibition in §3(a) is limited to notices sent "for the purposes of a non-essential eviction," a reasonable lay person could construe "eviction" to mean more than a court order resulting from a legal proceeding. Such a person could, for example, reasonably understand the language prohibiting "any notice, including a notice to quit," requesting that a tenant

vacate to be a prohibition on a written offer to pay a tenant to leave voluntarily.[15]

However, §3(a)(ii) does not, as plaintiffs argue, prohibit any _oral_ communications. Section 3(a)(ii) prohibits only "send[ing] any notice." An oral communication is not "sent" and, in any event, is not a "notice." Section 3(a)(ii), therefore, applies only to written communications.

1. The Prohibition on the Termination of Tenancies Regulates Conduct, Not Speech

Plaintiffs are unlikely to prove that the prohibition on the termination of tenancies violates the Free Speech Clause. "It is the duty of the party seeking to engage in allegedly expressive conduct to demonstrate that the First Amendment applies to that

---

[15]   The Massachusetts Attorney General has indicated in a press release that the Act prohibits the sending of more than only statutory notices to quit and similar documents. In discussing complaints of violations of the Act that the Attorney General has received, the Attorney General states that the office has heard of landlords "sending tenants notices to quit that are not labelled as such." Press Release, Mass. Att'y Gen. Maura Healey, "AG Healey Calls for Extension of Eviction and Foreclosure Moratorium" (July 17, 2020), https://www.mass.gov/news/ag-healey-calls-for-extension-of-eviction-andforeclosure-moratorium. Although not material, this statement reinforces the court's conclusion that §3(a)(ii) prohibits the sending of any written communication requesting or demanding that a tenant vacate a rental unit, not just statutory notices to quit.

The Attorney General also states in the same press release that "[i]t is unlawful to threaten, intimidate, or coerce a tenant to get them to leave the property," without identifying what law such actions would violate. Id.

conduct." <u>Wine & Spirits Retailers, Inc. v. Rhode Island</u>, 418 F.3d 36, 49 (1st Cir. 2005). Plaintiffs are unlikely to do so with regard to the termination of tenancies.

Terminating a tenancy alone is conduct, not speech, and it does not necessarily include any "communicative elements." <u>Texas v. Johnson</u>, 491 U.S. 397, 404 (1989). The prohibition on terminating tenancies, therefore, is not likely to be found to implicate the First Amendment. <u>See, e.g.</u>, <u>HomeAway.com, Inc. v. City of Santa Monica</u>, 918 F.3d 676, 685 (9th Cir. 2019) ("Because the conduct at issue -- completing booking transactions for unlawful rentals -- consists only of nonspeech, nonexpressive conduct, we hold that the Ordinance does not implicate the First Amendment.").

2. <u>The Prohibition on Sending Statutory Notices to Quit Governs Conduct which only Incidentally Effects Speech and, therefore, Does Not Violate the First Amendment</u>

Plaintiffs are not likely to prove that the §3(a)(ii) prohibition on sending statutory notices to quit violates the First Amendment.

Plaintiffs acknowledge that "[a] notice to quit or to terminate a tenancy is . . . a legal notice that a lease or tenancy is terminated." Mem. Supp. Mot. Prelim. Inj. 15 of 35 (Dkt. No. 6). It is, therefore, primarily a form of conduct.

As noted earlier, the Supreme Court has held that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." Sorrell, 564 U.S. at 567; see also Expressions Hair Design v. Schneiderman, 137 S. Ct. 1144, 1151 (2017). "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949). For example, in Giboney, the Supreme Court affirmed an injunction against otherwise lawful picketing because the sole purpose of the picketing was to force the defendant to enter into an agreement in restraint of trade in violation of a state criminal antitrust statute. See id. at 501-02.

In amplifying Giboney, the Supreme Court wrote in Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 52 (2006), that:

> Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading "White Applicants Only" hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct. See R.A.V. v. St. Paul, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct.").

<u>See also</u> <u>Pitt. Press Co. v. Pitt. Comm'n on Hum. Rels.</u>, 413 U.S. 376, 389 (1973) (newspaper publisher challenging ordinance had no First Amendment interest in placing want ads for employment which aided employers in indicating illegal gender-based hiring preferences because the restriction on advertising was incidental to ordinance's prohibition of discrimination in employment based on gender).

In the instant case, the purpose of sending a statutory notice to quit would be to initiate a judicial eviction unless the tenant voluntarily departed. However, all non-essential evictions are prohibited while the Moratorium is in effect. Therefore, the prohibition on sending statutory notices to quit addresses preventing unlawful conduct, which only incidentally burdens speech and is not likely to be found to violate the First Amendment. <u>See</u> <u>Giboney</u>, 336 U.S. at 501-02; <u>Rumsfeld</u>, 547 U.S. at 52; <u>Pitt. Press. Co.</u>, 413 U.S. at 389.

> 3. <u>With regard to Non-Statutory Requests that a Tenant Leave, §3(a)(ii) Is Not an Unconstitutional Restriction of Commercial Speech</u>

To the extent that §3(a)(ii) covers notices requesting or demanding that a tenant vacate in addition to statutory notices to quit, it is a restriction on commercial speech.[16] As explained

---

[16]   In arguing the motion for preliminary injunction, plaintiffs' counsel stated that §3(a) regulates commercial speech and is

below, plaintiffs are unlikely to prove that this restriction violates the First Amendment. The following analysis would also apply to the prohibition on sending statutory notices to quit if it were not deemed to be a prohibition of conduct with only an incidental impact on speech.

The constitutionality of regulations concerning commercial speech is analyzed under the "intermediate scrutiny" standard first articulated by the Supreme Court in Central Hudson, 447 U.S.

---

subject to intermediate scrutiny. See, e.g., Aug. 26, 2020 Tr. 14, 17 (Dkt. No. 120). However, in their opposition to defendants' motion to dismiss the amended complaint, plaintiffs contend that pursuant to the recent Supreme Court decision in Barr, 140 S. Ct. at 2346-47, the Act is a content-based restriction on landlords' speech and is, therefore, subject to strict scrutiny. See Opp'n Mot. Dismiss Am. Compl. 8-9 (Dkt. No. 88).

In Barr, the Court found a ban on robocalls that contained an exception for robocalls relating to a debt owed to the federal government was a content-based regulation of speech and, therefore, subject to strict scrutiny. See Barr, 140 S. Ct. at 2346-47. Analogizing to Barr, plaintiffs contend that the Act singles out speech by landlords for regulation, and as such is a content-based regulation of speech subject to strict scrutiny.

This argument is unmeritorious. "Appropriately tailored regulations of commercial speech . . . will necessarily target specific content and speakers." Dana's R.R. Supply v. Fla. Att'y Gen., 807 F.3d 1235, 1248 (11th Cir. 2015). Although §3(a) applies only to "a landlord or owner of a property", this does not create a speaker-based restriction because only a landlord or owner would be in a position to send a notice requesting or demanding that a tenant vacate the premises. To the extent plaintiffs contend that Barr has altered the level of scrutiny applicable here, in Barr the plurality explicitly stated that it did not intend to alter settled First Amendment law. See Barr, 140 S. Ct. at 2347.

at 564, and interpreted by it in Board of Trustees of the State University of New York v. Fox, 492 U.S. 469 (1989), Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995), and Lorillard Tobacco Co. v. Reilly, 533 U.S. 525 (2001). In Central Hudson, the Court stated that:

> In commercial speech cases [] a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquires yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566.

Sending of a statutory notice to quit would fail the first part of this test. Such notices would be misleading because they would express the landlord's intention to initiate eviction proceedings promptly at a time when such proceedings are prohibited by the §3(b) of the Moratorium. See Adjartey, 120 N.E.2d at 316 (a notice to quit "declares the landlord's intent to go to court to seek an eviction order if the tenant does not move out voluntarily before the stated deadline"); cf. In re R.M.J., 455 U.S. 191, 203 (1982) ("Misleading advertising may be prohibited entirely.").

Other notices requesting or demanding that a tenant vacate would not be misleading. However, §3(a)'s prohibition of them likely satisfies the other elements of the <u>Central Hudson</u> test.

As explained earlier, it is undisputed that in April 2020 the governmental interest in limiting the spread of the COVID-19 virus was legitimate and substantial. Defendants are not likely to prove that a prohibition on the sending of written notices requesting or demanding that a tenant vacate does not "directly advance[]" the government's asserted interest. <u>Cent. Hudson</u>, 447 U.S. at 566. As also explained earlier, in April 2020, the legislature and Governor had a proper basis to conclude that: (1) the COVID-19 virus is spread from person to person, and, therefore, social distancing is desirable; and (2) evictions would result in "doubling-up" and overcrowding in apartments, overcrowding in homeless shelters, and an increase of homeless people living on the streets. Requiring or prompting tenants to leave their rental units would injure the government's interest in limiting the spread of COVID-19. <u>See, e.g.</u>, Gaeta Aff. ¶¶8, 32-33 (Dkt. No. 30-9) (indicating that individuals who are evicted may "double up" in the home of relatives or friends or end up in homeless shelters, increasing their risk of contracting or spreading the COVID-19 virus); Barocas Aff. ¶26 (Dkt. No. 30-5) (explaining that individuals living "unsheltered" on the street are unable to practice proper social distancing and hygiene).

78

The mere sending of statutory notices to quit, or requesting or demanding that a tenant vacate, could result in their leaving without a court order. As the Supreme Judicial Court has written, a tenant who receives a notice to quit "may reasonably -- but incorrectly -- believe the notice to quit to mean that he or she must move out before the deadline." Adjartey, 120 N.E.3d at 316. This would also be true of notices that demand that a tenant leave but do not meet the requirements for a statutory notice to quit. For example, the record includes a study indicating that a significant number of tenants who receive an informal demand to vacate the premises do so before judicial eviction proceedings are initiated or concluded. See Caramello Aff. ¶¶21-25 (Dkt. No. 72-1) (citing M. Desmond & T. Shollenberger, Forced Displacement from Rental Housing: Prevalence and Neighborhood Consequences, 52 Demography 1751 (2015)). As even the "threat of eviction" may cause many tenants to vacate, id. at ¶25, the prohibition on sending all notices requesting or demanding that a tenant vacate the premises directly advances the state's interest in limiting the spread of the COVID-19 virus.

Although a closer question, plaintiffs are not likely to prove that §3(a)(ii)'s prohibition on sending notices is "more extensive than is necessary" to serve the government's interest. Cent. Hudson, 447 U.S. at 566. The Supreme Court explained the meaning of this prong of the Central Hudson test in Florida Bar, writing:

In _Fox_, we made clear that the "least restrictive means"
test has no role in the commercial speech context. "What
our decisions require," instead, "is a 'fit' between the
legislature's ends and the means chosen to accomplish
those ends," a fit that is not necessarily perfect, but
reasonable; that represents not necessarily the single
best disposition but one whose scope is 'in proportion
to the interest served,' that employs not necessarily
the least restrictive means but . . . a means narrowly
tailored to achieve the desired objective." Of course,
we do not equate this test with the less rigorous
obstacles of rational basis review; in _Cincinnati v.
Discovery Network, Inc._, 507 U.S. 410, 417, n.13 (1993),
for example, we observed that the existence of "numerous
and obvious less-burdensome alternatives to the
restriction on commercial speech . . . is certainly a
relevant consideration in determining whether the 'fit'
between ends and means is reasonable."

515 U.S. at 632 (quoting _Fox_, 492 U.S. at 480) (internal citations

omitted). The Supreme Court reiterated in _Lorillard_ that the "final

step of the _Central Hudson_ analysis . . . requires a reasonable

fit between the means and ends of the regulatory scheme." 533 U.S.

at 561.

In this case, plaintiffs are not likely to prove that there

is not a reasonable fit between the §3(a) prohibition on sending

statutory notices to quit, and other notices asking or demanding

that a tenant vacate, and the state's interest in April 2020 in

limiting the spread of the COVID-19 virus. Plaintiffs claim that

this interest could be adequately served by allowing summary

process cases to be filed and be litigated, and giving Housing

Court judges the authority to stay orders of eviction. However,

even assuming, without finding, this is true, the state is not

required to employ the least burdensome means of serving its important interest. See Florida Bar, 515 U.S. at 632. As indicated earlier, the Supreme Judicial Court has found that "[b]ecause the document's title -- 'notice to quit' -- does nothing to clarify its meaning, a tenant may reasonably misunderstand the legal force of a notice to quit. . . . [A] tenant may reasonably -- but incorrectly -- believe the notice to quit to mean that he or she must move out before the deadline." Adjartey, 120 N.E.3d at 316. The evidence to date indicates that many people vacate before being ordered by a court to do so. See Caramello Aff. ¶¶21-25 (Dkt. No. 72-1). Therefore, there is a "fit" between §3(a)'s prohibition on the sending of notices and the state's interest in limiting the spread of the COVID-19 virus.

There are evidently other, less burdensome alternatives to the restriction on commercial speech than the §3(a) prohibition on sending notices imposes. As explained earlier, other states, cities, and the federal government have moratoria on evictions. The parties have not cited, and the court is not aware of, any other moratorium with a provision comparable to §3(a), except for Connecticut's, which prohibits the sending of statutory notices to quit, but not other written requests. See Conn. Moratorium. See also note 10, supra. This indicates that elected officials in other states and the CDC have determined that an eviction moratorium can be effective without a counterpart to §3(a). The existence of

adequate alternatives is a "relevant consideration in determining whether the 'fit' between ends and means is reasonable." <u>Florida Bar</u>, 515 U.S. at 632 (quoting <u>Cincinnati</u>, 507 U.S. at 415 n.13). However, it is not necessarily dispositive, in part, the court infers, because there can be more than one reasonable "fit." <u>Id.</u>

In this case, when enacted in April 2020, the §3(a) prohibition on sending notices was temporary and initially intended to be in effect for only four months. There was a basis for the legislature and Governor to conclude that the mere sending of statutory notices to quit, or other written requests or demands to vacate, would prompt the displacement of many tenants and thus increase the spread of the COVID-19 virus. In these circumstances, the court finds plaintiffs are unlikely to prove that the Moratorium was not, in April 2020, a "reasonable fit" and, therefore, fails the <u>Central Hudson</u> test.

In view of the foregoing, plaintiffs are not likely to prove that when enacted in April 2020, §3(a) violated their First Amendment rights.

E. <u>Plaintiffs Have Standing to Assert and Are Likely to Prove that the Second Paragraph Required by 400 C.M.R. §5.03(2) Violates the First Amendment</u>

In Count III, plaintiffs allege that regulation 400 C.M.R. §5.03(2) compels speech in violation of the First Amendment because it requires any landlord who wishes to send a notice to a tenant about missed rent payments to include certain language, and provide

tenants with addresses to non-governmental websites of groups that will assist tenants in resisting their landlords' efforts to regain possession of their property. Among other things, the websites advise tenants on how to contact City Life/Vida Urbana, the organization which had a leading role in the enactment of the Moratorium and unsuccessfully sought to intervene to oppose plaintiffs in this case.[17]

In their Motion to Dismiss the Amended Complaint, defendants argue that plaintiffs lack standing to bring this claim. In essence, defendants contend that because plaintiffs are not required to send notices of rent arrearage to their tenants, there is not compelled speech.

For the reasons explained below, the court finds that plaintiffs have standing to assert the compelled speech claim alleged in Count III. In addition, the court finds that plaintiffs are likely to prevail on their claim that the second paragraph of 400 C.M.R. §5.03(2) unconstitutionally compels speech by requiring

---

[17]    As explained earlier, one of the sponsors of the Moratorium legislation, Representative Mike Connolly, posted an announcement to his website thanking City Life/Vida Urbana and crediting it for working with other advocates on the bill. See Press Release, Mass. State Rep. Mike Connolly, "Introducing legislation to halt evictions and foreclosures during COVID-19 emergency" (Mar. 13, 2020), https://www.repmikeconnolly.org/moratorium_evictions_foreclosures_coronavirus_emergency_connolly_honan; see also Dkt. No. 67, at 16 n.10.

plaintiffs to include in any notice of rent arrearage addresses of non-governmental websites that, in turn, refer tenants to tenant advocacy groups, including City Life/Vida Urbana, with interests adverse to plaintiffs'. As Massachusetts law provides that the regulation is severable, the statute, the other paragraphs of §5.03(2), and the other regulations promulgated under the Moratorium Act, are not affected.

The court will not enter a preliminary injunction against enforcement of that portion of §5.03(2) of the regulation, if defendants confirm, as they previously represented, that they will act consistently with the court's findings without the issuance of an injunction. See Aug. 24, 2020 Tr. 9:21-11:6, 62:17-21 (Dkt. No. 108).

###### 1.   The Regulation

The relevant regulation, 400 C.M.R. §5.03(2) provides:

(2) In order to minimize the risk that a tenant will face eviction for an accumulated non-payment of rent once the Act expires, and to promote the prompt resolution of such situations without resorting to the court system, landlords should provide tenants of residential dwelling units a written notice of each missed rent payment. If a landlord delivers such a notice, the notice must include the following statements, prominently displayed on the first page:

> "THIS IS NOT A NOTICE TO QUIT. YOU ARE NOT BEING EVICTED, AND YOU DO NOT HAVE TO LEAVE YOUR HOME. An emergency law temporarily protects tenants from eviction during the COVID-19 emergency. The purpose of this notice is to make sure you understand the amount of rent you owe to your landlord."

84

"For information about resources that may help you pay your rent, you can contact your regional Housing Consumer Education Center. For a list of agencies, see https://www.masshousinginfo.org/regional-agencies. Additional information about resources for tenants is available at https://www.mhp.net/news/2020/resources-for-tenants-during-covid-19-pandemic."

"You will not be subject to late fees or a negative report to a credit bureau if you certify to your landlord in writing within 30 days from the missed payment that your non-payment of rent is due to a financial impact from COVID-19. If possible, you should use the approved form at: https://www.mass.gov/lists/moratorium-on-evictions-and-foreclosures-forms-and-other-resources. If you cannot access the form on this website, you can ask your landlord to provide the form to you. You may also send a letter or email so long as it contains a detailed explanation of your household loss in income or increase in expenses due to COVID-19."

The notice may also include other information that will promote the prompt and non-judicial resolution of such matters, such as the total balance due, the months remaining and the total of lease payments expected to be made on a lease for a term of years, information on how to contact the landlord to work out a revised payment arrangement, and a reminder that after the state of emergency ends the tenant may face eviction if rent remains unpaid.

(3) If a landlord knows that the tenant is not proficient in English, the landlord should use reasonable efforts to deliver the notice in a language that the tenant understands. Landlords are encouraged to include with the notice a statement that the notice is important and should be translated, a form of which is available on the EOHED website.

Id. (emphases added). The first web address in the second paragraph

directs the user to a website listing each of the regional housing

authorities, which are responsible for, among other things, administering programs that provide eligible households with money that may be used for rent or other housing costs. Plaintiffs contend that the regional housing authorities often favor tenants' interests over landlords' interests.

The second web address in the second paragraph of §5.03(2) directs the user to a website maintained by the Massachusetts Housing Partnership, a statewide non-profit affordable housing organization that plaintiffs assert often advocates for tenants in opposition to landlords. The Massachusetts Housing Partnership website contains resources for Massachusetts tenants in English, Spanish, and Portuguese, including addresses for websites of organizations that will provide tenants legal assistance. Among other things, it includes the following text:

Eviction

Almost all evictions in Massachusetts are temporarily banned until August 18, 2020 or 45 days after the end of the COVID-19 state of emergency, whichever comes first.

Even though evictions are temporarily banned, your rent is still due on the usual dates. After the emergency you can still be evicted if your rent is unpaid and you have not made payment arrangements with your landlord. If you are unable to pay your rent, seek assistance now and reach out early to your landlord to discuss potential payment plans or accommodations. Here is an article with some helpful suggestions about dealing with your landlord: https://www.cnbc.com/2020/04/03/what-to-do-if-you-cantpay-rent-because-of-the-coronavirus-pandemic.html

If you are dealing with an eviction that was already in progress, here is a good source of legal information

about when cases can proceed in housing court: https://www.masslegalhelp.org/covid-19/eviction-court-updates. They also have information about how to find a lawyer if you think you need one.

If your landlord is threatening to lock you out or evict you, or is turning off the utilities in your unit, you can find information here https://www.masslegalhelp.org/health-mentalhealth/covid-19-illegal-eviction about your rights and how to get legal help.

You might also contact City Life/Vida Urbana, which is a tenant advocacy group. Ask them if they can help you or give you a referral. English (617) 934-5006 Español (617) 397-3773.

MHP, "MHP resources for Massachusetts tenants during the COVID-19 pandemic" (May 5, 2020), https://www.mhp.net/writable/resources/documents/Resources-for-tenants_updated_6-12-20.pdf (emphasis in last paragraph added).

2.   Standing

Defendants contend that plaintiffs lack standing to assert a compelled speech claim. At least for present purposes, this contention is incorrect.

The First Circuit addressed standing in cases alleging that government action discourages or "chills" protected speech in National Organization for Marriage v. McKee, 649 F.3d 34, 46-47 (1st Cir. 2011):

The constitutional aspect of standing embraces three core requirements:

"First, the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,

not "conjectural" or "hypothetical."' Second,
there must be a causal connection between the
injury and the conduct complained of -- the
injury has to be 'fairly trace[able] to the
challenged action of the defendant, and not
. . . th[e] result [of] the independent action
of some third party not before the court.'
Third, it must be 'likely,' as opposed to
merely 'speculative,' that the injury will be
'redressed by a favorable decision.'"

Ariz. Christian Sch., 131 S. Ct. at 1442 (quoting Lujan
v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

Id. The First Circuit then discussed chilled speech in the context

of the injury-in-fact element of this test:

[T]he Supreme Court has recognized "self-censorship" as
"a harm that can be realized even without an actual
prosecution." Virginia v. Am. Booksellers Ass'n, 484
U.S. 383, 393 (1988); see also N.H. Right to Life
Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st
Cir. 1996) ("[I]t is not necessary that a person expose
herself to arrest or prosecution under a statute in order
to challenge that statute in a federal court."). The
chilling of protected speech may thus alone qualify as
a cognizable, Article III injury.

The mere allegation of a "chill," however, will not
suffice to open the doors to federal court. See Laird v.
Tatum, 408 U.S. 1, 13-14 (1972) ("Allegations of a
subjective 'chill' are not an adequate substitute for a
claim of specific present objective harm or a threat of
specific future harm . . . ."). Where, as here, the
plaintiff claims injury based on such a chilling of
speech, the plaintiff must establish with specificity
that she is "within the class of persons potentially
chilled." Osediacz, 414 F.3d at 142. This burden will be
satisfied by record evidence supporting "an objectively
reasonable possibility that she would be subject to the
allegedly unconstitutional [law]." Id. at 143 . . . .

Id. at 47.

Here, plaintiffs have adequately alleged that they are

subject to the allegedly unconstitutional regulation. For example,

in her supplemental affidavit, Baptiste states that she feels it
is impossible to communicate with her tenants because they do not
answer the telephone, and if she wants to communicate in writing,
she is required to provide them with contact information for tenant
organizations that are fighting landlords, including by advocating
for legislation that she characterizes as "cancel[ling] rent for
one year." Baptiste Suppl. Aff. ¶¶5, 6 (Dkt. No. 60). Because
Baptiste has alleged that she wants to contact her tenants in
writing about their unpaid rent, but is not doing so because she
would have to include the language she finds objectionable that is
required by the regulation, Baptiste is engaged in self-censorship
which suffices to establish standing for present purposes. See
Nat'l Org. for Marriage, 649 F.3d at 46-47. See also Dubois v.
U.S. Dep't of Agriculture, 102 F.3d 1273, 1282 (1st Cir. 1996)
("[T]he court need not determine the standing of all plaintiffs if
at least one plaintiff has standing to maintain each claim.").

### 3.  Compelled Speech

In contrast to §3(a) of the statute, §5.03(2) of the
regulation is a content-based regulation of speech, not merely a
restriction on conduct with an "incidental burden[] on speech."
See Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra, 138 S.
Ct. 2361, 2373 (2018) (quoting Sorrell, 564 U.S. at 567). As the
Supreme Court noted in Becerra, "drawing the line between speech
and conduct can be difficult . . . ." Id. However, the Court

treated as speech, not conduct, a law that required crisis pregnancy centers that discouraged abortion to disseminate government-drafted notices of the availability of state-sponsored abortion services. Id. at 2373-74.

In Becerra, the Court distinguished the notices that included the required language concerning abortion services from a requirement that doctors provide to patients the information necessary for them to give "informed consent" before medical procedures because informed consent relates directly to services the doctors wish to render. Id. at 2373. In addition, informed consent has legal significance, as it distinguishes a valid medical procedure from battery. Id. Therefore, the requirement that doctors provide patients certain information before performing a medical procedure was deemed conduct with only an incidental burden on speech. Id.

As explained earlier, in the instant case the prohibition on the sending of statutory notices to quit in §3(a) of the Act is directed at a landlord's act of sending a notice to quit to a tenant, and the document has legal significance because a notice to quit is a prerequisite to the filing of a summary process eviction action. Therefore, §3(a)'s prohibition on the sending of statutory notices to quit regulates conduct with only an incidental burden on speech.

In contrast, §5.03(2) of the regulation encourages landlords to send notices of rent arrearage and, if a landlord does that, requires the inclusion of specific language. Such a notice is not mandatory and does not have independent legal significance. It only informs a tenant of the amount of rent owed and related matters. Therefore, §5.03(2) imposes content-based restrictions on speech, not merely restrictions on conduct with an incidental effect on speech. Thus, the standards and analysis that applied to §3(a)'s prohibition of the sending of statutory notices to quit do not apply to the challenged regulation.

The Supreme Court has "applied a lower level of scrutiny to laws that compel disclosures in certain contexts." Becerra, 138 S. Ct. at 2372 (citing Zauderer, 471 U.S. at 651). More specifically, "the State may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information,' . . . [but] outside that context it may not compel affirmance of a belief with which the speaker disagrees[.]" Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 573 (1995) (quoting Zauderer, 471 U.S. at 651) (internal citations omitted).

In Becerra, the Supreme Court emphasized that the lower Zauderer standard for reviewing disclosures applies to commercial speech concerning state-mandated "disclosure of 'purely factual and uncontroversial information about the terms under which . . .

services will be available.'" Becerra, 138 S. Ct. at 2372 (quoting Zauderer, 471 U.S. at 651). It held, therefore, that such disclosures "should be upheld unless they are 'unjustified or unduly burdensome,'" id., and based this ruling on its holding in Zauderer that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." Zauderer, 471 U.S. at 651.

However, the Court also held that Zauderer did not apply to the information that California required crisis pregnancy centers to provide. Becerra, 138 S. Ct. at 2372. It reached this conclusion because the mandated information "in no way relate[d] to the services that licensed clinics provide. Instead, it require[d] these clinics to disclose information about state-sponsored services -- including abortion, anything but an 'uncontroversial' topic." Id. (emphasis in original). Therefore, the Court held that the reasonably related, or rational basis, test for constitutionality that applied to the disclosures in Zauderer did not apply to the California statute at issue in Becerra. Id.

In Becerra, the Court went on to hold that the statute did not "survive even intermediate scrutiny," which it characterized as requiring that the statute be "sufficiently drawn to achieve" a "substantial state interest." Id. at 2375; see also Sorrell, 564 U.S. at 571-72; Cent. Hudson, 447 U.S. at 566.

Again, §5.03(2) requires that landlords include in any notice of rent arrearage they send to tenants two types of disclosures. As explained earlier, the second required paragraph mandates giving tenants who are sent notices of rent arrearage the addresses to websites maintained by non-governmental organizations, one of which includes referrals to tenant advocacy groups. The court finds plaintiffs are likely to prove that, with respect to this paragraph, this case is analogous to Becerra and the requirement is likely to be proven to violate the First Amendment. This required information concerns services provided by tenant advocacy organizations and does not relate directly to the services provided by landlords. Therefore, it is not subject to the rational basis review that disclosures receive under Zauderer. See Becerra, 138 S. Ct. at 2372. Instead, it is subject to at least intermediate scrutiny. Id. at 2375.

In April 2020, minimizing evictions in the midst of the COVID-19 pandemic was a substantial state interest. However, requiring that landlords who want to write tenants to inform them of how much rent they owe also refer those tenants to private advocacy groups that are adverse to the landlords' interests is not a means of serving the state's interest that survives intermediate scrutiny. While it is a fact that organizations like City Life/Vida Urbana provide legal services to tenants who want to resist being evicted, they also engage in other activities including, among

93

other things, advocating for legislation that restricts landlords' rights to evict, and litigating against them. As the Supreme Court explained in 1995, with regard to the Boston St. Patrick's Day Parade, the "general rule, that [a] speaker has the right to tailor [his or her] speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." Hurley, 515 U.S. at 573. As the Court explained, this is because "[s]ince all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" Id. (internal quotation marks and citations omitted) (emphasis in original). Plaintiffs do not want to encourage their tenants to work with private organizations to frustrate the landlords' efforts to regain possession of their property. They also do not want to appear to be endorsing City Life/Vida Urbana and other organizations by, in effect, seeming to recommend that their tenants seek assistance from them. Plaintiffs are likely to prove that they may not be compelled to do so.

There are constitutionally permissible means of advancing the state interest in minimizing evictions and displacement of tenants, such as by requiring the statements in the first and third paragraphs of §5.03(2). However, requiring plaintiffs to refer tenants to organizations which advocate positions with which

plaintiffs disagree, and which oppose the landlords' interests in the political arena and in court, is not one of them. See Becerra, 138 S. Ct. at 2376 (describing other means, such as a public-information campaign, that California could have pursued to disseminate information to pregnant women). Therefore, plaintiffs are likely to prove that the second paragraph of §5.03(2) does not survive even intermediate scrutiny and is unconstitutional compelled speech.[18]

The first and third required paragraphs of §5.03(2), which require that notices of missed payments inform tenants that they cannot be evicted, and of the circumstances in which they may not be charged late fees or subjected to negative credit reports, are likely to be found constitutional, whether or not viewed as mere disclosures under Zauderer. These paragraphs inform tenants of rights they have or will have if they inform their landlord that their missed payments are due to COVID-19. They are accurate, factual statements of the law. Although the landlords contend that they disagree with the law, the statements are not "controversial" because they correctly describe the law. Therefore, Zauderer

---

[18]   Indeed, the court believes that the second paragraph required by §5.03(2) may not survive rational basis review. See Hurley, 515 U.S. at 573-74; but see CTIA - The Wireless Assoc. v. City of Berkeley, 928 F.3d 832, 843 (9th Cir. 2019).

provides the proper framework for assessing these paragraphs, and rational basis review is the proper test to apply to them.

There is a rational basis for requiring landlords to provide these disclosures to tenants. Although they are a form of speech, they serve the legitimate governmental interest in minimizing the risk that tenants will believe that they are legally required to leave or believe they will soon be ordered to leave by a court. See Adjartey, 120 N.E.3d at 316. Therefore, requiring that a written notice of missed rent make clear that it is not a notice to quit, the tenant is not being evicted, and the tenant does not have to leave the home is reasonably related to the state's interest in assuring that tenants do not misunderstand the import of the document.[19] The same is true of the third paragraph of §5.03(2).

Accordingly, §5.03(2) is likely to be proven in part constitutional and in part unconstitutional. However, the

---

[19]  Even if Zauderer did not apply, the first and third required paragraphs would also likely survive intermediate scrutiny, which generally applies to content-based regulations of speech in commercial contexts. See Becerra, 138 S. Ct. at 2372; Sorrell, 564 U.S. at 571-72; Cent. Hudson, 447 U.S. at 566. For the reasons discussed above with respect to §3 of the Act, the government has a substantial interest in preventing the spread of the COVID-19 virus through eviction or displacement of tenants, and informing tenants of their rights under the Moratorium Act promotes that interest by reducing the likelihood that tenants will move voluntarily to avoid late fees, negative credit reports, or eviction proceedings.

unconstitutionality of part of the regulation does not affect the constitutionality of the Moratorium statute. Nor does it invalidate §5.03(2) as a whole because the regulation is severable.

Whether a state regulation is severable is a question governed by state law. See, e.g., Leavitt v. Jane L., 518 U.S. 137, 137-39 (1996); Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 440 (1st Cir. 2016). Under Massachusetts law, "even without an express severability clause in [a statute or regulation], there is a 'well-established judicial preference in favor of severability' . . . ." Peterson v. Comm'r of Revenue, 825 N.E.2d 1029, 1038 (Mass. 2005) (quoting Murphy v. Comm'r Dep't Indus. Accs., 635 N.E.2d 1180, 1183 n.3 (Mass. 1994)); accord Schwann, 813 F.3d at 440 (citing Peterson, 444 Mass. at 138). "In divining legislative intent, Massachusetts courts consider whether the structure of the statute allows the valid provisions to stand independent of the invalid, or whether the provisions are so entwined that 'the Legislature could not have intended that the part otherwise valid should take effect without the invalid part.'" Id. at 440-41 (quoting Murphy, 635 N.E.2d at 1183).

Here, the standards for severability are met. Section 3(g) of the Act requires that the Executive Office of Housing and Economic Development promulgate regulations to clarify and implement the Act. Invalidation of the statements referring tenants to the regional agencies, the Massachusetts Housing Partnership, and

97

tenant advocacy groups would not "impair the function of the statute [or the regulation] as a whole," as the principal purpose of this regulation is to require landlords to include disclosures to clarify tenants' statutory rights under their lease. Therefore, severing the second required paragraph of §5.03(2) of the regulation is appropriate.

F. <u>A Preliminary Injunction Will Issue If Necessary</u>

As plaintiffs have a reasonable likelihood of proving their compelled speech claim, they have satisfied the first essential requirement for obtaining a preliminary injunction. <u>See, e.g.</u>, <u>Gately</u>, 2 F.3d at 1225. They have also satisfied the second essential requirement because "irreparable injury is presumed upon a determination that the movants are likely to prevail on [a] First Amendment claim." <u>Sindicato Puertorriqueño</u>, 699 F.3d at 10-11 (citing <u>Elrod</u>, 427 U.S. at 373). Therefore, plaintiffs are eligible for preliminary injunctive relief.

The court must, however, also consider the balance of hardships and the public interest. <u>Charlesbank Equity Fund II</u>, 370 F.3d at 162. The balance of hardships favors plaintiffs. If a preliminary injunction issues against the continuation or enforcement of the second paragraph required by §5.03(2), the defendants will still have the other, likely constitutional means to serve their interest in temporarily restricting evictions. However, in the absence of relief, plaintiffs will continue to be

irreparably injured. The public interest would also be served by such an injunction as it would protect constitutional rights and remind elected officials of their responsibility to respect them.

Therefore, if necessary, the court will issue a preliminary injunction concerning the second paragraph required by §5.03(2). However, as indicated earlier, defendants have represented that they would obey a declaration of this court without the issuance of an injunction, subject to their right to seek a stay and appeal. See Aug. 24, 2020 Tr. 9:21-11:6, 62:17-21 (Dkt. No. 108). The court is, therefore, providing them an opportunity to rectify the situation before issuing a preliminary injunction. See, e.g., Farmer v. Brennan, 511 U.S. 825, 847 (1994).

VI.   CONCLUSION

In view of the foregoing, plaintiffs' motion for a preliminary injunction is being denied in part and is meritorious in one respect. Defendants are, however, being provided an opportunity to confirm or clarify whether they will, in view of this decision, promptly modify 400 C.M.R. §5.03(2) to remove the second required paragraph, at least until this case is decided on the merits. If not, the court will issue a preliminary injunction directing them to do so.

The motion for preliminary injunction has been decided based on the facts that existed on April 20, 2020, when the Moratorium was enacted. However, as explained earlier, "[a] law depending

upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." <u>Chastleton</u>, 264 U.S. at 547-48. In addition, the court has found that plaintiffs are not likely to prevail on some of their claims in part because when enacted the Moratorium was intended to be temporary and, initially at least, brief. The length of time for which the Moratorium is in effect will be relevant to whether it continues to be constitutional. Elected officials share with the courts a responsibility to assure that statutes and regulations do not violate the Constitution. The degree of deference accorded to their judgments by courts in the future will be influenced by whether they carefully consider the requirements of the Constitution and any changed facts in deciding whether the Moratorium should be continued and, if so, whether its provisions should be revised.

As stated at the September 10, 2020 hearing at which the court informed the parties of how it planned to rule on the motion for preliminary injunction, the court is now ordering the parties to continue to confer and to report their respective views on how this case should proceed.

VII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   For the reasons stated during the August 24, 2020 hearing concerning possible abstention, Defendants' Motion to Dismiss or

in the Alternative to Stay (Dkt. No. 26) is DENIED without prejudice.

2.   Defendants' Motion to Dismiss Counts II, III, and V of the Amended Complaint (Dkt. No. 69) is RESERVED.

3.   Pacific Legal Foundation's Motion for Leave to File a Brief as Amicus Curiae (Dkt. No. 103) is DENIED.

4.   Plaintiffs' and Defendants' Motions for Leave to File Excess Pages in their respective filings on the Motion for Preliminary Injunction (Dkt. Nos. 5, 31, 71) are ALLOWED.

5.   Plaintiffs' Motion to Strike Defendants' Supplemental Opposition to the Motion for Preliminary Injunction (Dkt. No. 117) is DENIED.

6.   Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 2) is DENIED with regard to Counts I, II, IV, and V, and RESERVED concerning the compelled speech claim in Count III, which is in part meritorious.

7.   By October 2, 2020, at 12:00 noon, the parties shall confer and:

a.   Defendants shall report whether they will promptly modify 400 C.M.R. §5.03(2) to remove the second required paragraph and, if so, how they will give public notice that it is no longer operative and will not be enforced at least until this case is decided on the merits.

     b.   The parties shall report concerning how they propose this case proceed.


UNITED STATES DISTRICT JUDGE